**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

GIGI JORDAN,

*Petitioner*,

vs.

AMY LAMANNA, in her official
capacity as Superintendent of the
Bedford Hills Correctional Facility,

*Respondent.*

Case No. 18-10868

**MEMORANDUM IN SUPPORT
OF PETITION FOR A WRIT OF
HABEAS CORPUS PURSUANT
TO 28 U.S.C. 2254**

### PRELIMINARY STATEMENT

Midway through petitioner Gigi Jordan's nine-week criminal trial, the judge abruptly declared that he had "to close the courtroom without any spectators," so that he and the lawyers could speak "about something that has to be done in private." 10/1/2014 Trial Tr. 1646 (Exhibit A to Decl. of Henninger S. Bullock). All of the spectators (including many members of the press) were expelled from the packed gallery, the courtroom doors were closed, and the courtroom deputy assumed a position guarding the doors. "Let's make sure no one enters the courtroom, please, sergeant," the trial judge instructed, because "[t]he courtroom is closed to spectators." *Id*. at 1647. The closure lasted for the duration of a lengthy and substantive proceeding addressing public commentary on the trial published on the internet, controversies over evidentiary rulings at trial, possible ethics violations by members of the defense team, and a motion for a corrective jury instruction. *Id*. at 1646-1667. The court took evidence during the hearing. *Id*.

A courtroom closure during a criminal trial like this is ground for automatic reversal on appeal unless the trial court finds as a matter of fact, *before* the closure,

that closing the courtroom is strictly necessary to protect an overriding interest. *See Presley v. Georgia*, 558 U.S. 209, 212-214 (2010) (per curiam); *Waller v. Georgia*, 467 U.S. 39 (1984). Despite this clear law, the trial judge closed the courtroom with no hearing and no findings of fact. Defense counsel objected to the closure, to no avail. And although the proceeding was transcribed, the transcript and exhibits taken during the hearing were sealed (over defense objection) for several hours after the hearing's conclusion. The courtroom closure had a clear but not fully knowable effect the remainder of the criminal proceedings. For example, the subject matter discussed at the hearing appears to have influenced the judge's predisposition to petitioner at the sentencing hearing. But the full effect of the closure cannot be ascertained.

Petitioner moved for post-conviction relief on the basis of the courtroom closure, but the trial court denied the motion. The Appellate Division, First Department, likewise rejected petitioner's Sixth Amendment claim and affirmed the conviction. The New York Court of Appeals declined further appellate review.

Under the Antiterrorism and Effective Death Penalty Act, 28 U.S.C.A. 2254(d), a federal court may grant a writ of habeas corpus to a state prisoner if (1) the prisoner requests relief on "the ground that [she] is in custody in violation of the Constitution," (2) the constitutional claim was "adjudicated on the merits" in state court, and (3) the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. 2254(d).

Those requirements are readily met. The courtroom closure here—taking place in the middle of petitioner's ongoing criminal trial, to address substantive

issues including published commentary on the admissibility of the evidence and discussions of instructions to the jury—plainly violated petitioner's Sixth Amendment's public-trial right. And it resulted in a structural error, requiring automatic reversal for a new trial. *See Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017); *Arizona v. Fulminante*, 499 U.S. 279 (1991). Because the state courts' contrary decisions were a an unreasonable application of U.S. Supreme Court precedent, this Court should grant a writ of habeas corpus and order that petitioner be released, retried, or at minimum resentenced in fully public proceedings.

## PARTIES

1.      Petitioner Gigi Jordan is a U.S. citizen and resident and domiciliary of the State of New York who is presently incarcerated at the Bedford Hills Correctional Facility in Bedford Hills, New York. Her inmate number is 15G0448.

2.      Respondent Amy Lamanna, sued in her official capacity as Superintendent of the Bedford Hills Correctional Facility, has immediate custody of petitioner.

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 2254. This court has further remedial authority pursuant to the All Writs Act, 28 U.S.C. 1651, and the Declaratory Judgment Act, 28 U.S.C. 2201 *et seq*.

4.      Pursuant to 28 U.S.C. 2241(d) and Local Civil Rule 83.3, venue is proper in this District because petitioner's trial took place within this District, in the Supreme Court of the State of New York for New York County, Part 82, located at 60 Centre Street, New York City, New York 10007.

5.      Venue is also proper because petitioner is presently in custody at the Bedford Hills Correctional Facility, which is within this District.

## EXHAUSTION OF STATE COURT REMEDIES

6.    Petitioner has exhausted her state court remedies as required by 28 U.S.C. 2254(b)(1)(A).

7.    To satisfy the exhaustion requirement, "which is not an exacting standard," petitioner must have "fairly presented" her federal constitutional claim to the state courts by apprising them of "both the factual and the legal premises of the claim [she] asserts in federal court." *Madera v. Superintendent, Livingston Corr. Facility*, 281 F. Supp. 3d 389, 402 (S.D.N.Y. 2017), *report and recommendation adopted* 2017 WL 6001838 (S.D.N.Y. Dec. 4, 2017). The point is to give the state courts "a fair opportunity to redress the federal claim." *Ibid.* "For a claim to be fully exhausted, it must be presented to the highest court of the state." *James v. Mazzuca*, 387 F. Supp. 2d 351, 359 (S.D.N.Y. 2005) (citing *Pesina v. Johnson*, 913 F.2d 53, 54 (2d Cir. 1990)).

8.    Petitioner has met these requirements. She objected to the courtroom closure on federal constitutional grounds contemporaneously with its occurrence. *E.g.*, 10/1/2014 Trial Tr. 1647-1649. She sought post-verdict relief before the trial court, asserting a violation of her federal public trial right. *See* Henninger Decl. Exhibit B. The trial court considered and rejected petitioner's Sixth Amendment claim. *See* Henninger Decl. Exhibit C.

9.    Petitioner continued to press her federal public trial claim in her appeal to the Appellate Division (*see* Henninger Decl. Exhibit D), which likewise considered and rejected her claim of federal constitutional grounds. *See People v. Jordan*, 145 A.D.3d 584 (N.Y. App. Div. 2016) (Henninger Decl. Exhibit E).

10.    Petitioner sought discretionary appellate review of the Sixth Amend-

ment issue before the New York Court of Appeals (Henninger Decl. Exhibits F & G), which denied review. *See People v. Jordan*, 29 N.Y.3d 1033 (2017) (Henninger Decl. Exhibit H).

11.    The United States Supreme Court denied certiorari on November 27, 2017. *See Jordan v. New York*, 138 S. Ct. 481 (2017) (Henninger Decl. Exhibit J).

## LEGAL BACKGROUND

12.    Few rights, if any, occupy a more favored position in the constitutional firmament than criminal defendants' right under the Sixth Amendment to a public trial. "For a civilization founded upon principles of ordered liberty to survive and flourish, its members must share the conviction that they are governed equitably." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 594 (1980). This truism "mandates a system of justice that demonstrates the fairness of the law to our citizens," and "[o]ne major function of [a] trial," held open to the public, "is to make that demonstration." *Id*. at 594-595.

13.    The right to a public trial reflects the Framer's judgment that openness is essential to "assur[ing] the criminal defendant a fair and accurate adjudication of guilt or innocence." *Richmond Newspapers*, 448 U.S. at 593. Thus, "in identifying the function of publicity at common law," both Hale and Blackstone "discussed the open-trial requirement not in terms of individual liberties but in terms of the effectiveness of the trial process." *Gannett*, 443 U.S. at 421.

14.    First, "the requirement that evidence be given in open court deterred perjury, since 'a witness may frequently depose that in private, which he will be ashamed to testify in a public and solemn tribunal.'" *Gannett*, 443 U.S. at 421 (quoting 3 William Blackstone, *Commentaries on the Laws of England* 373 (1768),

and citing Matthew Hale, *The History of the Common Law of England* 343, 345 (6th ed. 1820)). Accord *Waller*, 467 U.S. at 46 (openness "discourages perjury"). As another contemporary of the founding generation, Jeremy Bentham, put it: "the publicity of the examination or deposition operates as a check upon mendacity." Bentham 522.

15.     Second, the Framers understood that "the presence of interested spectators" keeps the participants in the proceeding "keenly alive to a sense of their responsibility and to the importance of their functions." *Waller*, 467 U.S. at 46 (quoting *Gannett*, 443 U.S. at 380). Publicity thus ensures the contentiousness of prosecutors, marshals, judges, and jurors, helping to forestall the injustice that may result from indifference or undue passion. *Gannett*, 443 U.S. at 382.

16.     The public-trial right also serves recognized social interests, apart from protecting the accused's right to a fair trial. For example, it is now well understood that "the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion" when a crime is committed. *Richmond Newspapers*, 448 U.S. at 571. The Court has "sometimes described [this] as [the] 'community therapeutic value'" of public trials. *Press-Enter. I*, 464 U.S. at 508. A public demonstration "that society's responses to criminal conduct are underway" helps to ease "the natural human reactions of outrage and protest." *Richmond Newspapers*, 448 U.S. at 570. Open proceedings thus answer the "fundamental, natural yearning to see justice done." *Id*. at 571. But the "community catharsis" brought about by a trial cannot occur "if justice is done in a * * * covert manner." *Ibid*.

17.     Public trials promote the appearance of justice, and thus the public's

confidence in the criminal justice system. "People in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 13 (1986) (*Press-Enter. II*) (quoting *Richmond Newspapers*, 448 U.S. at 572). "[T]he sure knowledge that *anyone* is free to attend [a criminal trial] gives assurance that established procedures are being followed and that deviations will become known." *Press-Enter. I*, 464 U.S. at 508.

18.     Thus, the public-trial right not only serves the interests of criminal defendants, but also "promotes confidence in the fair administration of justice." *Richmond Newspapers*, 448 U.S. at 572. In these ways, "the public trial right extends beyond the accused" and protects both the rights of the public (*Presley*, 558 U.S. at 212) and "the appearance of fairness so essential to public confidence in the system" (*Press-Enter. I*, 464 U.S. at 508).

19.     By the same token, measuring the practical effects of a violation of the public-trial right is, as the Supreme Court put it in *Waller*, a "practical impossibility." 467 U.S. at 49 n.9 (quoting *Connecticut v. Sheppard*, 438 A.2d 125, 128 (Conn. 1980)). Courts thus presume prejudice from violations of the public-trial.

20.     That is so for two reasons. First, a simple prejudice analysis is inapt to measure the "great, though intangible, societal loss that flows" from structural errors like a denial of the public-trial right. *Waller*, 467 U.S. at 49 n.9 (quoting *People v. Jones*, 391 N.E.2d 1335, 1340 (N.Y. 1979)). Second, inquiring how the participants in a closed proceeding would have behaved if the doors instead had been open—and then attempting to measure the impact of those differences on the ultimate outcome—would be "a speculative inquiry into what might have occurred

in an alternate universe." *Gonzalez-Lopez*, 548 U.S. at 150; *see also Weaver*, 137 S.

Ct. at 1908 ("[T]he effects of [structural] error[s] are simply too hard to measure.");

*id*. at 1910.

21.      Thus, prejudice from a public-trial violation must be presumed on dir-

ect appeal. *Weaver*, 137 S. Ct. at 1910-1912; *Waller*, 467 U.S. at 49-50. Such errors

"defy analysis by harmless-error standards by affecting the entire adjudicatory

framework." *Puckett v. United States*, 556 U.S. 129, 141 (2009) (quoting *Fulminante*,

499 U.S. at 309). Structural errors are "not amenable to harmless-error review"

(*Vasquez v. Hillery*, 474 U.S. 254, 264 (1986)) because the "precise effects" of such

errors are "unquantifiable" and "indeterminate," (*Sullivan*, 508 U.S. at 281-282)

and thus "cannot be ascertained" (*Vasquez*, 474 U.S. at 263). That is assuredly true

of violations of the public-trial right. *Weaver*, 137 S. Ct. at 1910; *Fulminante*, 499

U.S. at 309. Prejudice is thus presumed in direct appeals from violations of the

Sixth Amendment's public trial right. *Weaver*, 137 S. Ct. at 1910-1912; *Waller*, 467

U.S. at 49-50.

## FACTUAL ALLEGATIONS

22.      Petitioner, a prominent pharmaceutical executive, was indicted for a

single count of murder upon the death of her developmentally delayed eight-year-

old son. Following a closely-watched trial, she was acquitted of murder but

convicted of manslaughter, the jury having found that she acted under extreme

emotional distress. She was sentenced to an 18-year term of imprisonment.

23.      Around half-way through the nine-week trial, as court convened and

reporters and spectators settled into their seats (but before the jury or petitioner

entered), the prosecutor asked the judge for permission to approach the bench. A

discussion ensued off the record.

24.    Petitioner soon thereafter entered the courtroom. The trial judge noted her presence and began to say, "Counsel, what I'd like to do is" but was interrupted by the prosecutor, who hastily interjected: "This doesn't count as closed." 10/1/2014 Trial Tr. 1646. The judge responded, "Just wait a second." *Ibid*. He continued: "What I'd like to do is, we have to close the courtroom to make a record. We have to close the courtroom without any spectators in the audience for about five minutes, about something that has to be done in private. If everyone can step out for five minutes, please. Everybody." *Ibid*.

25.    Each one of the many spectators in the packed gallery, including many members of the press, were escorted out to the hallway. 10/1/2014 Trial Tr. 1646. The judge then added, "Let's have an officer outside, please. Let's see if we can close this door." *Ibid*.

26.    Counsel for petitioner objected immediately, explaining that "before the courtroom can be closed," the judge was required to make certain findings "on a record." 10/1/2014 Trial Tr. 1647. The judge responded that "[t]he record is going to be made outside the public's [presence]." *Ibid*. When counsel for petitioner continued to object, the judge responded, "you can object all you want," but "[s]omething happened that [the prosecutor] wants to place on the record, a very serious problem concerning Ms. Jordan." *Id*. at 1648. Petitioner's lawyer explained that he "[did not] know what the serious problem is" but insisted that it "[could] be articulated in an open courtroom consistent with the Sixth and First Amendments unless there exists at this point some basis for closing the courtroom," and "no basis currently exists." *Ibid*.

27. The trial court then heard from the prosecutor. The prosecutor introduced an exhibit into the record, under seal, comprising a number of "articles" that had been printed from a website titled "The Inadmissible Truth." 10/1/2014 Trial Tr. 1649. "[I]n effect," the prosecutor explained, the website "accuses, among others, your Honor of subverting justice in this case." *Id.* at 1650. Expressing evident concern at this, the judge asked "Where's that? Which page is that?" *Ibid.* The prosecutor asserted that it appeared at "multiple" points. *Id.* at 1651. After further discussing the contents of the website, the prosecutor attempted to prejudice the judge against petitioner: "The reason that I asked that the courtroom be closed for this, I didn't want a feeding frenzy that I think we all recognize would ensue from the defendant's desperate act of going—trying to go around the Court's rulings and trying to get into the public domain matters that this Court has ruled are inadmissible." 10/1/2014 Trial Tr. 1652.

28. The court interrupted, "I never had this happen before. Go on, what are you seeking? What are you seeking?" 10/1/2014 Trial Tr. 1652. In response, the prosecutor requested from the judge "a new instruction, of course, to the jury to make sure they don't look at any media" and an "assurance" from defense counsel that "[a]ll the rows of hired people that are in the first and second row and throughout the courtroom every single day, are not in violation of your Honor's ruling and the ethical standards." *Id.* at 1653.

29. After the prosecutor's presentation, the judge heard again from defense counsel, who reiterated: "[I]t is the defense position that the closed courtroom is not requested by us, is not necessary for us, is and remains unconstitutional and there is absolutely nothing in the record that [the prosecutor] just made that could

10

conceivably justify the closure of the courtroom. So, before I respond to the other points, I would ask that this constitutional abomination be ended and the spectators and the press be readmitted to an open court." 10/1/2014 Trial Tr. 1654. The trial judge continually refused to open the courtroom.

30.     Counsel and the trial judge engaged in a lengthy exchange about publicity, the website, and the rules of professional conduct. Throughout this exchange, defense counsel reiterated his objection to the closure. *E.g.,* 10/1/2014 Trial Tr. 1660 ("I just want to note that the constitutional violation is continuing every minute that proceedings such as these are sealed, are closed and the public is excluded."). The judge nevertheless refused to open the courtroom and ordered that the exhibits and proceedings would remain closed and that "the minutes will be sealed." *Id.* at 1664.

31.     The courtroom was reopened, and the day's public proceedings recommenced. 10/1/2014 Trial Tr. 1667.

32.     Following a lunch break, the trial judge revisited the issues of the courtroom closure and the sealing of the record. The judge admitted: "I didn't really have a chance to read everything because it came quite as a surprise to me this morning and there were other items to discuss before we had the jury come out, that maybe, maybe [the decision to close the courtroom and seal the transcript] was an erroneous ruling. Maybe this should be in the public domain, I don't know. I'm trying to think of the reason why it shouldn't. I can't think of a reason." 10/1/2014 Trial Tr. 1786. The judge then lifted the seal on the transcript of proceedings and the exhibits, explaining: "[I]f the record has any error committed by me, it was committed for maybe five, six hours. The record was sealed. I don't think it—that

will be detrimental to anyone. I just wanted to make that clear to everybody." *Id.* at 1787.

33.   The closure of the courtroom on October 1, 2014, and the exchange among the lawyers and the judge—*what* they discussed, *how* they discussed it, and the public's inability to witness the exchange—infected the remainder of the trial and the sentencing hearing in unknowable ways.

34.   During petitioner's sentencing hearing, for example, the trial judge repeatedly expressed his view that—notwithstanding the jury's verdict—he did not find petitioner credible or sympathetic. *E.g.*, 5/25/2015 Sent'g Tr. 96-99, 106. The judge emphasized, in particular, that he disapproved of petitioner's appearances on television and other media. *Id.* at 103, 105-107. Referring to her statement that she had not be allowed to "tell her story" (an unmistakable allusion to the subject matter of the closed hearing), the judge irritatedly insisted, "Untrue. Untrue." *Id.* at 103. The judge's statements at sentencing thus strongly suggest that the subject matter of the closed hearing prejudiced him in unknowable ways against petitioner.

## PROCEDURAL BACKGROUND

35.   Petitioner was convicted of first degree manslaughter. A judgment of conviction was entered on November 5, 2015.

36.   Petitioner was sentenced on April 25, 2015 to 18 years of imprisonment, followed by five years of supervised release. Certification of Disposition (Henninger Decl. Exhibit L); 5/25/2015 Sent'g Tr. 107-108 (Henninger Decl. Exhibit M).

37.   Following the trial's conclusion, petitioner filed a motion to set aside the verdict, arguing that the courtroom closure had violated her federal constitutional right to a public trial, requiring automatic reversal. *See* Exhibit B.

38.    The trial court denied the motion. *See* Exhibit C. The trial court readily admitted that "it is clear that a defendant's right to a public trial is implicated when a courtroom is closed during evidentiary proceedings." *Id*. at 5. It reasoned nevertheless that the "proceeding at issue was not the type of trial proceeding that falls within the ambit" of the public-trial right. *Ibid*. Although the court acknowledged that the State had asked for a jury instruction and that petitioner's counsel had discussed the legality of the closure, potential "violation[s] of the ethical and disciplinary rules with which attorneys are required to comply" (*id*. at 2), and whether the court intended a gag order, it inexplicably concluded that "no legal issues, nor anything of a substantive nature, [were] discussed" at the closed hearing. *Id*. at 5. And although the prosecutor had "handed up" marked exhibits about the court's rulings on the inadmissibility of trial evidence for the trial judge's review (*id*. at 2), the court also concluded that "nothing of an evidentiary nature was discussed" at the closed hearing. *Id*. at 5. In the end, the trial court concluded that "[t]he People cannot be faulted for bringing the emails and website to the Court's attention in a closed setting." *Id*. at 5-6.

39.    Petitioner appealed to the New York Supreme Court Appellate Division, First Department. *See* Exhibit D. Petitioner argued, among other things, that the expulsion of the public and closure of the courtroom midway through her trial had violated her right to a public trial under the Sixth Amendment to the U.S. Constitution. She asserted entitlement to a new trial, stressing that violations of the public trial right are structural errors requiring automatic reversal.

40.    The Appellate Division affirmed. *See* Henninger Decl. Exhibit E. With respect to the Sixth Amendment argument, the Appellate Division held succinctly:

Defendant's Sixth Amendment right to a public trial was not violated when the court briefly closed the courtroom during a discussion of a legal matter relating to protecting the jury from exposure to publicity about the case. This was the equivalent of a sidebar, robing room or chambers conference. The right to a public trial does not extend to such conferences, and does not restrict judges "in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings." Moreover, the conference had no impact upon the conduct of the trial other than having the court repeat its previous instructions about trial publicity and minutes and exhibits that had been sealed were unsealed the same day.

145 A.D.3d at 585 (citations omitted) (quoting *Richmond Newspapers*).

41.    Petitioner sought further review before the New York Court of Appeals. She asked the Court, in particular, to clarify the scope of the public trial right as it applies to interlocutory hearings like the one at issue in this case. *See* Henninger Decl. Exhibits F & G.

42.    The Court of Appeals denied discretionary review without comment. *See People v. Jordan*, 29 N.Y.3d 1033 (2017) (Henninger Decl. Exhibit H).

43.    The United States Supreme Court denied certiorari on November 27, 2017. *See Jordan v. New York*, 138 S. Ct. 481 (2017) (Henninger Decl. Exhibit J).

**ENTITLEMENT TO RELIEF**

44.    The trial court's closure of the courtroom violated petitioner's Sixth Amendment public-trial right. Specifically, the trial court's decision to close the courtroom without first finding that a closure was strictly necessary to protect an overriding interest was contrary to clearly established federal law, as determined by the Supreme Court of the United States, including *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017), *Presley v. Georgia*, 558 U.S. 209 (2010), and *Waller v. Georgia*, 467 U.S. 39 (1984).

45.    *Waller* "provided standards for courts to apply *before* excluding the

public from any stage of a criminal trial," including that "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Presley*, 558 U.S.at 213-214 (emphasis added) (quoting *Waller*, 467 U.S. at 48).

46.     The closure was clearly illegal under this framework.

47.     To begin with, the trial court did not conduct a *Waller* hearing at all. It made no findings of fact. This omission alone is enough to demonstrate an unreasonable constitutional violation.

48.     Beyond that, the State has never identified an overriding interest— such as petitioner's right to a fair trial or a witness's privacy—that might have necessitated closing the courtroom. For its part, the trial court expressly disclaimed that there was such an interest. 10/1/2014 Trial Tr. 1786 ("I can't think of a reason."). And even if there had been an important interest at stake, measures short of expelling the public for the gallery surely were available to protect that interest.

49.     The hearing was lengthy and covered substantive issues pertinent to the public's interest in the trial. The prosecution introduced evidence, which was accepted by the trial court and entered into the record. The proceeding was thus akin to a hearing on a motion *in limine* or an evidentiary hearing, and it was one to which the public-trial right attached. *See Presley*, 558 U.S.at 213 (the public-trial right attaches to "any stage of a criminal trial"); *Rovinsky v. McKaskle*, 722 F.2d 197, 201 (5th Cir. 1984) ("The right to a public trial does not turn on whether the

inquiry of a hearing is factual or doctrinal, substantive or procedural, but on the relationship of the issue raised at the hearing to the merits of the charge, the outcome of the prosecution, and the integrity of the administration of justice.").

50.    There is no Supreme Court precedent that permits brushing aside the closure in this case as the equivalent of a mere side bar or chambers conference. The trial judge actively expelled the public from the packed courtroom gallery in the midst of the trial proceedings. The judge then stationed a courtroom deputy at the courtroom door and instructed him not to allow any members of the public in. The hearing lasted for 15 minutes, and the content was substantive and involved evidence. That is plainly not a description of a "sidebar" (which happens at the bench, in open court not a closed courtroom) or a "chambers conference" (which takes place in chambers). *See Commonwealth v. Cohen*, 921 N.E.2d 906, 925 (Mass. 2010) (a sidebar is conducted "in open court"); *NBC Subsid. (KNBC-TV), Inc. v. Sup. Ct.*, 980 P.2d 337, 363 (Cal. 1999) (a chambers conference does not take place in the courtroom).

51.    What is more, the "discussion[s]" were not "relate[d] to protecting the jury from exposure to publicity," since the jury was not present and no relief was sought beyond a request for repetition of the same stock instruction for the jury to avoid publicity about the trial, an instruction already issued many times by the trial judge. *See* 145 A.D.3d at 585. Besides that, the publicity that was the subject of the hearing is encouraged under Supreme Court precedents, which hold that public airing of trial issues is important because an open gallery may "induce unknown witnesses to come forward with relevant testimony." *Gannett*, 443 U.S. at 382. Nothing in the Supreme Court's public-trial cases permits state courts to excuse a

plainly unconstitutional expulsion of the public from the courtroom by recharacter-
izing the expulsion, ex post, as something that it was not.

52.     That is especially so because the Sixth Amendment's aims are not just
to ensure a fair trial, but also to promote the *appearance* of a fair trial, and thus the
public's confidence in the criminal justice system. "People in an open society do not
demand infallibility from their institutions, but it is difficult for them to accept
what they are prohibited from observing." *Press-Enter. Co.* v. *Superior Court*, 478
U.S. 1, 13 (1986) (*Press-Enter. II*) (quoting *Richmond Newspapers*, 448 U.S. at 572).
The state courts' decisions rejecting petitioner's Sixth Amendment claim in this case
are contrary to this clearly established federal law.

53.     Nor is it an answer to say that petitioner's public trial right was not
violated because the judge kept a record of the hearing and later released the tran-
script. The U.S. Supreme Court has said that a transcript, which "is a very imperfect
reproduction of events that transpire in the courtroom," "is no substitute for a
public presence at the [proceeding] itself." *Richmond Newspapers, Inc. v. Virginia*,
448 U.S. 555, 597 n.25 (1980). "Indeed, to the extent that publicity serves as a check
upon trial officials, 'recordation . . . would be found to operate rather as a cloak than
check.'" *Id.* (quoting *In re Oliver*, 333 U.S. 257, 271 (1948)).

54.     What is more, under clearly established federal law, "a violation of the
right to a public trial is a structural error," "entitling the defendant to automatic
reversal without any inquiry into prejudice." *Weaver*, 137 S. Ct. at 1905-1909 (citing
and discussing cases); *accord Fulminante*, 499 U.S. at 309; *Waller*, 467 U.S. at 49
n.9. The full effect of the closure cannot be ascertained. The state appellate courts
were therefore required by clearly established federal law to order a new trial, or at

minimum to order a new sentencing given the influence the topic of the hearing had on the trial judge at the sentencing hearing. Their failure to do so was contrary to clearly established federal law. *See Weaver*, 137 S. Ct. at 1905-1908; *accord Fulminante*, 499 U.S. at 309; *Waller*, 467 U.S. at 49 n.9.

55.     In sum, petitioner's public-trial claim is a constitutional claim that was "adjudicated on the merits" in state court, and the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. 2254(d). Petitioner is accordingly entitled to a writ of habeas corpus, requiring her release, retrial, or at minimum resentencing.

Dated: November 20, 2018

Respectfully submitted,

/s/ *Henninger S. Bullock*

Henninger S. Bullock
Mayer Brown LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 506-2500

Michael B. Kimberly*
Mayer Brown LLP
1999 K Street NW
Washington, D.C. 20006
(202) 263-3000
**pro hac vice* motion to be filed

Norman H. Siegel
Siegel Teitelbaum & Evans, LLP
260 Madison Avenue, 22nd Floor
New York, NY 10016
(212) 455-0300

Earl S. Ward
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue
Rockefeller Center
10th Floor
New York, NY 10020
(212) 763-5000