Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY:  PART 82
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,

-v-                                                                                  Ind. 621-10

GIGI JORDAN,

                                                   Defendant.
-------------------------------------------------------------------x

## NOTICE OF MOTION TO SET ASIDE THE VERDICT PURSUANT TO CPL SECTION 330.30.

To:    District Attorney
       New York County
       Attn:  ADA Matthew Bogdanos

       PLEASE TAKE NOTICE:
       Upon the annexed Affirmation of Ronald L. Kuby, duly executed on

the 21th day of January, 2015, and all prior proceedings had herein, the

undersigned will move this Court, at 100 Centre Street, Part 82, at a time and

date to be determined by this Court, for an Order granting the Defendant's

motion to set aside verdict pursuant to CPL § 330.30, and any other further

relief as the Court may deem just and proper.

Dated:    New York, New York
          January 21, 2015
                                          Respectfully submitted,
                                          /s/ Ronald Kuby
                                          Ronald L. Kuby
                                          Law Office of Ronald L. Kuby
                                          119 West 23rd Street, Suite 900
                                          New York, NY  10011
                                          (212) 529-0223
                                          *Attorney for Defendant*

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY:  PART 82

-------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

-v-                                                                    Ind. 621-10

GIGI JORDAN,

                                       Defendant.

-------------------------------------------------------------------x


## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SET ASIDE THE VERDICT PURSUANT TO CPL SECTION 330.30.


Ronald L. Kuby
Law Office of Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, NY 10011
(212) 529-0223

*Attorney for Defendant*


Dated: January 21, 2015
New York, New York

# TABLE OF CONTENTS

THE TRIAL COURT'S MID-TRIAL COURTROOM CLOSURE
VIOLATED MS. JORDAN'S SIXTH AND FOURTEENTH
AMENDMENT RIGHTS, REQUIRING AUTOMATIC REVERSAL. ....... 1

   A.  STATEMENT OF FACTS ................................................................... 1

   B.  ARGUMENT ...................................................................................... 9

      1.  THE TRIAL COURT'S MID-TRIAL COURTROOM
      CLOSURE VIOLATED THE SIXTH AND FOURTEENTH
      AMENDMENTS, AND MADE NO WALLER FINDINGS
      PRIOR TO CLOSING THE COURTROOM REQUIRING
      AUTOMATIC REVERSAL OF THE DEFENDANT'S
      CONVICTION. .................................................................................... 9

CONCLUSION ................................................................................................. 18

# TABLE OF AUTHORITIES

Gannett Co. v. DePasquale
443 U.S. 368 (1979) .................................................................. 11

Gibbons v. Savage
555 F.3d 112 (2d Cir. 2009) ...................................................... 16

In re Oliver
333 U.S. 257 (1948) .................................................................. 17

People v. Jones
47 N.Y.2d 409 (Ct. App. 1979) .......................................... 9, 10, 15

People v. Echevarria
21 N.Y.3d 1 (2013) ................................................................... 12

People v. Floyd
21 N.Y.3d 892 (Ct. App. 2013) .......................................... 15, 16

People v. Martin
16 N.Y.3d 607 (Ct. App. 2011) .................................................. 16

Peterson v. Williams
85 F.3d 39 (2d Cir. 1996) .......................................................... 12

Presley v. Georgia
558 U.S. 209 (2011) .................................................. 12, 13, 14, 15

United States v. Gupta
699 F.3d 682 .............................................................................. 16

Waller v. Georgia
467 U.S. 39 (1983) ............................................................. passim

<u>THE TRIAL COURT'S MID-TRIAL COURTROOM CLOSURE
VIOLATED MS. JORDAN'S SIXTH AND FOURTEENTH
AMENDMENT RIGHTS, REQUIRING AUTOMATIC REVERSAL.</u>

### A.  STATEMENT OF FACTS

From the time that jury selection commenced on September 3, 2015, the case of <u>People v. Jordan</u> was covered on a daily or near-daily basis by at least the <u>New York Times</u>, the <u>Daily News</u>, the <u>New York Post</u>, the <u>Wall Street Journal</u>, <u>Newsweek</u>, <u>CBS</u>, and <u>CNN</u>. Reporters from these media outlets were present regularly in the courtroom.  In addition, the trial was well-attended by members of the general public and the legal profession.

At the commencement of the October 1, 2014 morning session, after members of the press and spectators had been seated in the courtroom, the prosecutor requested a conference at the bench.  For reasons not stated on the record (either before or subsequently), the conference was held off-the-record.  The defendant was not present in the courtroom.  (Tr., 1646).

When the defendant was brought into the courtroom the Court noted her presence and stated: "Counsel, what I'd like to do is…" (<u>Id.</u>). The Court got no further before the prosecutor interrupted and stated:  "This does not count as closed." (<u>Id.</u>).  To which the Court responded: "Just wait a second." (<u>Id.</u>).

The Court then summarily issued an extraordinary order, stating "we have to close the courtroom to make a record.  We have to close the courtroom without any spectators in the audience for about five minutes, about something that has to be done in private." (Id.).  The spectators, including members of the press, were forced to leave and the courtroom was then closed.  (Id.).  The Court ordered the sergeant to "make sure no one enters the courtroom." (Tr., 1647).

Defense counsel immediately objected, demanding that the Court cite its authority for this act.  The Court replied, "My authority." (Id.).  The Court stated that the prosecutor "wants to make a record about something *he didn't want to put on the record in front of the audience or the press*.  It has to do with Ms. Jordan." (Id.). (Emphasis added).

Defense counsel objected, arguing that no record justifying the closure had been made, that such findings must be made before closing the courtroom, and that no findings of fact justifying such a closure had been articulated. (Id.).  The Court replied "We're going to make the record right now. . . [and] the transcript will not be released immediately. Unless everyone consents to it…you can object all you want." (Tr., 1647-1648). The Court then stated that "[s]omething happened that Mr. Bogdanos wants

to place on the record, a very serious problem concerning Ms. Jordan." (Tr., 1648).

The defense again objected to the closed courtroom, arguing that the defense was not aware "what the serious problem is" but that "the serious problem . . . can be articulated in an open courtroom consistent with the Sixth and Fourteenth Amendments . . . [and] no basis currently exists." (Tr., 1648).

The Court then turned to the prosecutor, who articulated that his request to proceed *in camera* was motivated "about proceeding with a fair trial." (Tr., 1649). This concern for fairness, according to the prosecutor, arose as a response to "a website page that someone put up called The Inadmissible Truth." The prosecutor then supplied the Court and the parties with a printout of the first page of the website, and requested that it be placed under seal. (Tr., 1649-1650). Again, and without any basis, the Court agreed to seal the exhibit. (Tr., 1650). The prosecutor then asserted that the page, with links to other articles, "in effect, *accuses, among others, your Honor of subverting justice in this case…*[a]nd lest the defendant disavow any knowledge of this particular website, I have an e-mail from Ms. Jordan. It was sent out last night, yesterday -- (Tr., 1650-1651) (Emphasis added).

At this moment, it was clear that the prosecutor had demanded, and the Court acceded, to closing the courtroom so that the prosecutor could assail the opinions expressed by the defendant and protected by the First Amendment, in the public domain, and further, to inflame the Court by highlighting in an exaggerated manner, her purported criticism of the Court. Instead of immediately re-opening the courtroom, the Court responded: "Where's that?  Which page is that?" while searching through the pages provided by the prosecutor. (Tr., 1650). Thus emboldened, the prosecutor and the Court engaged in a remarkable exchange:

> Prosecutor:  It's multiple.  It's multiple.  The only proper way to do this is to go online.  And it accuses your Honor of refusing to allow information to come before the jury, hence the title of the website, The Inadmissible Truth.
>
> And lest the defendant disavow any knowledge of this particular website, I have an email from Ms. Jordan.  It was sent out last night, yesterday——
>
> The Court:  To whom?
>
> Prosecutor:  Several hundred email addresses.  Most of them appear to be the media.  You could see the e-mail address.  I printed it up in such a way that the e-mail addresses show.  Here's two copies for the Court.
>
> *       *       *       *
>
> And your Honor will see in the body of the e-mail itself how Ms. Jordan believes that the justice system is being stymied on many fronts resulting in the suppression of evidence that anyone would

> expect to hear at a fair trial.  And then Ms. Jordan goes at length on
> the website to explain *why it is this Court is actually—how this Court
> is actually doing that.*  And so, I felt several things, your Honor, I felt
> duty-bound to report this to the Court immediately.

(Tr., 1651-1652) (Emphasis added).

As to the basis for the courtroom closure, the prosecutor claimed he

made the request because allowing the public to learn of the website "may

be viewed by many objective observers as an act of desperation on the part

of the defendant seeing how the evidence is going in, and I didn't want the

defendant to be prejudiced . . . ." (Tr., 1652).

The Court then continued the inquisition, stating "well, this is coming

from somewhere, isn't it?  Do we know where it is coming from?  It says

from Thomas Truth and there is poetic justice nine-eighty-nine.  Who is

that?" (Tr., 1653).

When the defense was finally permitted to speak, defense counsel

began by reiterating the objection to the closed courtroom and demanding

that it be re-opened forthwith:

> [I]t is the defense position that the closed courtroom is not requested
> by us, is not necessary for us, is and remains unconstitutional and
> there is absolutely nothing in the record that Mr. Bogdanos just made
> that could conceivably justify the closure of the courtroom.  So before
> I respond to the other points, I would ask that this constitutional
> abomination be ended and the spectators and the press be re-admitted
> to an open court in New York City and the United States of America.

(Tr., 1654).

As to this application, the prosecution objected revealing its actual purpose in excluding the public and particularly the press, that because to open the courtroom would "in fact achieve the defendant's purpose of pre -- during the trial getting publicity about inadmissible matters, and doesn't that, Judge, in your Honor's estimation, risk a fair trial to both?" (Tr., 1654-1655).

The Court did not address that question.  Instead, the courtroom remained closed while the Court proceeded to interrogate *defense counsel*. The Court stated that "[w]hat's in this email and what's in this website? Clearly, to me, what I've seen so far, it's improper to say these things." Defense counsel responded, inquiring of the Court, "Improper?...[f]or whom?" (Id.).  The Court demanded to know "Where does it come from?" (Tr., 1656).  Defense counsel stated "I'm sorry, Judge, I'm not an investigator." (Id.).  Defense counsel then attempted to direct the conversation back to the closed courtroom, provoking a sharp exchange in which the Court stated "I know the law.  Please. . . . I do." (Id.).  Defense counsel responded:  "Frankly, if you did, the courtroom would not be closed, sir." (Tr., 1657).

The Court refused to re-open the courtroom, and over defense objection ordered that the minutes and exhibits be sealed. (Tr., 1658).

The Court then returned to its attempts to ascertain the origin of "these emails, Twitters, whatever." (Tr., 1659). The Court then noted "the jury is completely unaware of this." (Tr., 1660). Defense counsel noted that this was precisely the reason they were instructed not to go on the internet, emphasizing:

> And, indeed, Judge, had they chosen to disregard that instruction and just started Googling Gigi Jordan, there will be a myriad of things that would never make it into a courtroom, both from critics and supporters of Ms. Jordan, completely inadmissible things that are all over the internet. That's why you tell them not to do that.

(Id.). Again, defense counsel returned to the issue of the closed courtroom, asserting "the constitutional violation is continuing every minute that proceedings such as these are sealed and closed, and the public is excluded." (Id.).

The Court then proceeded to mark the sealed exhibits, then, while reviewing the email press release, commented, both ominously and somewhat incomprehensibly, "I just hope this is not going to continue. Someone's doing this. I don't know who. This is not going to this. This, I mean that." (Tr., 1662).[1] Defense counsel then spent several minutes trying to ascertain whether the Court was saying that it had "some sort of plenary

---

[1] Defense counsel heard the Court to say "This will stop." When defense counsel expressed concerned over the statement "this will stop" the Court did not correct counsel or disavow the statement, but again directed further inquiry to where the website originated. (Tr., 1664).

control over what is put on the internet regarding this case." (Tr., 1664).
The Court finally set down "I don't have a problem. There is no gag order as
long as, as long as, it's an accurate description of what's taking place." (Id.).

The proceeding concluded with the Court then directing that any
further application on the closed courtroom and sealed transcript and
exhibits be made in writing. (Tr., 1666). The courtroom was then re-opened
for continuation of testimony. (Tr., 1667). The jury was given a standard
instruction not to review any media accounts of the case. (Tr., 1669).

During the luncheon recess, either the Court, the prosecution, or both,
reviewed the law regarding the closure of the courtroom. When the
afternoon session convened, in open court, the tone changed markedly. The
Court first addressed the exhibits the prosecution had placed under seal,
asking why they should be sealed as the Court "didn't really look at the
communication that closely." (Tr., 1785). The prosecutor adverted back to
his prior statements. (Id.). The Court, not satisfied, asked for additional
bases. None were forthcoming from the prosecutor. (Id.).

The Court explained that it "didn't really have a chance to read
everything because it came quite as a surprise to me this morning…maybe it
was an erroneous ruling. Maybe this should be in the public domain, I don't
know. I'm trying to think of the reason why it shouldn't. I can't think of a

reason. " (Tr., 1786). Whereupon the Court ordered the transcript and

exhibits unsealed, noting:

> And again, it's now two-thirty. So if the record has any error
> committed by me, it was committed for maybe five, six hours. The
> record was sealed. I don't think that it – that will be detrimental to
> anyone.

(Tr., 1787).

Finally, in open court, the Court read a portion of the email at issue,

noting: It's from The Inadmissible Truth, it's entitled. Again, it's attributed to

her. It's not someone else's name on the thing." (Tr., 1788). The Court then

asserted that her trial was fair, would remain fair, and she will be permitted

to take the witness stand "and she will tell the whole story." (Tr., 1789).

### B.  ARGUMENT

1. THE TRIAL COURT'S MID-TRIAL COURTROOM CLOSURE
   VIOLATED THE SIXTH AND FOURTEENTH
   AMENDMENTS, AND MADE NO <u>WALLER</u> FINDINGS
   PRIOR TO CLOSING THE COURTROOM REQUIRING
   AUTOMATIC REVERSAL OF THE DEFENDANT'S
   CONVICTION.

In <u>People v. Jones</u>, 47 N.Y.2d 409, 416 (Ct. App. 1979), the New

York Court of Appeals held that "[p]ublic trial and fair trial are not

strangers. Hindering concealment of abuses of the judicial process is a

significant safeguard against unfair trials." Both the accused and the public

have a compelling interest in an open courtroom and a request by a prosecutor to close the courtroom for the testimony of an undercover officer was not sufficient to justify the closure. "[T]he discretion to limit the public nature of judicial proceedings is to be 'sparingly exercised and then, only when unusual circumstances necessitate it.'" Id. at 413. Even then, "no closing can be tolerated that is not preceded by an inquiry careful enough to assure the court that a defendant's right to a public trial is not being sacrificed for anything less than compelling reasons." Id. at 414.

The Jones Court foreshadowed the Supreme Court's decision, four years later, in Waller v. Georgia, 467 U.S. 39 (1983). In Waller, the Supreme Court held, that in addition to the public's qualified First Amendment right to attend courtroom proceedings, such a right was specifically guaranteed to the defendant in all parts of criminal proceedings by the Sixth Amendment: "The central aim of a criminal proceeding must be to try the accused fairly, and '[o]ur cases have uniformly recognized the public trial guarantee as one created for the benefit of the defendant.'" Id. at 46. (citation omitted).

The Supreme Court found two important interests served by the Sixth Amendment's public trial guarantee. First, the defendant benefits when "the public may see he is fairly dealt with and not unjustly condemned, and that

the presence of interested spectators *may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions....*" Id. at 46, quoting, Gannett Co. v. DePasquale 443 U.S. 368, 380 (1979) (Emphasis added).   The Waller Court made it clear that this interest in fair dealing extended not only to jurors, but also "ensuring that judge and prosecutor carry out their duty responsibly...." Id. at 46.   Second, "a public trial encourages witnesses to come forward and discourages perjury." Id.

In order to protect these vital interests, the Waller Court set forth that *before* a courtroom can be closed:

> [T]he party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the court must consider reasonable alternatives to close the proceedings, and it must make findings adequate to support the closure.

467 U.S. at 48.

Moreover, the Waller Court stressed that a defendant's Sixth Amendment public trial rights are implicated when a courtroom closure affects *the values protected by the right*.   These *values* are: "1) to ensure a fair trial; 2) *to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions;* 3) to encourage witnesses to come forward; and 4) to discourage perjury." Peterson v. Williams, 85 F.3d

39, 43 (2d Cir. 1996), (citing <u>Waller v. Georgia</u>, 467 U.S. 39, 46-47

(1984))(Emphasis added).

The Court of Appeals expressly adopted this test and noted there is

thus a "presumption of openness" that "may yield to other rights or interests

in rare circumstances only, and the balance of interests must be struck with

special care...." <u>People v. Echevarria</u>, 21 N.Y.3d 1, 11 (2013).

In re-affirming the continued vitality of <u>Waller</u>, the Supreme Court

held that the failure of a trial court to adhere to Waller's four-part test *before*

closing a courtroom *itself* violated the Sixth Amendment and required

reversal.  In <u>Presley v. Georgia</u>, 558 U.S. 209 (2011), the Georgia trial court

excluded the lone spectator, the defendant's uncle from jury selection on the

ground that the uncle should not "intermingle" with the prospective jurors.

<u>Id.</u> at 210.  The Georgia Supreme Court affirmed the conviction, holding that

"the trial court certainly had an overriding interest in ensuring potential

jurors heard no inherently prejudicial remarks from observers during voir

dire." <u>Id.</u> at 211.

The Supreme Court granted *certiorari*, and reversed, noting

"[n]othing in the record shows that the trial court could not have

accommodated the public at Presley's trial." <u>Id.</u> at 215.  This failure to

"consider all reasonable alternatives" to closing the courtroom itself

mandated reversal, whatever the merits of the trial court's concern about juror contamination. Id. at 216. In its *per curiam* decision, the Supreme Court agreed that "[t]here are no doubt circumstances where a judge could conclude that threats of improper communications . . . are concrete enough to warrant closing *voir dire*." Id. at 215. "But in those cases, the particular interest, and the threat to that interest, must be 'articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" Id. (citations omitted). The failure to apply Waller was fatal to the conviction.

In Ms. Jordan's case, the Court rejected the immediate objection to the closure by the defense asserting that "any closure must be done on the record...with specific findings of fact...and that no such basis exists" (Tr., 1647-1648), disregarding the mandated constitutional protocol prior to summarily closing the courtroom. The Court did not solicit, nor did the prosecution articulate any "overriding interest" that would be likely to be "substantially prejudiced" by an open courtroom. Neither did the Court consider any alternatives to closure or make "findings adequate to support the closure." Instead the Court disregarded the protections ensured by Waller, and foreclosed the rights of Ms. Jordan to a public trial, and the public's right to monitor the proceedings.

13

Having so precipitously moved, the Court then refused to entertain objections of counsel until the courtroom was actually closed, thereby completing the circular frustration of the Waller mandate. As in Presley, this total failure to adhere to Waller's procedures requires reversal.

Moreover, the record here needs no careful parsing before concluding that Waller's *substantive* requirements were never broached. The prosecution articulated two interests in his demand that the courtroom be closed—"fairness" to the defendant lest the spectators (and presumably the jury) conclude the website was an act of "desperation" and to prevent the media from disseminating allegations that the Court and prosecutor were unfair. The latter ground may be disposed of quickly: The desire to prevent the public from learning of Ms. Jordan's First Amendment complaints about the fairness of the proceedings is not an "overriding interest"; *it is that central evil* that an open courtroom is designed to prevent.

The Waller Court twice stated that the right to an open courtroom is for the defendant's benefit; there is no legal basis for the prosecution to assert these rights *jus tertii*. That is particularly true when the defense, at each opportunity it was given to speak, objected to the closure and demanded that the courtroom be re-opened.

There is no question but that an unequivocal violation of <u>Waller's</u> procedural requirements mandates automatic reversal.  <u>Presley</u>, 558 U.S. at 216 (Even if the trial court had an overriding interest in closing voir dire, "it was still incumbent upon it to consider all reasonable alternatives to closure. It did not, and that is all this Court needs to decide.").

Similarly, an improper courtroom closure during any portion of the trial proceedings requires automatic reversal.  This rule was recently repeated by the Court of Appeals in <u>People v. Floyd</u>, 21 N.Y.3d 892 (Ct. App. 2013).  There, the trial court excluded the defendant's mother during jury selection--due to the large size of the panel there was no room for her and she would have to wait until the trial court excused jurors to make room. The Court of Appeals held that the closure was improper and this "violation is per se prejudicial and requires a new trial." <u>Id.</u> at 894.  The Court of Appeals then reversed the defendant's conviction for murder in the second degree.

The reason for this mandatory rule of automatic reversal rule was set first set forth by the Court of Appeals in 1978 in <u>Jones</u>:

> [T]hough the Sixth Amendment speaks of the right as that of the "accused." It is well recognized that the public at large has an overriding concern with the values thus fostered... For example, public confidence is the administration of justice is enhanced when its doors are open to all, litigants and nonlitigants alike, and wide understanding of its methods moves in the same direction...The

harmless error rule is no way to gauge the great, though intangible, societal loss that flows from the frustration of such a goal.

47 N.Y.2d at 416.  The Waller Court agreed that a defendant need not prove prejudice to obtain relief.  467 U.S. at 49.  See also, e.g., People v. Martin, 16 N.Y.3d 607, 613 (Ct. App. 2011)("A violation of the right to an open trial is not subject to harmless error analysis and 'a per se rule of reversal irrespective of prejudice is the only realistic means to implement this important constitutional guarantee.'").[2]

There is an added, and more nuanced component to the severity of the Court's actions.  Whether calculated as such, the prosecutor was functionally accusing Ms. Jordan of some illicit behavior, and ascribing criticism of the Court to her.  Viewed objectively, this seemed less an effort to ensure a fair trial" than to castigate Ms. Jordan to the very judge charged with the responsibility of absolute fairness and impartiality.  It is hard to imagine a juncture where the dual interests vested in the defendant and the public by Waller could be any less paramount.

---

[2] The Second Circuit has adopted what it has deemed a "triviality exception" to the rule, where "[not] every temporary instance of unjustified exclusion of the public—no matter how brief or trivial, and no matter how inconsequential the proceedings that occurred" requires reversal.  United States v. Gupta, 699 F.3d 682, 688 quoting Gibbons v. Savage, 555 F.3d 112, 120 (2d Cir. 2009).

That is not the law in the State of New York.  The state Court of Appeals, post-Gibbons and post-Gupta, has adhered to the strict rule of automatic reversal and has never embraced a triviality exception.  Indeed, its 2013 decision in Floyd, automatically reversing a conviction because of the temporary exclusion of defendant's mother from voir dire, implicitly rejected the exception.

The intemperate response by both the prosecution and the Court to the free and fair expression of Ms. Jordan's First Amendment protected speech made in the public domain should never have occurred at all, and witness of the unseemly proceedings by the public and the press is the very "fairness" function that public scrutiny guarantees, and was subverted here.

In re Oliver, 333 U.S. 257, 270 (1948), stands for the proposition that the "*knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is intended to serve as an effective restraint on possible abuse of judicial power.*" (Emphasis added).  Whether the prosecution or the Court would have taken a more measured and legalistic response to the website had the proceeding been open to public scrutiny begs the essential constitutional question.  The open trial guaranteed by the Constitution and Waller, deigned to ensure that the "judge and prosecutor carry out their duty responsibly," is not rooted in factual speculation, but in concrete principles of fairness.

CONCLUSION

For the foregoing reasons, pursuant to CPL § 330.30, the verdict of guilty should be set aside, and any other further relief as the Court may deem just and proper.

Dated: January 21, 2015
New York, New York

/s/ Ronald Kuby

Ronald L. Kuby
Law Office of Ronald L. Kuby
119 West 23rd Street, Suite 900
New York, NY  10011
(212) 529-0223

*Attorney for Defendant*

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY:  PART 82
----------------------------------------------------------------------x

THE PEOPLE OF THE STATE OF NEW YORK,

   -v-                                                    Ind. 621-10

GIGI JORDAN,

                                    Defendant.

----------------------------------------------------------------------x

## MOTION TO SET ASIDE THE VERDICT PURSUANT TO CPL SECTION 330.30.

### AFFIRMATION IN SUPPORT OF MOTION

      Ronald L. Kuby, an attorney duly admitted to practice as such in the Courts of the State of New York, hereby affirms, under the pains and penalties of perjury, as follows:

1. I am attorney of record for Gigi Jordan, defendant herein, and I make this Affirmation in support of her motion to set aside the verdict pursuant to CPL § 330.30, as set forth in the accompanying Notice of Motion.

2. I incorporate by reference herein the Statement of Facts in the accompanying Memorandum of Law, pp. 1 - 9, as if fully set forth herein.  I affirm that those facts are true, based upon both personal

1

knowledge and upon information and belief.  The basis of my

information and belief include the prior representations made by the

prosecution herein and conversations with my client.


WHEREFORE, it is respectfully requested that this Court grant the

relief requested in the accompanying Notice of Motion.


Respectfully submitted,


/s/ Ronald Kuby

Ronald L. Kuby


Dated:      New York, NY
            January 21, 2015