Exhibit D

TO BE ARGUED BY:
MARC FERNICH, ESQ.

# Supreme Court of the State of New York
# Appellate Division: First Department



PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Respondent,*

-against-

GIGI JORDAN,

*Defendant-Appellant.*

## BRIEF ON BEHALF OF
## DEFENDANT-APPELLANT

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
810 Seventh Avenue, Suite 620
New York, New York 10019
(212) 446-2346
maf@fernichlaw.com
-AND-
LAW OFFICE OF ALLAN L. BRENNER
536 West Penn Street, 2nd Floor
Long Beach, New York 11561
(516) 897-6145
brennerlawlb@gmail.com

*Attorneys for Defendant-Appellant*

Supreme Court, New York County, Indictment  No. 621/10

DICK BAILEY SERVICE  (212) 608-7666  (718) 522-4363  (516) 222-2470  (914) 682-0848  Fax: (718) 522-4024
1-800-531-2028 - Email: appeals@dickbailey.com -Website: www.dickbailey.com

**[Reproduced on Recycled Paper]**

# **TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ........................................................................ v

QUESTIONS PRESENTED ........................................................................ 1

STATEMENT OF THE FACTS ................................................................. 3

  A. PRETRIAL PROCEEDINGS .............................................................. 3

  B. TRIAL ............................................................................................... 4

    1. Prosecution Case .......................................................................... 4

    (a) Juliane Mabey .............................................................................. 4
    (b) Hector Mirang .............................................................................. 5
    (c) Ivy Chen ....................................................................................... 5
    (d) Caroline Lyons ............................................................................. 5
    (e) Susanna Mills ............................................................................... 6
    (f) Christopher Nguyen ...................................................................... 6
    (g) Brian Mulkern .............................................................................. 7
    (h) Sultan Hall ................................................................................... 7
    (i) Denis Cavalli ................................................................................ 8
    (j) Marina Stajic ................................................................................ 8
    (k) Edward Barbieri ........................................................................... 8
    (l) Monica Smiddy ............................................................................. 8
    (m) Patrick Walsh .............................................................................. 9

    2. Excerpted Defense Case ............................................................... 9

    (a) Werner Spitz ................................................................................. 9
    (b) Sergeant John Crowley ................................................................ 10
    (c) Gigi Jordan .................................................................................. 10
    (d) Simon Ruvalcaba ........................................................................ 11
    (e) Carol Crow .................................................................................. 12
    (f) Sandra Hernandez ........................................................................ 13
    (g) Zhongxue Hua ............................................................................. 13
    (h) Sean Smith .................................................................................. 14

3. Verdict ........................................................................... 14

C. SENTENCING ............................................................... 14

ARGUMENT ......................................................................... 17

POINT I
THE TRIAL COURT INFRINGED JORDAN'S RIGHT TO
PRESENT A DEFENSE, VIOLATING THE FIFTH, SIXTH
AND FOURTEENTH AMENDMENTS, BY WRONGLY
EXCLUDING PIVOTAL STATE OF MIND EVIDENCE
AND REFUSING TO INSTRUCT THE JURY ON DURESS ................... 17

A. GUIDING LEGAL PRINCIPLES ....................................... 18

B. THE TRIAL COURT VIOLATED DUE PROCESS BY
SUPPRESSING THE FACTUAL PREDICATE FOR JORDAN'S
ATTEMPTED DURESS DEFENSE, WARRANTING A NEW TRIAL . 19

1. Evidence Regarding "Autism" and Trauma ........................................ 20

2. Evidence Regarding Jude's Ability to Communicate His Fears
and Victimization.................................................................... 22

3. Evidence Regarding Mirra's Mob Ties and Financial Fraud............. 26
    (a) Mirra's Mafia Connections.............................................. 26
    (b) Mirra's Financial Malfeasance As Motive...................................... 35

4. Law and Application.............................................................. 36

C. ALTERNATIVELY, DESPITE THE TRIAL COURT'S
EXCLUSIONARY RULINGS, THE PROOF AT TRIAL
SUFFICED TO REQUIRE A CHARGE ON DURESS........................... 38

1. Tzekov's Abuse of Jude ..................................................... 38
2. Mirra's Threats ................................................................. 42
3. Law and Application............................................................ 47

POINT II
THE TRIAL COURT'S IMPROPER COURTROOM
CLOSURE AND RECORD SEALING WAS PER SE
REVERSIBLE ERROR ................................................................ 52

A. BACKGROUND ................................................................ 52

B. CLOSING THE COURTROOM DURING SUBSTANTIVE
MIDTRIAL PROCEEDINGS, WITHOUT PRIOR RECORD
FINDINGS AND FOR DEMONSTRABLY INSUFFICIENT
REASONS, WAS PER SE REVERSIBLE ERROR ................................ 59

1. The Closure Order Contravened Waller's Compulsory
Procedure by Summarily Ejecting Spectators without
Contemporaneous Record Findings ........................................ 60

(a) No Findings Supporting Closure or Consideration
of Alternatives ........................................................ 61

(b) The Public Access Right Inescapably Attached to a
Midtrial Judicial Inquiry into Alleged Misconduct Involving
A Website Ascribed to the Accused ................................ 63

(c) There Is No Operative or Tenable Triviality Exception to
Waller's Automatic Reversal Rule, and the Closure Here
Was Not Trivial Even Presuming One ............................ 69

C. CONCLUSION ................................................................ 75

POINT III
JORDAN'S 18-YEAR SENTENCE SHOULD BE VACATED
BECAUSE IT WAS BASED ONILLEGITIMATE FACTORS ................ 76

A. THE SENTENCING COURT ABUSED ITS DISCRETION ............ 77

1. The Trial Court Improperly Relied on Acquitted Conduct ........ 77

(a) Abuse of Jude Mirra ................................................ 78

(b) Origin of Text Messages ................................................................. 79

(c) Raymond Mirra's Violent Threats.................................................. 80

(d) Jordan's Suicide Attempt ............................................................... 81

2. The Trial Court Impermissibly Punished Jordan for
Protected First Amendment Activity...................................................... 83

B. CONCLUSION ..................................................................................... 84

CONCLUSION .............................................................................................. 85

# <u>TABLE OF AUTHORITIES</u>

*Page(s)*

***Cases***:

ABC, Inc. v. Stewart, 360 F.3d 90, 99-100 (2004) ...................................... 75

Barrows v. U.S., 15 A.3d 673, 679 (D.C. 2011) ........................................... 64

California v. Trombetta, 467 U.S. 479, 485 (1984)...................................... 17

Cf. People v. Carr, 25 N.Y.3d 105, 113 (2015)........................................... 66

Cf. People v. Hudy, 73 N.Y.2d 40, 56 (1988) .............................................. 71

Chambers v. Mississippi, 410 U.S. 284, 294 (1973) .................................... 18

Com. v. Patry, 722 N.E.2d 979, 983 (Mass. App. Ct. 2000)........................ 64

Com. v. Riley, 15 N.E.3d 1165, 1170 (Mass. App. Ct.).............................. 69

Compare People v. Guevara, 135 A.D.2d 566, 567-68 (AD2 1987) ........... 61

Contra People v. Stewart, 57 A.D.2d 796 (AD1 1977)............................... 76

Crane v. Kentucky, 476 U.S. 683, 690 (1986) ............................................. 17

Dawson v. Del., 503 U.S. 159, 165 (1992)................................................... 83

Gibbons v. Savage, 555 F.3d 112, 120 (CA2 2009).................................... 69

Gilmore v. Henderson, 825 F.2d 663 (1987)................................................ 33

Guillry v. State, 856 S.W.2d 477, 478 (Tex. Ct. App. 1993) ...................... 66

Guzman v. Scully, 80 F.3d 772, 776 (CA2 1996) ....................................... 61

In re Oliver, 333 U.S. 257, 270 (1948).............................................. 67-68, 75

Jaramillo v. Artus,
  No. 9:12-cv- 01657-JKS, 2014 WL 2986926, at *16-*17
  (N.D.N.Y. July 2, 2014).......................................................................... 66

NBC Subsid. (KNBC-TV), Inc. v. Sup. Ct.,
  980 P.2d 337, 341 (Cal. 1999)........................................................... passim

Oahu Pubs., 331 P.3d at 485-86 ................................................................. 73

Peterson v. Williams, 85 F.3d 39, 43 (CA2 1996) ...................................... 59

People v. Amato, 99 A.D.2d 495, 496 (AD2 1984) ..................................... 34

People v. Black, 33 A.D.3d 338 (AD1 2006) ............................................... 76

People v. Bruner, 222 A.D.2d 738 (AD3 1995) ........................................... 31

People v. Butts, 72 N.Y.2d 746, 750 (1988) .................................... 18, 38, 51

People v. Cassasa, 49 N.Y.2d 668, 678-79 (1980) ...................................... 77

People v. Ciervo, 123 A.D.2d 393 (AD2 1986) ..................................... 49-50

People v. Corro,
   No. E036175, 2006 WL 226063, at *8 (Cal. Ct. App. Jan. 31, 2006) ....... 65

People v. DeAngelis, 5 A.D.3d 274, 274-75 (AD1 2004) ........................... 70

People v. DeBeer, 3 Misc. 3d 515, 517 (Ont. Cty. Ct. 2004) ...................... 73

People v. DeSarno, 121 A.D.2d 651 (AD2 1986) ........................................ 36

People v. Douglas, 29 A.D.3d 47, 51 (AD1 2006) ...................................... 34

People v. Echevarria, 21 N.Y.3d 1, 11 (2013) ............................................ 59

People v. Farrar, 52 N.Y.2d 302, 305-06, 308 (1981) ................................. 76

People v. Floyd, 21 N.Y.3d 892 (2013) ....................................................... 70

People v. Gibian, 76 A.D.3d 583, 585 (AD2 2010) ..................................... 31

People v. Gilmore, 66 N.Y.2d 863 (1985) ................................................... 32

People v. Goetz, 68 N.Y.2d 96 (1986) ................................................... 34, 36

People v. Grant, 191 A.D.2d 297 (AD1 1993) ............................................ 76

People v. Hassen,
   No. 10CA1480, P.3d , 2013 WL 765692, at *1
   (Colo. Ct. App. April 25, 2013), cert. granted,
   No. 13SC356, 2013 WL 5629841 (Colo. Oct. 15, 2013) .......................... 64

People v. Hudy, 73 N.Y.2d 40, 57 (1988) .................................................... 32

People v. Jaramillo, 97 A.D.3d 1147 (AD4 2012) ...................................... 66

People v. Jones, 47 N.Y.2d 409, 413 (1979) .......................................... 59, 69

People v. Kass, 59 A.D.3d 77, 86-87 (AD2 2008) ....................................... 31

People v. Lane, 112 A.D.2d 247, 248 (AD2 1985) ...................................... 34

People v. Loria, 190 A.D.2d 1006, 1006-07 (AD4 1993) ............................ 31

People v. Martin, 16 N.Y.3d 607, 612-13 (2011) ......................................... 60

People v. Matthews, 16 A.D.3d 135, 137 (AD1 2005) ................................ 31

People v. Maula, 163 A.D.2d 180 (AD1 1990) ............................................ 76

People v. McLeod, 122 A.D.3d 16, 19 (AD1 2014) ..................................... 18

People v. Miller, 39 N.Y.2d 543, 552 (1976) ................................................ 34

People v. Minor, 69 N.Y.2d 779, 780 (1987) ................................................ 31

People v. Moise, 110 A.D.3d 49, 54 (AD1 2013) ........................................ 74

People v. Olivero, 289 A.D.2d 1082, 1083 (AD4 2001) .............................. 65

People v. Padgett, 60 N.Y.2d 142, 144-45 (1985) ........................................ 42

People v. Peterson, 81 N.Y.2d 824, 825 (1993) ........................................... 70

People v. Petty, 7 N.Y.3d 277, 284 (2006) .................................................... 42

People v. Robinson, 89 N.Y.2d 648, 653 (1997) .......................................... 18

People v. Rosa, 153 A.D.2d 257 (1990) ........................................................ 32

People v. Sprowal, 84 N.Y.2d 113, 118 (1994) ............................................ 66

People v. Tolentino, 90 N.Y.2d 867, 869 (1997) ......................................... 61

People v. Torres, 128 Misc.2d 129 (Sup.Ct. Bronx Co. 1985) ................... 49

People v. Varlack, 259 A.D.2d 392, 394 (AD1 1999) ........................... 76, 78

People v. Watts, 57 N.Y.2d 299, 301 (1982) ................................................ 19

People v. Wesley, 76 N.Y.2d 555, 559 (1990) .............................................. 34

People v. Wilkonson, 281 A.D.2d 373, 374-75 (AD1 2001) ...................... 76

People v. Wolcott, 27 A.D.3d 774 (AD3 2006) ........................................... 50

Presley v. Ga., 558 U.S. 209, 213 (2010) ..................................................... 60

Richmond Newspapers v. Va., 448 U.S. 555 (1980) ........................ 65-66, 75

Rovinsky v. McKaskle, 722 F.2d 197, 201 (CA5 1984) ................. 65, 68, 72

Sirratt v. State, 398 S.W.2d 63, 67 (Ark. 1966) ........................................... 64

State v. Easterling, 137 P.3d 825, 831 n.11 (Wash. 2006) ........................... 64

State v. Lawrence, 167 N.W.2d 912, 915 (Iowa 1969) ................................. 64

State v. Leyerle, 242 P.3d 921, 925 (Wash. Ct. App. 2010) ........................ 64

State v. Ortiz, 981 P.2d 1127, 1138-39 (Hawaii 1999) ................................ 61

State v. Romano, 355 N.J. Super. 21, 35 (2002) .......................................... 48

State v. Sublett, 292 P.3d 715, 735 (Wash. 2012) ................................ *passim*

State v. Tapson, 41 P.3d 305, 309 (Mont. 2001) .......................................... 64

State v. Toscano, 74 N.J. 421, 440 (1977) .................................................... 48

U.S. v. Alcantara, 396 F.3d 189 (CA2 2005) ........................................ 66, 75

U.S. v. Bucci, 662 F.3d 18, 22 (CA1 2011) ................................................. 64

U.S. v. Carmichael,
  326 F. Supp. 2d 1267, 1270, 1272, 1290, 1302 (M.D. Ala.) ..................... 62

U.S. v. Contento-Pachon, 723 F.2d 691, 694 (CA9 1984) ........................... 50

U.S. v. Dove, 916 F.2d 41, 49(CA2 1990) ................................................... 19

U.S. v. Gomez, 92 F.3d 770, 777 (CA9 1996) ............................................. 50

U.S. v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006) .................................... 71

U.S. v. Gupta, 699 F.3d 682 (CA2 2012) ............................................. *passim*

U.S. v. Norris, 780 F.2d 1207, 1210 (CA5 1986) ....................................... 66

U.S. v. Saldana,
  No. CRIM. 2009-32, 2010 WL 2991039, at *4 (D. V.I. July 25, 2010) .... 64

U.S. v. Sorrentino, 175 F.2d 721, 722 (CA3 1949) ...................................... 64

U.S. v. Stewart, 686 F.3d 156, 166 (CA2 2012) ......................................... 83

Waller v. Georgia, 467 U.S. 39 (1984) ................................................. *passim*

Walton v. Briley, 361 F.3d 431, 433 (CA7 2004) ....................................... 60

Washington v. Texas, 388 U.S. 14, 19 (1967) .............................................. 18

*Statutes/Regulations and Misc*.:

Art. I, § 6 of the State Constitution ................................................. 18

Fifth, Sixth and Fourteenth amendments ....................................... 18

CPL § 470.15(6) ............................................................................. 77

Model Penal Code § 2.09 ............................................................... 48

Penal Law § 1.05 ............................................................................ 76

Penal Law § 40.00(1) ............................................................. *passim*

Penal Law § 125.25(1) ..................................................................... 3

Penal Law § 125.25(1)(a) .............................................................. 47

Wayne R. LaFave, Herold H. Israel,
 Nancy J. King, 5 Crim Proc. § 24.1(a) (2d ed. 1999) ................. 64

## QUESTIONS PRESENTED

1.    A jury acquitted the defendant of murder but convicted her of manslaughter, finding that she acted under extreme emotional distress in killing her young son and simultaneously attempting suicide. Did the trial judge deny the defendant due process by precluding her from pursuing the related defense of duress, whose elements substantially resemble those of EED, involved a similar factual predicate and would have demanded outright acquittal – not mere mitigation – if likewise accepted by the jury?

In precluding the proffered defense, the trial court (a) refused a requested jury instruction on duress that the record evidence amply supported and (b) excluded substantial additional evidence that would have enabled counsel to argue duress to the jury and unequivocally entitled the defendant to a charge on the issue.

2.    The Sixth Amendment and its New York counterpart guarantee the accused a public trial, a right that extends throughout the trial's entirety. Did the trial judge abridge this right by summarily closing the courtroom and categorically excluding spectators and reporters for the duration of a substantive midtrial inquiry – factual and legal in nature – as to the content and source of a website critical of the trial's conduct that the prosecutor attributed to the defendant, a matter of vital public concern?

Though he had not imposed a gag order on trial participants, the judge took these precipitous measures without making advance record findings of necessity or considering less drastic alternatives – structural defects and mode of proceedings errors compelling automatic reversal of the defendant's conviction, without a showing of prejudice or review for harmlessness.

3.     Did the trial court impose an excessive and unfair 18-year sentence predicated on (a) conduct of which the jury acquitted the defendant in accepting her EED defense and (b) a claimed absence of evidence that the court itself prevented the defendant from introducing in precluding her duress defense?

## STATEMENT OF THE FACTS

**A.    PRETRIAL PROCEEDINGS**

A February 8, 2010 indictment charged Jordan with a single count of second degree murder (P.L. § 125.25(1)). Despite evidence that Jordan had intended to take her own life and that of her son Jude Mira, prosecutors submitted no lesser-included offenses to the grand jury (A. 118).

From the outset, Jordan predicated her defense on two interwoven factual elements: her December 2007 discovery that Jude had been sexually abused by his biological father, Emil Tzekov, and a series of escalating death threats she received from her ex-husband, Raymond Mirra. In numerous pretrial submissions, Jordan professed her belief – objectively reasonable in the circumstances confronting her – that death was the only way she and Jude could escape the danger Mirra and Tzekov posed.

In January 2014, nine months before trial, the prosecution moved to preclude "state-of-mind evidence" supporting justification (self-defense and necessity under Penal Law Article 35) and duress defenses (A. 136-7). While barring evidence or argument relating to justification, the trial court, by order dated May 29, 2014, declined to foreclose a defense sounding in duress (A. 187).

3

**B.     TRIAL**

**1.     Prosecution Case**

Most of the prosecution's 23 witnesses testified to events immediately preceding and following Jude's death. Salient excerpts are summarized here.

**(a)     Juliane Mabey**

A teacher at New York's Studio School, Mabey met Jordan and Jude in September 2009, proffering that Jordan sought the best educational environment for Jude, who suffered from "speech dyspraxia," a neurological inability to speak (A. 957, 961, 1008).

Mabey testified that after Jude's enrollment, Jordan revealed that she had been working with Jude on communicating through a Blackberry. Jordan helped Jude type on the Blackberry by holding the device in one hand and using her free hand to assist Jude with the keyboard, a process Mabey's school superiors called "facilitated communication" (A. 978-9, 1005).[1] Jordan gave Mabey a Blackberry so she could communicate with Jude directly at school (A. 980, 1006).

Jordan told Mabey that Jude had endured sexual trauma, and Mabey acknowledged that his withdrawal, periodic disengagement and verbal difficulties

---

[1] Upon cross-examination, Mabey admitted that she was aware of Jude's communicating by use of a Blackberry prior to his acceptance and attendance at the school (A. 1002-03).

could indicate sex abuse (A. 989, 993, 1008). On discussing the abuse with Jude, Mabey told investigators, he had written "people hurt me" and recounted "someone sticking something up my penis" (A. 997-98).

### (b)   Hector Mirang

Mirang, a waiter at Manhattan's Peninsula Hotel, delivered food to Room 1603 sometime in the evening of February 3, 2010 (A. 1089, 1097).

### (c)   Ivy Chen

Chen, a Peninsula page, retrieved two envelopes from Jordan – addressed to the Red Cross and Doctors without Borders – around 7:30 pm on February 4 (A. 1103, 1109, 1114, 1118-19). Chen guessed that they contained checks (A. 1119) (correctly, as the evidence would reveal).[2] Chen picked up the envelopes at Room 1603. Jordan, appearing sober, asked her to send them certified mail from the post office at 46th and Lexington. (A. 1109-10, 1116).

### (d)   Caroline Lyons

Lyons, a maid, tried to enter Room 1603 after 10 am on February 4, but a robed woman answered the door and told her to come back another time (A. 1214). Lyons later noticed a "Do Not Disturb" sign on the door, still there the next

---

[2] *See generally* A. 2731-32.

morning when she heard – while cleaning the adjacent room – an eight-minute sound in Room 1603 like someone "moving around boxes" (A. 1218).

### (e)    Susanna Mills

Mills, the General Manager at Trump Tower where Jordan lived, was alerted to a situation around 8 am on February 5, 2010 (A. 1277). She ascertained that Jordan was staying at the Peninsula and told police, who had arrived at Trump between 10 and 11 (A. 1278, 1282).

While initially attesting to Jordan's disposition as demanding, when confronted on cross-examination with notes of her reports about Jordan to the prosecution, that Mills had described Jordan as "quiet," "generally nice" and "only abrupt or curt when Jude was sick," she corroborated such reports (A. 1286-87).

Jordan had advised Mills that items had been taken from her apartment, including a cell phone and jewelry, within 10 days of February 5, requesting installation of an additional security system (A. 1344, 1346).

### (f)    Christopher Nguyen

Around 11:45 on February 5, Mills called Nguyen, Peninsula's security director, to say police were coming to check on a guest (A. 1396, 1398).

Just before noon, Nguyen and four officers entered Room 1603, clearing away a chair that had been pushed against the door. In the dimly lit interior,

Nguyen saw a boy in the bed and Ms. Jordan "sitting on the floor," apparently unconscious (A. 1400, 1408, 1411, 1452). Finding Jordan unresponsive, Nguyen called an ambulance (*id*.).

### (g)   Brian Mulkern

Mulkern was among the police officers accompanying Nguyen into Room 1603 (A. 1475, 1477). He saw Jude, apparently deceased, on the bed and Jordan lying on the floor (A. 1478). Mulkern thought Jordan's eyes were open but she seemed very lethargic (A. 1480). He found a quantity of white pills on the floor in front of her (A. 1482).

### (h)   Sultan Hall

Hall, a responding paramedic, found Jordan on the floor of Room 1603, checked her vital signs and asked her questions that she answered. Though disheveled and confused, Jordan continued to talk to him as she was loaded into an ambulance and taken to a hospital (A. 1557-58). According to Hall, she toggled between lucidity and incoherence, saying she "need[ed] an attorney" and had swallowed a lot of pills trying to kill herself (A. 1614, 1628, 1633). Hall's incident report described Jordan as being in "an altered state of consciousness" due to a "drug overdose." (A. 1579, 1585)

### (i)   Denis Cavalli

Cavalli, a medical investigator, examined Jude's body at 3:30 pm on February 5 and opined that he died about 12 hours earlier (A. 1708).

### (j)   Marina Stajic

Stajic, a forensic toxicologist, testified that Jude's blood contained ethanol, Fluoxetine (antidepressant), Diphenhydramine (antihistamine), Hydrocodone (pain reducer), Alprazolam (anxiety reliever) and Acetaminophen (A. 1758).

### (k)   Edward Barbieri

Barbieri, another forensic toxicologist, testified that Jude's blood contained a potentially lethal cocktail of Acetaminophen, Acetazolamide, Xanax, Celecoxib, Clonidine, Fluoxetine and Zolpidem (A. 1857-65, 1872).

### (l)   Monica Smiddy

Based on Jude's autopsy and toxicology report, Dr. Smiddy opined that he died of acute intoxication from a combination of ethanol and pharmaceutical drugs (A. 1960). Though she claimed there were no obvious physical signs of sex abuse, she reported anal reddening and dilatation potentially indicative of penetration in the autopsy report (A. 1952-53). Ordering a "rape kit," Dr. Smiddy collected a tissue sample and created a microscopic slide of Jude's anal tissue and bowel wall (A. 2035-39).

### (m)   Patrick Walsh

Walsh, a financial advisor at Merrill Lynch, received a wire transfer authorization early on the morning of February 5, 2010 – purportedly from Jordan – instructing him to wire $125,000 from Jude's trust account to Bruce Kolleda, a Mirra business associate (A. 2126, 2140, 2144). Walsh admitted the wire transfer authorization was forged by Kolleda. (A. 2158). Walsh admitted that he knows now that Jordan could not have signed or sent the wire transfer authorization, but insisted he thought it was genuine at the time (*id.*).[3]

## 2.   Excerpted Defense Case

### (a)   Werner Spitz

Spitz, a preeminent pathologist, testified that Jude's forensics indicated abnormal anal dilatation. (A. 2430, 2445-46, 2485-86, 2489). Microscopic examination revealed "chronic inflammation" of the anus and bowel wall and "a fairly substantial amount of scar tissue" that was present for some time (A. 2502). This peculiar combination of symptoms – anal dilatation plus chronic inflammation and scarring – was consistent with repeated penetration by an adult penis (A. 2506).

---

[3] A federal lawsuit accuses Walsh, Kolleda, Mirra and others of stealing millions from Jordan and Jude's trust fund transmitted through forged wire authorizations (A. 2149). The trial court excluded the complaint and barred Jordan from eliciting the scheme's details (A. 2177).

### (b)    Sergeant John Crowley

Entering Room 1603 around noon on February 5, Sergeant Crowley heard retching, vomiting and agonized crying (A. 2756). He saw Jordan, looking "haggard" and "exhausted," kneeling on the floor in a nightgown, pills strewn about (A. 2756). She reached for pills and put them in her mouth while screaming uncontrollably (A. 2757, 2759).

When Sergeant Crowley tried to confirm Jordan's identity, she begged, "Please let me die" (A. 2761). Asked if there were any more children, Jordan replied, "I do not want to live" (A. 2762). Asked if Jude was her son, she repeated, "Please let me die" (*Id.*).

Sergeant Crowley believed Jordan was drug-intoxicated due to her white-rimmed lips, "irrational behavior" and "excited delirium" (A. 2766). She was "disconnected" and "unresponsive," with a "thousand-yard stare" (A. 2774).

### (c)    Gigi Jordan

Jordan's testimony is detailed in Points I and III, post. But its opening attributions introduced what followed:

> Q Ms. Jordan, on that date, those dates, at that place, did you give yourself
> and your son an amount of drugs that you believe would take your life and
> his?
> THE WITNESS: Yes, I did.

Q Were there events, circumstances, emotions and pressures which brought you to that time to that place to that action?
A Yes, there were.

Q And Ms. Jordan, was Jude Mirra autistic?
A No.

(A. 3196-97).

In brief, Jordan testified about her background and education (A. 3197-3205), her nursing, pharmaceutical and health care experience, and her becoming business partners and personally involved with Mirra (A. 3197-3218). She testified about the end of their romantic relationship, their continuing business partnership and their marriage (A. 3235-3245). Having separated from Mirra, she testified about meeting Emil Tzekov in 2000 and becoming pregnant (A. 3248-3252). Jude was born in 2001 (A. 3252).

Again, the aspects of Jordan's testimony bearing on her successful EED and thwarted duress defenses are elaborated in our Argument.

### (d)    Simon Ruvalcaba

Ruvalcaba, a cable installer, met Jude in Spring 2008 while working at Jordan's Lake Tahoe home (A. 4171).

Jude came to develop a bond with Ruvalcaba who visited him on occasion (A. 4174). While discussing a possible movie trip, Jude typed on a Blackberry, "I hate my dad" (A. 4178). Ruvalcaba saw Jude's fingers manipulating the keys,

Jordan holding the device with one hand and supporting his forearm with the other (A. 4180).

During a second visit soon afterward, Jude typed again that he hated his dad – that his dad had come into the room, told him to be quiet and "stuck it in or put it in or something like that" (A. 4184-85). Ruvalcaba reassured Jude telling him that he was a boxer and would "beat him [Tzekov] up" if he showed up (A. 4185).

At Ruvalcaba's last meeting with Jude, he typed that he was afraid and that in his dreams "his dad is chasing him, and wants to kill him" (A. 4190).

### (e)    Carol Crow

Crow, a certified trauma therapist specializing in EMDR (Eye Movement Desensitization and Reprocessing), began treating Jude in October 2008 (A. 4207). Jude communicated with her through facilitated Blackberry typing (A. 4218). "Jude chose letters on the Blackberry, his mother held his arm to stabilize [it], and he chose characters . . . which came up with words" (A. 4218).

Crow diagnosed Jude with Dissociative Identity Disorder, a condition recognized in the DSM-IV (A. 4213). Jude described being raped, forced to eat feces and having needles placed in his fingers and toes, relating that he was scared Tzekov would kill him (A. 4230-34). Crow believed Jude, and no one else, was communicating with her (A. 4238-39).

### (f)   Sandra Hernandez

Ms. Hernandez testified that she met Gigi Jordan and Jude through her mother, who had been Jordan's housekeeper in California (A. 4319). Thereafter, Hernandez also worked for Jordan coming to New York in the summer of 2009 to help take care of Jude (A. 4325). Hernandez testified that Jude would communicate by typing on a Blackberry (A. 4324).  According to Hernandez, Jordan would hold the Blackberry and while Jude placed his fingers on the letters, Jordan would hold his forearm to assist him (A. 4324-25). Hernandez testified that she would ask Jude a question, and he would run and grab the Blackberry to give to Jordan so he could respond (A. 4336).

Hernandez described the relationship between Jordan and Jude as "loving" and "caring;" she testified that Jordan was very protective of him (A. 4326).

### (g)   Zhongxue Hua

Hua, a former chief medical examiner in New Jersey, reviewed forensics from Jude's autopsy. An anal slide revealed deep fibrosis (scar tissue), suggesting an old anal sphincter injury (A. 4426-29). Autopsy photos showed unusually "significant dilation" of the anus area indicating – in conjunction with the scarring's depth, degree and distribution – "repeated" trauma to Jude's anus "not consistent with post-mortem dilatation" (A. 4431-34, 4456). According to Dr. Hua,

the distribution of the scarring to the muscle layers evinced "repeated" events of trauma to the anus (A. 4456).[4]

### (h)    Sean Smith

Among the police forcibly entering Room 1603 on February 5, Officer Smith told dispatch, in a recorded conversation, that the occupants were "DOA" (Jude), "barely alive" and "not DOA yet" [Jordan] (A. 4623-26). Smith also claimed that Jordan whispered a request for a lawyer when asked if she was ok, but he reported nothing of the kind on tape (A. 4632, 4638). Officer Smith described Jordan as drugged, listless and semi-conscious (A. 4632).

### 3.    <u>Verdict</u>

After days of deliberation, the jury acquitted Jordan of second degree murder, convicting her instead of first degree manslaughter based on the affirmative defense of EED (A. 5655).[5]

## C.    <u>SENTENCING</u>

Over strenuous objection, the prosecution relitigated – and the trial court revisited – at sentencing many of the key issues the jury resolved in Jordan's favor

---

[4] Notably, the prosecution did not proffer rebuttal testimony to Doctors Spitz and Hua's expert testimony regarding their findings.

[5] The prosecution called four rebuttal witnesses, severely discredited on cross-examination (A. 4834, 4970, 5021, 5078).

by acquitting her of murder, accepting her EED defense and convicting her only of manslaughter. As discussed in POINT III, this was nothing less than an illicit attempt to impeach the verdict collaterally.

Most striking, the prosecutor bombarded the court before sentencing with reams of emails, screenshots, and financial and medical records not introduced at trial in an effort to suggest that there was no "evidence whatsoever of sex abuse," repositing that Jordan had committed a cold, calculated murder. Arguing that the verdict foreclosed these claims, Jordan protested that it was unfair to now allow a proffer of evidence she had largely been precluded from introducing at trial, or otherwise countering or contextualizing with testimony from treating and non-treating experts alike. This was especially so in the absence of an evidentiary hearing. (A. 56-57, 63, 70, 5764, 5769, 5774-78, 5781; POINT I, post.)

The May 28, 2015 sentencing proceeding confirmed the defense's presage: that the court and prosecutor were bent on retrying the murder case the People had already lost. Summarily denying the hearing request and imposing a determinate 18-year sentence, the court blasted the EED defense and cast aside nearly all of the jury's core findings, replacing them with its own subjective view of the record. Worse, as amplified in POINT III, it did so chiefly by pointing to purported failures of defense proof that the court itself had affirmatively excluded. Among

15

the central propositions, embraced by the jury, for which the court found "no credible evidence": (1) Jude had been sexually abused, or at least Jordan reasonably believed he was; (2) Jude was not autistic, or at least Jordan reasonably believed he wasn't; (3) Jude described the abuse in writing via his typed communications; (4) Mirra forged documents, looted Jordan's assets and threatened to kill her; and (5) Jordan had attempted suicide (A. 105-11).

## ARGUMENT

## POINT I

### THE TRIAL COURT INFRINGED JORDAN'S RIGHT TO PRESENT A DEFENSE, VIOLATING THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS, BY WRONGLY EXCLUDING PIVOTAL STATE OF MIND EVIDENCE AND REFUSING TO INSTRUCT THE JURY ON DURESS

The affirmative defense of duress, integral to Jordan's trial strategy, shared a common factual nucleus with her successful claim of extreme emotional disturbance ("EED"). Both defenses hinged on Jordan's subjective belief – objectively reasonable from the perspective of one similarly situated – that when her ex-husband Raymond A. Mirra Jr. made good on his threats to kill her, nothing would keep her son Jude from suffering ruinous physical and sexual abuse at the hands of his biological father, Emil Tzekov.

Yet the court below, having denied prosecutors' *in limine* motion to preclude a duress defense, reversed course at trial, excluding evidence that further substantiated the factual and legal nexus between Jordan's conduct and the threat she and her son faced from Mirra and Tzekov. Stifling this evidence essentially stripped Jordan of a "meaningful opportunity to present a complete defense," necessitating a new trial. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)).

17

A second error, refusing a requested jury instruction on duress, provides a separate but related ground for remand. Despite the exclusionary rulings that hamstrung the defense, "a reasonable view of the [admitted] evidence" sufficed to allow a finding of duress, entitling Jordan to a charge on the theory. *People v. Butts*, 72 N.Y.2d 746, 750 (1988).

## A.   <u>GUIDING LEGAL PRINCIPLES</u>

The due process right to mount a defense is a "minimum essential[]" of a fair trial. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973). The Fifth, Sixth and Fourteenth amendments and their New York counterpart – Art. I, § 6 of the State Constitution – entitle the accused to present evidence supporting "[her] version of the facts," *People v. Robinson*, 89 N.Y.2d 648, 653 (1997) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)), and to have the jury instructed on "all claimed defenses . . . supported by a reasonable view of the evidence." *Butts*, 72 N.Y.2d at 750. *See generally People v. McLeod*, 122 A.D.3d 16, 19 (AD1 2014) (trial court discretion to admit or exclude evidence "circumscribed by the defendant's constitutional right to present a defense").

These prerogatives transcend and trump the trial judge's assessment of witness credibility or the relative strength of competing inferences. Indeed, it is beyond cavil that a "criminal defendant is entitled to instructions relating to [her] theory of defense, for which there is some foundation in the proof, *no matter how*

18

*tenuous that defense may appear to the trial court*." *U.S. v. Dove*, 916 F.2d 41, 49 (CA2 1990) (emphasis supplied); *accord Butts*, 72 N.Y.2d at 750 (court must view evidence "in the light most favorable to the defendant" in determining appropriateness of theory of defense charge); *People v. Watts*, 57 N.Y.2d 299, 301 (1982) ("When evidence at trial, viewed in the light most favorable to the accused, sufficiently supports a claimed defense, the court should instruct the jury as to the defense, and *must* do so when so requested.") (emphasis supplied).

**B.**   **THE   TRIAL   COURT   VIOLATED   DUE   PROCESS   BY SUPPRESSING   THE   FACTUAL   PREDICATE   FOR   JORDAN'S ATTEMPTED DURESS DEFENSE, WARRANTING A NEW TRIAL**

Owing to a batch of thinly-reasoned evidentiary rulings by the trial court, the defense struggled to put more than a bare framework of its duress theory before the jury. The admitted evidence – consisting largely but not exclusively of Jordan's own testimony – demonstrated her belief that Mirra and his associates would murder her at any moment, delivering Jude into the grasp of his sexually abusive father, Tzekov. In a stark retreat from its pretrial decision denying the prosecution's motion to preclude a duress defense, however, the court excluded the lion's share of evidence that corroborated and legitimized this core belief.

The court's rulings hobbled Jordan's effort to establish duress, which requires that defendant harbor a *subjective* fear of her tormentor that is *objectively*

reasonable to someone in her shoes. *See* **SUBPOINT I(B)(4)**, *post*. Since the prohibited evidence was central to the claim, its ouster constitutes reversible error.

### 1.    <u>Evidence Regarding "Autism" and Trauma</u>

The prosecution argued that Jordan's conduct sprung from frustration with her inability to "cure" Jude of "autism," rather than a genuine belief that Jude's loss of speech, monumentally-elevated norepinephrine (stress hormone) levels and developmental regression were caused or substantially exacerbated by the sexual and physical abuse he endured. In response, the defense proffered a battery of treating physicians and medical experts to testify that Jude's symptoms bespoke severe trauma.

The trial court rebuffed a defense bid to call Dr. Josephine Elia, a pediatric specialist, to explain why her examination and treatment of Jude had not included physical tests for sexual abuse (A. 4094-4103, 4788-92). The defense proffered that Dr. Elia's testimony would also have confirmed for the jury that the treatment she successfully offered to Jude undermined a diagnosis of autism (A. 4094-4103). Inexplicably, the court branded Dr. Elia's testimony irrelevant, even as it continued to hold up a lack of findings regarding sexual abuse in her medical records as a basis to conclude that the abuse had not occurred (*Id.*).

Further, the defense attempted to call Dr. Dirk Dhossche, the foremost expert on trauma-induced neuropsychiatric conditions in children, who diagnosed Jude as suffering from catatonia, a trauma-induced condition (A.4075-79, 4246-51, 4761-69). If permitted to testify, Dr. Dhossche would have described both the condition's manifestations and the treatment Jude received for it. (*Id.*) He also would have explained the degree to which catatonia and other trauma-induced conditions mimic autism. (*Id.*) The trial court deemed Dr. Dhossche's testimony irrelevant (A. 4079).

Finally, the court blocked the defense from calling Dr. Bessel van der Kolk, a leading authority on the developmental and physiologic effects of early childhood trauma (A. 4804). Dr. van der Kolk would have tendered expert testimony that Jude's extreme stress hormone elevations and unusual developmental abnormalities matched those of a child repeatedly subjected to severe trauma (A. 4782-87, 4792-93).

Collectively, the doctors' testimony would have explained any absence of abuse findings in Jude's early medical records and established that Jude's perplexing symptoms and unusual treatment responses were consistent with prolonged sexual trauma, not autism. In turn, that confirmation would have rendered Jordan's fear that Mirra would carry out his threats to kill her and send

21

Jude back to Tzekov – the trauma's author – objectively and subjectively reasonable in the circumstances presented, potently supporting her claim of duress. Penal Law § 40.00(1) (defendant compelled to commit crime by threat of imminent force that one of "reasonable firmness" in her "situation would have been unable to resist").[6]

### 2. Evidence Regarding Jude's Ability to Communicate His Fears and Victimization

The trial court also barred evidence supporting Jordan's contention that Jude had authored messages describing Tzekov's abuse (A. 4781-82, 4827).[7] As firsthand accounts of his father's predations, Jude's messages were instrumental to the defense case. They also drew sustained attacks and derision from the prosecution.

---

[6] Far from irrelevant, the nature and origin of Jude's condition was a hotly contested issue – to the point that the court itself plowed into the debate at sentencing, offering its own uninformed opinion in place of and contradicting the very expert testimony it had excluded. At sentencing, the court repeatedly capitalized on its preclusive rulings, highlighting the absence of the very evidence it prevented the defense from introducing at trial, *see* **SUBPOINT III(A)**, *post.* With regard to the proof of abuse, the court opined:

> She said she didn't want Jude to be "raped and tortured" any longer. She said this over and over again. This is what she believed. But the problem here is, *and it is a big problem*. There is no credible evidence on this record anywhere that Jude was ever, ever in his entire life the victim of sexual torture, or for that matter, sexual abuse of any kind. I will repeat that. No evidence at all (A. 105-06) (*emphasis added*).

[7] Ironically, as we shall see, the courts own skepticism of this claim informed its denial of a duress charge and imposition of an excessive sentence (A. 107-08, 5231).

The prosecutor's approach to this evidence piled inference upon innuendo, simultaneously attacking the messages' authenticity and blighting Jordan's credibility. Through cross-examination and summation, he ridiculed the notion that Jude was capable of composing the texts the defense had introduced, insinuating that Jordan must have written them herself to fabricate a narrative of abuse (A. 3929, 3934, 5773-78).

In response, the defense sought to call Darlene Hanson, a speech therapist with 25 years' experience in the use of handheld communication devices by autistic or otherwise nonverbal children (A. 4770-81, 4809-27, 5669-70). As defense counsel proffered, Hanson would have testified that the use of these devices opens genuine communication channels for such children, but many lack sufficient motor skills to operate the devices on their own, requiring assistance to do so (A. 4771). This method of communication, defense counsel continued, was beyond the jury's ken and warranted expert explanation (A. 4773, 5669-70). Hanson's testimony would have supplied it, dispelling any suggestion that the messages were written or otherwise instigated by Jordan. Of equal importance, Hanson also would have explained that autistic or otherwise non-verbal children can generally function at much higher intellectual levels than is outwardly apparent (A. 4810-14, 4823-25, 5669).

23

The court precluded Hanson from taking the stand, dismissing her testimony as unnecessary:

> I don't think any of these witnesses testified that they saw Ms. Jordan typing on the Blackberry with Jude… I mean, I was sitting here and I never heard anyone testify that the defendant was typing instead of him…There is no evidence of it.

(A. 4474-77).

Yet the court itself had said much the opposite the day before:

> Let me cut through all this. *The issue in the case is, is Ms. Jordan doing the typing or is Jude doing the typing. Anything relevant on that issue should be before the jury.*

(A. 4501, emphasis added).

Having seen the court flip-flop, the prosecutor duly fell in line, disclaiming any assertion that the messages were shams (A. 4771, 4774, 4777-78).

Nonetheless, the prosecutor went on to mock the idea that Jude had typed the messages – in both crossing Jordan and summing up – going so far as to remark, "If my 14 year old could do that I would be thrilled" (A. 3929, 3934, 5773-78).

More fundamentally, the right to call witnesses extends beyond rebutting overt prosecution arguments and entitles the defense to address any inference a juror might reasonably draw from the facts developed at trial. As defense counsel urged:

24

MR. BRENNER: I don't know what he is going to say. He is going to say what he is going to say about the typing. Whether it is her, the man on the moon, or [Defense Counsel] Ward, it doesn't matter to me. What matters to me is the context of the evidence as we've presented it. And what they have heard is a developmentally disabled child with diminished motor skills who starts to type, and that is not usual, but it may well be outside the ken of the jury, because there was testimony about diminished motor [skills]. There was testimony about diminished hand/eye coordination, the ability to particularize certain items with the hand, but that is not an unusual phenomenon for facilitated communication, but it may well be outside the ken of the jury to understand how someone who is developmentally disabled can be helped to communicate.

(A. 4779-80)

Hanson's testimony would have blunted the prosecution's assault – express and implied – on the integrity of Jude's typed evidence of trauma and the impact of the typed revelations on Jordan's state of mind leading up to the events charged in the indictment. And the jury, as final arbiter of the factual predicate for Jordan's defenses, deserved a full and fair explanation of the circumstances surrounding the typing. Excluding the evidence furnishing one was arbitrary and erroneous, particularly where, to quote the court, the texts' bona fides was the decisive "issue" and "anything relevant" to it should have gone "before the jury."[8]

---

[8] Remarkably, at sentencing the court opined that it did not believe that Jude was capable of authoring the text messages at all (A. 107-08). In so stating, the court contradicted its own articulated rationale for excluding the evidence in the first place.

### 3.    Evidence Regarding Mirra's Mob Ties and Financial Fraud

The trial court also stymied defense attempts to contextualize and legitimate Jordan's fear of Mirra. The court prohibited proof that Mirra (a) was affiliated with organized crime and (b) forged documents to raid Jude's trust fund and fraudulently convert Jordan's assets (A. 2118, 2173-74, 2177, 3513-16, 3519, 3536-42, 4065-66, 4071-72, 4151, 4602, 4758, 4923-24, 5449). This evidence would have shown that Mirra had the motive and propensity to carry out his murderous threats, conclusively substantiating the objective reasonableness of Jordan's deathly fear of Mirra in the eyes of the jury.

### (a)    Mirra's Mafia Connections

Fearful of Mirra's reputed links to the mob, Jordan hired through counsel a prominent investigative firm, Interfor,[9] to examine his activities and those of his associate, Louis Schipani. Interfor prepared a May 1, 2008 Report (Ct. Ex. 10, A. 5666-68) that confirmed Jordan's fears. According to the Report:

> Interfor ha[d] now received confirmation that Raymond Mirra and Louis Schipani [Mirra's

---

[9] Interfor was founded by Juval Aviv, a former member of the Israeli intelligence service (Mossad) and the planner of operation "Wrath of God," popularized in the Stephen Spielberg film *Munich*.

> longtime business associate] are on file with the US
> government as "associates of organized crime."

(A. 5668)

In an amalgam of confused and contradictory "rulings," the court first stated it would permit Jordan to "*testify* to . . . *whatever she knows*" regarding Mirra's mob ties, barring the defense, over its objection, from introducing Interfor's Report itself (A. 3511-14). Having thus ruled, however, the court then precluded Jordan from even making reference to the Report as a predicate for her belief, and ultimately foreclosed her from testifying regarding her own personal knowledge or experiences with Mirra that fueled her belief that he was connected to the mafia (A. 4052, 4072). Defense counsel repeatedly sought to clarify and confirm the court's position:

> THE COURT: So you want to ask her about this?
>
> MR. BRENNER: I want to ask her whether she -- she found this [referencing the Interfor Report], whether she asked her attorney to have this done, was it done, did she receive the report. I mean, she didn't --
>
> THE COURT: It's completely irrelevant.
>
> MR. BRENNER: How is it irrelevant?
>
> THE COURT: Mr. Brenner, let me say this: If you want to present evidence that Ray Mirra is a member of organized crime to the extent that it's relevant, present it. This isn't that. This doesn't link

him to organized crime in any way.[10]

MR. BRENNER: Why would evidence of his involvement in organized crime if I can produce the head of some crime family in Philadelphia and says: Yeah, Ray Mirra is my consigiliro.

THE COURT: Consiglieri.

MR. BRENNER: Right. *If she didn't know that, it wouldn't matter, right?*

THE COURT: *Right.*

MR. BRENNER: So the relevance such as it is --

THE COURT: Right.

MR. BRENNER: -- *is predicated on her knowledge of a given fact and the effect that that knowledge had on her state of mind.*

THE COURT: Let her testify to it.

MR. BRENNER: Testify to?

THE COURT: Let her testify to it.

MR. BRENNER: To what?

THE COURT: *To whatever she knows. Let her say it.* This isn't coming into evidence. You can't talk about this report.

---

[10] Even as the defense correctly argued the "truth of the matter" was an improper standard for introduction of the Interfor Report, it attempted to proffer testimony from Interfor president Aviv to address the sources and reliability of the Report's contents. The trial court refused it out of hand (A. 4602, 4758).

MR. BRENNER: So in theory, if Ms. Jordan says Mirra told me that he was best buddies with –

THE COURT: Joey Merlino[11]

MR. BRENNER: Right. And that impacted on [her] state of mind, that would be okay?

THE COURT: I guess if she heard him say it or she saw them together associated, I don't know. But this report you certainly can't ask about… *Whatever she wants to testify about to it.*

(A. 3513-16) (emphasis added).

In the event, however, the court did a dramatic about-face, *excluding* the very testimony it had previously ruled admissible:

MR. BRENNER: Ms. Jordan, did you on February— between February 3rd and February 5, 2010, believe that Raymond A. Mirra, Jr. was affiliated with organized crime?

MS. JORDAN: Yes.

MR. BRENNER:  And the basis for that belief, please tell us.

MR. BOGDANOS:  Objection . . .

THE COURT:  Sustained.

(A. 4052)

---

[11] Convicted Philadelphia crime boss Joey Merlino was identified in defense papers as a Mirra cohort.

Defense counsel protested the trial court's abrupt reversal of its prior ruling and the basis for the trial court's rejection:

> MR. BRENNER: …the Court went on to say, and I quote, let her say it, twice.
>
> THE COURT: Let her say what?
>
> MR. BRENNER: If she was told, if he told her.
>
> THE COURT: If he told her?
>
> MR. BRENNER: Yes.
>
> THE COURT: Ray Mirra told her he's a member of the organized crime?
>
> MR. BRENNER: I don't think he said I'm the Godfather. There are things he said that she would testify to…
>
> THE COURT: I'm not letting it in evidence, number one, and I'm not allowing the question about Ray Mirra being a member of organized crime, *because there is no evidence he is.* You have to have a good faith basis for asking about something.
>
> MR. BRENNER: Except where somebody believes it, whether they have a good faith basis for it or not.

(A. 4064-66) (emphasis added).

Precluding the Interfor report and limiting Jordan's testimony were discrete but related instances of reversible error. Whether or not the Interfor Report proved Mirra's connection to the mob – the question that seemed to preoccupy the court – it was not being offered for its truth. Rather, the Report that Jordan commissioned

and read spoke to her state of mind, enabling the jury to evaluate the objective reasonableness of her reaction to Mirra's threats in light of her *belief* that he was mafia-connected. *See People v. Matthews*, 16 A.D.3d 135, 137 (AD1 2005) ("state of mind [hearsay] exception" permits admission of out-of-court statement if its "mere utterance," irrespective of its "truth, may indicate circumstantially the state of mind of the hearer or of the declarant") (internal quotation marks omitted); *People v. Kass*, 59 A.D.3d 77, 86-87 (AD2 2008) (hearsay claim that informant was a "'very big drug dealer'" admissible for its effect on "defendant's state of mind, the central issue in the case"); *People v. Minor*, 69 N.Y.2d 779, 780 (1987) (hearsay admissible to show, among other things, defendant's state of mind supporting affirmative defense of inducement).[12]

Moreover, the statement by the court regarding "good-faith basis" is nearly impossible to fathom. The court had *just* reviewed an investigative report that alluded to Mirra's association with organized crime. Too, defense counsel had

---

[12] *See also People v. Loria*, 190 A.D.2d 1006, 1006-07 (AD4 1993) (evidence supporting accused's belief that victim was about to use deadly force erroneously excluded where ruling foreclosed valid justification defense); *People v. Gibian*, 76 A.D.3d 583, 585 (AD2 2010) ("defendant's testimony as to his mother's statement was admissible, as it was not to be elicited for the purpose of establishing the truth thereof, but merely to establish the defendant's state of mind upon hearing it") (citations and internal quotes omitted); *People v. Bruner*, 222 A.D.2d 738 (AD3 1995) ("statement was offered to prove [victim's] potential to be an aggressor in this type of act and to show that defendant had reason to fear her. We agree that the statement was admissible as an out-of-court statement to show the state of mind of defendant and [victim].").

made clear that in addition to the report, Jordan had knowledge imparted to her by Mirra of his involvement with the mob. The notion that this fell short of a "good-faith" basis to ask about those very facts defies logic and any reasoned understanding of evidentiary principles. *See People v. Hudy*, 73 N.Y.2d 40, 57 (1988) (defense counsel had good faith basis for questioning based on facts contained in investigative report).

The gravity of the court's limitation of Jordan's testimony was no less substantial. As this Court held in *People v. Rosa*, 153 A.D.2d 257 (1990), the sacrosanct right to present a defense includes "'the right to present the defendant's version of the facts . . . '" [citations omitted]. In *Rosa*, the trial court, like here, had prevented the defendant himself from testifying to facts directly germane to the presentation of his complete defense. In reversing, the Court reaffirmed that "a Trial Court abuses its discretion when it improperly impedes a criminal defendant's right to present his or her defense." *Id.*, [citations omitted].

In *People v. Gilmore*, 66 N.Y.2d 863 (1985), the prosecution adduced evidence that the defendant, charged with murder, had fled the jurisdiction prior to being arrested; this was proffered as proof of his "consciousness of guilt," categorical "state-of-mind" evidence. In a factual scenario remarkably akin to that here, the defendant sought to prove that it was his fear of the police that caused

32

him to flee.  To that end, the defense sought to elicit from the defendant's sister that the police had come looking for him, armed with shotguns and had threatened the defendant's brother, facts that she and her mother had passed on to the defendant. The trial court would not permit such evidence, ruling that "the defendant has an option of *explaining anything he wants to explain when he takes the stand*." *Id.*, at 723 (emphasis added).  In a turnabout eerily evocative of the rulings here, the trial court in *Gilmore* did *not* permit the defendant to relate what he had learned from his mother and sister, precluding the very evidence that informed his decision to flee, and that the court had sanctioned as the *only* means to prove the point.

The Court of Appeals ruled that in preventing the defendant from testifying to what he had learned regarding the police's activities at his home, "the trial court improperly impeded defendant's ability "to present his own witnesses to establish a defense" *Id.* at 867 [citation omitted].[13] Such obstruction of Jordan's right to explain the state-of-mind predicate for her actions is precisely what the trial court carried out here.

In addition, the trial court's exclusionary rulings hampered Jordan's duress

---

[13] The Court did not reverse, determining that the error, although palpably of constitutional dimension, was harmless. Two years later, the Second Circuit disagreed, reversing the conviction and granting Gilmore's writ of habeas corpus. *Gilmore v. Henderson*, 825 F.2d 663 (1987).

defense, as a criminal defendant asserting duress as a defense is allowed to introduce evidence of the victim's prior acts of violence, as well as the defendant's knowledge of her antagonist's "bad and violent reputation." *People v. Amato*, 99 A.D.2d 495, 496 (AD2 1984); *People v. Lane*, 112 A.D.2d 247, 248 (AD2 1985). This principle is rooted in the materiality of an accused's knowledge of her antagonist's propensity and ability to carry out his express and implied coercive threats. As such, the defendant's knowledge of such propensity, and its basis, must be admitted, so long as it is reasonably related to her defense. *People v. Miller*, 39 N.Y.2d 543, 552 (1976). Acts are considered reasonably connected to the defense if they are "sufficiently related in time and quality to the situation facing [the] defendant" in the present case. *See People v. Douglas*, 29 A.D.3d 47, 51 (AD1 2006); *People v. Wesley*, 76 N.Y.2d 555, 559 (1990) (*citing People v. Goetz*, 68 N.Y.2d 96, 114-15 (1986)) (noting that, in considering a justification defense, the jury must consider the circumstances facing the defendant, "includ[ing] relevant knowledge that the defendant may have had about [her antagonist]... and any prior experience that the defendant may have had" which could provide a reasonable basis to believe that the victim's intent was to injure the defendant). As the Court in *Miller* expressly observed, "'[t]he character of the deceased with reference to violence, when known to the accused, enables him to judge of the danger, and aids

the jury in deciding whether he acted in good faith, and upon the honest belief that his life was in peril." 39 N.Y.2d at 549 (emphasis added). In essence, these decisions logically merge the related concepts of imminence and propensity, whereby the greater the ability of the antagonist to carry out his threats, the more imminent the danger becomes.

Given these unambiguous principles, there can be no question that Jordan's knowledge of Mirra's mob connections, and the basis for that knowledge were crucially relevant to the element of duress that requires proof of the imminent ability of the antagonist to carry out his threats. As such, under the principles of *Gilmore* and *Rosa*, and the precedent mandating admission of propensity/ability evidence, the exclusion and curtailment of the defense's proof was error requiring reversal of Jordan's conviction.

### (b)  Mirra's Financial Malfeasance As Motive

The court also imposed a complete moratorium on evidence the defense endeavored to introduce regarding the financial fraud Jordan had uncovered and its proximate nexus to Mirra's threats. As clearly proffered by the defense, the relevance was that as Jordan had begun to uncover the proof of his forgeries and massive conversion of funds, she recognized that it provided "a strong motive for [Mirra] to kill me" (A. 2159, 2173-77, 3520-41, 3601, 4920-24). As a result, the

jury never learned that Mirra siphoned away tens of millions of dollars of Jordan's assets by forging her signature on mortgages, loans, property transfers, corporate sale and merger documents, and phony wire transfer authorizations – including a fraudulent transfer of more than $8 million from Jude's own trust fund account (A. 3600-03). This evidence, too, bore on Jordan's belief – and its objective reasonableness for one in her position – that Mirra would follow through on his threats to kill her to make sure that his massive financial fraud against her would remain unexposed.

### 4.    Law and Application

Penal Law § 40.00(1) provides:

> In any prosecution for an offense, it is an affirmative defense that the defendant engaged in the proscribed conduct because he was coerced to do so by the use or threatened imminent use of unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist.

Duress' "imminent use of unlawful physical force" element has two components. First, the defendant must *subjectively believe* a threat is imminent. Second, that belief, *viewed per the standpoint and experiences of the defendant*, must be objectively reasonable. *See People v. Goetz*, 68 N.Y.2d 96, 114 (1986); *People v. DeSarno*, 121 A.D.2d 651 (AD2 1986).

36

The evidence Justice Solomon disallowed impacted each prong. For one, the excluded medical testimony vindicated Jordan's allegations that Jude had been sexually abused. And that vindication, in turn, substantiated that Jordan's fear of the consequences of Jude's return to Tzekov was genuinely held. No less, it rendered the fear objectively reasonable under the circumstances confronting her.

Similarly, the precluded evidence of Mirra's mafia ties and evidence of his financial malfeasance confirmed the defense assertion that Mirra had the economic motive and the organized criminal means to presently carry out his threats to take Jordan's life and engineer Jude's return to Tzekov. And motive and means, for their part, made it more probable that Jordan's fear of those outcomes and her desire to preempt them were both subjectively and objectively reasonable under the totality of the prevailing circumstances.

 In asserting otherwise, the trial judge construed the proffered evidence in the *prosecution*'s favor and decided the duress issue himself instead of leaving resolution where it belonged – with a jury that ultimately accepted the analogous mitigating EED defense. This approach literally inverted the guiding legal principles surveyed earlier in **SUBPOINT I(A)**.

Precluding the evidence thus inhibited Jordan from establishing the expansive factual predicate that would have unquestionably entitled her to a jury

37

instruction on duress. It thereby neutered a duress defense expressly reserved in a pretrial ruling, impairing Jordan's ability to pursue it and thwarting its consideration by the jury. These prejudicial errors warrant reversal.

## C. **ALTERNATIVELY, DESPITE THE TRIAL COURT'S EXCLUSIONARY RULINGS, THE PROOF AT TRIAL SUFFICED TO REQUIRE A CHARGE ON DURESS**

Despite the bevy of errors just articulated, the admitted evidence, viewed "in the light most favorable" to the defense, sufficed to warrant a jury instruction on the issue of duress. *Butts*, 72 N.Y.2d at 750. The jury learned that Jordan, convinced that Mirra intended to redeem his threat to kill her and that her demise would deliver Jude into Tzekov's clutches, saw death as the only means of escape. The portions of the defense case that survived the court's exclusionary rulings, summarized below, provided ample basis for a finding of duress.[14] Withholding the charge therefore worked reversible error. *Id.*

### 1. **Tzekov's Abuse of Jude**

The jury heard evidence supporting Jordan's belief that Tzekov had sexually and physically abused Jude for much of his life. The evidence came via Jordan's testimony, Jude's writings, and testimony from Jude's trauma therapist and others

---

[14] These facts were amplified in a series of bail applications, dismissal motions and other pleadings from 2010 on.

who reported accounts of the abuse. Pathologists Spitz and Hua also confirmed that forensic evidence corroborated the abuse.

Jude Mirra developed normally and was a perfectly healthy, happy baby (A. 3264). At about 18 months old, however, he began to exhibit distress and intense fear, his sleep was erratic and he often spontaneously cried and screamed in pain for no apparent reason (A. 3270). These aberrations increased in frequency and severity, and were accompanied by an ultimate loss of speech (A.3269). Jude's distress and developmental regression were marked by medically inexplicable injuries and illnesses. His early medical records showed repeated instances of penile inflammation and irritation, scrotal swelling, urinary tract infections and episodes of copious blood in his urine (3278-79, 3330-31, 3353). His doctors could identify no cause for these and other unusual symptoms.

Also confounding were dramatic elevations of norepinephrine in Jude's system. Norepinephrine, the "fight-or-flight" hormone, was repeatedly found in Jude's bloodstream at five times the normal level, resulting in medical findings that Jude's blood pressure and heart rate were dangerously elevated, requiring two hospitalizations (A. 4681-84). Notably, Tzekov had unfettered access to Jude during that time (A. 3312).

The initial impression was that Jude's symptoms stemmed somehow from autism. But his profound response to medical treatments that would have no effect on autism belied that conclusion (A. 3283-96, 4665, 4692). These treatment responses were, however, consistent with those seen in individuals suffering from trauma. (A. 4683-84). Jude began to improve demonstrably in 2006 when Tzekov left the household (A. 3321-25). When Tzekov returned in late 2007, Jude once again regressed (A. 3326-27). He stopped making eye contact, developed tics, suffered unexplained bouts of severe diarrhea and again manifested penile irritation and inflammation, urinary tract infections and episodes of blood in his urine (A. 3328-32).

Finally, in December 2007, Jude broke down crying uncontrollably. He apprised his mother, largely through gestures and monosyllabic words, that he had been sexually abused (A. 3340). One month later, Jude roused from a deep sleep screaming "'Dad Bad, Dad Bad, Dad Bad!' at the top of his lungs" (A. 3354). Jude identified that Tzekov had repeatedly abused him (A. 3355).

In March 2008, having been separated from Tzekov, Jude began typing through communication devices about the abuse he had suffered, a method common among nonverbal children. Jude's writing included "graphic descriptions of ways he was hurt both sexually and physically. Most of it was about his father . .

40

." (A. 3367-68). He also reported that Tzekov had repeatedly threatened to kill him if he disclosed the abuse, resulting in Jude's ongoing deathly fear of his father. Jordan testified that Tzekov "told him never to talk and never to tell. I'll kill you if you talk. If I ever find out you spoke – I'll kill you . . . If you ever tell, I'll kill you. I'll find you. I'll kill you. This was the repeated thing [Jude] was saying in his typing" (A. 3369-70).

Jude's descriptions of the abuse provided a nightmarish roadmap to the causes of earlier unexplained symptoms and injuries that Jordan and his doctors had observed and documented. Later, in 2009, Jude – then eight – typed an essay at school about the emotional impact of the abuse he had suffered (A. 3545-47). He shared extensive details of the sexual and physical abuse with a child trauma therapist (A. 4228-33), as well as Simon Ruvalcaba, who had spent time with Jude (A. 4184-85).

Drs. Werner Spitz and Zhonghue Hua, forensic pathologists, separately testified that reviews of Jude's postmortem anal histology slides showed pathology consistent with penetration by an adult penis, including chronic inflammation, scarring, rectal fibrosis and extreme anal dilatation (A. 2485-2506, 4426-34, 4456-59).

Moreover, Dr. Carol Crow, a therapist, testified that Jude had typed in therapy sessions, describing "a lot of varying inhumane treatment that he received at the hands of his father," including "repetitive occasions" of rape (A. 4219, 4228-29). Simon Ruvalcaba testified that Jude typed that his "dad did bad things" to him, "told him to be quiet and then it was put it in or stick it in" and reported dreams of his father "chasing him and want[ing] to kill him" (A. 4184, 4190-91).

Through cross-examination and argument, the prosecution sought to discredit the defense account but offered very little countervailing substantive proof. As such, the central premise of the duress defense, Jordan's compelling fear that inaction would result in a recurrence of the torturous abuse and the ultimate death of her son, went largely unchallenged. Thus, given the minimal threshold showing required to secure a jury instruction,[15] the court's failure to grant the defense request was reversible error.

### 2.    <u>Mirra's Threats</u>

The evidence established that Jordan genuinely and reasonably feared that Mirra would kill her. These fears were compounded by her terror that if he

---

[15] It is undeniable the court must afford an instruction if there is "any reasonable view of the evidence," "considered most favorably to the defendant," that supports it. *People v. Padgett*, 60 N.Y.2d 142, 144-45 (1985); *see also People v. Petty*, 7 N.Y.3d 277, 284 (2006).

succeeded, Jude would be exposed to his sexually predatory father, who would ultimately follow through on his own threats to kill Jude.

As Jordan testified, as far back as 1992, when she began living with Mirra, she learned of his "short temper," "rages" and "inescapable . . . outbursts," consisting of cursing, screaming, and throwing and smashing objects directed toward her and others (A. 3231-32). During one such fit, Mirra hurled a metal bedframe at her, (A. 3232). Mirra also stored large caches of firearms in their Lake Tahoe home, and stashed 9 mm Glock handguns everywhere he and Jordan lived (A. 3431-32).

One of Mirra's violent episodes was particularly memorable. In 2006, Jordan asked Mirra about wire transfers reflected in a bank statement she had examined (A. 3427). Mirra "flew into a rage" (*Id.*). He screamed and cursed, calling her a "fucking bitch" (A. 3428). He threw a fax machine and other objects at her, overturning a desk and trying to pin her beneath it. (*Id.*). In February 2008, when Jordan tried to separate her finances from Mirra's, he left her threatening voicemail messages insisting that she communicate directly with him and not through lawyers she had hired to effect the separation (A. 3437). During the same period, Mirra demanded that the separation be on his terms; he threatened that otherwise he would see to Jude's return to Tzekov, which he knew was Jordan's

43

greatest fear (A. 4046). Phone records submitted at trial evinced multiple calls between Mirra and Tzekov at the exact time pinpointed by Jordan (A. 4046-4048, 4264).

From November 2009 to February 4, 2010, Mirra's threats escalated. In various incidents leading up to the latter date, Jordan and Jude were followed; items in her apartment went missing and would later "reappear" (A. 3557-58). She awoke on several mornings to find her apartment door - locked and double-bolted the night before - unlocked and left wide open, in one instance, with large quantities of Jude's medication gone (A. 3559, 3775-84).

In addition, Mirra had hired a bodyguard, Hymes Harris, who was introduced to Jordan by Mirra as a former Navy Seal (A. 3562). Mirra held out to Jordan that Harris was someone he'd hired to protect Jordan and Jude (A. 3563). But Harris admitted to Jordan in December 2009 that Mirra had retained him to watch and ultimately kill her (A. 3566).

Shaken, Jordan confided in Alan Goldblatt, an old friend who'd treated Jude. Goldblatt set up an appointment with his friend, an FBI agent in Newark, NJ (A. 3790). The meeting, slated for Christmas week 2009, never occurred (*Id.*). Mr. Goldblatt was found dead on December 24, 2009 (A. 3790-91). This convergence of harrowing events heightened Jordan's burgeoning fear.

The following month, as Mirra's threats continued to escalate, Jordan discovered that her signature had been forged on a prenuptial agreement that at her death would place 75% of her assets under Mirra's control (A. 3591-96). At the same time, she learned that tens of millions of dollars had been siphoned from her bank accounts over the past several years (A. 3602-03).

Jordan testified that Mirra's forgeries and thefts provided "a strong motive [for him] to want to kill me" (A. 3601). To that end, beginning in late January 2010, Mirra made a rash of ominous threats against her. In a string of increasingly volatile calls, Mirra snarled, "[h]aven't you figured out by now I know everything, every move you make. I know everything. I know everything you say and do" (A. 3604-07). "What the fuck are you thinking about, you're a dead woman" (A. 3608). During one conversation, Jordan said she knew about Mirra's thefts and forgeries. Mirra's chilling reply: "This is going to end . . . If you haven't figured out who you're dealing with by now, you're going to know very shortly" (A. 3609).

A few days later, Jordan testified, Mirra left her a voicemail fuming, "'I'm not dealing with your bullshit and your allegations' . . . He said again – he said 'this will end. This is over. Trust me. This is the end' . . . And he said, '[y]ou are a dead woman'" (A. 3612).

45

Jordan fled her apartment with Jude in tow, sure that "one way or another, Ray was going to kill me or get rid of me somehow. And … I didn't know what would happen to Jude. I didn't know if he would kill Jude. I was certain if Jude was alive, [Jude] would end up back with Emil again" (A. 3613-14).

Faced with this excruciating dilemma, and convinced that she would not survive to protect Jude, Jordan decided on February 3, 2010 to end both their lives (A. 3616).[16] She checked into the Peninsula Hotel with Jude, feeling "numb, defeated. I felt like it was over. It was done" (A. 3622) In the late hours of February 4, 2010, despairing of saving Jude, she administered doses of pills to him and then herself. Jude died, but police arrived to rescue Jordan.

---

[16] One of Jude's therapists recorded Jordan's final thoughts and feelings, conveyed in a February 2, 2010 exchange:

> [S]imultaneously leaving him in this world with no support system and no help, makes it impossible.
>
> I am in a world that is very heartless. I used to be a part of that, what is wrong, it is very greed based, how I made a living. I can understand why and how the world is
>
> When all the love you have to give isn't enough. He is suffering a lot now, and once I'm gone, he will suffer more. Very difficult to comprehend . . .
>
> Very few people are trustworthy, I find very few . . . I have gotten in situations that aren't just my fault. *I can't talk to you about this because it is not safe. Nothing can make me safe. We have a guarantee of nothing.*

(A. 72-73) (emphasis added).

Looking back on these events from the stand, Jordan recalled "the horrors of listening to what happened to [Jude] . . . listening to him talk about his terror and his fear every day, fifty times a day" (A. 3652). After everything she'd done to try and keep Jude safe – assuring him repeatedly that he *was* safe – Jordan realized that it was all "so utterly inadequate" (A. 3653). She had failed to protect him and "still couldn't protect him" (A. 3654).

### 3. Law and Application

The preceding evidence laid a solid foundation for the duress instruction the defense requested. The defense's viability is clear from the jury's verdict of EED. If, as the jury determined, Jordan's fear of Mirra and Tzekov constituted "a reasonable explanation or excuse" for EED, Penal Law § 125.25(1)(a), there is at least a reasonable possibility that a properly instructed jury would have concluded that the threat Mirra and Tzekov presented would overwhelm "a person of reasonable firmness in [Jordan's] situation." Penal Law § 40.00(1).

Moreover, as imminence is a consummate fact question uniquely confided to the jury, withholding the instruction was reversible error.

"[T]hough the statute requires proof that at the time of the criminal conduct, the defendant was reacting to a threat of physical force," historical facts provide the necessary framework for appraising a threat's nature and gravity. Marrus Commentary, New York CLS, Penal Law § 40.00. Accordingly, a

47

> [f]ull appreciation of the defendant's situation often includes a recognition of his past situation as well as any previous threats or intimidation leading up to the criminal act. *A pattern of threats or violence preceding the immediate threat necessarily lends credence to the reasonableness of the defendant's fear at the time of the criminal act.*

*Id*. (emphasis added).

The extent to which history and context shape one's perception of imminence was evident to the drafters of the Model Penal Code. They recognized that "long and wasting pressure may break down resistance more effectively than a threat of immediate destruction." MPC § 2.09, Comment at 8 (Draft No. 10 1960).

The New Jersey Supreme Court concurs, explaining:

> A per se rule based on immediate injury may exclude valid claims of duress by persons for whom resistance to threats or resort to official protection was not realistic. While we are hesitant to approve a rule which would reward citizens who fail to make such efforts, we are not persuaded that capitulation to unlawful demands is excusable only when there is a "gun at the head" of the defendant. We believe that *the better course is to leave the issue to the jury with appropriate instructions from the judge*.

*State v. Toscano*, 74 N.J. 421, 440 (1977), *superseded by statute on other grounds as stated in State v. Romano*, 355 N.J. Super. 21, 35 (2002) (emphasis supplied). Thus, it is "solely for the jury" – not the judge – "to determine whether a 'person of reasonable firmness in [defendant's] situation' would have failed to seek police

assistance or refused to cooperate, or whether such a person would have been …

able to resist." *Id*. at 441-42.

In short, "imminence" cannot be defined solely from the perspective of an objective observer.   Nor can it be assessed exclusively on some temporal continuum.  As set forth *supra*, there is a logical nexus between the propensity and ability of the antagonist to carry out his threats, and the defendant's perception of the imminence of the danger.  The more violent or well-equipped the purveyor of the threat, the less any passage of time will be germane to the reasonableness of the defendant's fears.

New York's recognition that subjective factors affect perceptions of imminence and ability to escape traces to *People v. Torres*, 128 Misc.2d 129 (Sup. Ct. Bronx Co. 1985) In *Torres*, although there was no temporally immediate peril to the defendant, the defendant's shooting of her violent and abusive husband warranted a flexible analysis of the imminence element. Admitting testimony explaining battered woman's syndrome, the court held that the test for justification is "whether the defendant's *subjective* belief as to the imminence and seriousness of the danger was reasonable . . . It is the defendant's state of mind and sense of fear which is critical to a justification defense [.]" *Id*. at 130-31; *see also People v.*

*Ciervo*, 123 A.D.2d 393 (AD2 1986) ("perceptions of the defendant" determine whether deadly physical force is "imminent").

In *People v. Wolcott*, 27 A.D.3d 774 (AD3 2006), the Third Department also extended the doctrine to make the defense available without an immediate threat. The *Wolcott* defendant drove a getaway car while her boyfriend robbed a convenience store. On appeal, the court permitted her to withdraw her guilty plea because she allocuted to participating out of fear of "her husband, he beat her in the past and threatened to kill her." *Id*. at 775. Though nothing suggested the husband forced her to drive the getaway car under threat of death – indeed, piloting a getaway car necessarily means she had been alone in the vehicle and could have left while he was committing the robbery – the defendant's statements nevertheless "implicated duress, an affirmative defense." *Id*.

These authorities illustrate the need to interpret "imminence" flexibly so as to avoid manifest injustice, and to afford legal protection for individuals who reasonably believe that appeals for law enforcement assistance will be futile. *See U.S. v. Contento-Pachon*, 723 F.2d 691, 694 (CA9 1984); *U.S. v. Gomez*, 92 F.3d 770, 777 (CA9 1996).

Here, Jordan testified that upon discovering Tzekov's sexual abuse, she was unable to obtain help for Jude despite extraordinary efforts. All around her were

deaf ears and disinterested eyes - from the unresponsive child protective system that told her law enforcement would not help because her son was non-verbal, to the child therapists who told her to forget about seeking help from law enforcement, that it could even backfire on her (which it did), to the lawyers who told her that all she could do was seek restraining orders that would not deter her rich and powerful ex-husband (A. 3344, 3350-51, 3362-63, 3615-16, 3837). Amid these futile and failed avenues of recourse, Jordan's sense of helplessness over her inability to protect Jude, coupled with her deathly fear of Mirra's escalating threats, propelled her to the inexorable realization that only death could provide refuge.

Viewing these circumstances in the defense's favor,[17] a properly instructed jury may well have absolved Jordan on the ground that the threats she and Jude faced would overwhelm "a person of reasonable firmness in [her] situation." Penal Law § 40.00(1). This is especially so because the jury, in returning a verdict of EED, found Jordan's reaction to be reasonable given the perceived gravity of the threats (A. 5470-71) (jury instructed that in order to sustain EED defense, "there must have been" a reasonable "explanation or excuse" for Jordan's behavior). Consequently, the conviction must be reversed.

---

[17]  *See Butts*, 72 N.Y.2d at 750.

51

**POINT II**

**THE TRIAL COURT'S IMPROPER COURTROOM CLOSURE AND RECORD SEALING WAS PER SE REVERSIBLE ERROR**

The trial court improperly closed the courtroom, ousted all spectators and sealed the record while entertaining extended midtrial argument on a matter of vital concern to the parties, the press and the public at large – without making the contemporaneous findings of necessity the Sixth and Fourteenth Amendments and their New York analogs require. *See Waller v. Georgia*, 467 U.S. 39 (1984). Indeed, the judge himself later conceded in writing that the closure had been totally *un*necessary. This violation of the right to an open trial dictates automatic reversal of Jordan's conviction.

**A.     BACKGROUND**

With its fraught allegations, Jordan's trial generated intense publicity and gavel to gavel press coverage.

On the morning of Oct. 1, 2014, as court convened and reporters and spectators settled into their seats, the prosecutor asked to approach the bench. A conference ensued that, for reasons unknown, took place off the record and in Jordan's absence (A. 2548).

When Jordan entered the well, Justice Solomon noted her presence and began to say, "Counsel, what I'd like to do is...." The prosecutor cut him off,

52

interjecting: "This does not count as closed." "Just wait a second," the judge bristled (*Id.*).

The judge then announced summarily, "we have to close the courtroom to make a record. We have to close the courtroom without any spectators in the [gallery] ... about something that has to be done in private" (*Id.*). The audience was ushered out and the sergeant directed to "make sure no one enters" (A. 2549).

Defense counsel objected, asking what authority supported the court's order. "My authority," the court replied, adding only that the prosecutor "wants to make a record about something he didn't want to put on the record in front of the audience or the press. It has to do with Ms. Jordan" (*Id.*).

Counsel continued to protest, complaining that no advance record findings had been made to justify the closure (*Id.*). "We're going to make the record right now," the judge offered nonresponsively, but "the transcript will not be released immediately. Unless everyone consents to it.... [Y]ou can object all you want" (A. 2549-50). "Something happened that [the prosecutor] wants to place on the record," the judge repeated cryptically, "a very serious problem concerning Ms. Jordan" (A. 2550). "[W]hat[ever] the serious problem," counsel rejoined, it "can be articulated in an open courtroom consistent with the Sixth and Fourteenth Amendments" (*Id.*).

The court then turned to the prosecutor, who ascribed his closure request to "fair trial" concerns surrounding a "website ... that someone [launched] called The Inadmissible Truth." The prosecutor handed up a paper copy of the site's home page and the court sealed it – again without explanation – at his urging (A. 2551-52). According to the prosecutor, the home page and linked articles "accuse[d], among others, your Honor of subverting justice in this case" (A. 2552).

Though it was now clear that the issue involved the exercise of a core constitutional right – the First Amendment right to free speech on a matter of public interest – the judge still did not reopen the courtroom. Instead he demanded, "Where's that? Which page is that?" while inspecting the sealed exhibit (A. 2552). A curious dialogue ensued:

> Prosecutor: It's multiple. It's multiple. The only proper way to do this is to go online.  And it accuses your Honor of refusing to allow information to come before the jury, hence the title of the website, The Inadmissible Truth.
>
> And lest the defendant disavow any knowledge of this particular website, I have an email from Ms. Jordan. It was sent out last night, yesterday –
>
> The Court:  To whom?
>
> Prosecutor: Several hundred email addresses.   Most of them appear to be the media. You could see the e-mail address. I printed it up in such a way that the e-mail addresses show.

***

> And your Honor will see in the body of the e-mail itself how Ms. Jordan believes that the justice system is being stymied on many fronts resulting in the suppression of evidence that anyone would expect to hear at a fair trial.  And then Ms. Jordan goes at length on the website to explain why it is this Court is actually – how this Court is actually doing that.  And so, I felt several things, your Honor, I felt duty-bound to report this to the Court immediately.

(A. 2553-54)

As to the basis for closing the courtroom, the prosecutor claimed he had made the application partly for *Jordan's* benefit. To this end, he affected concern that the website "may be viewed by many objective observers as an act of desperation on the part of the defendant seeing how the evidence is going in, and I didn't want the defendant to be prejudiced..." (A. 2554).

The Court continued the inquest, asking, "well, this is coming from somewhere, isn't it? Do we know where it is coming from? It says from Thomas Truth and there is poetic justice nine-eighty-nine. Who is that?" (A. 2555).

For his part, defense counsel pressed his objection to the closed courtroom and again sought its immediate reopening:

> [T]he closed courtroom is not requested by us, is not necessary for us, is and remains unconstitutional and there is absolutely nothing in the record that [the prosecutor] just made that could conceivably justify the closure of the courtroom. So before I respond to the other points, I would ask that this constitutional abomination be ended and the spectators and the press be re-admitted to an open court....

(A. 2556).

Continuing to resist, the prosecutor revealed his true motive for having the crowd tossed and pushing to proceed in secret. Inquiring in the open, he surmised, would "achieve the defendant's purpose of ... during the trial getting publicity about inadmissible matters, and doesn't that, Judge, ... risk a fair trial to both?" (A. 2556-57).

Brushing the question aside, the judge grilled *defense counsel* about the website's source and content as counsel strained to steer the conversation back to the closed courtroom (A. 2557). Meanwhile the judge not only kept the courtroom shut but sealed the transcript and remaining exhibits over renewed objection (A. 2560).

Revisiting the origin of "these emails, Twitters, whatever," the judge allowed – incongruously – that the jury is "completely unaware of this" (A. 2561-62). Yet as counsel pointed out, that was precisely why its members had been constantly instructed to avoid Internet and media accounts of the trial:

> [I]ndeed, Judge, had they chosen to disregard that instruction and just started Googling Gigi Jordan, there will be a myriad of things that would never make it into a courtroom, both from critics and supporters of Ms. Jordan, completely inadmissible things that are all over the internet. That's why you tell them not to do that.

(A. 2562).

With the "constitutional violation ... continuing every minute that proceedings such as these are sealed and closed, and the public ... excluded," the judge issued an opaque warning: "I just hope this is not going to continue. Someone's doing this. I don't know who. This is not going to [continue]. This [will stop], I mean that" (A. 2562, 2564).

In the end, however, the judge relented and declared, "I don't have a problem. There is no gag order as long as, as long as, it's an accurate description of what's taking place" (A. 2566). The jury was summoned and given another stock reminder to avoid news coverage of the case as testimony resumed (A. 2569-72).

When court convened in the afternoon following a break for lunch, the tone changed markedly. Asking why the exhibits from the closed session – the website excerpts and emails attributed to Jordan – should stay sealed, the judge confessed that he hadn't "really look[ed] at the communication[s] that closely" (A. 2687).

Nonplused by the prosecutor's response – which merely referred back to his earlier comments – the court reiterated that it "didn't really have a chance to read everything because it came quite as a surprise to me this morning.... [M]aybe it was an erroneous ruling. Maybe this should be in the public domain, I don't know. I'm trying to think of the reason why it shouldn't. I can't think of a reason" (A. 2688).

The judge went on to unseal the minutes and exhibits, remarking: "[I]t's now two-thirty. So if the record has any error committed by me, it was committed for maybe five, six hours" (A. 2689).

In a posttrial order declining to throw out the verdict, the court did "not ... dispute" that the closure lacked prior record findings of necessity and belatedly acknowledged that it was "[un]necessary" in fact – largely because the "information" addressed had "already" been publicly "disseminated" (A. 5, 8). The court opined, however, that record findings were themselves unnecessary. Though it involved a prosecutor's midtrial request for judicial intervention – in the form of a cautionary instruction to the jury and an injunction that defense counsel obey disciplinary rules and ethical restrictions – the court reasoned that the "proceeding at issue was not the type of trial proceeding that falls within the ambit of *Waller*" (A. 6). Any *Waller* violation, the court asserted alternatively, was too "*de minimis*" and "trivial" to implicate the Sixth Amendment or justify relief (A. 7).

**B.**  **CLOSING THE COURTROOM DURING SUBSTANTIVE MIDTRIAL PROCEEDINGS, WITHOUT PRIOR RECORD FINDINGS AND FOR DEMONSTRABLY INSUFFICIENT REASONS, WAS PER SE REVERSIBLE ERROR**

The Sixth Amendment guarantees criminal defendants the right to a "public trial." This central entitlement – to the "presence of interested spectators"[18] as proxies for the public at large – serves partly to "remind the prosecutor and judge of their responsibility to the accused and the importance of their functions,"[19] ensuring that she is "fairly dealt with and not unjustly condemned." *Waller*, 467 U.S. at 46 (citation and internal quotes omitted). "[D]iscretion to limit the public nature of judicial proceedings"[20] should thus be exercised "sparingly,"[21] in "rare circumstances only." *People v. Echevarria*, 21 N.Y.3d 1, 11 (2013).

To enforce the "presumption of openness," *id.*, the U.S. Supreme Court has devised an exacting protocol to be observed before trial proceedings may be conducted in private. Specifically:

> [T]he party seeking to close the hearing must [identify] an overriding interest that is [otherwise] likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the court must

---

[18] *Waller*, 467 U.S. at 46 (citation and internal quotes omitted).

[19] *Peterson v. Williams*, 85 F.3d 39, 43 (CA2 1996).

[20] *People v. Jones*, 47 N.Y.2d 409, 413 (1979) (citation and internal quotes omitted).

[21] *Ibid.*

consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48.

When a judge affirmatively excludes the public from "'any stage of a criminal trial'" without following this protocol, he effects an "unjustified" courtroom closure. *U.S. v. Gupta*, 699 F.3d 682, 687 (CA2 2012) (quoting *Presley v. Ga.*, 558 U.S. 209, 213 (2010)). And an unjustified closure – one lacking express findings entered on the record in advance – is itself a fundamental constitutional error meriting blanket reversal of an ensuing conviction, without a showing of prejudice or review for harmlessness.[22]

### 1. The Closure Order Contravened *Waller*'s Compulsory Procedure by Summarily Ejecting Spectators without Contemporaneous Record Findings

As the trial judge ultimately agreed, there is no "dispute" that he shirked his *Waller* duties here (A. 5). Indeed, the "record of this case fails to show" that the judge "even considered" the stringent "four-part test" the Supreme Court prescribes. *Walton v. Briley*, 361 F.3d 431, 433 (CA7 2004).

---

[22] *E.g., Presley*, 558 U.S. at 216 (*Waller* obliges court to "consider all reasonable alternatives to closure. It did not, and that is all this Court needs to decide."); *People v. Martin*, 16 N.Y.3d 607, 612-13 (2011) ("failure to consider any alternate accommodations violated defendant's right to an open trial, regardless of the reasons for closure"); *Gupta*, 699 F.3d at 684-85, 687, 689 (failure to "analyze the *Waller* factors" or "make *Waller* findings before excluding the public from the courtroom" requires reversal in "all but the rarest of cases").

### (a) No Findings Supporting Closure or Consideration of Alternatives

Most striking, the record lacks any semblance of an explicit judicial "finding[] adequate to support the closure," *Waller*, 467 U.S. at 48, or permit informed appellate review. Instead, the judge evicted the press and public peremptorily, stating only, "we have to close the courtroom to make a record" about "something that has to be done in private" (A. 2547-49, 2688-89). Worse, the judge cleared the courtroom on the prosecutor's bare say-so in an "off the record" bench "discussion,"[23] without considering *any* "alternatives" – "reasonable" or otherwise. *Waller*, 467 U.S. at 48.

These "conclusory justification[s]," *Guzman v. Scully*, 80 F.3d 772, 776 (CA2 1996), are "insufficient to satisfy" the second, third and "fourth prong[s] of the *Waller* test," and reliance on them "alone violated" the public trial guarantee. *State v. Ortiz*, 981 P.2d 1127, 1138-39 (Hawaii 1999) (citations and internal quotes omitted); *accord, e.g., Presley*, 558 U.S. at 215-16 ("particular interest, and threat to that interest, must be articulated along with [specific] findings"); *Martin*, 16 N.Y.3d at 612 (court made no compelling interest "finding on the record" concrete enough to warrant closure); *People v. Tolentino*, 90 N.Y.2d 867, 869 (1997)

---

[23] *Compare People v. Guevara*, 135 A.D.2d 566, 567-68 (AD2 1987) (reversing for improper closure where "court relied entirely upon the prosecutor's supposition").

(reversing where court "failed to articulate any factual findings to support its closure order").

Nor *could* the judge have properly made the requisite findings, for he conceded months later that the closure was wholly "[*un*]necessary" (A. 8). And rightly so. After all, the website imputed to Jordan "attack[ed] the conduct of [court,] police and prosecutor" in the very case on trial, *Waller*, 467 U.S. at 47 – classic "protected speech" falling solidly within the First Amendment. *U.S. v. Carmichael*, 326 F. Supp. 2d 1267, 1270, 1272, 1290, 1302 (M.D. Ala.) (similar site criticizing government's prosecution, attributed to defendant who "maintain[ed] his innocence and want[ed] the public to know all the facts as well as [] all the participants in this case," was "core" constitutional speech), *supplemented*, 326 F. Supp. 2d 1203 (M.D. Ala. 2004).

And as the judge also came to recognize,[24] most of the site's content had already been publicly circulated, with the jurors perpetually told to ignore media and Internet coverage of the trial.[25] In fact, one of the *prosecutor's* proposed remedies – yet another such warning from the bench, all obeyed presumptively –

---

[24] (A. 8).

[25] *E.g., Waller*, 467 U.S. at 47 n.6 (threat of tainting publicity "attenuated" where, as here, jurors have been "empaneled and instructed not to ... read or view press accounts of the matter"); *Matter of Associated Press v. Bell*, 70 N.Y.2d 32 (1987) (closure unwarranted where potentially inadmissible evidence already in public domain, particularly in large city).

would have further alleviated any specter of jury taint without chasing *anybody* from the courtroom.[26]

But rather than discard Ms. Jordan's conviction for noncompliance with *Waller*, the trial court sought to excuse the violation by claiming that *Waller did not apply at all*. In this vein, the court asserted – implausibly – that its midtrial investigation of the site's source and purpose was not a "trial proceeding" subject to the decision's constraints. It also suggested that any *Waller* violation was too "trivial" to offend the Sixth Amendment regardless (A. 6-8). Both contentions are false.

> **(b)** **The Public Access Right Inescapably Attached to a Midtrial Judicial Inquiry into Alleged Misconduct Involving a Website Ascribed to the Accused**

In holding *Waller* inapplicable, Justice Solomon tacitly endorsed the People's position that he *could* have conducted the website inquiry in chambers or at the bench, so it wasn't a "trial proceeding" implicating the Sixth Amendment's publicity pledge. *Id.* These assumptions are multiply flawed.

---

[26] *See NBC Subsid. (KNBC-TV), Inc. v. Sup. Ct.*, 980 P.2d 337, 341 (Cal. 1999) ("frequent and specific cautionary admonitions to the jury and clear and direct instructions, rather than closure of the courtroom to the public, constitute the accepted, presumptively adequate, and typically less restrictive means of dealing with this potential problem [risk of jury contamination by 'inadmissible evidence or information' in 'highly publicized matter']").

i.     The "closed proceedings in question were held outside the jury's presence *in the courtroom*." *NBC Subsid.*, 980 P.2d at 363. They were "*not* in fact held in chambers" or at the bench. *Id.* (emphasis supplied). "[S]uch is not the factual scenario presented in this case," and judges should "decline to base" their decisions on "purely speculative facts." *State v. Easterling*, 137 P.3d 825, 831 n.11 (Wash. 2006).

ii.     More fundamentally, *Presley* "recently made clear" what a gaggle of lower courts have long understood: "the Sixth Amendment right to a public trial extends to *any* stage of a criminal trial," *U.S. v. Bucci*, 662 F.3d 18, 22 (CA1 2011) (quoting 558 U.S. at 213) (emphasis ours), and "*Waller* provided the appropriate standards for courts to apply *before* excluding the public from *any* [such] stage." *State v. Leyerle*, 242 P.3d 921, 925 (Wash. Ct. App. 2010) (emphasis supplied).[27] In particular, the public trial right "attaches from the [trial's] commencement,"[28] reaches "beyond the actual proof at trial"[29] and is "not limited"

---

[27] Authorities acknowledging that the public trial "guarantee" spans "the entire trial," *People v. Hassen*, No. 10CA1480, ___ P.3d ___, 2013 WL 765692, at *1 (Colo. Ct. App. April 25, 2013), *cert. granted*, No. 13SC356, 2013 WL 5629841 (Colo. Oct. 15, 2013), include: *U.S. v. Sorrentino*, 175 F.2d 721, 722 (CA3 1949); *Barrows v. U.S.*, 15 A.3d 673, 679 (D.C. 2011); *Sirratt v. State*, 398 S.W.2d 63, 67 (Ark. 1966); *State v. Tapson*, 41 P.3d 305, 309 (Mont. 2001); *State v. Lawrence*, 167 N.W.2d 912, 915 (Iowa 1969); *Com. v. Patry*, 722 N.E.2d 979, 983 (Mass. App. Ct. 2000); and Wayne R. LaFave, Herold H. Israel, Nancy J. King, 5 Crim Proc. § 24.1(a) (2d ed. 1999).

[28] *U.S. v. Saldana*, No. CRIM. 2009-32, 2010 WL 2991039, at *4 (D. V.I. July 25, 2010),

to "times when the jury is present,"[30] contemplating a "trial [that] is [presumptively] open to the general public at *all* times." *People v. Corro*, No. E036175, 2006 WL 226063, at *8 (Cal. Ct. App. Jan. 31, 2006) (emphasis supplied).

               iii.    Among the trial proceedings it subsumes, the Sixth Amendment access right

> forbids state courts to conduct hearings in camera [or at the bench] on matters arising in the course of a criminal trial, absent overriding need to foreclose public attendance, articulated in the court's findings at the time of closure.

*Rovinsky*, 722 F.2d at 199 (emphasis supplied). Put another way, "a proceeding that would be subject to a right of access if held in open court does not lose that character simply because the trial court chooses to hold the proceeding in chambers." *NBC Subsid.*, 980 P.2d at 363 (footnotes omitted).

    To be precise, this is true at least where, as here, the defense protests the public's exclusion[31] and the chambers or bench conference concerns substantive

---

*aff'd*, 431 F. App'x 191 (CA3 2011).

[29] *Presley*, 558 U.S. at 212.

[30] *Rovinsky v. McKaskle*, 722 F.2d 197, 201 (CA5 1984).

[31] *Rovinsky*, 722 F.2d at 201 ("Sidebar conferences in which defendant's counsel participates without objection do not violate the right to a public trial."). *Rovinsky* distinguished the rationale of the People's principal cases chiefly on this ground, rendering them materially harmonious. *Compare id.* & n.13 with *People v. Olivero*, 289 A.D.2d 1082, 1083 (AD4 2001) and *Richmond*

issues, as opposed to mere ministerial or housekeeping matters. *Id.* at 363-64 & n.34; *accord, e.g., U.S. v. Alcantara*, 396 F.3d 189 (CA2 2005) (reversing automatically where substantive proceedings held in robing room absent advance record findings of necessity); *Guillry v. State*, 856 S.W.2d 477, 478 (Tex. Ct. App. 1993) (same where trial judge conducted substantive hearing in jury room without "articulat[ing] a state interest that outweighed appellant's interest in public scrutiny").[32] Indeed, the *Gupta* court overturned a conviction where the public was excluded from jury selection improperly – i.e., sans prior *Waller* findings – *despite* the fact that parts of the closed proceedings occurred "at sidebar" and in the "jury room." 699 F.3d at 685.

---

*Newspapers v. Va.*, 448 U.S. 555 (1980); *see also U.S. v. Norris*, 780 F.2d 1207, 1210 (CA5 1986) ("Norris made no contemporaneous objection to the [private] chambers conferences," so "we need not consider his [appellate] objection") (cited in *Olivero*, 289 A.D.2d at 1082).

The distinction is sound. Since the Sixth Amendment public trial right "benefit[s]" the accused, *Waller*, 467 U.S. at 46 (citations and internal quotes omitted), her counsel are free to waive its protections by knowingly participating in private bench or chambers conferences. But where counsel protest the public's exclusion from a bench or chambers conference addressing substantive issues, and where the court proceeds privately without making express *Waller* findings on the record in advance, reversal would follow *a fortiori*.

The only other case the People mustered on this point – *People v. Jaramillo*, 97 A.D.3d 1147 (AD4 2012) – likewise involved unpreserved exclusions from "brief [chambers] conferences regarding ministerial or scheduling matters." *Jaramillo v. Artus*, No. 9:12-cv-01657-JKS, 2014 WL 2986926, at *16-*17 (N.D.N.Y. July 2, 2014).

[32] *Cf. People v. Carr*, 25 N.Y.3d 105, 113 (2015) ("no justification" for exclusion from "in camera proceeding clearly involv[ing] substantive issues as opposed to ministerial matters"); *People v. Sprowal*, 84 N.Y.2d 113, 118 (1994) (defendant's presence "generally required" even at "ancillary proceedings" so long as he can "potentially contribute").

iv.    Applying these teachings here, Justice Solomon's midtrial inquiry regarding the website was manifestly substantive in nature. After all, the prosecutor had accused Jordan of what he considered grave misconduct – attempting to "subvert[] justice" by poisoning the jury with evidence that had been ruled inadmissible – relating to the handling and subject matter of the very case on trial (A. 2552). And to remedy the claimed misconduct – which could have spawned contempt or obstruction proceedings, among others, were the People's allegations accepted – the prosecutor sought affirmative judicial relief in the form of cautionary instructions to the jury and admonitions to the defense.

Thus, the covert proceeding operated as a de facto mini-trial – walled off from the scrutiny of public and press – where Jordan was accused of illicit behavior and castigated by the very judge charged with absolute objectivity and impartiality. These circumstances squarely implicated publicity's cardinal virtues – most prominently, ensuring that the accused is "fairly dealt with"[33] and reminding judge and prosecutor of their respective "responsibilities" and the "importance of their functions." *State v. Sublett*, 292 P.3d 715, 735 (Wash. 2012) (Madsen, C.J., concurring); *accord, e.g., Norris*, 780 F.2d at 1210 (public attendance serves to "insure that the judge and prosecutor act responsibly"); *In re Oliver*, 333 U.S. 257,

---

[33] *Waller*, 467 U.S. at 46.

270 (1948) (knowledge that "every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power"). This is doubly so "because there was no jury present to act as a safeguard" during the website inquest, *Sublett*, 292 P.3d at 723, and the site itself – as noted – "attack[ed] the conduct of [court,] police and prosecutor." *Waller*, 467 U.S. at 47.

"The need for an open proceeding" is "particularly strong" under these conditions, "public scrutiny" having "salutary effects," *id.,* and citizens possessing a keen interest in the "integrity of the administration of justice." *Rovinsky*, 722 F.2d at 201 (citation and footnote omitted). Indeed, it is hard to imagine a scenario where the defendant's and society's twin interests in openness, synthesized in *Waller*, coalesce more perfectly.

     v.    It follows from all this that the midtrial website inquiry was a presumptively open proceeding requiring an "overriding need to foreclose public attendance, articulated in the court's findings at the time of closure." *Rovinsky*, 722 F.2d at 199. Failing those mandatory findings, Jordan's conviction crumbles.

     vi.    In maintaining otherwise, Justice Solomon waved away Jordan's flurry of strenuous objections and shrugged off the weight of precedent

anchoring them. Instead he casually labeled the proceeding "[non]substantive" (A.

6-7), without marshaling a jot of authority to support that self-serving trope.

*Contra, e.g.*, *Sublett*, 292 P.3d at 722 ("whether the public trial right attaches to a

particular proceeding cannot be resolved based on the label given" it); *Com. v.

Riley*, 15 N.E.3d 1165, 1170 (Mass. App. Ct.) ("cannot be resolved solely on the

label we give the event") (citation and internal quotes omitted), *lv. denied*, 23

N.E.3d 105 (Mass. 2014), *cert. denied*, 135 S. Ct. 1858 (2015). This pat approach

simply assumed the argument's conclusion and begged the question presented.

### (c) There Is No Operative or Tenable Triviality Exception to *Waller*'s Automatic Reversal Rule, and the Closure Here Was Not Trivial Even Presuming One

Courts in some jurisdictions recognize a so-called "triviality exception" to

*Waller*'s "per se rule of reversal,"[34] opining that not "every temporary instance of

unjustified exclusion of the public – no matter how brief or trivial, and no matter

how inconsequential the [private] proceedings" – necessarily warrants relief.

*Gibbons v. Savage*, 555 F.3d 112, 120 (CA2 2009); *but see Gupta*, 699 F.3d at

685, 687-88, 690 (exception "narrow[ly]" confined to "limited circumstances" and

"rarest of cases"; "[f]ailure to comply" with *Waller* "nearly" always "require[s]

reversal"). In an apparent nod to this line of cases, Justice Solomon alternately

---

[34] *Jones*, 47 N.Y.2d at 417.

suggested that "the closure here was so *de minimis* and so trivial that setting aside the verdict would be a miscarriage of justice" (A. 7).

But that is not the law in New York State. "[N]either" the Court of Appeals nor, for that matter, the U.S. "[S]upreme [C]ourt" has ever "adopted" or applied a triviality exception, *Hassen*, 2013 WL 765692, at *4, to "uph[o]ld the closure of a court proceeding during trial." *Oahu Pubs.*, 331 P.3d at 477 (footnote omitted); *cf. Easterling*, 137 P.3d at 825 (Washington high court has "never found a public trial [] violation to be *de minimis*"). And the People, evidently realizing as much, never asked Justice Solomon to do so either. ( A . 5 7 3 1 - 3 2 ) ("*federal court*" not "constrained to grant relief" if closure "later" found "impermissible") (emphasis supplied). Indeed, as recently as 2013, the Court of Appeals automatically reversed a murder conviction where a defendant's mother was temporarily excluded from *voir dire*, implicitly rejecting the exception. *People v. Floyd*, 21 N.Y.3d 892 (2013).[35]

---

[35] Nothing in the pair of stray New York cases cited by Justice Solomon diminishes this conclusion, (A. 7). *People v. Peterson* involved a "brief and *inadvertent* continuation of a proper courtroom closure," not "an improper *affirmative* closure order" in the first instance. 81 N.Y.2d 824, 825 (1993) (denial of "public trial right requires an *affirmative act* by the trial court excluding persons from the courtroom") (emphasis supplied). And this Court's passing reference to an "[in]substantial closure" in *People v. DeAngelis* was distinguishable dicta ("In any event,"), as the momentary removal of the defendant's brother was found to advance the "overriding interest" of "exclud[ing]" a "potential fact witness." 5 A.D.3d 274, 274-75 (AD1 2004).

More pointedly, the exception is doctrinally flawed and *should* not prevail in New York, amounting to little more than harmless error analysis in "disguise[]." *Cf. People v. Hudy*, 73 N.Y.2d 40, 56 (1988). And harmless error analysis confounds the logical predicates for the automatic reversal rule: namely, that publicity's benefits are abstract and intangible – and the "consequences" of its denial "unquantifiable and indeterminate" – making concrete prejudice highly probable but difficult to detect and too institutionally expensive to litigate in individual cases. *U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006); *see generally, e.g., Gupta*, 699 F.3d at 689 ("it is the openness of the proceeding itself, regardless of what actually transpires, that imparts the appearance of fairness so essential to public confidence in the system as a whole") (citation and internal quotes omitted).

At any rate, an order precluding public access to the content of substantive midtrial proceedings for "five, six hours" hardly qualifies as a trivial impediment (A. 2689). This is especially true where, as previously discussed, the "scrutiny" of "interested spectators" would have served "salutary" Sixth Amendment goals. *Waller*, 467 U.S. at 46-47 (citation and internal quotes omitted). Most starkly, it would have encouraged judge and prosecutor to treat Jordan "fairly"[36] in the face of a website denouncing their performance, impugning her investigation's

---

[36] *Waller*, 467 U.S. at 46.

"integrity"[37] and assailing her trial's "administration,"[38] with "no jury [otherwise] present to act as a safeguard." *Sublett*, 292 P.3d at 723. In all, Jordan's case is a poor vehicle to test the "outer boundaries" of any ostensible "triviality standard," even assuming one's existence and validity as a matter of New York law. *Gupta*, 699 F.3d at 685, 689 (internal quotation marks omitted).

To buttress his triviality theory, the judge oddly stressed that "the record was sealed for ... a matter of hours," the court having "decided to unseal" it "after the luncheon recess, at approximately 2:30 p.m." (A. 8). These truisms prove too much.

      i.     As the judge's own comments indicate, the unsealing did not occur until significantly *after* – **not** *before* or contemporaneously with – his summarily emptying the gallery (A. 2686-89).

      ii.     To the contrary, it is undisputed that the judge actually *sealed* the transcript *simultaneously* with expelling all observers and locking the doors behind them – *both* without placing prior *Waller* findings on the record (A. 2548-50). That scarcely repaired the constitutional violation. If anything, it was a separate and distinct breach of the open trial guarantee – one

---

[37] *Rovinsky*, 722 F.2d at 201.

[38] *Ibid.*

that merely added insult to injury, compounding the underlying closure error and punctuating the need for reversal.

        iii.    Put more succinctly, sealing the transcript absent concurrent findings worked the equivalent of an extra, unjustified closure in and of itself. *E.g.*, *People v. DeBeer*, 3 Misc. 3d 515, 517 (Ont. Cty. Ct. 2004) (judges may only "close the courtroom *and* seal the record[]" upon a showing of some "specific circumstance that gives rise to a significant probability of prejudice") (emphasis supplied); *NBC Subsid.*, 980 P.3d at 368 ("no finding" of substantially probable prejudice "absent closure *and* temporary sealing") (footnote omitted) (emphasis supplied).

        iv.    As one court aptly explained:

> [T]he denial of [a] motion to release ... transcripts was in itself a denial of the [public] right of access.... It must be tested by the same standard and must satisfy the same procedural prerequisites as the initial closure. Therefore, the same procedural and substantive protections that must be observed by a court considering closure of courtroom proceedings in which the public has a [presumptive] right of ... access must also be observed if a court is contemplating to deny access to the transcript of the closed proceeding.

*Oahu Pubs.*, 331 P.3d at 485-86 ("public access to a transcript of a closed proceeding must be given the same protections as a courtroom proceeding") (citations and internal quotes omitted).

v.      Nor did the transcript's delayed "release"[39] some "five, six hours" later[40] "rectify" the antecedent "harm" to Jordan or the public. *Id.* at 471, 483 n.35 ("belated" unsealing a "less[er]" protection of public access than "contemporaneous findings") (citation omitted). Subsequently releasing minutes of a wrongly closed proceeding "fail[s] to cure the [Sixth Amendment] error" because "it is the exclusion *itself* that violates the constitution." *People v. Moise*, 110 A.D.3d 49, 54 (AD1 2013) (emphasis supplied); *accord Alcantara*, 396 F.3d at 201 (transcript's "later" availability "does not satisfy" access right); *id.* at 204 (recording proceeding and "providing public access" to transcript "does not satisfy the open court requirement").

vi.     As the Second Circuit cogently elaborated:

The ability to see and to hear a proceeding as [it] unfolds is a vital component of the ... right of access – not, as the government describes, an incremental benefit.

***

[D]ocumentary access is not a substitute for concurrent access, and vice versa.... [W]here a right of access exists, a court may not deny access to a live proceeding solely on the grounds that a transcript may later be made available. Such a transcript would not fully implement the right of access because some information, concerning demeanor, non- verbal responses, and the like, is necessarily lost in the translation of a live proceeding to a cold transcript.

---

[39] *Oahu Pubs.*, 331 P.2d at 471.

[40] (A. 2689).

*ABC, Inc. v. Stewart*, 360 F.3d 90, 99-100 (2004) (citation and internal quotes omitted); *see also Richmond Newspapers*, 448 U.S. at 597 n.22 (transcript "no substitute" for "public presence" at "trial itself. As any experienced appellate judge can attest, the 'cold' record is a very imperfect reproduction of events that transpire in the courtroom.").

## C.   <u>CONCLUSION</u>

Conducting substantive midtrial proceedings under a cloud of secrecy, in the absence of reviewable record findings justifying such a drastic restriction, is no trifling matter. Doing so here vitiated Jordan's elemental right to a public trial – that ancient and invaluable check on "abuse" of official "power" – forcing her conviction's reversal. *Oliver*, 333 U.S. at 270. Holding "significant proceedings behind closed doors – without [prior] notice" or "any statement of reasons" – is "inconsistent with our open system of justice." *Alcantara*, 396 F.3d at 203. It extinguishes a crucial "safeguard" against "employ[ing] our courts as instruments of persecution" and cannot be condoned. *Oliver*, 333 U.S. at 270.

## POINT III

**JORDAN'S 18-YEAR SENTENCE SHOULD BE VACATED BECAUSE IT WAS BASED ON ILLEGITIMATE FACTORS**

A sentencing court may not base its sentence on conduct for which a defendant has been acquitted. *People v. Black*, 33 A.D.3d 338 (AD1 2006).[41] Rather, determining an "appropriate sentence requires the exercise of discretion after due consideration given to, among other things, the crime charged, the particular circumstances of the individual before the court and the purpose of a penal sanction, i.e., societal protection, rehabilitation and deterrence." *People v. Farrar*, 52 N.Y.2d 302, 305-06, 308 (1981); *see also* Penal Law § 1.05.

Here, the trial court shunned the prescribed holistic approach for a purely retributive one, sentencing Jordan to 18 years. *Contra People v. Stewart*, 57 A.D.2d 796 (AD1 1977) (sentence should promote reformation and rehabilitation, not retribution). Along the way, the court expressed palpable disdain for the jury's rejection of the indictment's second degree murder charge – and tangible disgust

---

[41]  *See also People v. Wilkonson*, 281 A.D.2d 373, 374-75 (AD1 2001); *People v. Varlack*, 259 A.D.2d 392, 394 (AD1 1999) (sentencing court abused its discretion in considering two crimes of which appellant had been acquitted); *People v. Grant*, 191 A.D.2d 297 (AD1 1993); *People v. Maula*, 163 A.D.2d 180 (AD1 1990) (sentencing statements indicated court improperly considered victim's death despite defendant's acquittal on those charges).

76

with Jordan's resort to the First Amendment during the pendency of her high-profile prosecution.

Enhancing Jordan's punishment upon these illicit criteria was a flagrant abuse of discretion. This Court should therefore exercise its authority under CPL § 470.15(6) and either modify the sentence or vacate it and remand for resentencing before a different judge. Alternatively, the "interest of justice" warrants mitigation of the harsh penalty imposed for an act that the jury determined was not entirely willful.

## A.    THE SENTENCING COURT ABUSED ITS DISCRETION

### 1.    The Trial Court Improperly Relied on Acquitted Conduct

The jury, concluding that the defense had met its factual and legal burden with respect to EED, acquitted Jordan of second degree murder. In so doing, the jury resolved two key trial disputes in Jordan's favor. First, the jury determined that she acted under the influence of an extreme emotional disturbance "and that the claimed explanation as to the cause of [her] action [was] not contrived or a sham." *People v. Cassasa*, 49 N.Y.2d 668, 678-79 (1980). Second, the jury found the disturbance to be objectively reasonable under the "circumstances as [Ms. Jordan] perceived them at the time." *Id.* at 679.

Evidently the verdict did not sit well with the trial judge. The court made its sentiments plain at sentencing, explaining its imposition of the exorbitant prison

77

term with a stinging rebuttal of the defense case and, by extension, the jury's verdict. The implication of the court's statements is unmistakable: as a practical matter, Jordan was punished for the murder of which she was acquitted rather than the manslaughter of which she was convicted. It follows that the sentence is legally infirm and cannot stand. *See Black*, 33 A.D.3d at 342 (remanding for resentencing where "court's comments" reflected improper "consideration [of] conduct underlying the charges of which defendant was acquitted"); *Varlack*, 259 A.D.2d at 394 (reducing sentence in circumstances similar to *Black*'s).

### (a)    Abuse of Jude Mirra

To begin, the court flatly discounted any possibility that Jude had been sexually abused. While acknowledging that Jordan *believed* Tzekov had "raped and tortured" him, the court insisted that "[t]here is no credible evidence on this record anywhere that Jude was ever, ever in his entire life the victim of sexual torture[] or … sexual abuse of any kind." (A. 105-106).

In fact, the record belies the court's assertion, despite its exclusionary rulings. To this end, there was (i) trial testimony from two forensic pathologists, Drs. Werner Spitz and Zhongxue Hua, that Jude's postmortem anal histology slide showed inflammation, scarring, fibrosis and extreme anal dilatation, all consistent with sexual abuse; (ii) a mysterious medical history thick with otherwise

inexplicable physical irregularities and symptoms, betrayed by Jude's own words as indicia of abuse; (iii) Jordan's own testimony; and, most important, (iv) *the verdict itself*. Had the jurors shared the court's skepticism of Jude's abuse or Jordan's state of mind regarding it, they surely would have convicted her of intentional murder.

To make matters worse, the court went on to offer its own armchair diagnoses – neuroscientific and psychological – of Jude and his mother, respectively. "[T]he record in this case established that Jude was severely autistic," the court proclaimed. "Apparently, the defendant either could not or would not accept this." (A. 106-07). Yet it was the court itself that had excluded scads of competing trial evidence, barring a clutch of expert defense witnesses from testifying as to how and why Jude's behavioral and physical symptoms defied an autism diagnosis. *See ante* **POINT I**. A sentencing court cannot have it both ways, taxing a defendant for an incomplete record that it prevented her from fully developing.

### (b)    Origin of Text Messages

Continuing its incompetent excursion into neuroscience, the trial court, discussing Jude's reports of abuse at Tzekov's hands, insinuated that Jordan herself had composed the text messages admitted as evidence. "It's hard for me to believe

that Jude Mirra had the intellectual capacity to communicate on the level the defendant described," the court held forth. "To write lengthy dialogue, using three-syllable words, what I used to call 'fifty-cent words,' an eight-year old autistic boy. That's not credible. It is contrary to the evidence. How can anyone believe that?" (A. 107-108).

But again, the court had *precluded* testimony from defense witness Darlene Hanson confirming that an eight-year-old boy could indeed have typed the subject texts by a method that she had used for 25 years with other nonverbal children. *See ante* **POINT I(B)(2).** The double standard the court employed – excluding proffered defense evidence as irrelevant for trial purposes while leaning on the absence of that evidence to augment Jordan's punishment – typified its unfair approach throughout the sentencing hearing.

### (c)    Raymond Mirra's Violent Threats

The trial court next turned to another aspect of Jordan's defense: her mortal terror of Mirra and concomitant fear that he was about to kill her.

In this vein, the court purported to recognize that Jordan believed all of the following: (i) "Mirra was trying to kill her"; (ii) "Jude would be subjected to living the rest of his life in the custody of abusers" if he succeeded; and (iii) "Mirra was stealing a substantial portion of her fortune, forging her name on money transfers,

altering a prenuptial agreement, as well as a divorce decree" (A. 106). But in the next breath the court broadly declared that there was "*no credible evidence that any of these things were true*[.]" (A. 106) (emphasis supplied); *see also* (A. 115).[42]

By accepting the EED defense, however, the jury necessarily found that Jordan had presented *enough* "credible evidence" of these propositions to render her belief in their truth objectively reasonable to someone in her situation. *See Cassasa*, 49 N.Y.2d at 678-79. In suggesting otherwise, the court yet again endeavored to impeach the verdict improperly in service of inflating Jordan's sentence.

### (d)   Jordan's Suicide Attempt

Finally, the trial court bluntly rejected Jordan's testimony that she had attempted suicide. *See* A. 110 ("*I don't believe, I never believed, and again I don't know if the jury believed it*") (emphasis added); A. 110-11 ("any person who ingested what the defendant said she ingested [Ambien, Xanax and Hydrocodone and vodka], would surely have been dead"). This was still another tacit effort to impugn the jury's verdict. For if the jurors felt that Jordan had feigned suicide and

---

[42] The court also rejected the findings in a report submitted for consideration at sentencing by forensic psychologist L. Thomas Kucharski, PH.D, that "Jude was the victim of horrific physical and sexual abuse, best characterized as torture." (A. 5866).

lied about it on the stand, it is inconceivable that they would have acquitted her of intentional murder.

In fact, the notion of a staged suicide – beyond its wholesale want of record support – was roundly refuted by a pair of first responders who independently recounted Jordan's condition upon their arrival. *See* (A. 4623-26) (Officer Smith tells police dispatcher that Jordan was "barely alive" and "not yet" DOA; A. 2756-57, 2766 (Det. Crowley recalls seeing "white ring on the outside of [Jordan's] lips" consistent with drug overdose, and hearing agonized "screaming," "crying," "retching" and "vomiting"). Reinforcing this unchallenged eyewitness testimony was expert defense toxicologist Alphonse Poklis, who verified that the officers' reports comported with one who had nearly succumbed to a cocktail of alcohol and prescription medication (A. 3057-60).

Yet the presiding justice, unfazed by the abundant evidence corroborating the defense position – that Jordan had indeed ingested lethal quantities of drugs and alcohol – again presumed to substitute his own judgment for that of the jury, rewriting the record to fit the narrative he preferred.[43]

---

[43]  In questioning the authenticity of Jordan's suicide bid, the sentencing court also exploited unfairly its exclusion of testimony by Dr. Donald Hoffman, a prominent toxicologist, regarding the on-scene investigators and DA's failure to order a blood draw from Jordan for chemical analysis, along with the loss – and consequent unavailability for forensic testing – of a residual blood sample obtained by the hospital (A. 4602-05). To make matters worse, the court refused to

2.     **The Trial Court Impermissibly Punished Jordan for Protected First Amendment Activity**

The First Amendment disables judges from penalizing defendants based on "beliefs, association, or speech" unrelated to the "issues involved in the sentencing proceeding." *U.S. v. Stewart*, 686 F.3d 156, 166 (CA2 2012) (citing *Dawson v. Del.,* 503 U.S. 159, 165 (1992)).

Notwithstanding this prohibition, the record suggests that Jordan's media interviews during trial heavily influenced the stiff sentence she received. Immediately "before … impos[ing that] sentence," the judge thus took pains to "mention" that

> [o]n Thursday the 30th, someone approaches me after court and says, "Do you know that Gigi Jordan is going to be on Dr. Phil tomorrow?" I said, "What?  Are you kidding me?"
>
> . . . .
>
> I couldn't believe it, couldn't believe it . . . . I never thought it was a coincidence . . . . This is during the time that the jury was deliberating. Also that Friday night, Inside Edition, Channel 2 News. Again, I don't believe in coincidences.

(A. 115-16).

The quoted remarks – coupled with the judge's reaction to the website attributed to Jordan and other instances of express hostility to Jordan's appeals in

---

instruct the jury on the loss unless Jordan stipulated that police and prosecutors were blameless (A. 5154-5157).

the court of public opinion[44] – indicate that displeasure with her engaging in free speech figured prominently in the hefty punishment meted out. As no gag order curtailed the exercise of Jordan's First Amendment rights, this error alone necessitates relief from sentence.

## B.    **CONCLUSION**

The trial court improperly penalized Jordan for conduct of which the jury acquitted her, effectively repudiating the verdict. The court drew adverse inferences from evidentiary gaps that its own exclusionary rulings created and prevented Jordan from filling. And it punished Jordan's resort to constitutionally protected speech – despite the absence of a gag order – during the pendency of a case that dominated the headlines and captured the popular imagination. Her 18-year sentence must be stricken or modified accordingly.

---

[44] (A. 115-16, 5562-69, 5574-76, 5612-16, 5627-32, 5640-48).

## **CONCLUSION**

For the reasons stated, this Court should vacate Jordan's conviction and sentence.

Respectfully submitted,

_____

Marc Fernich
Law Office of Marc Fernich
810 Seventh Avenue, Suite 620
New York, New York 10019
212-446-2346
maf@fernichlaw.com

Allan L. Brenner
Law Office of Allan L. Brenner
536 West Penn Street - 2nd Floor
Long Beach, New York 11561
516-897-6145
brennerlawlb@gmail.com

CERTIFICATE OF COMPLIANCE
PURSUANT TO 22 NYCRR § 670.10.3(F)

The foregoing brief was prepared on a computer. A proportionally spaced typeface was used, as follows:

Name of typeface: Times New Roman
Point size:            14
Line spacing:        Double

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum containing statutes, rules, regulations, etc., is 16,428.