Exhibit F

HON. GEORGE BUNDY SMITH (RET.)
549 WEST 123 STREET, SUITE 13F
NEW YORK, NEW YORK 10027

SIEGEL TEITELBAUM & EVANS, LLP
260 MADISON AVENUE, 22ND FLOOR
NEW YORK, NEW YORK 10016

LAW OFFICE OF MARC FERNICH
810 SEVENTH AVENUE, SUITE 620
NEW YORK, NEW YORK 10019

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 FIFTH AVENUE, 10TH FLOOR
NEW YORK, NEW YORK 10020

Jan. 19, 2017

Hon. Janet DiFiore
Chief Judge
New York Court of Appeals
20 Eagle St.
Albany, NY 12207

Attn.: Hon. John P. Asiello, Clerk of the Court

      Re:    *People v. Gigi Jordan*, N.Y. Co. Ind. No. 621/10

Dear Chief Judge DiFiore:

      Gigi Jordan seeks leave to appeal an Appellate Division, First Department

ruling affirming a New York County Supreme Court judgment (Solomon, J.)

convicting her of manslaughter upon a jury verdict and sentencing her to 18 years

of prison. Jordan argues principally that the presiding judge erred in closing the

courtroom -- offending her state and federal constitutional and statutory rights to a

public trial – for the duration of a substantive midtrial hearing without following

the procedure mandated by the U.S. Supreme Court and this one.

## STATEMENT

      The Sixth and Fourteenth Amendments and state counterparts entitle

criminal defendants to a "public trial." To curtail that right, (1) "the party seeking

Hon. Janet DiFiore
Jan. 19, 2017
Page 2

to close the hearing must advance an overriding interest that is [otherwise] likely to be prejudiced"; (2) "the closure must be no broader than necessary to protect that interest"; (3) "the trial court must consider reasonable alternatives to closing the proceeding"; and (4) the court "must make findings adequate to support the closure." *Waller v. Ga.*, 467 U.S. 39, 48 (1984); *People v. Garay*, 25 N.Y.3d 62, 69-70 (2015). Closing the courtroom without satisfying this four-part test is presumptively prejudicial and requires automatic reversal, without resort to harmless error analysis. *People v. Echevarria*, 21 N.Y.3d 1, 15 (2013).

In this case, the presiding judge summarily cleared the courtroom, excluded all spectators and sealed the record for a midtrial hearing concerning extra-judicial allegations – imputed to the defendant – that the court and prosecutor were subverting justice and inhibiting her right to a fair trial by improperly suppressing material evidence. The judge took this drastic step – ejecting the public and press – on the prosecutor's unrecorded say-so at the bench, eschewing the *Waller* protocol entirely.

As the court itself later confessed, the closure was both "erroneous" and "unnecessary" (A. 5, 8, 2688-89). But instead of reversing automatically, the Appellate Division excused the *Waller* violation by calling the hearing "the equivalent of a sidebar, robing room or chambers conference," to which the "public trial" right ostensibly "does not extend." *People v. Jordan*, slip op., __ N.Y.S.3d __, 2016 WL 7394528, at *1 (AD1 Dec. 22, 2016). Improperly invoking a harmless error

Hon. Janet DiFiore
Jan. 19, 2017
Page 3

standard, the Appellate Division also opined that the closed proceeding had no discernible "impact upon the conduct of the trial." *Id.*

Jordan seeks to appeal that ruling, proposing these questions for review:

1.    Do the content and substance of a given proceeding – rather than its form or label – control attachment of the Sixth Amendment right to a public trial?

2.    Can courts avoid a violation of that right – which applies to sidebars regardless – by recasting a proceeding's nature and renaming it after the fact?

If leave is granted on the closure issue, defendant also will renew her Appellate Division argument that the trial court erred in precluding her proffered defense of duress. *Id.* An oral hearing on this application, personal or telephonic, is respectfully requested. *See* 22 NYCRR § 500.20(a)(3).

## BACKGROUND

A Manhattan grand jury indicted Jordan, a prominent pharmaceutical executive, for a single count of murder upon the death of her developmentally delayed eight-year-old son. A petit jury convicted her of manslaughter, crediting the affirmative defense that she had acted under the influence of extreme emotional disturbance. She is serving an 18-year sentence.

Jordan's high profile trial generated intense publicity and gavel to gavel press coverage. One month into her nine-week trial, on the morning of Oct. 1, 2014, as court convened and reporters and spectators settled into their seats (but before the jury entered), the prosecutor asked to approach the bench. A discussion ensued

Hon. Janet DiFiore
Jan. 19, 2017
Page 4

that, for reasons unknown, took place off the record and in Jordan's absence (A. 2548).

When Jordan entered the well, Justice Solomon noted her presence and began to say, "Counsel, what I'd like to do is...." The prosecutor cut him off, interjecting: "This does not count as closed." The judge bristled, "just wait a second." *Id.*

The judge then announced summarily, "we have to close the courtroom to make a record. We have to close the courtroom without any spectators in the [gallery] ... about something that has to be done *in private.*" *Id.* (emphasis supplied). The spectators were ushered out and the doors secured by court officers as the judge instructed the sergeant to "make sure no one enters" (A. 2549). Defense counsel immediately objected, asking what authority supported the court's order. "My authority," the court replied, adding only that the prosecutor "wants to make a record about something he didn't want to put on the record in front of the audience or the press" – and noting, "it has to do with Ms. Jordan." *Id.*

Counsel continued to protest, complaining that no judicial findings had been made to justify ejection of the public. *Id.* "We're going to make the record right now," the judge offered nonresponsively, but "the transcript will not be released immediately. Unless everyone consents to it.... [Y]ou can object all you want" (A. 2549-50). "Something happened that [the prosecutor] wants to place on the record," the judge repeated cryptically, "a very serious problem concerning Ms. Jordan" (A.

Hon. Janet DiFiore
Jan. 19, 2017
Page 5

2550). "[W]hat[ever] the serious problem," counsel rejoined, it "can be articulated in an open courtroom consistent with the Sixth and Fourteenth Amendments." *Id.*

The court then turned to the prosecutor, who recalled that the judge had informed "both parties" to abide by certain "ethical guidelines concerning publicity during the trial" and reassured that he wasn't "suggesting that the defense attorneys ha[d] knowledge of what [he was] about to say" (A. 2551). The prosecutor then attributed his closure request to "fair trial" concerns surrounding a "website," handing up a paper copy of the home page that ascribed the site's content to Jordan. *Id.* The court sealed the document – again without explanation – at the prosecutor's urging (A. 2551-52). The prosecutor then proffered that the home page and linked articles on the website "accuse[d], among others, your Honor of subverting justice in this case" (A. 2552).

Though it was now clear that the issue involved the exercise of a core constitutional right – the First Amendment right to free speech on a matter of public interest – the judge still did not reopen the courtroom. Instead he demanded, "Where's that? Which page is that?" while inspecting the sealed exhibit (A. 2552). The following dialogue ensued:

> Prosecutor: It's multiple. It's multiple. The only proper way to do this is to go online. And it accuses your Honor of refusing to allow information to come before the jury, hence the title of the website, The Inadmissible Truth.
>
> And lest the defendant disavow any knowledge of this particular website, I have an email from Ms. Jordan. It was sent out last night, yesterday –

Hon. Janet DiFiore
Jan. 19, 2017
Page 6

> The Court: To whom?
>
> Prosecutor: Several hundred email addresses. Most of them appear to be the media. You could see the e-mail address. I printed it up in such a way that the e-mail addresses show.
>
> ***
>
> And your Honor will see in the body of the e-mail itself how Ms. Jordan believes that the justice system is being stymied on many fronts resulting in the suppression of evidence that anyone would expect to hear at a fair trial. And then Ms. Jordan goes at length on the website to explain why it is this Court is actually – how this Court is actually doing that. And so, I felt several things, your Honor, I felt duty-bound to report this to the Court immediately.

(A. 2553-54)

The prosecutor then accused the defendant of "trying [by publishing the website] to go around the court's rulings and trying to get into the public domain matters that this court has ruled is inadmissible" (A. 2554). As to the basis for closing the courtroom, the prosecutor now claimed he had made the application partly for *Jordan's* benefit. To this end he affected concern for the defendant, claiming that he sought the closure to avoid the media "feeding frenzy" that would ensue if the press learned of her "desperate act" of posting the site. *Id.* But that notion was belied by the prosecutor's earlier contention that the site was already sent to "several hundred [media] email addresses" (A. 2553).

For his part, defense counsel pressed his objection to the closed courtroom and again sought its immediate reopening:

Hon. Janet DiFiore
Jan. 19, 2017
Page 7

> [I]t is the defense position that the closed
> courtroom is not requested by us, is not necessary
> for us, is and remains unconstitutional and there is
> absolutely nothing in the record that [the
> prosecutor] just made that could conceivably justify
> the closure of the courtroom. So before I respond to
> the other points, I would ask that this
> constitutional abomination be ended and the
> spectators and the press be re-admitted to an open
> court....

(A. 2556)

The prosecutor then revealed his true motive for having the public (and especially the press) tossed out and pushing to proceed in secret. Inquiring in the open, he surmised, would surely "achieve the defendant's purpose of ... during the trial getting publicity about inadmissible matters, and doesn't that, Judge, ... risk a fair trial to both?" (A. 2556-57).

Brushing the question aside, the judge grilled *defense counsel* about the website's source and content as counsel strained to steer the conversation back to the closed courtroom (A. 2557). Meanwhile the judge not only kept the courtroom shut but sealed the transcript and remaining exhibits over renewed defense objection (A. 2560).

Revisiting the origin of "these emails, Twitters, whatever," the judge allowed – incongruously – that the jury is "completely unaware of this" (A. 2561-62). Indeed, as defense counsel proffered, that was precisely why the jury had been repeatedly instructed to avoid Internet and media accounts of the trial:

> [I]ndeed, Judge, had they chosen to disregard that
> instruction and just started Googling Gigi Jordan,

Hon. Janet DiFiore
Jan. 19, 2017
Page 8

> there will be a myriad of things that would never
> make it into a courtroom, both from critics and
> supporters of Ms. Jordan, completely inadmissible
> things that are all over the internet. That's why
> you tell them not to do that.

(A. 2562)

Defense counsel then added pregnantly:

> [T]he constitutional violation is continuing every
> minute that proceedings such as these are sealed
> and closed, and the public is excluded.

*Id.*

The following colloquy ensued:

> The Court: What's in this email and what's [in] this
> website? Clearly, to me, what I've seen so far, it's
> improper to say these things.
>
> Defense Counsel: Improper?
>
> The Court: Improper.
>
> Defense Counsel: For whom?
>
> The Court: For whom? This is talking about
> evidence that is not admitted at trial…

(A. 2557)

At that point, the judge issued an opaque warning: "I just hope this is not
going to continue. Someone's doing this. I don't know who. This is not going to
[continue]. This [will stop], I mean that" (A. 2564).

Hon. Janet DiFiore
Jan. 19, 2017
Page 9

In response to further defense objections, the court acknowledged, "[i]t's preserved. If she's convicted, this will be an issue, I imagine, on appeal. I don't know" (A. 2559).

Appearing to retract his earlier denunciations of Jordan's protected speech, the court declared, "I don't have a problem. There is no gag order," then sowed confusion anew by adding the caveat, "as long as, as long as, it's an accurate description of what's taking place" (A. 2566). After reasserting that "the minutes will be sealed" over renewed defense objection, the court summoned the jury and reminded it again to avoid news coverage of the case as testimony resumed (A. 2566, 2569-72).

When the trial proceedings convened in the afternoon following a break for lunch, the court's tone changed markedly. Asking the prosecutor why the exhibits from the closed session – the website excerpts and emails attributed to Jordan – should stay sealed, the judge confessed that he hadn't "really look[ed] at the communication[s] that closely" (A. 2687).

Nonplused by the prosecutor's response – which merely referred back to his earlier comments – the court reiterated that:

> I didn't really have a chance to read everything because it came quite as a surprise to me this morning.... [M]aybe it was an erroneous ruling. Maybe this should be in the public domain, I don't know. I'm trying to think of the reason why it shouldn't. I can't think of a reason.

(A. 2688)

Hon. Janet DiFiore
Jan. 19, 2017
Page 10

The judge went on to unseal the minutes and exhibits, remarking: "[I]t's now two-thirty. So if the record has any error committed by me, it was committed for maybe five, six hours" (A. 2689).

## REASONS FOR GRANTING LEAVE

**THE COURT SHOULD HEAR THIS CASE TO CLARIFY THAT (1) CONTENT AND SUBSTANCE – NOT FORM OR LABEL – DETERMINE ATTACHMENT OF THE SIXTH AMENDMENT PUBLIC TRIAL RIGHT, (2) SIDEBAR CONFERENCES HELD IN OPEN COURT ARE SUBJECT TO PUBLIC ACCESS AND (3) COURTS CANNOT EVADE *WALLER* VIOLATIONS BY RECHARACTERIZING IMPROPERLY CLOSED PROCEEDINGS AFTER THE FACT**

## A.   STATEMENT

There is no "dispute" that the trial court failed to comply with *Waller* or make the findings it prescribes before closing the courtroom (A. 5, 8). Indeed, the court itself acknowledged as much in sustaining the verdict after trial,[1] conceding that the closure was wholly "[un]necessary" – largely because the "information" addressed had "already" been publicly "disseminated." *Id.* At issue, then, is the Appellate Division's contention that the public access right did not apply because the midtrial hearing – prompted by a website and press release in Jordan's name that accused the judge and prosecutor of suppressing evidence and treating her

---

[1] Upon a CPL § 330.30 motion to vacate (A. 5, 8).

Hon. Janet DiFiore
Jan. 19, 2017
Page 11

unfairly – was "equivalent" to a "sidebar, robing room or chambers conference."

*Jordan*, 2016 WL 7394528, at *1.

In a word, the Appellate Division was wrong. The "closed proceedings in question were held outside the jury's presence *in the courtroom*," *not* "in chambers" or at the bench. *NBC Subsid. (KNBC-TV), Inc. v. Sup. Ct.*, 980 P.2d 337, 363 (Cal. 1999) (emphasis supplied). That truth alone controls, compelling the remedy the Supreme Court and this one demand: automatic reversal for want of *Waller* compliance. *Echevarria*, 21 N.Y.3d at 15.

## B.   OPERATIVE LAW

It is fundamental that the public access guarantee "extends beyond" the actual presentation of "proof at trial." *Com. v. Downey*, 936 N.E.2d 442, 447 n.9 (Mass. App. 2010). In fact, "*all* trial proceedings are presumed open"[2] and "*no* phase of a criminal trial is exempt from the public trial guarantee." *State v. Smith*, 876 N.W.2d 310, 338-39 (Minn. 2016) ("*Smith MN*") (Stras, J., concurring) (emphasis supplied). Rather, the access right "applies to the *entire* trial,"[3] embracing "any" and all material "stage[s]." *Bucci v. U.S.*, 662 F.3d 18, 22 (CA1 2011) (quoting *Presley v. Ga.*, 558 U.S. 209, 213 (2010)); *see, e.g., Smith MN*, 876 N.W.2d at 328 ("public trial guarantee applies to all phases of trial") (citations, internal quotes and alteration omitted).

---

[2] *State v. Smith*, 334 P.3d 1049, 1056 (Wash. 2014) (en banc) ("*Smith WSH*") (Wiggins, J., concurring in result) (emphasis supplied).

[3] *State v. Reed*, 352 P.3d 530, 540 (Kan. 2015) (emphasis supplied) (citation omitted).

Hon. Janet DiFiore
Jan. 19, 2017
Page 12

Material stages include "arguments of counsel on ... disputed question[s],"[4] along with discussions about jury instructions and "the admissibility of key evidence." *Smith WSH*, 334 P.3d at 1058 (Wiggins, J., concurring in result); *see also id.* at 1067-68 (Owens, J., dissenting). A broad construction of the right to "open proceeding[s]" advances its salutary purposes: most notably, "discourag[ing] prosecutorial overreaching and encourag[ing] judicial evenhandedness," *State v. Sullivan*, No. 112, 638, 366 P.3d 664, 2016 WL 563000, at *2 (Kan. App. Feb. 12, 2016) (unpublished), and enhancing criminal trials' "basic fairness" and "appearance of fairness." *Press-Ent. Co. v. Sup. Ct.*, 478 U.S. 1, 9 (1986).[5]

In short, publicity is a "core safeguard to the justice system" and an "important" constraint on the "judiciary," *Smith WSH*, 334 P.3d at 1054 n.12, since "[w]ithout publicity all other checks are inefficient." *Oliver*, 333 U.S. at 271. It deters "misconduct and partiality" and "helps ensure that judges and lawyers are accountable for what occurs during trial." *Smith WSH*, 334 P.3d at 1067 (Owens, J., dissenting).

---

[4] *Smith MN*, 876 N.W.2d at 343 (Stras, J., concurring).

[5] *See, e.g., In re Oliver,* 333 U.S. 257, 270 (1948) ("knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power"); *Smith MN*, 876 N.W.2d at 39-40 (access right checks abuses of power, "opening the judicial process to public inspection" and curbing attempts to employ courts as "instruments of persecution"); *Smith WSH,* 334 P.3d at 1054 (access guarantee a "prophylactic measure allowing the public to observe the process and weigh the defendant's guilt or innocence for itself," promoting society's "strong interest in protecting the transparency and fairness of criminal trials") (citation and internal quotes omitted).

Hon. Janet DiFiore
Jan. 19, 2017
Page 13

It follows from all this that a reviewing court cannot determine "whether the public trial right attache[d] to a particular proceeding"[6] based simply on the "label" a prosecutor or judge chooses to "give the event." *Com. v. Riley*, 15 N.E.3d 1165, 1170 (Mass. App. 2014). The inquiry is "functional rather than formal,"[7] shunning "arbitrary lines"[8] and rendering the "type of proceeding" – "not [its] location" – "de[cis]ive." *Smith MN*, 876 N.E.2d at 329.

Thus, contrary to the Appellate Division's approach, "merely characterizing something as a 'sidebar'" or its equivalent "does not make it so." *Smith WSH*, 334 P.3d at 1054 n.10. Quite the opposite: Courts regularly find "public trial" violations where the "content" of an improperly closed bench or chambers proceeding transcends the ministerial or mundane "subject[s]" those sorts of conferences "traditional[ly]" cover. *Id.*

In *Rovinsky v. McKaskle*, for example, the Fifth Circuit found a publicity violation where the trial judge entertained private arguments in chambers. As the court stressed, the Sixth Amendment access right "forbids state courts to conduct hearings in camera on matters arising in the course of a criminal trial, *absent overriding need to foreclose public attendance, articulated in the court's findings at the time of closure.*" 722 F.2d 197, 199 (1984) (emphasis supplied); *accord U.S. v. Alcantara*, 396 F.3d 189 (CA2 2005) (striking conviction where substantive robing

---

[6] *State v. Sublett*, 292 P.2d 715, 735 (Wash. 2012).

[7] *Smith MN*, 876 N.E.2d at 342 n.4 (Stras, J., concurring).

[8] *Smith WSH*, 334 P.3d at 1058 (Wiggins, J., concurring in result).

Hon. Janet DiFiore
Jan. 19, 2017
Page 14

room proceedings held without advance record findings of necessity). And more recently, the Second Circuit overturned a conviction where the public was excluded from jury selection improperly – i.e., sans prior *Waller* findings – *despite* parts of the closed proceedings having occurred "at sidebar" and in the "jury room." *U.S. v. Gupta*, 699 F.3d 682, 685 (2012).

More fundamentally, comparing the closed hearing in this case to a sidebar only begs the question, as the Sixth Amendment equally entitles the accused "during trial to have spectators present in the courtroom *while sidebar conferences t[ake] place* out of their earshot." *Com. v. Cohen*, 921 N.E.2d 906, 925 (Mass. 2010) (emphasis supplied).

Although "the public cannot hear what is being said" at the bench, "the ability to observe itself furthers the values that the public trial right is designed to protect." *Id.* As one judge cogently explained:

> [S]idebar conferences permit members of the public to view the conduct of the attorneys and the judge, even if members of the gallery cannot hear what the attorneys and judge are saying. In [that] situation, the trial itself remains open and public, which is [precisely what] the Sixth Amendment requires.

*Smith MN*, 876 N.W.2d at 343 n.5 (Stras, J., concurring); *accord, e.g., Wilder v. U.S.*, 806 F.3d 653, 661 (CA1 2015) (Toruella, J., concurring) (sidebars permissible inasmuch as "*held in open court*, where all the public can observe (even if they

Hon. Janet DiFiore
Jan. 19, 2017
Page 15

cannot hear) the proceedings") (emphasis supplied), *cert. denied*, 136 S. Ct. 2031 (2016).[9]

Thus, it is well established that "a proceeding that would be subject to a right of access if held in open court does not lose that character," as the Appellate Division wrongly supposed, "simply because the trial court chooses to hold the proceeding in chambers." *NBC Subsid.*, 980 P.2d at 363 (footnotes omitted).

This is especially true where, as here, the defense protests the public's exclusion and the substantive issues addressed in the proceedings distinguish them from chambers or bench conferences. *Id.* at 363-64 & n.34; *accord, e.g., Rovinsky*, 722 F.2d at 201 ("Sidebar conferences in which defendant's counsel participates *without objection* do not violate the right to a public trial.") (emphasis supplied); *see also U.S. v. Norris*, 780 F.2d 1207, 1210 (CA5 1986) ("Norris made no contemporaneous objection to the [private] chambers conferences," so "we need not consider his [appellate] objection") (cited in *People v. Olivero*, 289 A.D.2d 1082 (AD4 2001)).

Since the Sixth Amendment public trial right "benefit[s]" the accused, *Waller*, 467 U.S. at 46 (citations and internal quotes omitted), her counsel are free to waive its protections by willingly participating in private bench or chambers conferences. But where counsel protest the public's exclusion from a bench or

_____

[9] *See also Downey*, 936 N.E.2d at 449 n.13 (while "sensitive matters can be addressed at sidebar in an open courtroom, the values underlying the right to public trial cannot be preserved when the courtroom is closed to the public").

Hon. Janet DiFiore
Jan. 19, 2017
Page 16

chambers conference addressing substantive issues, and where the court proceeds

privately without making express *Waller* findings on the record in advance, reversal

follows *a fortiori*.

In sum, whatever a court might call a given proceeding, the ultimate inquiry

distills to "whether public access plays a significant positive role in the functioning

of the particular process in question." *Reed*, 352 P.3d at 540. Regarding the closed

hearing in this case, the answer is an emphatic "yes."

## C.   APPLICATION OF LAW TO FACT

By any objective measure, the "content" of the closed proceeding went far

beyond the minor, technical matters "traditional[ly]" addressed at the bench or in

chambers. *Smith WSH*, 334 P.3d at 1054 n.10. Instead, it involved "arguments of

counsel"[10] and "discuss[ions of] jury instructions"[11] stemming from charges of

judicial "abuse"[12] and "prosecutorial misconduct"[13] in the "bad faith"[14] suppression

of "key [defense] evidence." *Id.* at 1058 (Wiggins, J., concurring in result). These are

exactly the sort of accusations – attacking the "transparency,"[15] integrity and

"conduct" of the judge and "prosecutor," and spurring recriminations against the

---

[10] *Smith MN*, 876 N.W.2d at 343 (Stras, J., concurring).

[11] *Smith WSH*, 334 P.3d at 1058 (Wiggins, J., concurring in result).

[12] *Oliver*, 333 U.S. at 270; *Reed*, 352 P.3d at 542.

[13] *Reed*, 352 P.3d at 541.

[14] *Smith WSH*, 334 P.3d at 1054.

[15] *State v. Easterling*, 137 P.3d 825, 830 (Wash. 2006).

Hon. Janet DiFiore
Jan. 19, 2017
Page 17

accused for constitutionally protected speech – that "require[] circulation in the fresh air ... accompany[ing] public observation." *Reed*, 352 P.3d at 541-42; *see also, e.g., id.* at 541 ("the public ... has an interest in having allegations of government misconduct heard in an open forum"); *id.* at 542 (access right "designed to protect against" threats of "judicial, prosecutorial or public abuse") (citation omitted).

By the People's account, the website imputed to Jordan, dubbed "The Inadmissible Truth," "accused the court" of "'subverting justice' by 'refusing to allow information to come before the jury'" AD1 Ans. 43. And an email sent to the press announcing the site's launch – ascribed by the prosecutor to Jordan – alleged that "the justice system" and "[t]he prosecutor" had "stymied" the "truth seeking process" by "suppressi[ng] ... evidence that anyone would expect to hear at a fair trial" – evidence "tell[ing] the whole story of the torment [her] son endured and how and why this horror happened." *Id.* at 42-43.

In the closed proceedings the prosecutor charged Jordan with generating the "website" and assailed her criticisms of the judge (A. 2553-54) ("*Ms. Jordan* goes at length on the website to explain ... how this Court is actually [stymying justice]") (emphasis supplied). "[C]reating th[e] website and sending" the email, he said, were "desperate" efforts to "go around the Court's rulings" and "get into the public domain matters" held "inadmissible" (A. 2554) And he sought affirmative judicial relief in the form, among others, of a cautionary instruction to the jury. AD1 Ans. 40, 43, 48-49; A. 2555.

Hon. Janet DiFiore
Jan. 19, 2017
Page 18

Defense counsel pushed back, arguing that Jordan had a "constitutional right" to post the site, especially since there are "myriad ... things that would never make it into a courtroom, ... completely inadmissible things all over the Internet" (A. 2558, 2562); *see also* A. 2566 (court lacks "plenary control over what is put on the Internet regarding this case" given "law regarding prior restraints on speech"). Counsel further maintained that Jordan's lawyers were permitted to publicly "describe ... proceedings that took place" in the "course of [] trial" and "what transpired in the courtroom" (A. 2562-63)

For its part, the court ejected the public and sealed the minutes, then warned the defendant ominously that her constitutionally protected speech was "improper," cautioning "this is not going to continue" (A. 2557, 2564).

As these excerpts illustrate, the closed proceeding was "not [remotely] analogous to" a typical bench or chambers conference dealing with routine housekeeping points. *Smith WSH*, 334 P.3d at 1054. To the contrary, it concerned "allegations of government misconduct" – by judge and prosecutor alike – in suppressing vital evidence, thereby thwarting the truth-seeking process and denying the defendant a fair trial. *Reed*, 352 P.3d at 541. These allegations provoked countercharges against the defendant – from both judge and prosecutor – of impropriety attending her motive in creating and publishing the site. "[A]rguments of counsel" on these "disputed questions" ensued, *Smith MN*, 876 N.W.2d at 343 (Stras, J., concurring), alongside the prosecutor's request for renewed

Hon. Janet DiFiore
Jan. 19, 2017
Page 19

cautionary instructions to the jury. *See, e.g., Smith WSH*, 334 P.3d at 1058 (Wiggins, J., concurring in result).

Against this backdrop, there is no denying that "public access [would have] play[ed] a significant positive role in the functioning of the particular process" at stake, enhancing both its "basic fairness" and the "appearance of fairness." *Press-Ent. Co.*, 478 U.S. at 8-9. With the judge and prosecutor's "conduct" under direct "attack[]," *Waller*, 467 U.S. at 47, and countercharges of wrongdoing issuing in response, the situation virtually begged for "contemporaneous review in the forum of public opinion," *Oliver*, 333 U.S. at 270, to "remind[] the prosecutor and judge of their responsibility to the accused and the importance of their functions." *Peterson v. Williams*, 85 F.3d 39, 43 (CA2 1996). Indeed, circumstances more urgently demanding that kind of "reminde[r]" are hard to imagine. *Waller*, 467 U.S. at 47. Instead, the public's "interest in having allegations of government misconduct heard in an open forum"[16] was foreclosed, hindering its ability to "serve as a check on abuses of justice" since the proceeding was "conducted behind closed doors." *Smith MN*, 876 N.W.2d at 340 (Stras, J., concurring).[17]

In suggesting otherwise, the Appellate Division "mistakenly equated the values protected by the right to public trial with the interests protected when

---

[16] *U.S. v. Waters*, 627 F.3d 345, 360 (CA9 2010).

[17] *Cf., e.g., Smith WSH*, 334 P.3d at 1058 (Wiggins, J., concurring in result) ("discussion over the admissibility of key evidence is of public interest"); *id.* at 1068 (Owens, J., dissenting) ("public access plays a significant positive role" in functioning of "evidentiary discussions," so "public trial right attaches to" them).

Hon. Janet DiFiore
Jan. 19, 2017
Page 20

inquiry regarding sensitive matters is done at sidebar in *open court*." *Downey*, 936
N.E.2d at 449 n.13 (emphasis supplied). And even bypassing spectators' ability to
observe conventional sidebars, so labeling a particular proceeding only begins, not
ends, judicial examination. *Smith WSH*, 334 P.3d at 1054 n.10; *NBC Subsid.*, 980
P.2d at 363. The real questions are: Was the proceeding "limited" in "content" to the
pedestrian "subject[s]" – normally involving scheduling or administrative details –
"traditional[ly]" addressed at the bench? *Id.* Or was it, instead, the type of
proceeding in whose "functioning" publicity "plays a significant positive role"? *Press-
Ent. Co.*, 478 U.S. at 8.

The hearing at issue plainly fits the second category, so the access right
demonstrably attached. *Cf. Smith WSH*, 334 P.3d at 1067 (Owens, J., dissenting)
("hiding discussions over evidence" in "private" does not "foster trust in our judicial
system"). And because the court closed the proceeding without following the *Waller*
protocol, the right was violated, dictating automatic reversal. *See Echevarria*, 21
N.Y.3d at 15.

### D.    OTHER POINTS

The Appellate Division's remaining remarks are similarly unavailing.

**First**, the Appellate Division's ruling that the closed hearing "had no
[tangible] impact on the conduct of the trial"[18] defies the teachings of the Supreme
Court and this one, which have long held that an improper closure – viz., one

---

[18] *Jordan*, 2016 WL 7394528, at *1.

Hon. Janet DiFiore
Jan. 19, 2017
Page 21

lacking contemporaneous *Waller* findings – is presumptively prejudicial and constitutes per se reversible error, without review for harmlessness. *Id.*

**Second**, the Appellate Division intimated that closure was appropriate to "protect[] the jury from exposure to [case-related] publicity."[19] But the jury was not present when the courtroom was closed and the website hearing occurred. And were the *Waller* factors applied in this case, no reasoned analysis would find an "overriding interest likely to be prejudiced,"[20] especially since the "information" at issue had "already" been publicly "disseminated" (A. 5, 8). What's more, the judge had previously admonished the jury to disregard extrinsic information published about the case, an "instruction[]" they were presumed to have "follow[ed]." *Smith WSH*, 334 P.3d at 1055 n.13.[21]

It is beyond debate that neither "the Government [n]or the court identif[ied] an overriding interest, much less establish[ed] that it was likely to be prejudiced," on the record[22] *before*[23] the closure took place. *U.S. v. Candelario-Santana*, 834 F.3d

---

[19] *Ibid.*

[20] *Waller*, 467 U.S. at 45.

[21] *See, e.g., Smith MN*, 876 N.W.2d at 339 (no reason for closure where inadmissible evidence discussed was "in the public record"); *id.* at 337 (Stras, J., concurring) (closure to keep media from publicizing evidence ruled inadmissible plainly incompatible with purposes of First and Sixth Amendments); *id.* at 339 ("concerns" that jurors would violate their oath by "read[ing] press accounts" of exclusionary rulings are "hypothetical," "speculative" and "do not justify … closure"); *id.* at 340 ("concern[s]" about "press accounts" favor access, not closure, as "press coverage serves the important structural safeguard of opening the judicial process to public inspection" and in no way "threat[ens]" *defendant's* "right to a fair trial").

[22] *E.g., Bucci*, 662 F.3d at 30; *Smith MN*, 876 N.W.2d at 340-41 (Stras, J., concurring).

Hon. Janet DiFiore
Jan. 19, 2017
Page 22

8, 23 (CA1 2016), *cert. filed*, No. 16-7412 (Dec. 30, 2016). And the court certainly "articulated no findings to that effect." *Id.* Instead, the judge summarily announced: "[W]e have to close the courtroom to make a record ... *in private*" (A. 2548-49) (emphasis supplied).

That has the cart pulling the horse; record findings of necessity must precede, not follow, an order banishing observers. A reviewing court cannot conjure a finding that doesn't exist – or resurrect a justification that the trial court rejected – long after the fact. *Wilder*, 806 F.3d at 663-64 (Toruella, J., concurring) ("post-hoc justifications [do] not excuse the closure"; findings required in the moment). In the "absence of any finding of an overriding interest," the "closure fails the *Waller* test at the first prong" alone. *Candelario-Santana*, 834 F.3d at 23.

**Third**, the Appellate Division's observation that the "minutes and exhibits that had been sealed were unsealed the same day" is a truism that proves too much. *Jordan*, 2016 WL 7394528, at *1. For they shouldn't have been sealed at all, never mind for "five [or] six hours,"[24] as the trial court agreed in granting their delayed release – independent and aggravating access violations. *See* AD1 Def. Br. 72-75; *see also People v. Moise*, 110 A.D.3d 49, 54 (AD1 2013) (subsequently releasing minutes of wrongly closed proceeding "fail[s] to cure the [Sixth Amendment] error" because "it is the exclusion *itself* that violates the constitution") (emphasis

---

[23] *E.g., Presley*, 558 U.S. at 213; *Gupta*, 699 F.3d at 687; *Owens v. U.S.*, 483 F.3d 48, 62 (CA1 2007); *Bowden v. Keane*, 237 F.3d 125, 131-32 (CA2 2001).

[24] (A. 2689).

Hon. Janet DiFiore
Jan. 19, 2017
Page 23

supplied); *Alcantara*, 396 F.3d at 201 (transcript's "later" availability "does not

satisfy" access right); *id.* at 204 (recording proceeding and "providing public access"

to transcript "does not satisfy the open court requirement").

## **CONCLUSION**

By excluding the public summarily – without prior *Waller* analysis or

findings on the record – from a substantive midtrial hearing on material matters,

the trial court violated Jordan's Sixth and Fourteenth Amendment rights to a public

trial. For the benefit of bench and bar alike, this Court should hear Jordan's case

and repudiate the Appellate Division's elevation of form over function.


Respectfully,



The Honorable George Bundy Smith (Ret.)
549 West 123 Street, Suite 13F
New York, NY 10027
(212) 666-9732



Norman H. Siegel, Esq.
SIEGEL TEITELBAUM & EVANS, LLP
260 Madison Avenue, 22nd Floor
New York, NY 10016
(212) 455-0300

Hon. Janet DiFiore
Jan. 19, 2017
Page 24

/s/ Earl S. Ward

Earl S. Ward, Esq.
EMERY CELLI BRINCKERHOFF &
ABADY LLP
600 Fifth Avenue at Rockefeller Center,
10th Floor
New York, NY 10020
(212) 763-5000

/s/ Marc A. Fernich

Marc A. Fernich, Esq., Counsel of Record
LAW OFFICE OF MARC FERNICH
810 Seventh Ave., Suite 620
New York, NY 10019
(212) 446-2346

*Attorneys for Defendant*

## INDEX OF CASES

*Bowden v. Keane,* 237 F.3d 125 (CA2 2001) ................................................................. 22

*Bucci v. U.S.*, 662 F.3d 18 (CA1 2011) ..................................................................... 11, 21

*Com. v. Cohen*, 921 N.E.2d 906 (Mass. 2010) .................................................................. 14

*Com. v. Downey*, 936 N.E.2d 442 (Mass. App. 2010) .................................... 11, 15, 19-20

*Com. v. Riley*, 15 N.E.3d 1165 (Mass. App.), *lv. denied*, 23 N.E.3d 105 (Mass. 2014), *cert. denied*, 135 S. Ct. 1858 (2015).......................................................................... 13

*In re Oliver*, 333 U.S. 257 (1948) ................................................................... 12, 16, 19

*NBC Subsid. (KNBC-TV), Inc. v. Sup. Ct.*, 980 P.2d 337 (Cal. 1999)....................................................................... 11, 15, 20

*Owens v. U.S.*, 483 F.3d 48 (CA1 2007) ........................................................................ 22

*People v. Echevarria*, 21 N.Y.3d 1 (2013)............................................................ 2, 11, 20

*People v. Garay*, 25 N.Y.3d 62 (2015) ............................................................................ 2

*People v. Jordan*, slip op., __ N.Y.S.3d __, 2016 WL 7394528 (AD1 Dec. 22, 2016) ............................................... 2-3, 11, 20-22

*People v. Moise*, 110 A.D.3d 49 (AD1 2013)................................................................... 22

*People v. Olivero*, 289 A.D.2d 1082 (AD4 2001) ............................................................ 15

*Peterson v. Williams*, 85 F.3d 39 (CA2 1996) ............................................................... 19

*Presley v. Ga.*, 558 U.S. 209 (2010).......................................................................... 11, 22

*Press-Ent. Co. v. Sup. Ct.*, 478 U.S. 1 (1986) ....................................................... 12, 19-20

*Rovinsky v. McKaskle,* 722 F.2d 197 (CA5 1984)...................................................... 13, 15

*State v. Easterling*, 137 P.3d 825 (Wash. 2006)............................................................. 16

*State v. Reed*, 352 P.3d 530 (Kan. 2015).............................................................. 11, 16-18

*State v. Smith*, 876 N.W.2d 310 (Minn. 2016) ..................................... 11-14, 16, 18-19, 21

*State v. Smith*, 334 P.3d 1049 (Wash. 2014) .............................................. 11-13, 16, 18-21

*State v. Sublett*, 292 P.3d 715 (Wash. 2012) ................................................... 13

*State v. Sullivan*, No. 112, 638, 366 P.3d 664,
2016 WL 563000 (Kan. App. Feb. 12, 2016) (unpublished)............................................ 12

*U.S. v. Alcantara*, 396 F.3d 189 (CA2 2005) ........................................................... 18, 30

*U.S. v. Candelario-Santana*, 834 F.3d 8, 23 (CA1 2016),
*cert. filed*, No. 16-7412 (Dec. 30, 2016) .................................................... 13-14, 22-23

*U.S. v. Gupta*, 699 F.3d 682 (2012)....................................................................... 14, 22

*U.S. v. Norris*, 780 F.2d 1207 (CA5 1986) ........................................................... 15

*U.S. v. Waters*, 627 F.3d 345 (CA9 2010)............................................................. 19

*Waller v. Georgia,* 467 U.S. 39 (1984) ........................................................2, 15, 19, 21

*Wilder v. U.S.*, 806 F.3d 653 (CA1 2015),
*cert. denied*, 136 S. Ct. 2031 (2016) ........................................................... 14-15, 22

Friedman, J.P., Moskowitz, Webber, Kahn, Gesmer, JJ.

2524      The People of the State of New York,     Ind. 621/10
                        Respondent,

                  -against-

      Gigi Jordan,
            Defendant-Appellant.
            _____

Law Office of Marc Fernich, New York (Marc Fernich of counsel), and Law Office of Allan L. Brenner, Long Beach (Allan L. Brenner of counsel), for appellant.

Cyrus R. Vance, Jr., District Attorney, New York (Vincent Rivellese of counsel), for respondent.

            _____

    Judgment, Supreme Court, New York County (Charles H. Solomon, J.), rendered May 28, 2015, convicting defendant, after a jury trial, of manslaughter in the first degree, and sentencing her to a term of 18 years, unanimously affirmed.

    The court properly declined to instruct the jury on the defense of duress, and properly excluded evidence having no relevance except to the extent it supported a legally baseless purported duress defense.  Furthermore, even if the excluded evidence had been admitted there would still have been no basis for a duress charge.  The strange, euthanasia-like defense offered by defendant did not satisfy any of the statutory requirements of a duress defense.

Viewed most favorably to defendant, her claim was essentially that she killed her eight-year-old son because she believed that her dangerous ex-husband would kill her at some future time, that her death would lead to her son being sexually abused by another ex-husband, who was the boy's biological father, and that her son would be better off dead than being subject to such abuse.  Initially, we note that defendant was not precluded from raising a psychiatric defense, and she did assert an extreme emotional disturbance defense, which the jury apparently accepted when it acquitted her of murder.

The affirmative defense of duress requires proof that a defendant engaged in proscribed conduct because he or she was "coerced to do so by the use or threatened imminent use of unlawful physical force," which force or threatened force must be such that "a person of reasonable firmness in [the defendant's] situation would have been unable to resist" (Penal Law § 40.00). Inherent in the concept of coercion is that a third party compels a defendant to commit a particular crime, and does so by using or threatening force.  Here, there was no claim that defendant's ex-husband made any threats aimed at coercing defendant into harming her son.  In any event, the ex-husband's alleged threat of harm to defendant was not "imminent" (*see People v Moreno*, 58 AD3d

22

516, 518 [1st Dept 2009], *lv denied* 12 NY3d 819 [2009]).

Defendant's Sixth Amendment right to a public trial was not violated when the court briefly closed the courtroom during a discussion of a legal matter relating to protecting the jury from exposure to publicity about the case.  This was the equivalent of a sidebar, robing room or chambers conference.  The right to a public trial does not extend to such conferences, and does not restrict judges "in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings" (*Richmond Newspapers, Inc. v Virginia*, 488 US 555, 598, n 23 [1980]; *see People v Olivero*, 289 AD2d 1082 [4th Dept 2001], *lv denied* 98 NY2d 639 [2002]).  Moreover, the conference had no impact upon the conduct of the trial other than having the court repeat its previous instructions about trial publicity and minutes and exhibits that had been sealed were unsealed the same day.

23

The record does not establish that defendant's sentence was based on any improper factors, and we perceive no basis for reducing the sentence.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED:  DECEMBER 22, 2016

_____
DEPUTY CLERK

24

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:   PART 82
-------------------------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,   :   **DECISION AND ORDER**
   :   INDICTMENT 621-10
    -against-     :
   :
GIGI JORDAN,          DEFENDANT  :
-------------------------------------------------------------------x
CHARLES H. SOLOMON, J.:

      On November 5, 2014, defendant was found guilty by a jury of Manslaughter in the First

Degree [Penal Law §125.20(2)].  The proof at trial established that defendant killed her eight

year old son, Jude Mirra, by feeding him an overdose of prescription medication.  The jury found

that the defendant was acting under the influence of an extreme emotional disturbance.

Therefore, they found her guilty of Manslaughter in the First Degree rather than intentional

Murder, as charged in the indictment.  On January 21, 2015, defendant filed a motion to set aside

the verdict pursuant to CPL 330.30(1).  The People filed a response in opposition on March 12,

2015, to which the defense replied on April 14, 2015.  Defendant argues that her right to a public

trial was violated when, on October 1, 2014, the courtroom was briefly closed to the public at the

request of the prosecution and over defense counsel's objection.  Defendant argues that this

alleged violation, standing alone, requires that the jury's verdict be set aside.

      CPL 330.30(1) permits the court to set aside or modify a verdict prior to sentencing upon

"any ground appearing in the record which, if raised upon an appeal from a prospective judgment

of conviction, would require a reversal or modification of the judgment as a matter of law by an

appellate court."  A motion to set aside the verdict does not lie when the facts supporting the

claim rest outside the record.  People v. Giles, 24 NY3d 1066 (2014).  Here, the motion is

properly before the Court as defendant's claim is wholly a matter of record.

The facts, as relevant to this motion, are not in dispute.  Jury selection commenced on September 3, 2014 and concluded on September 8, 2014.  The People's first witness was called on September 10, 2014.  The People presented twenty-six witnesses on their case-in-chief, which concluded on September 29, 2014.  The defense case commenced that same day with the testimony of Dr. Werner Spitz.  Dr. Spitz' testimony continued on October 1, 2014.

On October 1, 2014, when the parties first appeared that morning, and prior to the arrival of the jury, the People asked to approach the bench concerning something that had happened on the previous evening.  A brief bench conference was held during which the People outlined what they wanted to place on the record in a closed courtroom.  The People asked that they be allowed to make a record in a closed courtroom because they were concerned that the right to a fair trial might be compromised if the press and public were present.  Defense counsel objected to the People's application and, over their objection, the Court closed the courtroom to hear the People's application.

The People brought to the Court's attention that an email had been sent to more than 100 people, many of whom appeared to be members of the media, from "Thomas Truth" informing them of the creation of a website entitled "GigiJordanTruth.com."   The People handed up a copy of the email, as well as a list of the recipients' email addresses.  The purported reason for the website and email was to inform the recipients of information that the Court had already ruled was inadmissible at defendant's trial.  In addition to that, defendant maintained that she was not getting a fair trial.  The closing line of the email was, "I've posted this website in the hope that the truth will come out. -Gigi Jordan."  As would be expected, this email and website were of great concern to the Court.

2

The People asked the Court to instruct the jury once again not to read, listen to or watch anything reported about the case in the media.  Additionally, the People asked the Court to obtain an assurance from defendant's attorneys that no one associated with defendant's legal team was responsible for creating this website and disseminating the email in question.  Ronald Kuby, a member of the defense team, but not present at counsel table during this trial, objected to the closure of the courtroom.  Mr. Kuby acknowledged that if a member of the defense team or anyone affiliated with the defense team was responsible for creating the website, that would constitute a violation of the ethical and disciplinary rules with which attorneys are required to comply.  The Court noted the defense objection to the closure and stated that the minutes of the proceeding would be transcribed and placed under seal in the court file.  The defense objected to the record being sealed.  Additionally, Mr. Kuby asked if defense counsel would be permitted to speak to the media about what had just transpired in the closed courtroom.  The Court stated that there was no "gag" order in place and therefore, defense counsel was free to accurately report what took  place in the closed session.  Finally, the Court invited Mr. Kuby to move in writing to unseal the minutes and stated that if the defense made the application it would be ruled on before the end of the trial.  As it turns out, it was unnecessary for the defense to make any type of motion or application concerning these minutes.

The proceedings in the closed courtroom lasted approximately fifteen minutes.  In the transcript, the proceedings start at page 1646 and conclude at page 1667, approximately twenty-one pages in an almost 5000 page trial transcript.  When the courtroom was reopened, the jury was brought in and Dr. Spitz was recalled to the stand for  continued cross-examination.  Dr. Spitz' testimony continued until the luncheon recess.   The Court reconvened after the lunch hour

3

and there was a discussion regarding Dr. Spitz' testimony.  At approximately 2:30 p.m., the issue

of whether the previously sealed minutes should remain under seal was revisited.  After hearing

from the People, the Court indicated that there was no legal reason why the minutes from earlier

that morning should remain under seal.  Accordingly, the Court ordered that the minutes be

immediately unsealed and that they be made part of the public record.

Defendant argues that her right to a public trial was violated when the Court closed the

courtroom without first making the appropriate findings under Waller v. Georgia, 467 US 39

(1984).  Because of that alone, defendant maintains that the motion to set aside the verdict must

be granted.  The People first argue that the rules set forth in *Waller* do not even apply to this case.

That is so, they contend, because the type of proceeding in question in this case does not even

involve defendant's right to a public trial.  The People next argue that even if *Waller* applied in

this situation, the Court did comply with the *Waller* requirements.  Finally, the People assert that

even if the Court was wrong in closing the courtroom and in sealing the record, the error was so

trivial and so inconsequential that it would be inconceivable to set aside the jury's verdict for that

reason.

The law in this area is not in dispute.  Every defendant is guaranteed the right to a public

trial under both the Sixth and Fourteenth Amendments, as well as under the New York State

Constitution.  People v. Echevarria, 21 NY3d 1, 11 (2013).  The main issue on this motion is the

scope of that right.  In *Waller*, the Supreme Court stated, "[t]his Court has not recently

considered the extent of the accused's right under the Sixth Amendment to insist upon a public

trial, and has never considered the extent to which that right extends beyond the actual proof at

trial."  Waller, *supra* at 44.  The court was called upon to determine whether the right to a public

4

trial "extends beyond the actual proof at trial" and whether it should apply to suppression hearings. *Id.* Cognizant of the purposes underlying the right to a public trial, which are to ensure the accused is dealt with fairly by both the court and prosecution, as well as to encourage witnesses to come forward and to discourage perjury, the court held that the right to a public trial encompassed suppression hearings. The court later extended a defendant's right to a public trial in criminal cases to the jury selection process. Presley v. Georgia, 558 US 209 (2010); *accord* People v. Floyd, 21 NY3d 892 (2013); People v. Martin, 16 NY3d 607 (2011). Thus, it is clear that a defendant's right to a public trial is implicated when the courtroom is closed during evidentiary proceedings. People v. Echevarria, *supra* (closure during undercover officer's testimony); People v. Kin Kan, 78 NY2d 54 (1991)(closure during accomplice's testimony); People v. Mateo, 73 NY2d 928 (1989)(closure during witness' cross-examination). However, the facts here are quite different.

The proceeding at issue was not the type of trial proceeding that falls within the ambit of *Waller*. Significantly, no testimony was being taken, no legal issues, nor anything of a substantive nature, was being discussed. When evaluated in light of the concerns the right to a public trial is designed to protect, it is clear that none of them are implicated here. First, as stated, nothing of an evidentiary nature was discussed. Next, the proceeding cannot be characterized as a substantive trial proceeding, such as jury selection, wherein a defendant does have the right to a public trial. The subject matter of the proceeding was an allegation that defendant was disseminating to the press and public information about the case that had been previously ruled inadmissible by the Court. This was completely tangential to the trial and had nothing to do with the evidence in the case. The People cannot be faulted for bringing the emails

5

and website to the Court's attention in a closed setting.  Understandably, they did not want to

highlight that information, because to do so might very well have created additional media

coverage that might have been difficult for the jury to avoid.  Equally valid was the

prosecutions's concern that one of the many people employed by defendant might have been

involved in the dissemination of the emails and creation of the website.  If that were so, this

would constitute a total disregard for the Court's numerous admonitions regarding trial publicity

and the ethical guidelines.  Under these circumstances, the People's request that an inquiry be

made of the defense team in a closed setting was certainly appropriate.  However, the simple fact

that this proceeding took place inside the courtroom during trial does not mean that it was a trial

proceeding, as contemplated by *Waller*.

      Finally, even if under some strained interpretation *Waller* was found to apply to this case,

the closure here was so *de minimis* and so trivial that setting aside the verdict would be a

miscarriage of justice.  *See,* People v. Peterson, 81 NY2d 824 (1993); People v. DeAngelis, 5

AD3d 274 (1st Dept 2004), *lv denied* 2 NY3d 798; Gibbons v. Savage, 555 F3d 112 (CA2 2009),

*cert denied* 558 US 932.  Indeed, the closure was hardly a closure at all.  The courtroom was

closed for approximately fifteen minutes in a two month long trial.  A transcript encompassed

only twenty-one pages of an almost 5000 page record.  In addition, the Court told defense

counsel that he could speak to the media about what had transpired during the proceeding,

provided that he did so accurately.  It should also be noted that the discussion was on the record

and both exhibits, namely the email and the recipient list, were placed under seal, allowing for

the possibility of unsealing at a later time.  In fact, defense counsel was invited to make a written

application to unseal the minutes and the Court stated that a ruling would be made prior to the

end of trial.  Significantly, counsel never had to make an application because after the luncheon recess, at approximately 2:30 p.m., the Court decided to unseal the record.  As stated, the closure lasted only approximately fifteen minutes and the record was sealed for only a matter of hours. The subject matter discussed was not evidentiary in nature and was in no way related to the trial proceedings.  Ironically, closing the courtroom in the first instance was not even necessary.  That is so because the highly prejudicial and totally inaccurate information had already been disseminated to the press and public the previous evening in the email signed by the defendant. However, even if under some theory it was error to close the courtroom to discuss this sensitive issue, the closure was clearly not the type that should result in the verdict being set aside.

For the reasons set forth above, the Court finds that there is no legal basis requiring the reversal of the judgment of conviction by an appellate court.  Accordingly, defendant's motion to set aside the verdict under CPL 330.30(1) is denied.

Dated:   May 28, 2015
         New York, New York

_____
CHARLES H. SOLOMON, J.S.C.

7