# Exhibit G

HON. GEORGE BUNDY SMITH (RET.)
549 WEST 123 STREET, SUITE 13F
NEW YORK, NEW YORK 10027

SIEGEL TEITELBAUM & EVANS, LLP
260 MADISON AVENUE, 22ND FLOOR
NEW YORK, NEW YORK 10016

LAW OFFICE OF MARC FERNICH
810 SEVENTH AVENUE, SUITE 620`
NEW YORK, NEW YORK 10019

EMERY CELLI BRINCKERHOFF & ABADY LLP
600 FIFTH AVENUE, 10TH FLOOR
NEW YORK, NEW YORK 10020

February 16, 2017

Hon. Janet DiFiore
Chief Judge
New York Court of Appeals
20 Eagle St.
Albany, NY 12207

Re:     *People v. Gigi Jordan*, N.Y. Co. Ind. No. 621/10

Dear Chief Judge DiFiore:

We submit this letter pursuant to Rule 500.20(a)(4) to apprise the Court of the United States Supreme Court's recent grant of certiorari in *Weaver v. Massachusetts* (that court's No. 16-240) and to supplement our original letter brief seeking leave to appeal with additional arguments explaining the need for this Court's intervention. Although *Weaver* comes to the U.S. Supreme Court in the context of a collateral challenge to a closure involving an ineffective assistance claim, the grant of certiorari confirms the importance of the public trial right and the need for clarification on how it applies in this case and other cases like it.

## QUESTIONS PRESENTED

The questions presented in the application for leave to appeal are (1) whether the First Department erred by characterizing the courtroom closure in this case—one according to which the courtroom was cleared, the doors were closed, and court staff were instructed to "make sure no one enters" (A. 2549)—as akin to a mere sidebar or chambers conference; and (2) if so, whether a court may close a courtroom without first determining whether an overriding interest requires the closure or considering reasonable alternatives to the closure.

Hon. Janet DiFiore
Feb. 16, 2017
Page 2

### SUPPLEMENTAL REASONS FOR GRANTING LEAVE TO APPEAL

Few rights, if any, occupy a more favored position in the constitutional firmament than criminal defendants' right under the Sixth Amendment to a public trial. Since the founding of this Nation, the Federal Constitution has required that criminal trials be held open, "thus giving assurance that the proceedings were conducted fairly to all concerned and discouraging perjury, the misconduct of participants, or decisions based on secret bias or partiality." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 556 (1980).

In fact, the public trial right is so essential that its wrongful denial ranks among the "very limited class" of errors—those affecting the "framework within which the trial proceeds"—that the Supreme Court considers "structural" in character. *United States v. Marcus*, 560 U.S. 258, 263 (2010) (citations and internal quotes omitted). Other examples include biased judges and racially rigged grand juries[1]; improper deprivations of the rights to counsel, self-representation and counsel of choice[2]; deficient reasonable doubt instructions[3]; and constructively amended indictments.[4]

These "structural defects in the constitution of the trial mechanism," *Arizona v. Fulminante,* 499 U.S. 279, 309-10 (1991), are so basic and profound that they "necessarily render a criminal trial fundamentally unfair [and] an unreliable vehicle for determining guilt or innocence." *Puckett v. United States,* 556 U.S. 129, 141 (2009) (structural errors vitiate the "entire adjudicatory framework") (citations and internal quotes omitted); *Neder v. United States,* 527 U.S. 1, 8 (1999) (structural errors "infect the entire trial process").

Because the "benefits" of the rights underlying structural errors are generally "unquantifiable and indeterminate," *Gonzalez-Lopez,* 548 U.S. at 150, and the "effect[s]" of their loss hard to "assess," *Marcus*, 560 U.S. at 264, structural defects "defy" harmless error "analysis," *Gonzalez-Lopez,* 548 U.S. at 148-49 (citations and internal quote omitted), and are "presumed prejudicial," *United States v. Olano,* 507 U.S. 725, 735 (1993), compelling automatic reversal of an ensuing conviction. *See Neder*, 527 U.S. at 8 (structural defects "defy harmless error review").

Consistent with its robust conception of the public trial guarantee, the Supreme Court has construed the term "trial" expansively in this context. Rather than confine it to the receipt of evidence, the examination of witnesses and the

---

[1]   *Tumey v. Ohio,* 273 U.S. 510 (1926); *Vasquez v. Hillery,* 474 U.S. 254 (1986).
[2]   *Gideon v. Wainwright,* 372 U.S. 335 (1963); *McKaskle v. Wiggins,* 465 U.S. 168 (1984);
      *United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006).
[3]   *Sullivan v. Louisiana*, 508 U.S. 275 (1993).
[4]   *Stirone v. United States*, 361 U.S. 212 (1960).

Hon. Janet DiFiore
Feb. 16, 2017
Page 3

arguments of counsel, the Court has held the term to encompass a range of ancillary proceedings occurring both before and after the swearing of the jury and the taking of testimony. Prominent examples include de facto contempt proceedings (*In re Oliver*, 333 U.S. 257 (1948)), pretrial suppression hearings (*Waller v. Georgia*, 467 U.S. 29 (1984)) and jury selection (*Presley v. Ga.*, 558 U.S. 209 (2010)). Conversely, no Supreme Court decision has excused the closure of *any* part of a criminal prosecution by deeming it a non-"trial" proceeding.

The First Department's decision in this case cannot be squared with this basic rule, placing the law of New York in conflict with the authoritative holdings of the Supreme Court and other States and federal circuits. The recent grant of certiorari in *Weaver* indicates that the law surrounding the public trial right is in need of clarification; that is now especially so in this State, in light of the First Department's decision below. For the benefit of the courts that must administer the Sixth Amendment and the criminal defendants whose liberty is protected by it, this Court should grant review in order to bring clarity to the important questions presented in the application.

A.   **The First Department's decision in the case conflicts with Supreme Court precedent and the holdings of other courts**

As we explained in the application for leave, this case involves an unambiguous courtroom closure. The trial judge himself made no mistake about that: "We have to close the courtroom without any spectators," he explained, so that he and the lawyers could speak "about something that has to be done in private." (A. 2548). All spectators were ushered out, the courtroom doors were closed, and the judge instructed the sergeant to "make sure no one enters." (A. 2549). A more clear-cut example of a courtroom closure would be difficult to imagine.

The closure lasted for the entire duration of a lengthy and substantive exchange among the judge and the lawyers concerning public commentary on the trial. Defense counsel objected repeatedly and from the outset, asking what authority supported the closure. "My authority," the court replied, adding only that the prosecutor "wants to make a record about something he didn't want to put on the record in front of the audience or the press." (A. 2549).

On appeal, the First Department declared summarily that, although "the court briefly closed the courtroom during a discussion of a legal matter," Ms. Jordan's "Sixth Amendment right to a public trial was not violated" because the closure "was the equivalent of a sidebar, robing room or chambers conference," to which the "public trial [right] does not extend." *People v. Jordan*, 44 N.Y.S.3d 378, 379 (App. Div. 1st Dep't 2016). That decision is shockingly wrong, and if it is allowed to stand, it is certain to sow confusion among the lower courts in this State.

In *Richmond Newspapers*, the Supreme Court explained that "our ingrained tradition of public trials and the importance of public access to the broader purposes

Hon. Janet DiFiore
Feb. 16, 2017
Page 4

of the trial process, tip the balance strongly toward the rule that trials be open." 448 U.S. at 598. In a footnote immediately following that statement, the Court clarified that "[t]he presumption of public trials is, of course, not at all incompatible with reasonable restrictions imposed upon courtroom behavior in the interests of decorum." *Id.* at 598 n.23. Thus, "when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle." *Id.* And "judges are [not] restricted in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings." *Id.*

The First Department latched onto that footnote to justify the closure here. But it did so unthinkingly, without explanation. In fact, the footnote provides no support for the trial judge's actions in this case, and the First Department's contrary conclusion conflicts with the reasoning of at least two state supreme courts and one federal court of appeals. This Court's immediate intervention is therefore necessary to resolve the confusion and disuniformity that will follow if the First Department's decision is allowed to stand.

***First,*** the closure in this case was assuredly not a sidebar, or what *Richmond Newspapers* called a bench-side "huddle." The Supreme Judicial Court of Massachusetts, for example, has explained that a sidebar is an exchange between the judge and lawyers that takes place "in open court [and] permits members of the public to observe the judge" and all other participants in the proceeding. *Commonwealth v. Cohen*, 921 N.E.2d 906, 925 (Mass. 2010). Thus, "[e]ven though the public cannot hear what is being said [at a sidebar], the ability to observe itself furthers the values that the public trial right is designed to protect." *Id. Accord, e.g.*, *State v. Smith*, 876 N.W.2d 310, 343 n.5 (Minn. 2016) (Stras, J., concurring) (a sidebar "permit[s] members of the public to view the conduct of the attorneys and the judge, even if members of the gallery cannot hear what the attorneys and judge are saying").

That does not remotely describe what took place in Ms. Jordan's case. Again, the courtroom was literally *closed*; the members of the public were instructed to leave, and a police sergeant was placed outside the door and told to prevent any members of the public from entering. That is no sidebar. Although "sensitive matters can be addressed at sidebar in an open courtroom, the values underlying the right to public trial cannot be preserved when the courtroom is closed to the public." *Commonwealth v. Downey*, 936 N.E.2d 442, 450 (Mass. 2010). Just so here.

The First Department's perfunctory characterization of the courtroom closure in this case as a mere "sidebar" thus conflicts not only with the commonsense understanding of that term, but also with the settled law of a sister State. *Cf. State v. Smith*, 334 P.3d 1049, 1061 (Wash. 2014) (Wiggins, J., concurring) (acknowledging "confusion" and a lack of "clear guidance to trial and appellate judges" on the sidebar exception). If the concept of the sidebar truly means

Hon. Janet DiFiore
Feb. 16, 2017
Page 5

something different in New York than it means in Massachusetts, it should be this Court that says so.

**Second,** the courtroom closure was not a mere "chambers conference," either. On this point, a critical limiting principle warrants emphasis: The Supreme Court in *Richmond Newspapers* noted (in the same footnote cited by the First Department) that "conferences in chambers" fall outside of the public trial guarantee only "*inasmuch as such conferences are distinct from trial proceedings*." 448 U.S. at 598 n.23 (emphasis added). But as we explained in our original letter to this Court, the hearing here was not distinct from the trial; on the contrary, it took place smack in the middle of it.

The First Department's decision thus further conflicts with decisions of the United States Court of Appeals for the Fifth Circuit and the California Supreme Court. According to the Fifth Circuit, the Sixth Amendment "forbids state courts to conduct hearings in camera on matters *arising in the course of a criminal trial*, absent overriding need to foreclose public attendance, articulated in the court's findings at the time of closure." *Rovinsky v. McKaskle*, 722 F.2d 197, 199 (1984) (emphasis added). But that is just what happened here: The judge closed the courtroom completely, in the middle of the course of Ms. Jordan's criminal trial, without first finding that an overriding need justified it (none did).

What is more, the California Supreme Court has explained that "closed proceedings" cannot qualify as "chambers conferences" when they are "held outside the jury's presence *in the courtroom*, and the trial judge only belatedly deem[s] the courtroom an 'extension of chambers' on the same day." *NBC Subsid. (KNBC-TV), Inc. v. Sup. Ct.*, 980 P.2d 337, 363 (Cal. 1999) (emphasis added). Here–post hoc, and without explanation—the First Department relabeled what the trial court itself had called a "trial proceeding" (A. 7) as a "chambers conference." And the California court went on to reject the suggestion that "chambers proceedings are categorically 'not part of the trial process'" and thus not protected by the First and Sixth Amendments; such proceedings are often substantive and thus cannot be closed absent an overriding need. *Id*. In rejecting Ms. Jordan's appeal in this case, the First Department assumed the opposite.

The First Department failed to grapple with these essential points. As a result, it has thrown this State's law of public trials into disarray, deepening confusion in an area of law around which the lower courts are already in need of guidance—as the Supreme Court's grant of certiorari in *Weaver* indicates. For its part, this Court has not yet opined on the proper application of *Richmond Newspapers*' footnote 23 or the true scope of sidebars and chambers conferences. This case provides an ideal opportunity to clear up the confusion.

Hon. Janet DiFiore
Feb. 16, 2017
Page 6

### B.  Proper resolution of the questions presented is a matter of exceptional importance

The clarity of the First Department's errors and the confusion that will result if they go uncorrected are reasons enough for the Court to grant Ms. Jordan's application for leave to appeal. But leave is especially warranted because the questions presented here are matters of tremendous importance to the proper functioning of the State's criminal justice system.

The public trial right is essential to the fairness—and the appearance of fairness—of every criminal trial. "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed." *Press-Enter. Co. v. Superior Court of California*, 464 U.S. 501, 508-510 (1984). As detailed in our moving papers, the closed midtrial proceeding at issue addressed extrajudicial allegations by the accused via a website (and emails to the press reporting it), that the judge and prosecutor were suppressing crucial evidence and trying her unfairly. These accusations—impugning the integrity of the judge who would preside over the rest of Ms. Jordan's trial, make critical evidentiary rulings and ultimately impose her sentence—squarely implicate publicity's cardinal virtue: "[R]emind[ing] the … judge of [his] responsibility to the accused and the importance of [his] function[]." *Peterson v. Williams*, 85 F.3d 39, 43 (2d Cir. 1996) (citing *Waller*, 467 U.S. at 46-47). The judge's reaction to those accusations was to summarily clear the courtroom so that he could rebuke Ms. Jordan for exercising her First Amendment rights, all while shielding himself from scrutiny by public and press alike. Yet it is in just such circumstances that it is most important to keep the judge "keenly alive to a sense of [his] responsibility and to the importance of [his] functions" by the "presence of interested spectators." *Waller*, 467 U.S. at 46 (quoting *Gannett Co. v. DePasquale*, 443 U.S. 368, 380 (1979)). Such openness "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." *Press-Enter. Co.*, 464 U.S. at 508-510.

There is therefore more at stake here than just Ms. Jordan's rights—the public itself has a fundamental and independent interest in observing all stages of criminal trials. As the Supreme Court explained in *Richmond Newspapers*, there is a "significant community therapeutic value of public trials," recognized since the time the Bill of Rights was adopted: "…the open processes of justice serve an important prophylactic purpose, providing an outlet for community concern, hostility, and emotion." 448 U.S. at 556. When the public are not allowed to "observe" all aspects of a criminal trial, the trial cannot "satisfy the appearance of justice." *Id*. It is therefore well understood that violations of "the public trial right" necessarily compromise "the public reputation and integrity of [criminal trial] proceedings." *United States v. Negron-Sostre*, 790 F.3d 295, 306 (1st Cir. 2015).

Hon. Janet DiFiore
Feb. 16, 2017
Page 7

These concerns have particular weight in trials like this one, involving intense media interest. When the press covers a case closely, courtroom closures are especially conspicuous and apparent, and their damage to the reputation of the judiciary is amplified. Turning that observation on its head, the First Department here invoked concerns for "protecting the jury from exposure to publicity about the case" as a justification for the closure. *Jordan*, 44 N.Y.S.3d at 379. But as the Supreme Court explained in *Richmond Newspapers*, concern for media interest, even jury taint, is no justification for a courtroom closure. 448 U.S. at 581. This is especially so "when [the] defendant makes an informed decision to object to the closing of the proceeding" (*Waller*, 467 U.S. at 50, n. 6), as occurred in this case. And, of course, "that rationale is further attenuated where, as here, the jurors have been empaneled and instructed not to discuss the case or read or view press accounts of the matter." *Id. Accord, e.g.*, *NBC Subsidiary*, 980 P.2d at 369 (courts "must presume that jurors generally follow instructions to avoid media coverage, and to disregard coverage that they happen to hear or see").

Against this backdrop, further appellate review is warranted not only to restore uniformity to the law of public trials and to bring the law of the State back in line with the Supreme Court's precedents, but also to ensure that the reputation and integrity of the criminal justice system is preserved in this case and those like it that follow.

Hon. Janet DiFiore
Feb. 16, 2017
Page 8

## CONCLUSION

The Court should grant the application for leave to appeal and take this opportunity to restore clarity on the questions presented.

Respectfully submitted,

The Honorable George Bundy Smith (Ret.)
549 West 123 Street, Suite 13F
New York, NY 10027
(212) 666-9732

Norman H. Siegel, Esq.
SIEGEL TEITELBAUM & EVANS, LLP
260 Madison Avenue, 22nd Floor
New York, NY 10016
(212) 455-0300

/s/ Earl S. Ward
Earl S. Ward, Esq.
EMERY CELLI BRINCKERHOFF & ABADY LLP
600 Fifth Avenue at Rockefeller Center, 10th Floor
New York, NY 10020
(212) 763-5000

/s/ Marc A. Fernich
Marc A. Fernich, Esq. (counsel of record)
LAW OFFICE OF MARC FERNICH
810 Seventh Ave., Suite 620
New York, NY 10019
(212) 446-2346

*Attorneys for Defendant*

## INDEX OF CASES

*Arizona v. Fulminante,* 499 U.S. 279 (1991) ........................................................ 2

*Commonwealth v. Cohen*, 921 N.E.2d 906 (Mass. 2010) ................................... 4

*Commonwealth v. Downey*, 936 N.E.2d 442 (Mass. 2010)................................. 4

*Gannett Co. v. DePasquale*, 443 U.S. 368 (1979) .............................................. 6

*Gideon v. Wainwright,* 372 U.S. 335 (1963) ....................................................... 2

*In re Oliver*, 333 U.S. 257 (1948) ........................................................................ 3

*McKaskle v. Wiggins,* 465 U.S. 168 (1984) ........................................................ 2

*NBC Subsid. (KNBC-TV), Inc. v. Sup. Ct.*,
980 P.2d 337 (Cal. 1999) ................................................................................. 5, 7

*Neder v. United States,* 527 U.S. 1 (1999) ......................................................... 2

*People v. Jordan*, 44 N.Y.S.3d 378 (App. Div. 1st Dep't 2016) .................... 3, 7

*Peterson v. Williams*, 85 F.3d 39 (2d Cir. 1996) ............................................... 6

*Presley v. Ga.*, 558 U.S. 209 (2010) ................................................................... 3

*Press-Enter. Co. v. Superior Court of California*, 464 U.S. 501 (1984) ........... 6

*Puckett v. United States,* 556 U.S. 129 (2009).................................................... 2

*Rovinsky v. McKaskle,* 722 F.2d 197 (5th Cir. 1984) ........................................ 5

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ..................... 2-7

*State v. Smith*, 876 N.W.2d 310 (Minn. 2016) ................................................... 4

*State v. Smith*, 334 P.3d 1049 (Wash. 2014) ...................................................... 5

*Stirone v. U.S.*, 361 U.S. 212 (1960) ................................................................... 2

*Sullivan v. La.*, 508 U.S. 275 (1993)................................................................... 2

*Tumey v. Ohio,* 273 U.S. 510 (1926) .................................................................. 2

*United States v. Gonzalez-Lopez,* 548 U.S. 140 (2006). .................................... 2

*United States v. Marcus*, 560 U.S. 258 (2010)................................................... 2

*United States v. Negron-Sostre*, 790 F.3d 295 (1st Cir. 2015).......................... 6

*United States v. Olano,* 507 U.S. 725 (1993) .................................................... 2

*Vasquez v. Hillery,* 474 U.S. 254 (1986) ........................................................... 2

*Waller v. Georgia,* 467 U.S. 39 (1984).......................................................... 3, 6-7

*Weaver v. Mass.*, No. 16-240 (cert. granted Jan. 13, 2017)....................... 1, 3, 5