# Exhibit M

1

SATI SINGH
SENIOR COURT REPORTER
NEW YORK STATE SUPREME COURT
100 CENTRE STREET, ROOM 1620
NEW YORK, NY 10013

Phone:  646-386-4227
Fax:    212-374-0689
SS 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

TO:  ALLAN L. BRENNER, ESQ.

DATE OF BILL:  June 4, 2015

NAME OF CASE:  People -v- Gigi Jordan

INDICTMENT NO:  621-10

DATE OF PROCEEDINGS:  May 28, 2015

BEFORE:   Honorable Charles Solomon

TOTAL AMOUNT PAID:  $540.00

Sati Singh, RPR
Senior Court Reporter

```
 1    SUPREME COURT:  NEW YORK COUNTY
      TRIAL TERM:   PART 82
 2    ------------------------------------X
      THE PEOPLE OF THE STATE OF NEW YORK
 3                                           IND.#:
                                             0621-10
 4                  -against-
                                             CHARGE:
 5    GIGI JORDAN,                           MANSLAUGHTER 1

 6                                           PROCEEDINGS:
                                             SENTENCE
 7                      Defendant.
      ------------------------------------X
 8                          100 Centre Street
                            New York, New York 10013

 9                          May 28, 2015

10    B E F O R E:     HONORABLE CHARLES SOLOMON
                          Justice of the Supreme Court
11

12    A P P E A R A N C E S:

13    FOR THE PEOPLE:

14                  CYRUS R. VANCE, JR., ESQ.,
                    New York County District Attorney
15                  One Hogan Place
                    New York, New York 10013
16                  BY:  MATTHEW BOGDANOS, ESQ.
                    MARIT DELOZIER, ESQ.
17                  Assistant District Attorneys

18
      FOR THE DEFENDANT:
19
20                  ALLAN L. BRENNER, ESQ.
                    536 West Penn Street, 2nd Floor
      Long Beach, NY 11561
21
22                  LAW OFFICE OF RONALD L. KUBY
                    119 West 23rd Street, Suite 900
                    New York, NY 10011
23                  BY:  RONALD L. KUBY, ESQ.

24                  EARL WARD, ESQ.
                    600 Fifth Avenue, 10th Floor
25                  New York, NY 10020
```

```
 1              SIEGEL TEITELBAUM & EVANS, LLP
                Attorneys at Law
 2              260 Madison Avenue, 22nd Floor
                New York, NY 10016
 3              BY:  NORMAN SIEGEL, ESQ.

 4

 5                   *    *    *    *    *

 6

 7              THE COURT:  Let's please bring Ms. Jordan out and

 8      we can start.

 9              THE CLERK:  Calendar number two, Gigi Jordan.

10              THE COURT:  Counsel, can we please get

11      appearances.

12              MR. BRENNER:  For Ms. Jordan, Allan, A-L-L-A-N,

13      Brenner, B-R-E-N-N-E-R.

14              Good morning, Judge.

15              MR. KUBY:  Ronald Kuby, 119 West 23rd Street, New

16      York, New York, Twitter@occupykuby.

17              Good morning, Judge.

18              THE COURT:  Good morning.

19              MR. WARD:  Earl Ward for Ms. Jordan.

20              MR. SIEGEL:  Norman Siegel, Siegel, Teitelbaum &

21      Evans, 260 Madison Avenue, New York, New York.

22              THE COURT:  Good morning.

23              People?

24              MR. BOGDANOS:  Matthew Bogdanos and Ms. Marit

25      Delozier for the People.
```

1          Your Honor, good morning.  Good morning, counsel.

2     Good morning, Ms. Jordan.

3          THE COURT:  Counsel, let me give you my decision

4     on the 330.30 motion, the motion to set aside the verdict.

5          I'll give a copy to counsel, please.

6          I indicated already orally the motion was denied.

7     Today you will get my reasoning, findings and conclusions.

8          Counsel, I will give it to you in a second.  I

9     just want to go over the rules here.

10          When we have the prosecution called on to speak,

11     and when we have the defense called on to speak, I don't

12     want interruptions.  In other words, if Mr. Bogdanos is

13     speaking, I don't want any hands up, any interruptions,

14     anything at all.

15          When he finishes, if the defense wants to put

16     something on the record that they feel he said I shouldn't

17     rely on, you can do that.  If I agree with you, I wouldn't

18     rely on it.

19          The same goes for the prosecution.  Defense

20     counsel is speaking, I don't want any interruptions.  If

21     you feel again when a lawyer is finished talking, that

22     there is something that you object to that you think I

23     shouldn't consider, I will listen to it, and if I agree

24     with it, I wouldn't consider it.  That's the way we are

25     going to operate.  And of course when I'm speaking, I'm not

```
 1      going to be interrupted, that I know.  So let's do this:
 2      Let's find that decision first on that 330.30.  Let's do
 3      that.
 4                  Are we ready to proceed with sentencing?
 5                  MR. BOGDANOS:  Yes, your Honor.
 6                  MR. BRENNER:  Yes, your Honor.
 7                  MR. KUBY:  Not precisely.
 8                  THE COURT:  Okay.
 9                  MR. KUBY:  Judge?
10                  THE COURT:  Yes.
11                  MR. KUBY:  Although we will be ready very, very
12      soon, in light of the Court's ruling --
13                  THE COURT:  Which ruling?
14                  MR. KUBY:  The contemporaneous objections to what
15      we perceive or believe to be or can prove are inaccurate or
16      misleading statements, the contemporaneous objections will
17      not be permitted by the Court?
18                  THE COURT:  Correct.
19                  MR. KUBY:  I do need to raise a couple of issues
20      then.
21                  THE COURT:  Sure.
22                  MR. KUBY:  Prior to the formal commencement of
23      sentencing.
24                  THE COURT:  That's fine.
25                  MR. KUBY:  Thank you, Judge.
```

1          As we have said in our briefs, the due process is

2      required at sentencing, and one aspect of due process is of

3      course the Court may only rely on things that are accurate

4      and proven, or at least reliable and accurate.

5          In order to guarantee that, the defense is given

6      notice in the sense that we have the opportunity to speak

7      last, and an opportunity to be heard.  And usually in the

8      ordinary case, that's more than sufficient, because in the

9      ordinary case, we know precisely what it is or generally

10     what it is the prosecution is going to say.

11         Nonetheless, there have been a series of

12     submissions by the prosecution that simply make the words

13     he is going to be saying utterly unforeseeable to us, and

14     as a result, when we're dealing with things that are

15     unforeseeable or deliberate opacity, we have responded with

16     a large number of documents, hopefully none of which will

17     be necessary.

18         It's also our hope that after Mr. Bogdanos speaks,

19     we will be in a position to correct any misstatements that

20     we believe he has made, correct him on the spot with the

21     appropriate records, as anyone who makes inaccurate

22     statements.

23         THE COURT:  Well, didn't I say that you could do

24     that?

25         MR. KUBY:  Yes.

1              THE COURT:  Okay.

2              MR. KUBY:  But since we don't know what he is

3       going to say, I just want to put the Court on notice that

4       we may or may not be in a position to respond as

5       comprehensively today as we would wish.

6              THE COURT:  Okay.

7              MR. KUBY:  Number one.

8              THE COURT:  Go ahead.

9              MR. KUBY:  Number two:  There are clearly some

10      areas that the prosecution may not argue, because by

11      definition, they are not reliable and not accurate.  And

12      specifically I'm making reference to the jury's decision in

13      this case.

14              It was an unusual case in the sense that the

15      defense had the burden of proof, and the defense carried

16      the burden of proof.  Unlike a case where there is simply a

17      finding of not guilty, you can read in or not anything you

18      want as to those issues as to what created reasonable doubt

19      on one count or another.  That's not the case here, and we

20      know that the jury found three things by a preponderance of

21      the evidence.

22              Number one:  That the defendant had an extreme

23      emotional disturbance.  We know that because that was one

24      of the elements that you charged the jury.

25              Number two:  In committing the homicide, defendant

1          was acting under the influence of that extreme emotional

2          disturbance, again the second element in the charge you

3          gave the jury that they found.

4                    And last, there was an explanation or excuse for

5          that EED that was reasonable, given the perspective of the

6          defendant in what she knew at the time, and of course the

7          explanation that Ms. Jordan gave, it was necessarily

8          credited by the jury, was that her son had been sexually

9          abused by his biological father, and that Ray Mirra had

10         been robbing Ms. Jordan, committing healthcare fraud, and

11         she was afraid that she would come to harm or death at his

12         hands.  Those are the facts that were found by the jury.

13                   So any argument that the prosecution intends to

14         make here that this was not really an EED or she should not

15         have believed the things that she believed or that they

16         didn't actually influence her decision to attempt to take

17         her own life or kill her son, or that it was unreasonable

18         for her to have believed those things, those are

19         foreclosed.  Those arguments are foreclosed as a due

20         process matter by the jury's verdict.

21                   The prosecution put forward that case, the

22         prosecution lost that case, and the prosecution may not use

23         sentencing as a means, direct or indirectly of undoing the

24         jury's verdict this time in front of the audience of one.

25                   Number two, and I believe number two has been

Proceedings                                                      8

1    addressed, and I'm always loathe to repeat anything that

2    Mr. Bogdanos says to me off the record, but I think I'm

3    safe here, and if I'm not, I will be properly chastised.

4         We raised an issue in a couple of letters about

5    precluding the prosecution from arguing that the medical

6    treatments that Ms. Jordan sought for her son, to preclude

7    him from arguing that --

8         THE COURT:  Wait a minute.  You're speaking --

9         MR. KUBY:  I'm sorry.  Am I speaking too loud?

10        THE COURT:  You are low.

11        MR. KUBY:  Too quietly?

12        THE COURT:  You never do.

13        MR. KUBY:  Too clearly?  I was going to say,

14   because of the representations that Mr. Bogdanos has made,

15   that there has been no comment or any comment about the

16   impropriety of the medications, Mr. Bogdanos assures us

17   that he remains the same person that he was when he uttered

18   those words.  He is a man of his word.  He has no intention

19   of making those arguments, and so that's really all I have

20   to say about that.

21        Last, last, we believe that any matter that is

22   relevant, that was relevant or would be relevant to Ms.

23   Jordan's guilt of the homicide that Mr. Bogdanos

24   prosecuted, that he elected not to use at trial, should be

25   either foreclosed from inquiry here, that he should in

Proceedings                                                    9

1    essence be estopped from using those materials here, or if

2    he chooses to use them, at a minimum, we be granted an

3    evidentiary hearing to rebut that.

4              I understand why a good prosecutor, and again

5    A.D.A. Bogdanos is a great prosecutor, I understand why

6    even a good prosecutor would never ask a question that he

7    does not know the answer to in advance and/or that the

8    answer cannot irk him one way or the other, and I respect

9    that decision, and I respect his decision not to confront

10   Ms. Jordan with the many, many documents that she could

11   have testified about, that illustrate her desperation, her

12   fears, and her state of mind.

13             But, what he can't do, is hold back on cross that

14   which is the greatest truth finding tool the human mind can

15   conceive, only to keep it in his back pocket so that he

16   could argue without the benefit of evidence, something that

17   the Court should be taking into consideration or believing.

18             So with that sort of preliminary view of what is

19   and what is not acceptable, I will sit and not interrupt

20   Matthew Bogdanos in the course of his statement.

21             THE COURT:  Mr. Bogdanos, you want to respond?

22             MR. BOGDANOS:  I'm not exactly sure why we needed

23   the preview because we know beyond a shadow of a doubt,

24   that every single word Mr. Kuby just said will be repeated

25   once I sit down, so your Honor had to hear it twice.

```
 1              I'm going to save your Honor the trouble of
 2      hearing it from me twice, because I'm all -- all of these
 3      arguments on which Mr. Kuby is flat out wrong on the law,
 4      and it's tough for me to say, because it so rarely happens
 5      with Mr. Kuby, but he is wrong on the law in this case that
 6      somehow you can only use at sentencing what was admitted at
 7      trial, is actually the exact opposite of what 390.30 and
 8      390.40 actually says.
 9              But putting that aside, upon the pains of
10      consistency, in the last 36 hours, the defense has filed
11      three thousand pages of materials, materials.  It might not
12      have been 36 hours.  I got it about 8 o'clock the other
13      night, so what's that, say 30 hours?  Three thousand pages
14      of materials not introduced at evidence -- at trial.
15              In addition to that, a report from Dr. Putnam,
16      and I'm going to cover more of that in my argument, Dr.
17      Putnam who didn't testify at trial, reports from Dr.
18      Kucharski who didn't testify at trial.
19              THE COURT:  Spell that for the record.
20              MR. BOGDANOS:  K-U-C-H-A-R-S-K-I.  Dozens and
21      dozens of letters from people who didn't testify at trial.
22      All of that that they did, is fine, it's contemplated by
23      the statute, that's exactly what 390.30 and 390.40 say,
24      it's appropriate.
25              It's interesting to know that in 390.30 and 390.40
```

1      it says defense and prosecution in the same sentence.

2              The rules are the same, so there is no such legal

3      fiction as Mr. Kuby would desperately want this Court to

4      accept that sentencing matters must have been admitted in

5      evidence at trial.  That rule doesn't exist.  It doesn't

6      exist for the defense, it doesn't exist for the People.

7              So with that, your Honor, I would like to

8      actually, if I may, I do want to address in more detail Mr.

9      Kuby's argument, but I'll address them in my sentencing

10     argument, you don't need to hear them twice.

11             THE COURT:  Mr. Kuby, I don't want to hear any

12     more.  Here is the rule I'm setting, and I will say it

13     again:  When he finishes speaking, if you feel he said

14     something improper, something he shouldn't be allowed to

15     say, you tell me.

16             MR. KUBY:  Right.

17             THE COURT:  And if he did, and I feel he did, then

18     I wouldn't consider it.  That's it.

19             MR. KUBY:  Okay.  Well, he just did.

20             THE COURT:  Fine.

21             MR. KUBY:  So I'm allowed to respond.

22             THE COURT:  I don't want a response.  I don't want

23     to turn this into a circus.  I don't want a response.

24             MR. KUBY:  Well, I recognize you don't.

25             THE COURT:  Yes.

1           MR. KUBY:  I don't --

2           MR. BOGDANOS:  Judge, I'm going to ask you, is it

3     not what you just said five minutes ago, twice now?

4           THE COURT:  Can everyone sit down.  This is

5     exactly what I didn't want to happen today.

6           MR. KUBY:  I understand you didn't, but I was

7     specifically misquoted by Mr. Bogdanos which he almost

8     never does.

9           THE COURT:  You have to rely on me to separate the

10    things that I should consider, from the things that I

11    shouldn't consider and I can't consider, as I said.

12          And, this is the rule:  That when someone is

13    speaking, there are no interruptions.  When that person is

14    finished speaking, you can make whatever objections you

15    want to what that person has said.  That goes equally for

16    both sides.

17          Let arraign the defendant for sentence, please.

18    There is no further argument on this.

19          THE CLERK:  Gigi Jordan, you're before the Court

20    for sentencing following your conviction by trial of the

21    crime of manslaughter in the first degree as to indictment

22    621 of 2010.

23          Before being sentenced, the Court will allow you,

24    your attorney, and the A.D.A. an opportunity to address the

25    Court with respect to any matter relevant to the question

Proceedings                                    13

1    of sentence.

2                     For the People?

3                     THE COURT:  Mr. Bogdanos.

4                     MR. BOGDANOS:  Thank you, your Honor.

5                     Your Honor, defendant was convicted of having

6    killed Jude under the influence of extreme emotional

7    disturbance.  The People accept, as we always do, the

8    verdict.  It was reached after a fair and lengthy trial in

9    which both sides were given their opportunity to present

10   the evidence.

11                    I respectfully submit, your Honor, this trial was

12   about as appeal proof as any trial I have ever seen.

13                    Your Honor was extraordinarily fair to both sides,

14   and by definition, in this case, it's a fair verdict.

15                    Under no circumstances is anything I'm about to

16   say intended or designed in any way, shape or form to

17   undercut that verdict.  We accept it as a just and fair

18   verdict.

19                    In this case, the jury decided to exercise

20   leniency, to exercise its mercy dispensing function of

21   finding the defendant guilty of the lesser included offense

22   of manslaughter in the first degree, and that is as far as

23   we may go in reading anything into that verdict.

24                    The defense, as evidenced this morning, and in the

25   written submissions, would have read so much more into the

1      verdict, and ask your Honor to read so much more into the

2      verdict that isn't there.

3              For example, at page five of their May 19

4      submission, the defense argues that the unusual and

5      tortuous medical history, somehow, quote, served as

6      reasonable indicia of abuse, close quote.

7              I assume what the defense meant was that it served

8      as indicia of the alleged sexual abuse by someone else, and

9      they were not saying that the relentless medical procedures

10     were the abuse.

11             So taking that to be their argument, and I want to

12     be clear, I said it at trial, I'm saying it now, I'm not

13     asking your Honor to consider the dozens of -- two dozen

14     invasive medical procedures defendant had Jude go through

15     in his lifetime.

16             It is not my place or position to second-guess any

17     of those medical professionals; they were all approved by

18     licensed medical professions.

19             That is not forming that behavior on the part of

20     Ms. Jordan, is not forming any portion of my argument on

21     sentencing.

22             We must, however, be abundantly clear about the

23     verdict.  And no side, neither the People nor the defense

24     can go beyond the actual verdict and cannot opine what the

25     jury was thinking.  That's actually not permitted by the

1    law.  We are not allowed to try and pierce the verdict.

2    The verdict does not say anything at all about whether or

3    not the medical procedures over Jude's life were reasonable

4    or not.  Nothing.  Silent.

5            The verdict does not say anything at all about

6    whether the defendant was or was not paranoid delusional.

7    You can't say that.

8            The verdict does not say anything at all about

9    whether or not Jude was or was not sexually abused.  Not a

10   word.  You can't say that.

11           So what does the verdict say?  Well, it says

12   exactly what the legislature and the courts have told us,

13   and I cite three cases.

14           First, Justice Cardozo who said, what we have is

15   merely a privilege offered to the jury to find the lesser

16   degree, when the suddenness of the intent, the vehemence of

17   the passion seems to call irresistibly for the exercise of

18   mercy.

19           I have no objection to giving them this dispensing

20   power, but it should be given to them directly, and not in

21   a mystifying cloud of words.

22           It's actually Justice Cardozo who came up with the

23   mercy dispensing language that the courts are so fond of.

24           THE COURT:  Let's wait for the sirens.

25           MR. BOGDANOS:  Certainly, Judge.

1          You say when, Judge.

2              In People vs. Patterson, Court of Appeals case

3      from 1976, 39 N.Y.2d 288, I quote, The Court held that the

4      defendant acted because of an extreme emotional disturbance

5      does not negate intent.  The influence of EED explains the

6      defendant's intentional action, but does not make the

7      action any less intentional.

8              The purpose of the EED defense is to permit the

9      defendant to show that his actions were caused by a mental

10      infirmity not arising to the level of insanity, and that he

11      is less culpable for having committed them.  Close quote.

12              Under Patterson then, all that one can legally

13      argue in this case, is that the defendant had a mental

14      infirmity, has had a mental infirmity not arising to the

15      level of insanity.  That's it.  More than that, neither

16      side can say about the jury's verdict.

17              Similarly, the Court of Appeals again in People

18      vs. Casassa, C-A-S-A-S-S-A, at 49 N.Y.2d 668, and I quote,

19      In the end, we believe that what the legislator intended in

20      in enacting a statute was to allow the finder of fact the

21      discretionary power to mitigate the penalty when presented

22      with a situation, which under the circumstances appears to

23      them to have caused an understandable weakness in one of

24      their fellows.

25              Perhaps the chief virtue of the statute, is that

1        it allows such discretion without engaging in a detailed

2        explanation of individual circumstances in which the

3        statute would apply, thus avoiding internal quotations, the

4        mystifying cloud of words which Mr. Justice Cardozo

5        affords.  Close quote.

6               Under Casassa then under the Court of Appeals, all

7        we can say about this case is that whatever this mental

8        infirmity Ms. Jordan had not rising to the level of

9        insanity, caused an understandable weakness in her, a

10       weakness that the jury recognized.

11              Given her testimony about her decade of

12       psychiatric treatment, and her additional testimony on the

13       stand about putting aluminium foil on the walls and double

14       locking the doors, and putting the chair by the door, we

15       would be on firm footing to say that some of that mental

16       infirmity involved paranoia, but more than that we can't

17       go.

18              Legally, and under the facts, we cannot go beyond

19       what the Court of Appeals and Mr. Cardozo have told us.

20       What we can say, however, is that under the law, the jury's

21       verdict in exercising leniency took the word "life" out of

22       the sentence.  That's what they did.

23              The possible sentence went from 25 to life for

24       murder in the second degree.  And, remember, in order to

25       get to EED, the jury first had to find her guilty of murder

1    in the second degree, otherwise it couldn't go to EED.  So

2    they found her guilty of murder in the second degree first.

3    That we know is an operation of law.  The maximum sentence

4    for that is 25 to life.  Then they found EED.  The maximum

5    sentence for that is 25, the same number, without the word

6    life.  That is the extent of the jury's verdict, and that

7    is the extent of the jury's leniency.

8           The jury's mercy dispensing power within the

9    construct established by the law, it took the word life out

10   of the equation.  But the courts and the legislature and

11   the jury have left 25 years as a legal sentence, 25 years

12   as a sentence consistent with justice, and the verdict

13   handed down by the jury.

14          Allow me, your Honor, to illustrate why that is

15   actually the sentence that is most fair in this case.

16          When I say illustrate, really, I mean remind your

17   Honor, because truly I suspect there is nothing I'm about

18   to say over the next 20 minutes, maybe a tiny bit longer,

19   that is going to be new to your Honor.

20          It has been seven months since the verdict, and so

21   I do want to just highlight a few of those points, and the

22   first is a video that was played during the trial.  Do we

23   have it, please.

24          THE COURT:  Just turn that so the defense can see,

25   please.  Can someone do that.

1          MR. BOGDANOS:  I will just remind your Honor about

2     the happiness that was Jude Mirra.

3          THE COURT:  Can everyone see over here?

4          (Video played in open court.)

5          MR. BOGDANOS:  And then, your Honor, a portion of

6     the video that shows Jude playing with Emil Tsekov, the man

7     claimed to have sexually abused Jude.

8          That would be Jude kissing Emil Tsekov.  We can

9     stop.  The Emil Tsekov who Dr. Maureen Packard, the defense

10    witness testified that when he walked in the room, Jude

11    squealed with laughter.  And if I can just stay on laughter

12    for one moment.

13         Every single person who testified about Jude

14    Mirra, testified what a happy child he was.  How he was

15    truly happy all the time, from early infancy up through The

16    Studio School and throughout this, your Honor, as your

17    Honor well remembers, I submit, the only person who wasn't

18    happy, the only person who was miserable, the only person

19    who was tortured was the defendant throughout the entire

20    time.

21         It's the same person, the only person who could

22    actually ever get Jude to stop laughing.  The only person

23    who could ever get Jude to stop being happy, the only

24    person who Jude ever really needed to fear, obviously the

25    person he should have been able to trust most, the

1        defendant.

2                  But against all of this evidence, against all of

3        the videos, and we could go on, but I wouldn't, the defense

4        offers that Jude had been sexually abused, except there is

5        no evidence of that.

6                  I think it's not quite 10,000 pages of medical

7        records, all told.  I filed as a presentence memorandum, a

8        complete set of the medical records, medical records that

9        both sides have had for, my goodness, years, and portions

10       of which your Honor of course have had, portions of which

11       had been received in evidence, I -- all of which had been

12       testified to.

13                 Nothing in those records had not already been

14       testified to on cross-examination of either Ms. Jordan or

15       Dr. Hua, H-U-A, or Dr. Spitz.  I'm not going to list the

16       two dozen -- 23, I think, separate sets of medical records

17       that documented Jude's life from birth until death.  I

18       guess if you include the autopsy, that makes it an even two

19       dozen.

20                 They have one thing in common through every single

21       medical record.  No evidence of sex abuse whatsoever.  No

22       doctor or nurse who ever treated Jude in life ever found

23       evidence of sex abuse, and indeed, we know some of them

24       were looking for sex abuse; never found it, never.  I don't

25       know another way to say it.  Never.  No evidence

1        whatsoever.

2                Dr. Packard, the defense expert who treated him

3        for years, found no evidence of sex abuse.  Dr. Smiddy who

4        did the autopsy, found no evidence of sex abuse.  I'm not

5        going to list all the doctors, your Honor, it's a lot.

6        It's not just those sets of medical records, because in

7        those sets of medical records, sometimes you have three,

8        four, five, six sets of nurses and doctors who examined

9        Jude.  Nobody ever found sex abuse ever, though the defense

10       says and offers Dr. Putnam.

11               Now, here is an interesting thing:  Dr. Putnam was

12       going to be a defense witness.  We had gotten the discovery

13       material, we were going to do a conditional examination

14       because of his health.

15               Defense went through his health, thank goodness,

16       and they went through the request for a conditional

17       examination, but he was going to testify at trial.  I had

18       his report.  He was going to testify that in his expert

19       opinion, I, never having met Jude, never having examined

20       Jude, never having nothing, he was going to testify.  Let

21       me say this again:  Despite never having met Jude or

22       examined Jude, he was going to testify that Jude was

23       sexually abused.

24               Then Dr. Spitz testified to, among other things,

25       the same thing about the sex abuse, and after, what's the

1    word, performance, I don't know if it's after how many days

2    on the stand, and I don't know the right word.  Is the word

3    embarrassing?  His testimony.  Is the word shameful?  Is

4    the proper word malpractice?  Is the proper word perjury?

5    Is the proper word all the above?  I don't know.  But after

6    Dr. Spitz, another expert hired, who they paid, offered by

7    the defense, another person who didn't examine Jude, they

8    are persons who had an opinion about what did or didn't

9    happen to Jude.

10            After Dr. Spitz finished testifying, the defense

11   withdrew Dr. Putnam, and never put him on the stand.

12            A very, very wise gentleman that I respect a great

13   deal, and I will say, admire a great deal, said,

14   cross-examination, let me get it right, is the greatest

15   crucible, the greatest truth teller.  They didn't put Dr.

16   Putnam on the stand to be cross-examined, yet they submit

17   his report, an un-cross-examined report.

18            I submit, that report isn't worth a whole lot.

19   Consider it, your Honor.  I leave it, I commend it to your

20   Honor's discretion what to think about Dr. Putnam.

21            Then we come to Dr. Kucharski.  Once again,

22   someone who did not go through cross-examination.

23            Dr. Kucharski who never met Jude.  Dr. Kucharski

24   who we waited seven months for his report, seven months.

25   Again and again defense asked for more adjournments so that

1        Dr. Kucharski could submit his report to the Court.
2               So, again, first we have to ask what's it worth?
3        After all, on May 16th of 2014, in this very courtroom, at
4        page 25 of the transcript, your Honor ordered Ms. Jordan,
5        as required by law, to submit to a psychiatric examination.
6               Your Honor said, "You know you have to submit for
7        an examination, sit for an examination, the statute, you
8        understand that?
9               "Yes.
10              "You have spoken to your lawyers?
11              "Yes.
12              "You understand that if you refuse, there are
13       certain consequences possible for this?
14              "ANSWER:  Yes.
15              "From your refusal, and your continuing to refuse
16       to be examined, is that correct?
17              "ANSWER:  Yes."
18              She refused to be examined by court ordered
19       psychiatrists, choosing instead to hire one.  That was the
20       same hiring process that got her Dr. Spitz, and we get his
21       report.  It is all of 14 -- it is really 13 pages, and the
22       signature page, and what do we see?  The report that I got
23       again, well, 36 hours before sentencing?  Word for word,
24       the defendant's testimony.  Word for word.  The source of
25       his information is the defendant.

1          I could have saved everyone the trouble, and Ms.

2    Jordan the expense.  Just photocopy her testimony, and we

3    would have gotten the same exact thing.  But here's the

4    best, one quote from this hired employee, Dr. Kucharski:

5    "After careful consideration of all the materials reviewed,

6    and my direct interview with Ms. Jordan" -- let me say that

7    once again, "and my direct interview with Ms. Jordan, it is

8    my professional opinion, within reasonable psychological

9    certainty"  -- I don't even -- what is that?  He made that

10   up.  Within reasonable psychological certainty?  That's not

11   a legal standard, he made that up, "that Jude was the

12   victim of horrific physical and sex abuse."

13          So, after talking to Ms. Jordan, we wait seven

14   months for someone to come in and tell us after talking to

15   Ms. Jordan, it is his psychological opinion talking to Ms.

16   Jordan, it's his psychological opinion, that some other

17   person at some other place and some other time had been

18   sexually abused.

19          Judge, are you kidding me?  I leave, I commend

20   that report to your Honor's judgments.

21          As similarly, they offered Carol Crow.  Your Honor

22   remembers her, she got her internet application right, she

23   filled it out, she paid the fee, and she is now qualified

24   via the internet to do something.  I'm sorry, I don't

25   remember, but I remember that it had to do with

1       pulsars, and multiple personalities, one of which was

2       eiken, the other one was --

3                   MS. DELOZIER:  Tiger.

4                   MR. BOGDANOS:  Another personality was tiger.

5       This is a woman who typed as Ms. Jordan read to her from a

6       Blackberry.  So this Carol Crow person, in other words,

7       very high paid secretary who takes dictation, these are the

8       experts that the defense offered to rebut the silence in

9       the record of any sex abuse.  I commend all of that to your

10      Honor's judgment.

11                  Where does that leave us, your Honor?  Well, if we

12      strip all this away, what the statute tells us, both 390.30

13      and 390.40, is that, your Honor, one of the things your

14      Honor should focus on is the circumstances surrounding the

15      crime, both before, during and after, and so I'm going to

16      just walk your Honor through some, highlighting some of

17      those circumstances, all of which I know your Honor is well

18      aware of, so I will do this relatively quickly.

19                  According to Ms. Jordan, when she first learned

20      about -- when she began to believe that Jude had been

21      sexually abused, that was December of 2007.  She never took

22      him to a hospital, she never took him to a doctor, she

23      never took him to a therapist, she never did anything for

24      Jude.  What she did, however, was report this to her

25      therapist.

1            Your Honor saw the e-mail.  In that e-mail, she

2     didn't talk about the impact to Jude.  What she said to Dr.

3     Lacter at page 140 of Dr. Lacter's records in the e-mail

4     is, you have some time for me?  Of course that's the theme,

5     isn't it?  Me.  Do you have some time for me?  Not, can you

6     recommend a child trauma specialist for Jude?  Not, which

7     hospital should I take Jude for to check him out?  Not,

8     what tests should I take Jude for to see his blood tests or

9     anything to make sure Jude is okay?  Not, Jude needs help,

10    what can we do for Jude?  It was all about Ms. Jordan, as

11    it always was.  What can we do for me?

12            I need to see you, I need to double up my sessions

13    with Dr. Baker, I need to go extra time to Dr. Lacter,

14    remembering of course that she is getting treated, she

15    didn't take Jude.

16            Tell me what you pay attention to, a philosopher

17    once said, and I will tell you who you are.

18            Ms. Jordan was a doted mother, no argument.  But

19    we should, your Honor, not forget who was at the center of

20    her world, and it wasn't Jude.  So that's the first report.

21            Then, she takes Jude to Cheyenne, and of course in

22    Cheyenne she is committed, Jude is taken away from her, and

23    after a hearing, Jude is given back to her.  More at the

24    end on that.

25            Then we have the Defendant's e-mail and web

1       activity I filed with the Court sentencing memorandum

2       number two, and we should be clear, I highlighted for your

3       Honor 18 separate e-mails or web activity of the defendant

4       in the weeks, months, and weeks leading up to her killing

5       of Jude.  All of that was given to us by the defense after

6       their review, after their attorney/client review.  So none

7       of this is something that the defense didn't know about, of

8       course they did, and it's the defendant's computer

9       activity, the defendant's e-mail activity given to the

10      People by the defendant or by the defense counsel after the

11      judicial review.  And what do we learn?  I'm just going to

12      highlight just a couple.

13               On December 23rd of 2009, so six weeks before she

14      kills Jude, she writes -- she appears to be consolidating

15      her financial affairs, and that's something the defendant

16      testified to at length at trial, and she writes an e-mail

17      to one of her bankers in Switzerland, telling the banker,

18      Julius Baer Financial Company, that she is restructuring

19      her financial affairs, and I will quote, that she expects

20      to be in Switzerland in two to three months.  End quote.

21               So right before Christmas of 2009, six weeks

22      before she kills Jude, she is, from her own words, her own

23      e-mail given to me by the defense, she is planning on being

24      in Switzerland, has the access to resources, has the intent

25      to go to Switzerland.

Proceedings                                           28

1          She then, starting on January 9, again multiple
2     internet searches for lawyers.  Among them, and it's the
3     nationally renowned lawyers, Ted Wells is one, Carlyn
4     McCaffrey, C-A-R-L-Y-N, M-C-C-A-F-F-R-E-Y.
5          The interesting thing about Carlyn McCaffrey, that
6     web search that she does on January 9 on her computer, now
7     we are less than four weeks before she kills Jude, well,
8     that's one of the eleven recipients of that e-mail, the I'm
9     going to kill Jude, here is why I killed Jude e-mail, the
10    e-mail she sent out the weekend she killed Jude from the
11    Peninsula Hotel, that's one of the recipients of that
12    e-mail.
13         So she is searching for Ms. McCaffrey on January
14    9, 2010, all of which is consistent, the Court of Appeals
15    tells us with EED.  It does not negate intent, it does not
16    negate premeditation, it does not negate the planning, it
17    just explains, as the Court of Appeals tell us.
18         Then beginning on January 10th of 2010, Ms. Jordan
19    begins searching for autism centers, autism treatments, and
20    there is a lot, a lot of those searches, dozens and dozens
21    over the course of the next week.
22         She is searching for residential autistic
23    programs, searching for autistic treatment programs,
24    obviously all of which is fair, is reasonable, makes sense.
25    You have an autistic child, and you are -- and you have the

1    resources, so you're searching for ways of improving your

2    child's life.  That makes sense.

3            What doesn't make sense is that here at trial, Ms.

4    Jordan has consistently made, and through her paid-for

5    expert people, through her expert reports, has consistently

6    maintained that he was not autistic.

7            Well, if he is -- if that's what your claim is

8    now, why are you spending weeks, and I'm not going to pull

9    up all the e-mails, I truly lost count, I don't mean

10   e-mails, it's web searches.

11           I know your Honor is a very savvy computer user.

12   Whenever you go onto a page, the computer captures an image

13   of that page, then go to the next page, it captures an

14   image of that page.  That's about the extent of what I know

15   about this, but it's relentless.

16           That's good parenting, her search for autism

17   treatment, autism centers, autism drugs, autism options.

18   That's good parenting.  That isn't the point of this.

19           The point is if that's what you're doing in the

20   months leading up to killing Jude, now, now after you kill

21   him, now you are claiming he wasn't autistic, it was

22   something else?

23           There is a search for antiaging systems on January

24   24th of 2010.  I don't know what to make of that, I commend

25   that to your Honor.

1         She goes on with her life, she is looking for

2    property in late January of 2010.  She is looking for

3    property in New York, she is looking for property in Palm

4    Beach.  The one in Florida, is it Palm Beach?  Palm Beach

5    is the one in Florida, Palm Springs is California.  She is

6    looking for property in Florida, and lots of searches for

7    property.  She has the resources, she has the ability to

8    move, to relocate.

9         Then on February 4, she does an internet research

10   at exactly 8:25 that evening, she does internet research on

11   John Rusty Wing, one of her ultimate defense attorneys.

12   I'm going to say that date and time again, Judge.  February

13   4, the weekend she kills Jude, at 8:25 p.m. she does

14   internet research on Mr. Wing, and then on February 5th at

15   about 12:36 in the morning, she sends a test e-mail to

16   Mr. Wing, and it literally says, test, no contents.

17        Your Honor will recall that it was about an hour

18   and change later at 1:53 the morning of the fifth when she

19   begins transferring funds, you know the $125,000 she

20   transfers from one account to another.  I think in her

21   words, I'm balancing the checkbook, trying to make sure the

22   bills were paid.

23        Then at 2:24 that morning, February 5, so right

24   after she has already e-mailed Rusty Wing, she has already

25   e-mailed Pat Walsh to transfer funds at 2:24, she does

1        research on how to subscribe to the Bill O'Reilly monthly

2        newsletter, and then she actually paid for a monthly

3        premium membership.

4                If you recall, your Honor, I know you do, please

5        allow me to say it out loud, she does that from the

6        Peninsula Hotel, from the room where Jude is, by that time,

7        if not dead, in a coma and dying.  And while that's

8        happening, she is paying for monthly premium membership on

9        Bill O'Reilly monthly newsletter.

10               And then at 2:33, nine minutes later is the final

11       draft of the e-mail that she sends:  Here is why I killed

12       Jude e-mail.  At 2:33 is when the Microsoft Word, the

13       program last saved the document, last modified, last saved.

14       And then finally just a few minutes later at 2:40, so seven

15       minutes later, Ms. Jordan begins sending out that e-mail.

16       She actually sends it five different times to a total of

17       eleven recipients, one of whom I already told you is Ms.

18       McCaffrey, the lawyer she had researched four weeks

19       earlier.  So that's the timeline of the circumstances

20       surrounding the offense.

21               Very quickly, what about Ms. Jordan's testimony at

22       trial?  Two things only on that.

23               One is, I would recall to your Honor's memory, the

24       testimony of Ms. Mabey.  Ms. Mabey was a Studio School

25       teacher that Jude loved so much, who testified that the

Proceedings                                                        32

1     Blackberry messages that were in evidence introduced by the

2     defense, particularly notes 53 and 64, had actually been

3     altered and tampered with.  They were introduced in

4     evidence, they were purported to be notes, messages sent to

5     Ms. Mabey by defendant, and her testimony at page 3672 is

6     that they have been altered.

7               Similarly, Ms. Rotter was presented with e-mails

8     that came or were purported to come from Ms. Rotter to Ms.

9     Jordan, and then back and forth introduced as Defense

10    Exhibits, and Ms. Rotter also said that they were not her

11    e-mails, they appeared to have been altered, and about 187

12    pages were missing in those.

13              What to make of that, your Honor, about the clear

14    evidence of altering and tampering?  I said it at trial,

15    I'm going to say it again.

16              In no way, shape or form do I think any of the

17    gentlemen at that table did it or any of the people that

18    work for them.  That altering and tampering was clearly

19    done before, before February 5th of 2010.

20              With regard to one set, one of the people that the

21    defendant talked about seeing was a Suzi Tortora.

22              THE COURT:  Let me just interrupt, I hate doing

23    it, but the reporter, when someone is finished speaking,

24    you could give her a list of all these names, both sides.

25              MR. BOGDANOS:  S-U-Z-I, and Tortora,

1      T-O-R-T-O-R-A.

2                THE COURT:  She wasn't here during the trial, the

3      reporter.

4                MR. BOGDANOS:  Right.  Ms. Tortora was one of Ms.

5      Jordan's therapist.  She is not a psychiatrist.  Her

6      company was Dancing Dialogue I think is the name of it, and

7      on February 2nd of 2010, there was a a session between Ms.

8      Jordan and Ms. Tortora, that's February 2nd of 2010.  That

9      session was captured in Ms. Tortora's notes at page 229,

10     notes of course, given Ms. Tortora was one of the potential

11     defense witnesses, and we were given Ms. Tortora's notes,

12     and so that the Bate stamp is Tortora 229, as I said given

13     by the defense.

14                Here's a line from Ms. Tortora's notes, and it

15     reads:  Gigi, and I'm going to quote, if I didn't have

16     Jude, I would try to make a change like what you do.

17                On February 2nd of 2010, Ms. Jordan is telling her

18     therapist about what she would do if she didn't have Jude,

19     opining, daydreaming about what she would do.  And of

20     course, we know from the defendant's own testimony, that at

21     the time she said that, she was already planning to kill

22     Jude.  How do we know that?

23                At 2768 of the transcript, the defendant's

24     testimony on the stand, she said, she thought about killing

25     him, and I'm going to quote, for days prior to that

```
 1          February 3, and then later on.  I'm not sure exactly how

 2          many days.  Close quote.

 3                 Days.  In other words, when she makes that

 4          statement to Ms. Tortora, the evidence of record shows she

 5          was already planning on killing Jude.

 6                 And then of course your Honor recalls the planning

 7          itself, driving around just finding the perfect hotel to

 8          kill him.

 9                 Your Honor also recalls, so there is no need to go

10          into detail, that the levels that Jude had in his body were

11          consistent with greater than 50 pills.  By all testimony,

12          it appears anywhere from 15 to 20 Xanax pills, at least 15

13          or more Ambien, and a fatal level of Clonidine.

14                 THE COURT:  Can you wait a second again.

15                 MR. BOGDANOS:  Clonidine?

16                 THE COURT:  No, no, no.

17                 Let's try now.

18                 MR. BOGDANOS:  Yes, sir.

19                 There was a question, there has been a question in

20          this courtroom about whether the defendant did or did not

21          try to kill herself.  I take no position on whether she did

22          or didn't.  I'm sure you could argue if she really wanted

23          to kill herself, my goodness, she knew how with more than

24          5,000 pills in that room.  She knew how to kill Jude.  But

25          really, your Honor, whether she did or did not, is of no
```

1    moment in this sentence that the People are recommending,

2    but her behavior in the circumstances surrounding the

3    offense are, and in this regard, I point out what happened

4    when the first responders arrived at the scene.

5              Judge, by my count, there were nine altogether

6    between uniformed police officers and emergency medical

7    technicians, that includes the people who actually took her

8    downstairs, transported her to the hospital, nine

9    altogether.  And what was the single thing she said to

10   every one?  I want a lawyer.

11             There is no -- I want to make it abundantly clear,

12   because I fear that the defense will try to cast this

13   argument as they have tried to cast other arguments that

14   I'm not making into some punishment for asking for a

15   lawyer.  Of course not, absolutely not.  Absolutely her

16   right to ask for a lawyer.  But I offer that only as it

17   offers insight into the defendant's state of mind in what

18   the statute tells us about the circumstances surrounding

19   the offense.

20             Here as people approach her, ma'am, what did you

21   give him, what did you take?  I want a lawyer.  Are you

22   okay?  I want a lawyer.  I don't care.  Remember this whole

23   interchange?  I don't care.  Look at me, I'm trying to save

24   your life.  What did you take?  I want a lawyer.

25             One officer, that was Hall, as I recall:  I'm not

1    a cop.  What did you take?  I want a lawyer.  And then

2    during the transport, again and again and again, I want a

3    lawyer, I want a lawyer, and more times than the one

4    officer could count.

5              You're so distraught, you're so devastated, you're

6    so pushed beyond the breaking point, that the first words

7    out of your mouth are I want a lawyer?  Doesn't that

8    require some measure, some level of self control, self

9    awareness, some measure of self?  Well, there is that theme

10   again, self.  I want a lawyer, again and again.

11             And, again, your Honor, under no circumstances

12   should she or anyone be punished for asking for a lawyer,

13   but you don't get to have it both ways, Judge.  You don't

14   get to say, I'm so distraught, I was so beyond the breaking

15   point, I didn't know what I was doing, I had no other

16   recourse.

17             Yes, I have tens of millions of dollar.  Sure, I

18   can go to Switzerland.  Sure, I have my passport.  Sure, I

19   could go anywhere I wanted in the world, but I was so

20   distraught that's my only recourse, but at the same time

21   have the presence of mind, have the presence of sense to

22   say I want a lawyer, I want a lawyer, I want a lawyer, I

23   want a lawyer.  Those are not consistent.

24             Judge, in conclusion, we're here to determine the

25   appropriate sentence.  I could highlight how the defendant

1    has skillfully manipulated this system for five years in

2    the exact way that she manipulated every other person who

3    came into contact with her, from Ray Mirra to Emil Tsekov

4    to the entire staff at the Trump Hotel, to doctors all over

5    the country anxious for funding and reasons to fund their

6    research.  You already know all of this.  I could talk

7    about how Jude would be 14 years old this July 13, but you

8    already know that.

9              I could remind your Honor how well he was doing at

10   The Studio School, especially with Ms. Mabey.  How they

11   were bonding, how much she enjoyed being with him, and how

12   much of an improvement she had seen in him over the time

13   that they were together.  You don't need to hear that from

14   me, Judge.

15             I would rather, Judge, stress that as your Honor

16   well knows, the true work of any society, Judge, is

17   measured not in how it cares for the wealthiest, for the

18   best, for the brightest.  The real value of a society is

19   measured in how that society protects its weakest, its most

20   vulnerable.

21             Few, if any, I suspect, your Honor, have come

22   across this courtroom who have been as dependent, as

23   vulnerable, as worthy of our protection as Jude Mirra, and

24   we failed, we, capital we, we failed him:  The system,

25   could have, should have, would have in Cheyenne.  We

1      didn't.

2              The system was alerted to the danger that Ms.

3      Jordan was, put Ms. Jordan into involuntary commitment,

4      separated her from Jude, and then ultimately gave him back

5      to the person who would one day kill him less than two

6      years later.

7              Think about it, Judge, how defense counsel got up

8      at Cheyenne, Wyoming, and said the defendant is not a

9      threat to herself to Jude or to others.  You have the

10     transcript.

11             Some experts said at that time, Ms. Jordan is not

12     a threat to herself, to Jude, to others, just like the

13     experts are claiming here in their reports.  And they were

14     so good back then, they were so persuasive, that they

15     convinced the Judge in Wyoming that they were right, and

16     that the prosecution was wrong, and the system ordered that

17     happy, sweet little child back into the custody of the

18     person who would plan, and then intentionally kill him.  As

19     my 13 year old would say, Judge, that's a total fail.

20             Sure, different jurisdiction, different Judge,

21     different prosecutor, different laws, different attorneys.

22     We don't get off that easily, the system.  We don't get to

23     wash our hands of the harsh truth.  Try as we might, they

24     are never going to get completely washed clean, kind of

25     like Lady Macbeth, this is going to stay with us forever.

Proceedings

39

1               We had the chance to stop it, and we gave him back

2          to her.  There will never come a time, I suspect, that any

3          of us forget that.

4               As my grandmother, God rest her soul, used to say,

5          fool me once, shame on you; fool me twice, shame on me.

6               We can't bring him back, we can't rewind, we can't

7          undo, no do-overs.  We can't say to the Judge in Wyoming,

8          Judge, with all due respect, I mean this sincerely, you

9          screwed up.  We can't say to the defense counsel in

10         Wyoming, you were wrong.  We can't say to those nurses,

11         Traci Jones, Lynn Huyler, we can't say to them, you were

12         right, you were right two years earlier.  We can't say to

13         that D.A., you didn't try hard enough.  None of that means

14         anything, because he is dead.

15              So, Judge, I'm asking this Court to take care of

16          him in death like we didn't in life.

17                    By saying, Jude, your life mattered.
Whatever

18          paranoid delusions your mother had, you were
still a

19          vibrant child, a joyful life, a life that
should have grown

20          old and struggled with all the vagaries of the
human life.

21          A life that should have started to have
playdates, and

22          maybe even advancing to drop-off playdates, and
then maybe

23          even some day, sleepovers, and then the bane of
any parent

24          existence, maybe even a birthday party at Chuck
E.

25          Cheese's.  This is what he should have had.


                        Sati Singh, RPR
                     Senior Court Reporter

Proceedings                                            40

1          He should have had clown birthday parties and

2     magic birthday parties.  He should have had candles on a

3     cake, that no matter how hard you blow them out, they don't

4     go out, and we all know what his response would have been,

5     it would have been laughter.

6          He should have had Shirley Temple's with a cherry

7     at a restaurant, pretending that it's a real drink.  He

8     should have had friends, other children with or without

9     challenges.  Whatever the challenge is, whatever the

10    learning disability:  Autism, Down Syndrome, whatever it

11    is, he should have had the chance.

12         Parents, those parents, they don't kill their

13    children.  They struggle, as all parents do.

14         Maybe I'm just too old-fashioned, Judge, but where

15    I come from, you don't kill children.  The list of reasons

16    that are okay to kill children is pretty short.  It's zero.

17    My list, zero.  Your list, Judge, zero.  I suspect everyone

18    else in this courtroom, zero.  Ms. Jordan's list, yeah, not

19    zero.

20         He should have grown old, gone to the junior prom

21    with or without a date.  He should have stood on the boys'

22    side, and at some point muster up enough courage to go to

23    someone to dance, and when she says no, take a long walk.

24         All of us have probably suffered there, probably

25    not your Honor, but the rest of us have.  He should have

1    had that.  He will never have any of it.  He will never

2    have any.  And the worst part is, she had all the

3    resources, chances, opportunities, could have done

4    anything, so many other options, and instead she chose to

5    kill him.  And for that, Judge, she should be sentenced.

6    And, Judge, she ought to be sentenced to the maximum.

7    Thank you.

8            THE COURT:  Counsel, I was going to give the

9    reporter a break.

10           You want to be heard now or after the break?

11           MR. BOGDANOS:  I have a note.

12           THE COURT:  He has to go to a different courtroom,

13   if you want to take a break now.

14           MR. BRENNER:  Well, apparently the note didn't

15   stop him from saying the last bunch of stuff that he said,

16   so.

17           MR. BOGDANOS:  Really?

18           THE COURT:  Hold on, please.

19           MR. BOGDANOS:  That's offensive.

20           THE COURT:  Gentlemen, please, please.  You want

21   to be heard now?

22           MR. BRENNER:  I do, briefly, okay.

23           I want it clear though that what happened during

24   the trial with the side comments and side interruptions, I

25   thought that your rules were absolutely clear, nobody at

1      this table made a sound or even moved during the course of

2      Mr. Bogdanos' presentation.  So, whether he finds something

3      that I'm going to say offensive or not, there has to be the

4      same cone of silence surrounding that table as there was

5      for this table; we all agree?

6              THE COURT:  We all agree.

7              MR. BRENNER:  Okay.  We do want, we do want a

8      break because we need to confer, because the danger that

9      Mr. Kuby raised at the beginning, and which was the subject

10     of some discourse, is I have heard about 96 percent of what

11     Mr. Bogdanos has just said to the Court, and you know when

12     I heard it, I heard it in closing argument.

13             I heard it when the prosecution made its effort to

14     dissuade the jury, to convince the jury that this was a

15     murderous state of mind, and not one of extreme emotional

16     disturbance.  That her state of mind in calculation, in

17     consideration, in all forms were such, that there was in

18     fact no extreme emotional disturbance.  Every single

19     argument, save one, I have heard before.  And, what it

20     sounded like to me is he picked a new jury, and retried the

21     EED defense again.

22             So, now we are in the position of pushing back,

23     however long that takes, and in whatever form it may

24     manifest itself.

25             THE COURT:  I don't understand what that means,

```
1       "pushing back."

2                   MR. BRENNER:  Well, for example.

3                   THE COURT:  You can speak today.

4                   MR. BRENNER:  Mr. Bogdanos read one line from a

5       series of handwritten notes by Ms. Tortora who, despite

6       protestations to the contrary, notwithstanding, was not Ms.

7       Jordan's therapist.

8                   THE COURT:  Let me say this:  I really hate to

9       interrupt.  If you want to take a break, we can take a

10      break now.  When we come back, when we come back, I will

11      give you as much time as you want --

12                  MR. BRENNER:  I understand.

13                  THE COURT:  -- to put on the record what you

14      object to and why, okay?

15                  MR. BRENNER:  Fair enough.

16                  THE COURT:  Again, I will tell you one thing, we

17      are not adjourning sentencing today.

18                  MR. BRENNER:  Fair enough, your Honor.

19                  THE COURT:  I'm just letting you know that.

20                  MR. BRENNER:  We will put our protestations on the

21      record.

22                  THE COURT:  Let's take about 15 minutes, we will

23      all come back about 25 to twelve.

24                  MR. BOGDANOS:  And with the Court's permission,

25      I'm going to go down to eleven.
```

```
1                    MR. KUBY:  I need Ms. Jordan at the table.

2                    THE COURT:  We are taking a break.  I'm taking a

3          break.  You want to speak to her?  You want to speak to her

4          here, I don't care, as long as it's okay with the crew.

5                    (Whereupon, a brief recess was taken.)

6                    THE COURT:  Case on trial continued.

7                    All parties are present.  Defendant is present.

8                    When we took our break about 10, 15 minutes ago, I

9          think, when we took our break about 15 minutes ago, Mr.

10         Brenner, I think you wanted to make a statement concerning

11         what Mr. Bogdanos said or object to what he said?

12                   MR. BRENNER:  I'm being completely candid with

13         you.

14                   THE COURT:  I hope so.

15                   MR. BRENNER:  We did not know the parameters or

16         the boundaries of what Mr. Bogdanos would address, so the

17         structure that we have developed to deal with that has been

18         literally in a room in the last 15 minutes.

19                   THE COURT:  Okay.

20                   MR. BRENNER:  So the way that we're going to

21         approach this is that Mr. Kuby is going to speak first, he

22         is going to address his objections, and some other matters,

23         and then I will speak after that with regard to some other

24         points that Mr. Bogdanos had addressed.

25                   THE COURT:  When are you going to speak on
```

1            sentencing?

2                    MR. BRENNER:  That I will be addressing,

3            sentencing.

4                    THE COURT:  When is that?

5                    MR. BRENNER:  When Mr. Kuby is done.

6                    THE COURT:  Fine.  I just thought you wanted to

7            just speak about what Mr. Bogdanos said, but you can.

8                    MR. BRENNER:  We are.

9                    THE COURT:  Go ahead.  I'm sorry.

10                   MR. BRENNER:  But once that's done --

11                   THE COURT:  Yes.

12                   MR. BRENNER:  -- and whatever the Court's position

13           is on that, we will then, if constrained to proceed into

14           addressing the sentencing itself.

15                   THE COURT:  Okay.

16                   MR. BRENNER:  Or --

17                   THE COURT:  Go ahead.

18                   MR. BRENNER:  And Ms. Jordan will speak last.

19                   THE COURT:  Of course.

20                   So who wants to speak first, if anyone, about what

21           Mr. Bogdanos said?

22                   MR. KUBY:  I think, Judge, that I will.  I will

23           begin.

24                   THE COURT:  Okay.

25                   MR. KUBY:  And I will say this:

Proceedings                                    46

```
 1              MR. BOGDANOS:  Judge, I'm sorry.  I apologize.
 2      One second ago we got a verdict, we got a verdict.
 3              MR. KUBY:  This is just incredible.  I didn't get
 4      to the first sentence.
 5              MR. BOGDANOS:  Really.  Really.  Stop it.  Stop
 6      it.
 7              We got a verdict, Judge.
 8              THE COURT:  He has a verdict in a case downstairs.
 9      He will go down and come back in 15 minutes.  It has
10      nothing to do with Ms. Jordan.
11              MR. KUBY:  We can do this in fact, since one of my
12      applications is going to be an adjournment so we can have
13      an evidentiary hearing to rebut the false statements that
14      were made during sentencing, we can all leave right now as
15      far as I'm concerned.
16              THE COURT:  Well, you can leave, but I'm
17      sentencing her today.
18              MR. KUBY:  It doesn't matter, it doesn't matter
19      what needs to be rebutted?
20              THE COURT:  You can leave.  Go take care of your
21      other case.  Fifteen minutes.
22              MR. BOGDANOS:  It's on the eleventh floor, Part
23      61.  I will be right back.
24              (Whereupon, a brief recess was taken.)
25              THE CLERK:  Recalling calendar number three, Gigi
```

1      Jordan.

2              THE COURT:  All parties are present.  Defendant is

3      on her way out.  Ms. Jordan is on her way out.

4              Ms. Jordan is now present.  Once she is settled,

5      we will start.

6              Mr. Kuby, I think you were about to begin.

7              MR. KUBY:  Yes, Judge.

8              I would like to begin these portions of the

9      proceedings by again formally putting on the record what I

10     said just before Matthew Bogdanos said he got his verdict.

11             There were a number of things raised in the course

12     of the sentencing proceedings:  Mr. Bogdanos' arguments

13     that referenced documents, referenced materials and

14     evidence that Ms. Jordan was not confronted with at trial,

15     and so my request is that we have an adjournment for an

16     evidentiary hearing where we can introduce both documents,

17     and more important, Ms. Jordan's voice to explain the

18     meaning of those documents, explain the meaning of the web

19     searches.

20             Of course at such a hearing, she would be sworn

21     and subject to cross-examination by Mr. Bogdanos, which I

22     think we all recognize at least in the abstract is

23     preferable to two lawyers arguing inferences based on

24     documents in the absence of evidence.  So that's my initial

25     request.

Proceedings                                              48

1              THE COURT:  Okay.  The People want to be heard on

2        that?

3              MR. BOGDANOS:  People oppose that, your Honor, and

4        request we move forward to sentencing in accordance with

5        CPL 390, your Honor.

6              THE COURT:  Mr. Kuby, do you have anything else on

7        that issue?

8              MR. KUBY:  No.

9              THE COURT:  The application is denied.  You have

10       an issue on appeal of course by my denial of this

11       obviously.

12             MR. KUBY:  So let me then try to rebut some of the

13       things that Mr. Bogdanos said, and I have to do it really

14       in the sense of making an offer of proof.  But before I do

15       that, again I think we need to understand the legal

16       parameters here, and Mr. Bogdanos was quite right, I do

17       need to say some of these things a second time.  I need to

18       say them a second time because he refused to abide by the

19       first admonition, and not do them the first time.

20             More specifically, the idea that the only thing

21       you can read into the record is that the jury rendered the

22       verdict they rendered, is simply not the law.  It would be

23       as if I would get up here in a murder case where a

24       defendant was found guilty and say, Judge, you cannot

25       assume, you cannot presume that the jury found that the

1      person was dead.  You'll look at me and you will say, don't

2      be ridiculous, Mr. Kuby, death is one of the elements of

3      the offense by virtue of their verdict, they found the

4      decedent was dead, you're making a ridiculous argument.

5      And, of course I would be making a ridiculous argument.

6      But Mr. Bogdanos has no problem basically making exactly

7      that argument.

8              The jury was instructed that in order to find EED,

9      they had to find, as material elements, that the defendant

10     had an extreme emotional disturbance; they found that.

11             That in committing the homicide, the defendant was

12     acting under the influence of that extreme emotional

13     disturbance; they found that.

14             And what the prosecution cannot or will not

15     accept, despite the fact that they say they accept their

16     argument, belies that acceptance, that there was an

17     explanation for the EED that was reasonable, and most of

18     what I have heard is Mr. Bogdanos arguing that it was not

19     reasonable.  It was absurd, it was ridiculous, there is no

20     evidence.  That he is making exactly the argument he made

21     to the jury, exactly the argument that the jury rejected

22     and found for the defense by a preponderance of the

23     evidence.

24             So, he can, he can quote Justice Cardozo's

25     observations about the juridical purpose of EED, and where

1           it fits into the Anglo-American -- J-U-R-I-D-I-C-A-L.

2                     MR. BOGDANOS:  Keep going.

3                     MR. KUBY:  And where --

4                     MR. BOGDANOS:  He spelled it wrong.

5                     MR. KUBY:  And where it fits in the grand history

6      of Anglo-American jurisprudence, but those are the very

7      sordid, mystifying words that we don't have to entertain,

8      because the jury was not given the opportunity to exercise

9      mercy.

10                    The statute may exist for the purpose of allowing

11     the jury to come to a determination other than murder, and

12     that may well have been, and indeed is the legislative

13     intent.

14                    The jury was not asked what sentence should Ms.

15     Jordan receive; what mercy should she receive.

16                    The jury, as I recall, and I was not here, but I

17     did read about it in the transcript, was told by you what

18     the law was.  And they were bound to follow the law, and

19     they followed the law, and they came to their

20     determination.

21                    So, so, the jury was not exercising mercy.  The

22     jury was finding facts and applying the law to those facts

23     for better or for worse.  Mercy is yours.

24                    Now, Mr. Bogdanos again, there is no evidence that

25     Jude had been sexually molested by Tsekov, and Mr. Bogdanos

 1          took a number of different formulations of that, and he was

 2          uncharacteristically less careful than he usually is.  His

 3          favorite formulation has been, there is no evidence that

 4          Jude was sexually molested when he was alive given by any

 5          doctor who examined him.  Then he got a little more

 6          expansive.  But we know from Dr. Spitz, we know from Dr.

 7          Putnam, that there were findings of sexual abuse.

 8                  Indeed, these were not examining physicians.  We

 9          know from Dr. Dhossche whose appearance on the stand was

10          precluded by Mr. Bogdanos, that Jude Mirra, far from being

11          the happy, skipping little boy that Mr. Bogdanos would

12          claim he was, in fact was almost certainly suffering from

13          trauma, induced catatonia, catatonia, and that's why Dr.

14          Dhossche treated him in the way that he did.

15                  And we also know, that Mr. Tsekov, and I have

16          submitted these documents, and I refer to document, in this

17          case 4806, I will be happy to give the Court a specific

18          copy of that page, but it's in the documents that we

19          submitted, Mr. Tsekov who wisely was not called by Mr.

20          Bogdanos, did speak to an investigator of ours, and had no

21          problem telling that investigator things that I would not

22          admit to my wife in a quiet bedroom when I thought we were

23          alone.

24                  That Mr. Tsekov admitted self catheterization

25          during sex.  He admitted drinking his fresh urine.  He

1    admitted collecting his urine, drying it into a paste, and

2    then smearing it all over his body.  He would drink a

3    concoction of olive oil and lemon juice five times an hour

4    during the full moon, and then his subsequent welcome

5    excretion of what he said were green balls, and he would

6    use an electrical shock box to supposedly kill the bacteria

7    and fungus in his body.

8           Who could imagine such a person would sexually

9    abuse a child?  I don't know.  Crazy.  Paranoid.  And we

10   could go on through the Tsekov documents.

11          The number of people who were close to him, his

12   former clients who left him because of his inappropriate

13   behavior, the history of rape in his own family and other

14   things.  But, Mr. Bogdanos, again, wisely chose not to call

15   Mr. Tsekov, although it would have been an easy thing to

16   do, put Mr. Tsekov on the stand and say, I didn't do

17   anything but love that child.  But I think we all at this

18   point know better.

19          Mr. Bogdanos made reference to the 12-23 e-mail in

20   which Ms. Jordan was consolidating her finances.  And

21   again, as the Court knows, it was I believe December 20 --

22          THE COURT:  Was that intended for the record?

23          MR. KUBY:  Yes.

24          THE COURT:  I don't think the reporter got that.

25          Mr. Kuby:  On December 20, that Alan Goldblatt

Sati Singh, RPR
Senior Court Reporter

1    died, and Alan Goldblatt was sort of Ms. Jordan's last,

2    last refuge, and last person of safety.

3          Alan Goldblatt had made arrangements, and I'm not

4    sure if this is in the record, I certainly make it as an

5    offer of proof, he had actually made arrangements with an

6    FBI agent for Ms. Jordan and Mr. Goldblatt and an attorney

7    for Ms. Jordan in this case who was going to be Marc

8    Agnifilo to accompany Ms. Jordan to meet with them, and to

9    be talking to the FBI about the things that happened to

10   Jude.

11         He died on the 20th, and at that point Ms. Jordan

12   is dealing with her attorney, Gay Woodhouse, and Gay

13   Woodhouse advises her quite wisely and sensibly to get rid

14   of all your business dealings with Mirra, get away from him

15   in every respect that you possibly can.  And that was the

16   course of her restructuring her finances.

17         Ms. Jordan ending up telling BJB, the bank which

18   she was going to call in Switzerland, she did that because

19   she was trying to get a bank statement.  But there was no

20   effort to go to Switzerland, and no attempt to go to

21   Switzerland.  And I think Ms. Jordan testified at trial

22   that she did not think that she or her son would be safe in

23   some foreign country where she really knew no one and

24   nothing.  In fact, she didn't think she would be safe at

25   all, but she was trying, Judge, she really was.

Proceedings                                        54

1              The internet search for lawyers on January 9,

2      2010, I would show at a hearing, there was a wide variety

3      of lawyers that Ms. Jordan was looking to talk to, to try

4      to find some help for herself, for Jude, some way of

5      defending herself against Mirra.  One of those lawyers was

6      in fact Rusty Wing.  And Ms. Jordan met with Mr. Wing

7      desperately seeking help.  Ms. Jordan met with Richard

8      Emery desperately seeking help.  I don't know why these are

9      considered to be sinister things.  Mr. Bogdanos somehow

10     tosses them out there, and I don't know, expects some

11     inference of wrongdoing to be drawn?

12             But in an evidentiary hearing, we would call those

13     attorneys.  We would call Ms. Jordan where she made the

14     disclosures about what was happening to her and happening

15     to her son, and the way she sought their assistance.

16             Mr. Bogdanos, made reference to the autism

17     treatment facilities and why would Ms. Jordan seek an

18     autism treatment facility where she maintains her son

19     didn't have autism?  Really?  That's really an argument?

20     And that somehow she made up, after his death, that he

21     didn't really have autism?  You know the medical records,

22     Judge.

23             Virtually every physician, if not every physician

24     including the most distinguish physicians in the country

25     who had the best credentials, who couldn't be bought by

Proceedings                                                    55

1        anybody, or manipulated by anybody, let alone by Ms.

2        Jordan, all agree, if this was autism, it was extremely

3        atypical.  They all agree that this could well be something

4        else.  And, they all put their best minds to work at trying

5        to figure out what it was.

6                As we know, parents with autistic children are

7        carrying that burden of the autism diagnosis, that they

8        will do that.  And we know that not just from this case, we

9        know it from former assistant district attorney Kevin Hines

10       who wrote a letter to this Court on behalf of Ms. Jordan,

11       who himself has gone through this process, happily didn't

12       have to go through it as a single parent, and happily was

13       able to find relief, where Ms. Jordan found none.

14               But the idea that you would take a child who has

15       autistic symptoms, who needs the type of day-to-day care

16       that autistic children get, and look for an autistic

17       treatment facility for him because there is no treatment

18       facility for what he has because the doctors still haven't

19       figured it out, somehow that's wrong, or that's part of a

20       contrivance?

21               Antiaging.  Mr. Bogdanos tosses that out.  The

22       antiaging e-mails.  He says well, I don't know what to make

23       of that, I will leave that to you, Judge.

24               Well, I know what to make of it, Judge.  I guess

25       antiaging sounds like Ms. Jordan was intending to be around

1    for a long time, so that's why she was researching

2    antiaging on the internet.

3           If you look at documents 1331 to 1345, you will

4    see a series of e-mails between Ms. Jordan and Dr.

5    Salvatore Alessci, a psychiatrist, a physician.  I will

6    spell it all out when I'm done.

7           THE COURT:  All right.

8           MR. KUBY:  When I'm done.

9           Talking about a drug called Stablon.  Stablon,

10   which was the trade name for a more elaborate drug that I

11   can't pronounce and wouldn't try to.  But it's an

12   antidepressant, it's a unique type of antidepressant, and

13   she and Dr. Alessci were corresponding about this

14   antidepressant or its possible use for Jude.

15          And, Ms. Jordan was informed by Dr. Alessci that

16   the place you can get this in the United States is at a

17   website called Antiaging, and she went on that website, and

18   she ordered a bottle of Stablon in order to continue to try

19   to help her son.

20          Nothing sinister, nothing peculiar.  Has no

21   particular relevance at all, except part of the pattern of

22   Ms. Jordan trying to care for her son, but somehow A.D.A.

23   Bogdanos thought that that was relevant and had to be

24   thrown in.

25          Ms. Jordan in the last month of Jude's life and

1        what she thought was going to be the last -- her last

2        month, she worked really hard to try to maintain some sense

3        of normality for her son.

4               So, did she buy some clothing for herself online

5        at the Gap?  Yes, at the Gap.  She did.  That e-mail was

6        there too.  I don't know what that says about her in the

7        Court's view or Mr. Bogdanos' view, no idea why it was put

8        in.

9               Did she also, as you will see at document 1887 to

10       one 1892, I think she also shopped for clothes for Jude

11       online and buy him T-shirts even as late as January 25,

12       2010.  Yes, she did.  Yes, she did.

13              She did what people do.  Even under extreme

14       circumstances, even under horrific circumstances, even

15       under circumstances that none of us could imagine, somehow,

16       someway people try, especially for their children, to carve

17       out some piece of normality, and those efforts to carve out

18       normality are somehow thrown back in her face as some sort

19       of insidious proof oh, that she is rational, and planning,

20       and fully in control of what's going on.

21              Bill O'Reilly.  Wow.  What's that about?  Bill

22       O'Reilly?  What does that have to do with anything?  I

23       don't know, I don't.  Again, it's one of these things that

24       the A.D.A. Bogdanos throws out, and he knows, he knows the

25       context as does the Court.

1               First of all, by the way, she did not pay for a

2      subscription.  Check the credit card records.  There was no

3      paid subscription for the Bill O'Reilly letters.  What

4      there was, was a series of e-mails, mails, suicide note,

5      her suicide note.  May God help us all, suicide note.  That

6      was sent to the lawyer she interacted with, to members of

7      the media, to other people that Ms. Jordan thought might

8      tell the story as to what happened to her after she was

9      gone and after Jude was gone, and I suppose she thought

10     Bill O'Reilly was one of those people, she thought Nancy

11     Grace was one of those people that she had seen on TV who

12     seem to care about victims, seem to care about victims, she

13     was one of those people.

14               She sent them out to law enforcement as well,

15     hoping that they would do something postmortem after her

16     death, after Jude's death about Tsekov, and that's all it

17     was, that's all it was.

18               One thing Mr. Bogdanos said during what I would

19     call his peroration, was he threw out to the Court it is

20     never okay to kill a child.  What's your list of reasons

21     where it's ever, ever okay to kill a child?  It's never

22     okay to kill a child.  And, you know what, we are not

23     arguing that it is.  But those words, those words sound

24     particularly hollow to me coming from that side of the

25     table and the Government that that side of the table

1    represents.

2              I recall a very famous woman, very famous woman,

3    her name is Madeleine Albright.  Revered.  Probably gave

4    some sort of a commencement speech.  And she was asked, the

5    period of Sanctions killed 600,000 Iraqi children, was it

6    worth it?  She said, yes.  Six hundred thousand dead

7    children.  Not to talk about all of the children we in the

8    society have authorized the killings of, and it's always

9    been okay.  Always been okay.  It's been war or collateral

10   damage or unavoidable or very sad, or we wish it didn't

11   happen, or we wish they had not forced us, but we do it all

12   the time.  You cause the death of one child who you

13   desperately love, you sit here and you call them murderer.

14   You kill a million children, they call you Madam Secretary

15   or mister general, sir.

16             So don't stand there in this courtroom and don't

17   stand here in front of this Court and talk about how it's

18   never okay to kill children.  You want to talk about

19   getting the blood off your hands?  A lot of blood on a lot

20   of hands over dead children.

21             And last, A.D.A. Bogdanos said, the system failed,

22   we failed.

23             I guess, I guess that's a way of taking

24   responsibility.  I suppose when I say I failed, I accept

25   responsibility, and I almost heard Mr. Bogdanos saying that

1    on behalf of the system.  And I agree, we did fail, we all

2    did.

3              Law enforcement failed, doctors failed.  There is

4    a lot of failures to go around.  But the great thing about

5    being able to say we failed and accept that kind of

6    responsibility, is you're not accepting any responsibility

7    whatsoever.

8              So the consequence of our collective failure is to

9    impose, in the prosecution's view, the maximum possible

10   sentence on Ms. Jordan, that will teach us for our failure.

11             Punish the person who actually cared about Jude

12   Jordan the most, and punish her as severely as the law will

13   allow you to do.  That's what Mr. Bogdanos is telling you.

14             I'm going to sit down and let brother Brenner

15   speak.  I just want to say that, as I said before, there is

16   nothing, nothing in the world that is so tragic, that a

17   trip through the criminal justice system cannot make it

18   worse.  So I'm asking you to do this, is just don't make

19   this, this horror show, worse than it absolutely has to be.

20             THE COURT:  Thank you, Mr. Kuby.

21             Mr. Brenner, do you want to address the Court on

22   sentencing?

23             MR. BRENNER:  Yes, I do.

24             THE COURT:  Go ahead.

25             MR. BRENNER:  Yes.  First, I do need to say that

```
 1            in listening to the prosecution's presentation, I had some
 2            sense that the reality that unfolded in this courtroom was
 3            suspended, and a new reality was attempting to be imposed
 4            upon the Court.  And I put before you this:  Gigi Jordan
 5            manipulated Raymond Mirra, Mr. Bogdanos said that.  And, of
 6            course, given the constraints that the Court put on certain
 7            evidence, what Mr. Mirra did or didn't do, or said or
 8            didn't say, was somewhat limited.  But surely, there was no
 9            evidence presented to this Court and no evidence affixed to
10            any of these thousands of pages of documents, that Ms.
11            Jordan manipulated Mr. Mirra.  To the contrary.
12                     Had we been allowed to proceed, and the Court
13            deemed it not within the four corners of the relevant
14            issues at the trial, we would have presented the millions
15            of dollars of stolen money from Ms. Jordan by Mr. Mirra,
16            the hundreds of forged documents which were used to steal
17            that money by Mirra and his cronies, and the notion that
18            somehow Mr. Bogdanos who was at the very least aware of
19            that posture, and aware of the documents that exist,
20            because they were furnished to the prosecution, will now
21            say she manipulated everybody:  Everybody at Trump, Ray
22            Mirra, Emil Tsekov, everybody and anybody, a proposition
23            for which there was absolutely no evidence, but that did
24            not stop Mr. Bogdanos.
25                     There is an alternant reality counter to that
```

Proceedings                                    62

1      which was presented to the jury and which the jury decided

2      upon before this Court.

3              And, I harken to a word, cherry-pick.  And quite

4      frankly, your Honor, I look to find a quotation by some

5      dead person as to what cherry-pick means, because that's

6      the current state with which Mr. Bogdanos seems to be most

7      comfortable, but I couldn't.

8              So it has its common meaning.  Cherry-pick is you

9      take a bunch of information, you find that which you like

10     the most, you take a little piece out, and you disregard

11     the rest, and you present that for the point that you're

12     trying to make.

13             The most glaring, and I submit to you the most

14     abusive example of that was Mr. Bogdanos' allusion to the

15     note of Ms. Tortora which was from my review of the

16     entirety of the documentary evidence, the last therapist to

17     have any kind of meaningful exchange with Ms. Jordan.  The

18     last entry of notes starts on February 2, three days before

19     these events.  And, it is clear from the notes which you

20     can find at our page 800 to 810, and I think they are worth

21     looking at, and the People's pages 226 to 236.

22             Ms. Jordan is in Florida, as you may recall, in

23     the days leading up to what took place in the Peninsula.

24     She was in Florida, and they were speaking on the

25     telephone, and Mr. Bogdanos took this line from the middle

1      of one of the pages, the second page:  If I didn't have

2      Jude, I would try to make a change.  And, I mean, I suppose

3      the relevancy of that in this context, is Gigi Jordan is

4      thinking about getting rid of this boy and changing her

5      life.  If I didn't have him, things would be different, it

6      would be better, it would be great.

7              I don't have to put him in a home, I don't have to

8      put him in one of those places, I can just get rid of him.

9      I suppose that in some twisted sense that was the nature of

10     his proffer.

11             The problem of course is that it was

12     cherry-picked.  The problem of course is that there are

13     entries before and after, and if indeed we are allowed,

14     permitted, mandated to re-examine Ms. Jordan's state of

15     mind, there is nothing like as inciting as these entries

16     which I'm going to read into the record.  They are at pages

17     800 to 810.

18             Jordan to Tortora:  A meaningful way of being his

19     mother, but his future is compromised.  That simultaneously

20     leaving him in this world with no support system and no

21     help, makes it impossible.

22             I am in a world that is very heartless.  This is

23     three days before the event at the Peninsula.  I used to be

24     a part of that, what is wrong, it is very greed based, how

25     I made a living.  I can understand why and how the world is

1    now, and then, if I didn't have Jude, I would try to make a

2    change.

3            When all the love you have to give isn't enough.

4    He is suffering a lot now, and once I'm gone, he will

5    suffer more.  Very difficult to comprehend.

6            Next page to Tortora, three days before these

7    events.  The only happy time in my life was when Jude was

8    an infant.

9            Very few people are trustworthy, I find very few.

10   I'm not trusting my judgment.  I have gotten myself into

11   situations that more normal people wouldn't.  I have gotten

12   in situations that aren't just my fault.  I can't talk to

13   you about this because it is not safe.  Nothing can make me

14   safe.  We have a guarantee of nothing.  I am to the wall, I

15   have complete hopelessness right now.

16           That's Gigi Jordan to this therapist three days

17   before she took Jude's life and attempted to take her own.

18           Why in the world would Mr. Bogdanos, in the midst

19   of that narrative, clearly evincing Ms. Jordan's

20   existential hopelessness that she is confiding, and nobody

21   is going to know what she said from Florida to New York,

22   why would Mr. Bogdanos read the one line that out of

23   context intimates, suggests, implies that there is some

24   plan afoot to get rid of Jude?

25           Not, at the end of my rope.  Not, I'm hopeless to

1    the point of not knowing what to do, I'm to the wall.  What

2    could be more palpably clear than that?  I'm to the wall.

3              Three days later she checks into the Peninsula and

4    takes Jude's life and attempts to take her own.  Fair is

5    fair.  Context is everything, as we know.

6              What happened here today, for whatever purpose and

7    for whatever years we are attuning to what Mr. Bogdanos was

8    actually saying was, here's this one line that smacks of

9    premeditation, cold-bloodedness and a desire to be rid of

10   this child.  Context is everything.

11             As is the notion, and you know, I actually had

12   this exchange with the Court at one point, because the

13   Court either pre-echoing or echoing Mr. Bogdanos' assurance

14   that the medical records are replete with no evidence of

15   sexual abuse, and I wondered to myself as I have then and

16   now, does a child walk into a plasmapheresis procedure with

17   a sign about his neck that says, I have been sexually

18   abused?  Does a child who can't otherwise communicate

19   somehow finds some way to do that at age three, four, five?

20             What would the evidence of sexual abuse for a

21   plasmapheresis treatment have been?  How would it ever show

22   up in a blood test?  Of course not.  In an echocardiogram?

23   Of course not.  In an MRI or a CAT scan?  It's ridiculous.

24             I wonder, as I stand here now, in how many

25   instances Mr. Bogdanos' Special Victims Unit has prosecuted

```
 1    rape and sexual abuse cases where the medical records going
 2    back for five years don't say anything about sexual abuse?
 3    They are healthcare examinations:  Fine, a little
 4    withdrawn.  Not doing so well in school.  Not so happy
 5    anymore.  Not laughing all the time.  But, no physical
 6    evidence of anything like sexual abuse.  And, to that
 7    extent, we again at the trial made an effort to answer
 8    those claims to call the doctors who had extensive hands-on
 9    medical exchanges with Jude and with Ms. Jordan.  We
10    weren't permitted to.
11             You've seen the letters from the doctors, you've
12    seen the letters for a variety of purposes.  One is that
13    whether Mr. Bogdanos calls it into question or not, his
14    oblique references to the numbers of visits, the number of
15    pages, how often Jude was made to go to take these
16    treatments, as if Ms. Jordan walked into the Mayo Clinic
17    and literally held a gun to the head of the doctor and
18    said, you must treat my son.  Or went to Dhossche and said,
19    you have to find he is catatonic, so later I can say he was
20    sexually abused.  That was not the way that the medical
21    records told the tale here.  And what you have is
22    symptomatology that is otherwise absolutely inexplicable.
23             I mean, as a matter of commonsense, if a young
24    male boy has been sexually abused, a young man, five, six
25    years old, been forced to penetrate someone else with his
```

1     penis, and he was not communicative, what would one expect

2     to find?  Oh, I don't know.  A penile penetration from a

3     young boy:  Bacteria, dirt not where it belongs?  Urinary

4     tract infections which the medical records are replete with

5     explanations do not happen with that frequency in that

6     young a child.

7              Judge, this notion that somehow the medical

8     records should show that somebody examined his anal cavity

9     with a colposcope or something else in the midst of

10    plasmapheresis or a bone marrow transplant, that's

11    ridiculous.  In any other setting, it would defy

12    commonsense.  But here, we hear there is no evidence and

13    has never been any evidence of sexual abuse, and therefore,

14    by the way, therefore what?  There is a therefore what?

15    Therefore, you should sentence her to the maximum because

16    the medical records don't document what the jury said there

17    was some objective evidence of?

18             The jury has already spoken on this.  We

19    presented, to the degree permitted by the Court, the

20    objective information we could, that Jude Mirra was

21    sexually abused and that Gigi Jordan was in fear of her

22    life from Raymond Mirra.

23             There were places that the Court cut it off, and

24    there were places that the Court was permissive in allowing

25    us evidencing that.  And as we eat and scratched our way

Proceedings                                                          68

 1      through our evidence, we said to the jury, this is what she

 2      believed, this is what she subjectively believed.

 3              She was on the stand for three and a half days,

 4      subject to his cross-examination.  The questions that he

 5      raised today, he didn't ask her, but, okay.  That was --

 6      that's his right.  He brought it up today instead of

 7      bringing it up to her when she could explain it.

 8              Okay.  But, in the light of that examination and

 9      cross-examination, bathe in that light, in those chairs

10      there sat the jury, and they heard from her, and to the

11      degree that you allowed it, they heard the evidence which

12      supported it, which was the objective nexus to her

13      subjective beliefs, and he stood up and said exactly what

14      he said today.  Nobody kills a child, it just doesn't

15      happen.  It just isn't done.  It's just not allowed.  It's

16      just not permitted.  Murder.  Murder.  Murder.

17      Premeditation.  Lack of genuine anything that she believed.

18      Murder.  Murder.  Murder.  Jury said, sorry, not murder.

19              I tend to disagree with the prosecution's read on

20      what the value of that verdict is.

21              I agree with his reading of what the Court of

22      Appeals has told us.  What the Court of Appeals has told us

23      is this is the opportunity for the jury to hear and decide

24      whether the person should be afforded leniency,

25      understanding and mercy.  Leniency, understanding/empathy

Proceedings                                              69

1      and mercy.  Concepts which seem to have not found their way

2      to this side of the room at any point from the moment that

3      Gigi Jordan was arrested.  And the notion that Mr. Bogdanos

4      will tell you, well, that mercy ended when they took life

5      off the table.  Excuse me?

6              He spent five minutes telling you, us, that you

7      cannot second guess what the jury had in their minds.  You

8      cannot interpret what their act meant.  So how does he know

9      that what they did was take life off the table?  How does

10     he know that what they did is not as consistent with

11     saying, we don't think this woman should have to spend

12     another day in jail, as with his notion that it is worth 25

13     years, 22 years, 23 years?

14             I agree, I agree, you can't probe the jury's mind

15     to assess what they thought, but what the legislature and

16     the Court of Appeals tells us, that that act, the

17     confluence between EED and manslaughter is the

18     manifestation of those three words:  Empathy, leniency and

19     mercy.

20             You don't start drawing lines and saying that

21     means that they only took life off the table.  That's an

22     outrage.  I agree with Kuby.

23             MR. KUBY:  Good thing.  It is a good thing.

24             MR. BRENNER:  Maybe it is, maybe it isn't.

25             The application of those terms is for this Court

```
 1    and this Court alone.  And so, when speaking for Mr.

 2    Bogdanos, the titular head of this office sent out a

 3    message that said Ms. Jordan showed no mercy to her son,

 4    and should be afforded no mercy at sentence.  Is that

 5    really what this case was about?  Is that really what the

 6    evidence shows?  Is that really what the message is that

 7    the jury sent?

 8            They afforded her mercy.  They sent their message

 9    that she should have mercy.  It cannot now be supplanted by

10    some posturing by the prosecution.

11            Judge, we have, I, many as a participant in this

12    system, are offended by the notion that anyone who

13    disagrees with what Bogdanos says is a whore.

14            THE COURT:  Is a what?

15            MR. BRENNER:  A whore, someone who sells their

16    services for the coin of the roll.  That Dr. Kucharski with

17    his CV and the head of the Forensic Psychology Department

18    at John Jay where I think some prosecutors actually go and

19    take courses, I know police officers do that, he sold his

20    opinion to Ms. Jordan for a filthy lucre, just like Spitz,

21    and Hua and Putnam, whores all, because they had the

22    temerity to examine the record and come up with a

23    conclusion and an opinion that is different than his.

24            So, if you can't argue substantively with what

25    Kucharski says, call him a whore, call him a paid witness.
```

1          It besmirches his integrity, his reliability, his integrity

2     with nothing more than the slings and arrows of outrageous

3     accusations.

4               Mr. Bogdanos knows, I think, what a forensic

5     evaluation is.  And the notion that a forensic psychologist

6     would speak to someone other than Ms. Jordan as the primary

7     source for his evaluation and his assessment he is asked to

8     make based on his observations, his exchange, his dialogue,

9     his view of her, his understanding of her history, whether

10    she suffers from some psychiatric or psychological malady

11    that was his charge.

12              Who would he speak to other than her as the

13    primary source to make that assessment, Bogdanos?  Well,

14    'cause that would be a short conversation.  This is the way

15    it's done.

16              A court-ordered psychiatric evaluation, as I

17    understood it when it was related to me, would have been

18    limited to any dialogue with Ms. Jordan, that and that

19    alone, and then a report prepared for the Court.

20              Kucharski went beyond that he reviewed, other

21    materials, spoke to other people, and for that, and for his

22    conclusion that he credits her account, and that she is

23    free from psychiatric disorder, borderline personality

24    disorder or anything other than depression related to the

25    fact that she has been in jail for five years, and that she

1    took her son's life, that she is free from any disorder,

2    for that conclusion, he is accused of being saleable.  It's

3    just not fair, it's just not right, it's just not just.

4             Judge, we submitted a wide variety of letters from

5    across the Jordan universe:  Friends, family members,

6    healthcare professionals, an ex-prosecutor.  They all

7    trumpeted really two different things, and I'm putting

8    Putnam to the side for a moment.

9             One, the unquestioned depth of love and devotion

10   of this woman to her child.  Bogdanos said she was a

11   devoted mother, nobody can question that, but there was

12   nobody who was more important than herself.

13            Well, where did that come from?  Is that the

14   evidence that the Court heard here?  Is that the evidence

15   even the lady from the Trump Towers who said that if she

16   had to have reported Gigi everytime that she was rude to

17   her, she wouldn't have been able to do her job, and then

18   she sort of retreated from that.  That unfriendly a

19   witness, even that witness acknowledges the relationship

20   between Jude and his mother.

21            As a matter of fact, everyone who had daily

22   contact with them:  Caregivers, therapists, boxers in Las

23   Vegas who only installed TV cables, workers in the house,

24   anyone and everyone, friend or foe, attested to the same

25   thing, the depth, the ocean depth of her love and devotion

1     for this child.

2              The notion that he comes here and says to you that

3     the only occasion that Jude ever stopped smiling was

4     because of her, is an offense.   Offensive.

5              Did anybody say that at this trial?   Is there

6     anything submitted in the record that shows that Jude was a

7     smiling child except for those occasions when he was with

8     his mother?   Is that what the film shows?   Is that what the

9     video shows?   Is that the video shown?   Of course not.

10             Sometimes I wonder about whether we lose our

11    objectivity in the battle, and the charge that we each have

12    to present the facts fairly, from an advocate's point of

13    view, fairly and accurately gets lost in the need to win,

14    because I think that's what's happened here, I do.

15             You know, there are rules for us, some are

16    codified, some are unwritten, that as attorneys,

17    particularly as criminal defense attorneys, we're not

18    supposed to have some emotional investment or connection to

19    the case or the client.   There is danger that abounds in

20    that.   That at all times we must retain our fairness and

21    our objectivity.   But I will say this, and each of the men

22    at this table can attest to this:

23             That on occasion, the circumstances or the nature

24    of the client drags us close to that line between

25    professional advocate and personal champion.   I'm standing

1    straddling that line now as I address the Court, here and

2    now.

3            I have known and worked with Ms. Jordan on a daily

4    basis for nearly two years.  Short of Mr. Kuby, I know more

5    about the documents and statements and papers and persons

6    than anyone in the criminal defense team.

7            I went to Cheyenne, I traveled to Cheyenne and

8    spoke to the people who detained Ms. Jordan and separated

9    her from her son, and I personally understood both as an

10   attorney and as her advocate what an abomination that was.

11           I went to California to seek out Emil Tsekov and

12   understood with some clarity and finality the twisted world

13   in which he is.

14           I spoke and conferred with each of the doctors who

15   afforded significant treatment to Jude, and understood that

16   he was a medical mystery.  That the things that were ailing

17   him, his response to medication, his performance on autism

18   tests, all debunk the notion that he was suffering from

19   simple autism.  And each of them also affirmed that Ms.

20   Jordan's journey to try and find some way to assuage this

21   child's suffering was legitimate, that they were behind

22   him, that they supported him.

23           I met, broke bread, spoke face-to-face with the

24   therapists, all of them who afforded Jude treatment, and

25   understood from them in no uncertain terms the bond between

1        Gigi Jordan and her son, and their notion, their avowed

2    notion that Jude would not want her to spend one more day

3    in jail.

4              I traveled to California and Las Vegas and spoke

5    to caregivers, friends, acquaintances, again affirming the

6    depth of her love for this child, and his love for her.

7              Each affirming that their belief that unless she

8    was under incredible pressure or incredible duress or

9    incredible strain, she would never have done this child

10   harm, and all of them, and they wrote letters to support

11   that notion.

12             I met with Dr. Putnam and Dr. Vanderkolk whose

13   brilliance conveyed to me their unquestioned notion that

14   what they saw in the medical records, the unexplained

15   medical phenomenon consistent with the typing and other

16   evidence, led them to the conclusion that Jude was sexually

17   abused, which mysteriously was borne out not by Dr.

18   Smiddy's examination of the slide, but Dr. Hua and Dr.

19   Spitz, as I remember.

20             Rather than calling somebody to say, oh, Hua and

21   Spitz, they are whores, they are paid, they didn't see what

22   they saw, there is nothing there; I heard from the People

23   some attack about scarring being consistent with a whole

24   variety of disorders of sexual abuse, as if they were

25   conceding the scarring was actually there.

1          I met with parents of autistic children again and

2     again and again to emphasize to me so I could emphasize to

3     you, the devastating and difficult road that parents of a

4     developmentally disabled child follow, and how they could

5     understand, if not agree, with the pressures that led Gigi

6     Jordan to the place that she was at.

7          I spoke with Darlene Hansen, the recipient of the

8     anonymous benevolence of Ms. Jordan's contributions, her

9     commitment to serving children who are non-communicative

10    and cannot help themselves.  She explained to me what

11    facilitating communication was, and then showed me how this

12    has benefited, open windows and doors for children who have

13    not been able to speak or function.

14          So, Judge, when I talk to you, I'm not making it

15    up, I'm not spitting one line from a document, I am

16    speaking to you, straddling that line both as professional

17    advocate and personal representative.

18          I ask you those three words:  Empathy, mercy,

19    leniency.  I ask you to do that which the jury has

20    permitted you to do, which the legislature has mandated,

21    which the Court of Appeals has described.  Apply those

22    three concepts here.  Do it in the jury's name.  Do it in

23    Ms. Jordan's name.  Do it in Jude's name.  Thank you.

24          THE COURT:  Thank you, Mr. Brenner.

25          I know that Ms. Jordan wants to speak.  I assume,

Proceedings                                                          77

1    Mr. Kuby, did you want to say anything else on sentencing,

2    because I will give you an opportunity.  I don't know if

3    you want to say anything else, or anyone else wants to

4    speak.

5              MR. KUBY:  Surprisingly, I don't Judge.

6              THE COURT:  Mr. Ward?

7              MR. WARD:  No.

8              THE COURT:  Mr. Siegel?

9              MR. SIEGEL:  No.

10             THE COURT:  Ms. Jordan, you have a right to make a

11   statement on sentencing, and I will give you the

12   opportunity, obviously.  I think probably it is going to be

13   this afternoon.

14             Now it's about ten to one, so we will come back

15   after lunch, and I will hear what you have to say if you

16   wish to make a statement.

17             We are adjourned until -- let's make it 2:30

18   because I want to give the reporter a little bit of an

19   extra rest here.  2:30.

20             (Luncheon recess.)

21             THE CLERK:  Calendar number two, Gigi Jordan.

22             THE COURT:  This is case on trial continued.

23             All parties are present.

24             I think where we left off -- everyone can be

25   seated.

Sati Singh, RPR
Senior Court Reporter

1          I think where we left off this morning, I was

2     calling on Ms. Jordan to see if she wanted to make a

3     statement.  If she wish to make a statement, I ask a couple

4     of things:

5          Number one, there is a microphone.  We ask her to

6     speak into the microphone.  And, you can remain seated.

7     Speak into the microphone so the reporter can hear you, and

8     speak slowly so the reporter can take down what you have to

9     say, okay?

10          THE DEFENDANT:  Good morning -- good afternoon.

11          Um, I wanted to first say --

12          THE COURT:  Ms. Jordan, this is not going to work.

13     You have to speak louder, the reporter has to take it down.

14          THE DEFENDANT:  I want to say first that this is

15     something that's gone on for five and a half years now

16     almost, and I appreciate your patience over this long

17     period of time.

18          And, I wanted to say that one of the things that I

19     wanted to first off explain, has come up also in other

20     respects to this, and I wanted to put some context to it,

21     is the number of lawyers that I had.

22          And, what I wanted to explain to you about that is

23     that one of the reasons that I had so many lawyers as I

24     did, part of how that is, is in the very beginning of when

25     this happened, and when I woke up, and I'm still alive and

1          here, I made the determination that the only reason that

2          there was for me to be here was to try to explain what had

3          happened to my son, and hopefully get some kind of justice

4          for him in his stead, that he didn't get in his life, and

5          in the beginning.

6                    Maybe bad advice, I was told by several lawyers

7          that no one would ever hear my story or believe my story,

8          or I will never be able to prove my story.

9                    So, just by short way of explanation, that's some

10         of the reasons why I continued to endeavor to try to do

11         that.  And, it took all the time and effort to be able to

12         get all of these references, and all of this information

13         over a period of so many years.

14                   Some of the things that happened in the trial, and

15         some of the things that were said today, there are some

16         things that I hadn't plan to discuss, and my lawyers

17         covered generally, but I was hoping that you would allow me

18         to tell you about certain things in a little more detail.

19                   THE COURT:  You're free to make whatever statement

20         you wish, for as long as you wish.

21                   THE DEFENDANT:  Thank you.

22                   MR. BRENNER:  Just to make things easier, I'm

23         going to hand this up to the Court.

24                   THE COURT:  What is it?

25                   MR. BRENNER:  It is a document that she is going

Proceedings                                                        80

1      to be referring to, and we are going to provide one to the

2      prosecutor as well.

3                  THE COURT:  Mr. Brenner, do you want this to be

4      part of the record on sentencing?

5                  MR. BRENNER:  Yes, please.

6                  THE COURT:  So we will make this part of the

7      record.

8                  I don't know if you want to mark it as a

9      sentencing exhibit from the defense, we can do that as

10     well.  But, again, she has a copy, I have a copy, the

11     prosecution has a copy.

12                 So, whenever you're ready, you can continue.

13                 THE DEFENDANT:  Okay.  Thank you.

14                 One of the things that came up a number of times

15     during my trial, and today again, was whether the fact that

16     Jude was actually abused.  Particularly, how it could be

17     that he saw so many doctors in so many places, and nobody,

18     none of them identified that there was a certain kind of

19     abuse or not, and many of the things that are in this

20     record here is a summary or is part of certain records.

21                 There are things that I didn't even know fully

22     about until I saw it happened, and over years of combing

23     through the records, were these things noted and determined

24     and noticed.

25                 So, there could be more than this, but there is

1     three sections, and one section has to do with the number

2     of times that he had urinary tract infections, from when he

3     was three years old until he was six years old; urinary

4     tract infections or findings of red blood cells in his

5     urine.  They are all listed here on these dates when he

6     would have this irritation and rubbing and having

7     difficulty peeing, and I would take him to the doctor, and

8     they would do a urine culture, and the test, and you can

9     see the number of times where they found abnormal findings.

10          Sometimes there is an actual urinary tract

11    infection, and he is treated.  Other times they found some

12    bacteria, but red blood cells which are abnormal.  You

13    don't have red blood cells in your urine.  Those are

14    symptoms of trauma.

15          I took him to two different urologists as a result

16    of this.  One of them was when he was having that trauma,

17    he was having that kind of irritation and rubbing and

18    having difficulty peeing, and he was seen, and I was

19    appalled that I was not told, in going back over the notes

20    later, how abnormal that is.

21          Even as a nurse, you don't know all of these

22    different things.  I didn't know that.  I didn't know that

23    in young boys it's considered extremely unusual, and it

24    does not occur to even have one urinary tract infection if

25    you're under the age of six.  I didn't know that.  They say

Proceedings                                                                    82

1        that if you have that, it's because you have some kind

2        of trauma, like your urethra somehow is not normal, or

3        there is some kind of problem.  But that was in the notes.

4              He was saying, if this is truly urinary tract

5        infection, then we should do a test to see if there is a

6        blockage or something like that.  And I was not informed of

7        that until I see these records.  But then he had again

8        those same symptoms, and I ended up taking him to another

9        urologist, and again he noted urinary tract infection, and

10       he found this extremely unusual.  And, he had extreme

11       flushing of his face.  And he wanted to test his urine.

12             And, I'm trying to say this, not to complicate

13       things, and through all of these medical terminology, but

14       he found that the stress hormones in his blood were

15       extraordinarily high, like seven to eight times the normal,

16       and he then referred him to test and see if there is some

17       kind of tumor of his adrenal glands, because no one could

18       explain how his stress hormones would be extremely high.

19       That's how we wound up going to these evaluations and

20       looking for these tumors.

21             They found he had extraordinarily high blood

22       pressure, heart rate.  His respiratory rate was

23       accelerated.  Then he had swelling of his scrotum.

24             THE COURT:  You're going a little bit too fast, I

25       think.

Proceedings                                            83

1                   THE DEFENDANT:  I'm sorry.  I'm nervous.

2                   And then when he started getting worked up for the

3          tumor, and in between those notes, while he was having

4          blood pressures as high as 180 over 90 as a then, four year

5          old, and oxygen levels of 90 to 94 percent without being on

6          oxygen, and his heart wall thickened from pumping so hard

7          and so fast, and no one could explain at Columbia, at

8          Cornell, but it's in there.

9                   When you look among the notes, you see among those

10         hospital admissions they say -- I'm sorry.  They say -- it

11         is the next page, this is at Columbia, the endocrine

12         service is examining him, and he said earlier, you know,

13         the doctors who are examining him, genital, it says,

14         reddening of the skin, usually in patches, as a result of

15         injury or irritation, or it is called erythematous.  And

16         another doctor says at Columbia, excoriation on foreskin

17         positive.

18                   THE COURT:  Does the reporter have a copy of this?

19         Then maybe the reporter can get a copy.  Some of these

20         medical terms are very difficult, so she can understand the

21         words.  Let's give her a copy, and let her just acclimate

22         herself.

23                   Wait for her to just look at some of this and then

24         you can continue.

25                   THE DEFENDANT:  The medical term is erythematous,

1    and it means reddening of the skin.  It usually is a result

2    of injury or irritation.

3              And then, so for successive days they are

4    commenting.  But, you know, what they were worried about

5    was extraordinarily high blood pressure.

6              His heart rate was through the roof.  His oxygen

7    saturation was so low that his lips were turning blue.  No

8    one noted this to me.  There was excoriation of the

9    foreskin, and I remember the doctor saying, I should order

10   Aquaphor, some type of ointment to put on his foreskin.

11             Then at the next admission at Cornell, they could

12   not do the MRI because they said his blood pressure was too

13   high, they said it was dangerous.

14             Later he was admitted to Cornell to try to do the

15   MRI.  The resident wrote:  Testicles scrotum enlarged.

16   Possible hernia suspected.  He didn't have a hernia.

17             Then later at Stanford, and I take him there

18   because he started having what's called frank red blood

19   cells, which means not just like the little tinging of the

20   water, but like blood is coming out.  And, they note, it

21   says, lab reports show red blood cells in urine.  Full

22   field.  Full field means that the urine they put into the

23   microscope, they are looking to count how many red blood

24   cells there are, and they assign one plus or two plus.  It

25   says, full field.  It means the whole thing is red blood

1    cells.

2              Again he has another incidence of this, and he was

3    going to have a follow-up appointment at Stanford.

4              Before that, he had an incidence right after New

5    Year's, and again it was a positive urine culture and red

6    blood cells.

7              So that's just some of the things that I wanted

8    you to be aware of in the medical record to try to explain

9    in some way how the attention was on these much more

10   serious medical problems he was having, and these things

11   were noticed and noted in the medical records, but were

12   never identified directly, and there was never an inquiry

13   made at the time, and that includes me.

14             I was just trying to find out why his blood

15   pressure was 200 over 100, and why his heart rate was over

16   150, over 170, why his lips were turning blue.  And that's

17   what I was trying to figure out.

18             More importantly, it's even hard for me to say

19   this as I live through it, and I want to tell you this

20   because I speak for myself.  Is that when he was just two,

21   a little over two and a half, almost two and a half, he had

22   begun going to one dentist who had been saying that he had

23   some cavities, and trying these fluoride treatments, and he

24   was clearly in pain, and I called my dentist who is a much

25   better dentist, who was horrified at what he saw was in his

1   mouth, and what he saw in his mouth, he was actually

2   red-faced.

3          I don't know what this dentist was doing, but I do

4   know if he was crying all the time, crying all the time,

5   and he was crying in his office, the dentist office, and he

6   said, I don't know if you have been having behavioral

7   issues like this.  But it may well be that he has been in

8   excruciating pain.  He wound up having two root canals with

9   abscesses, and 11 cavities filled at two and a half years

10  old.

11         In waiting for the surgery over five days, he was

12  in so much pain, even on Motrin, that they had to order an

13  antibiotic to deal with the abscesses in his mouth.

14  Thereafter, again -- that was in December of '03.

15         In January of '04, he was seen again when he was

16  going for another evaluation at another hospital.  They

17  wanted to see him, given his history, and once again they

18  found multiple abscesses left and right.  They did two

19  surgical extraction, and full mouth rehabilitation with IV

20  antibiotics given.  Then again in Chicago we went there,

21  again.

22         Yes, here it is.  I'm sorry.  On April the 11th,

23  he had acute dental cavities, alveolar abscess.  Eight

24  cavities and three extractions.  And then again, he was

25  away from his father in '09, because he had developed so

1    much of an overcrowding, because his teeth had moved

2    together from all the extractions he previously had, he had

3    two more extractions, but that was not related to the

4    infections.

5         But, you know, he reported feces being put in his

6    mouth, and quite frankly, your Honor, until Dr. Putnam

7    connected those two things, I still had not connected those

8    two things, because it's beyond my imagination even after

9    my son told me that, and I believed him.  Because there had

10   been incidents where I had actually one time smelled

11   something that smelled like fecal smell.  I was a nurse,

12   and so his mouth smells like feces.

13        Even knowing that, and him telling me and having

14   the medical background I had, I never connected it.

15        And, all I can say is that the abuse he suffered

16   was so extreme, and at such an early age, that it had such

17   profound and lasting effects physically, emotionally,

18   developmentally, that it is not something that was easily

19   recognized by anyone, and it is just very important for me

20   to let you know that and be aware of that.  And, thank you

21   for hearing me out.

22        The other thing that I wanted to say was that I

23   wanted to read you something that Jude had wrote to his

24   teacher.  This was about an essay that he wrote that I read

25   during the trial about his abuse, and he said, Jude wrote:

1    "You are going to be sad if I show you my essay."  He

2    hadn't fully written it yet.  He was writing it.  And he

3    said, "You are going to be sad if I show you my essay.  And

4    she said, "Thanks for preparing me.  I know that you are

5    filled with lots of feelings."  And he said, "I have an

6    appointment with my therapist Suzi at 3:30, but if I leave

7    now, I can also have another hour with her at 2:30 too.

8    What do you think I want to say?  I also need to ask her

9    about the essay, and if I should tell you what I feel, and

10   how I got to feel like this?"  And the teacher said, "You

11   don't have to tell me anything you are not ready to tell,

12   but I'm prepared to listen to anything you want to tell

13   me."  And Jude said, "Okay, but most people say that, but

14   they're not."  And she said, "It is very hard for people to

15   tolerate their own feelings, so it is even harder to hear

16   about someone else's."  And Jude responded, "Yes, you are

17   telling a lot, it's true."  And I can tell you, it's true.

18        So, that was -- I didn't come in prepared with all

19   this medical stuff, but after this was talked about today,

20   I wanted to say those things, and I wanted to tell you

21   that.

22        I just started out, when I woke up, I was alive.

23   When I found I had survived, I promised my son I would do

24   everything I could to bring to light what happened to him.

25   What I was unable to protect him from and how he suffered.

1          And I hope that somehow, I could get some small

2     justice for him that he had not received in life.  And I

3     also hoped that maybe by telling his story, people might

4     become aware, and think and talk about the problem of child

5     abuse in children who don't speak.  The easiest prey for

6     child predators.

7          How the signs that are so often missed in children

8     who behave normally or typically, losing eye contact,

9     solitude, and staying away from people, not sleeping,

10    acting out in school even violently, or crying without

11    explanation.  Changes that professionals might recognize,

12    but still are often overlooked in typical children or

13    ascribed to some other reason.

14         Well, with children with developmental

15    disabilities as severely affected as my son, those exact

16    signs associated with child abuse are the norm.  It's very

17    hard to spot even for the best professionals; and abusers

18    know this.  But much of society does not think about it.

19    It is too painful.  Parents are terrified for the future of

20    these children already.  It's hard to recognize and harder

21    to face, as Jude did with the teacher.  It's, you're

22    telling a lot, it's true.  It's hard to face those years,

23    face that reality.

24         Sadly, at least for now, that has not happened.

25    In some ways I'm the villain, I have been kind of a villain

1    in all this, which I understand in a way detracted from the

2    very thing that I wanted to do, which is for people to

3    understand and know how he suffered, and that this has

4    happened to other people too.

5              There were things that happened to me.  There were

6    threats to my safety and my ability to keep my son safe.  I

7    don't know that you believe that, and maybe I shouldn't

8    presume you don't.  I don't know.  Or maybe you think that

9    I should have been able to find some other way to deal with

10   it, with these threats, and that I didn't do enough.

11             All I can say, is I can promise you that I did all

12   that I could to the best that I could.  Not less.  That's

13   all I can say about that.  And that I truly feared for my

14   son in a way that no one could have ever imagined.

15             I found his whole life that he suffered so much,

16   and I'll live with that guilt for the rest of my life every

17   day.

18             Not one day goes by that I don't remember his

19   beautiful face, his pain, the beautiful things he would

20   tell me, and the horrible things he would tell me that

21   happened to him.

22             I don't know if you have ever seen a child

23   suffering, but there is -- but there is nothing sadder in

24   the whole world.

25             THE COURT:  If you want to take a second.  And the

Proceedings                                                              91

1      reporter is having some difficulty.

2                  Whenever you're ready.   Take your time.

3                  THE DEFENDANT:   If you believe the actual

4      circumstances of what Jude faced without me, you understand

5      three things:   That I loved Jude more than anything in this

6      world, that I believed that he would live and die in

7      unbelievable agony, and there is no sadder person in this

8      world than me.

9                  THE COURT:   The reporter is not getting this.   I'm

10     sorry.   Take a few minutes, if you want to drink some water

11     or something because the reporter has to get down what

12     you're saying, do you understand?   Just take your time.

13                 THE DEFENDANT:   That I can't touch him, smell his

14     hair or see his beautiful smile.

15                 My only way of surviving each day is the hope that

16     I can do good for other children that suffered Jude's

17     plight, and try to help programs that support them in being

18     able to speak either through speech therapy or being able

19     to type and trying to raise awareness of child abuse in

20     children are vulnerable like Jude.

21                 For five years I have come here and watched you,

22     listened to you, and I have often looked over your head and

23     I see, "In God We Trust," and I wanted to say something

24     from the Bible that I'm sure you're familiar with.

25                 It says, "Solomon's Prayer For Wisdom:

1          Solomon loved the Lord, walking in the statutes of
2     David his father.  Only he sacrificed and burnt incense in
3     high places.
4          And the king went to Gibeon to sacrifice there;
5     for that was the great high place.  A thousand burnt
6     offerings did Solomon offer upon that alter.
7          At Gibeon the Lord appeared to Solomon in a dream
8     by night, and God said, 'Ask what I shall give thee.'  And
9     Solomon said, 'thou hast shown unto thy servant David, my
10    father, great mercy according as he walked before thee in
11    truth and in righteousness and in uprightness.  And you
12    have kept for him this great and steadfast love and have
13    given him a son to sit on his throne this day.  And now, O
14    Lord my God, you have made your servant king in place of
15    David my father.
16         And, thy servant is in the midst of thy people
17    which thou hast chosen, a great people, too many to be
18    numbered or counted for multitude.  Give therefore thy
19    servant an understanding heart to judge thy people, that I
20    may discern between good and bad, for who is able to judge
21    this your great people?'
22         And, the speech pleased the Lord that Solomon had
23    asked this.
24         And God said onto him, because thou hast asked
25    this thing, and has not asked for thyself long life or

1    asked for riches for thyself, or the life of your enemies,

2    but have asked for yourself understanding to discern what

3    is right, behold, I have done according to thy word.

4    Behold I have given thee a wise and understanding heart,

5    since there was none like you before thee, and neither

6    after thee shall any arise like onto thee."

7              So it is my prayer, that like your namesake, King

8    Solomon, you will find that compassion and wisdom and apply

9    it in my case.

10             Thank you, your Honor.

11             THE COURT:  Thank you, Ms. Jordan.

12             Let's take about five minutes, and we will come

13   back, and I will pronounce my sentence.  We will take about

14   a five, ten minutes recess.

15             (Whereupon, a brief recess was taken.)

16             THE CLERK:  Recalling calendar number two, Gigi

17   Jordan.

18             THE COURT:  Case on trial continued.  All parties

19   are present.

20             Defendant is present.

21             Let's wait for Mr. Ward to come in because he was

22   here during the whole trial, I think he should be here now.

23             Yes, all parties are now present.  Mr. Ward is

24   present.  Defendant is present.

25             Let me just start off by saying some basic things

Proceedings                                          94

1    about sentencing.

2              I have to consider the crime defendant was

3    convicted of, and I have to consider who the defendant is

4    obviously, and the circumstances under which the crime was

5    committed.

6              As is true in this case and true in every case,

7    what I have to do is I have to decide on what I think is a

8    fair and just and proper sentence.  If someone has any

9    difficulty hearing me, just let me know.

10             Defendant was convicted on November 5th of last

11   year after a two-month trial of manslaughter in the first

12   degree.  The jury found that she intentionally killed her

13   eight-year-old son, Jude Mirra, while acting under the

14   influence of extreme emotional disturbance, thereby

15   reducing her culpability from murder in the second degree

16   to manslaughter in the first degree.

17             No one, no one, certainly not me, can criticize

18   the jury's verdict.  And, let me make it clear, she is not

19   being sentenced for murder, she is being sentenced for

20   manslaughter in the first degree.

21             At the outset, let me talk about her for a second.

22   It is very difficult for me to understand the defendant.

23   She is a very complicated person.  She was in 2010, she

24   still is.  Really, a complete mystery to me.

25             On the one hand, she is extremely accomplished.

1        She put herself through college, gained a nursing degree,

2        became a corporate executive, and in partnership with her

3        former husband, Ray Mirra, started a company in the

4        healthcare and pharmaceutical field, and became a self-made

5        multimillionaire.  Her fortune was estimated at between 30

6        and 40 million dollars.  I don't know how accurate those

7        numbers are, but that's what the testimony was at trial.

8               In addition to that, she had real estate:  A house

9        in Santa Barbara, San Francisco, Lake Tahoe, Florida, three

10       apartments at Trump International, and a brownstone on the

11       Upper West Side.

12              I have to also mention the letters I received on

13       her behalf.  She is philanthropic.  She has donated large

14       amounts of money to worthy charities, and again those

15       letters speak about those charities, and certainly go to

16       her credit.

17              All these things are difficult to reconcile with

18       the defendant who is here today.

19              It is not disputed that she intentionally killed

20       her son.  She planned his death, and she killed him by

21       feeding him these prescription medications.

22              Her testimony at trial was that she killed him in

23       order to protect him from further sexual torture at the

24       hands of his biological father, Emil Tsekov, and his

25       adoptive father, Raymond Mirra, and numerous other people.

1            She said, and this is her testimony, that she

2      believed that Mirra hired someone to kill her, and that

3      after she was dead, he and Tsekov would get custody of Jude

4      and subject him to a lifetime of sexual torture as they had

5      allegedly been doing since he was a toddler.

6            According to her, the only way she could protect

7      him was to kill him and then kill herself.

8            The jury found that based upon these beliefs,

9      which obviously they found to be objectively and

10     subjectively reasonable under the circumstances defendant

11     was acting under an extreme emotional disturbance, and

12     therefore, as I said, they convicted her of manslaughter in

13     the first degree.

14            Now, although she believed in her mind that a lot

15     of these things were true, as the jury obviously found she

16     did believe, there is a lot of these things that I think

17     there is no credible evidence to support.  Let me talk

18     about that.

19            She said she didn't want Jude to be "raped and

20     tortured" any longer.  She said this over and over again.

21     This is what she believed.  But the problem here is, and it

22     is a big problem.  There is no credible evidence on this

23     record anywhere that Jude was ever, ever in his entire life

24     the victim of sexual torture, or for that matter, sexual

25     abuse of any kind.  I will repeat that.  No evidence at

1       all.

2                    She believed that almost everyone who came in

3       contact with Jude:  His biological father, uncles,

4       grandparents, his adoptive father, his family, caretakers

5       were all abusing Jude and doing terrible things to him.

6       There is absolutely no evidence of this, none, none at all.

7                    Again, defendant believed it, and as evidenced by

8       the jury's verdict, the jury felt that what she believed is

9       reasonable under the circumstances, and again found her

10      guilty of manslaughter, not murder.

11                   Now, her belief that some of Jude's torturers were

12      in a satanic cult is completely unfounded.  No evidence at

13      all of this.

14                   She testified that Ray Mirra was trying to kill

15      her, and that Jude would be subjected to living the rest of

16      his life in the custody of abusers.  Because she believed

17      Mirra was going to have her killed, she decided to kill

18      Jude, so she could protect him.

19                   She also believed that Mirra was stealing a

20      substantial portion of her fortune, forging her name on

21      money transfers, altering a prenuptial agreement, as well

22      as a divorce decree.  Again, no credible evidence that any

23      of these things were true, none of them.  However, she

24      believed they were.

25                   Now, I think it's fair to say that the record in

1    this case established that Jude was severely autistic.  I

2    think that's clear.  Apparently, the defendant either could

3    not or would not accept this.  I'm not sure which it was.

4              Defendant believed that Jude was the victim of

5    sexual torture for years, which in her mind somewhat

6    explained the medical and psychological problems from which

7    he suffered.

8              She also repeatedly insisted at trial, that she

9    was able to communicate with Jude by computer, a method

10   termed, "facilitated communication."

11             Now, I think the inference, and the only inference

12   that could be drawn from the evidence is that Jude could

13   not write, couldn't write a single word, only speak a few

14   simple words.  Let me explain this.

15             He was enrolled in The Studio School on the Upper

16   West Side in the fall of 2009, a school that deals with

17   children who have problems similar to Jude's.

18             Now, only a few months before Jude died, his

19   teacher said they were making progress.  They got him to

20   say one word, "Hi."  And that was progress for Jude to say

21   that word.

22             It's hard for me to believe that Jude Mirra had

23   the intellectual capacity to communicate on the level the

24   defendant described.  To write lengthy dialogue, using

25   three-syllable words, what I used to call "fifty-cent

1      words," an eight-year-old autistic boy.  That's not

2      credible.  It is contrary to the evidence.  How can anyone

3      believe that?  Again, the defendant believed it, and the

4      jury found that her beliefs were reasonable.

5              If you look at the messages that Jude allegedly

6      wrote, typed, I don't think any eight-year-old boy would be

7      able to write those things.

8              Now, it bears repeating, and I want to go into

9      this.  There is no credible evidence that Jude was ever

10     sexually abused by anyone.

11             Jude was seen by many, many doctors, top medical

12     centers all over the country for legitimate reasons.  No

13     one is criticizing the defendant for taking him to those

14     doctors.  But not a single one of them, not a single one

15     saw any signs, any indication that he had been abused

16     sexually.

17             Now, however, there were two people who did

18     examine him.  In Cheyenne, Wyoming in March of 2008, Jude

19     was removed from the defendant's custody briefly, and he

20     was examined head to toe, up and down, backwards, sideways,

21     in every imaginable way by two people.  Both of these

22     people were experts in the diagnosis of sexual abuse in

23     children.  Between them, they had 50 years experience in

24     this area.  Neither of them, neither of them, saw any sign

25     whatsoever that Jude was sexually abused.

1          And, if you recall the trial testimony, Jude was

2     placed in front of a laptop, a laptop computer for one half

3     hour, and didn't type one word, couldn't type one word.

4     Again, this is an issue I think that was clearly, clearly

5     established that Jude was not the victim of sexual abuse.

6          Traci Jones, one of the examining nurses from

7     Cheyenne, Wyoming, was told that Jude had been "fisted" by

8     a satanic cult.  We all know what that means, fisted by a

9     satanic cult.  This type of abuse is the type of thing

10    nurses look for.  Nothing, nothing at all.  If he had been,

11    certainly this would have been obvious to those people.

12         Now, although the defendant tries to substantiate

13    this claim of sexual abuse through Dr. Putnam, most

14    recently we received a letter from Dr. Putnam in April, I

15    believe, and I think there was something after that from

16    him.  He didn't testify at trial.

17         Let me make this clear:  The defense elected not

18    to call him.  I want to repeat, that it was the defense

19    decision not to call him.  If anyone says anything

20    different, they are lying, because  I was here, we all were

21    here, there was an election made not to call him.  There

22    has been a lot of talk about Dr. Putnam, and I will come

23    back to that.

24         His conclusions, Putnam's conclusions are based

25    solely upon his examinations of the records of other

1    physicians.  That's all it's based on.  And there was also

2    Dr. Spitz, and need I say anything more about Dr. Spitz.

3    He also is an expert called by the defense.  No need to go

4    into his testimony.

5             But getting back to what I said at the outset,

6    there are a few things that are clear here.

7             One of the things I don't believe, I never

8    believed, and again I don't know if the jury believed it,

9    but it was certainly a factor in this case, the suicide

10   attempt.  Let me talk about that.

11            It's impossible for me to believe that the

12   defendant really tried to kill herself, and let me explain

13   why.

14            There is expert testimony here, uncontradicted at

15   trial, that Jude Mirra died between the hours of 11:30 p.m.

16   on Thursday night February 4, and 7:30 a.m. on the morning

17   of Friday, February 5.  Sometime during that eight-hour

18   window, Jude Mirra died.  That's uncontroverted.  That was

19   a proven fact at trial.

20            Now, any person who ingested what the defendant

21   said she ingested, would surely have been dead or at least

22   unconscious by the time the police broke in.

23            Now, even assuming, even assuming in the best

24   light for the defense that Jude died at 7:30 in the

25   morning, the latest that he could have possibly died

1      according to expert testimony, the defendant took these

2      pills that she took, Ambien, Xanax and Hydrocodone and

3      vodka.  If she had taken what she said she took, she would

4      have been either dead or unconscious when the police broke

5      in four and a half hours later.

6              On national television, which I will come back to,

7      October 31, while the jury is deliberating, a non

8      sequestered jury was deliberating, she spoke on television,

9      national television.  She said she took over 60 milligrams

10     of Xanax, over 50 milligrams of Ambien, and 10 Hydrocodone

11     pills with vodka.

12              I think this would have killed a six-foot-five,

13     300-pound linebacker, that much drugs in anyone's system.

14     However, that's what she testified to.

15              When EMT and the police broke in about twelve noon

16     on February 5, her vital signs were normal.  Uncontradicted

17     testimony at trial.  Vital signs were normal.

18              Clearly any person who took that much Xanax and

19     Ambien and Hydrocodone, and topped it off with vodka, would

20     not have normal vital signs.  Also, she was lucid enough to

21     ask for a lawyer.  Highly proper to ask for a lawyer, but

22     she was lucid, which is another factor.

23              But, finally, the icing on the cake.  There was a

24     maid who cleaned the sixteenth floor, she worked at the

25     Peninsula Hotel for 26 years, her whole 26-year career was

1        spent cleaning the sixteenth floor, and Jude was found in

2        room 1603.

3              There was a "Do Not Disturb" sign on 1603, so the

4        maid goes to 1604, this is now Friday morning around 11

5        o'clock, an hour before the police arrived, and what did

6        she hear?  She hears people, somebody moving something

7        around.  She does not hear it once, she does not hear it

8        twice.  She estimated that this lasted for eight minutes.

9        It couldn't have been Jude Mirra.  Obviously, it had to be

10       the defendant.  Her testimony was not contradicted or

11       controverted in any way.  We know that the defendant was

12       alive at 11:00 a.m.

13             She was sure of it.  Someone might argue how does

14       she know where the noise was coming from.  She was standing

15       next to a wall in room 1604, the same wall that is adjacent

16       to 1603.  She was next to it, and she heard what was going

17       on in the room next to her, which is 1603.  That's the

18       reason she concluded, and again reasonably, that someone

19       was walking around and moving boxes or moving something.

20             Defendant also said on national television, again

21       October 31 while the jury is deliberating, that she was not

22       allowed to, quote, "Tell her story."  Untrue.  Untrue.  She

23       testified almost uninterrupted for four full days on the

24       witness stand.

25             She, I think, more than anyone who has ever been

1       in this courtroom, has had more of an opportunity to have

2       their day in court and "tell their story" despite what she

3       says.

4              I'm not an expert, far from an expert, but the

5       defendant appears to be someone who has psychological

6       problems.  I don't know, she may or may not, but she

7       appears to me to be someone who does.

8              A report submitted by the defense two days ago,

9       May 26th, from Dr. Thomas Kucharski, touches on her mental

10      health, mental condition, but he gives no basis at all to

11      conclude she has any psychiatric problems.  None.  She does

12      not have any disorder.  He says that she is suffering from

13      ordinary depression.

14             Well, anyone who is being sentenced after being

15      convicted of manslaughter, I'm sure is going to be

16      depressed; it doesn't surprise me.  That's the only thing

17      this doctor, the defense expert who submitted a letter to

18      me on sentencing, the only thing he found, ordinary

19      depression.  It would be nice to have some underlying

20      psychiatric condition to point to, to explain all this, but

21      there isn't any, there isn't any.  The doctor says nothing

22      wrong with her except being depressed.

23             The problem I have is a big problem.  This is five

24      years later.  The defendant was convicted of committing a

25      crime on February 10, 2010.  You would think, one would

1    think, I certainly would think, that I would hear something

2    from the defendant about having remorse for what she did.

3    Something.  I killed my son, why did I do that?  Some kind

4    of remorse.  She had five years to think about this.

5            Again, on national television when she was asked a

6    question, "Would you do this all over again?"  She said,

7    "only next time" -- she said, "Yes, only next time I would

8    do a better job in killing myself."  A better job in

9    killing herself.  That's her exact words.  Never said I'm

10   sorry.

11           Now, that's a problem in the case.  You would

12   think in 2015 the defendant would say something like, "what

13   a terrible thing I did.  How could I have killed my own

14   son?  How could I do that to my own flesh and blood?"  But

15   she still says, which amazes me, that she would do it

16   again, do the exact same thing.

17           Now, does EED really last five years?  I have

18   never heard of a case in my whole lifetime where extreme

19   emotional disturbance lasted five years.

20           Again, I can see the jury believing it was

21   reasonable for defendant to believe what she felt, and she

22   acted under the influence of extreme emotional disturbance.

23   But five years later, same thing.  It's hard for me to

24   believe.

25           Defendant has attempted to portray this as a

1    tragedy.  I think there are many tragedies here.  First and

2    foremost is Jude Mirra.  Smiling, happy eight-year-old boy

3    who was killed by his mother.  All of her money, all the

4    resources.  She decided to kill him.  There are so many

5    different things she could have done, different courses she

6    could have taken, even believing what she believed.  Again

7    she had all the money in the world to help Jude, and she

8    wound up taking his life.

9            Also, she deprived Emil Tsekov, Jude's biological

10   father one of life's most precious gifts, his own child.

11           Also, a number of other people, other people's

12   reputations she has attempted to ruin by making totally,

13   totally unsupported accusations against them of the most

14   horrible kind, which have no basis in fact, even though she

15   believed them to be true.

16           She accused Emil Tsekov, Ray Mirra, and many, many

17   other people of repeatedly sexually abusing Jude Mirra.

18   She accused Mirra of being involved in the deaths of other

19   people, and even being associated with organized crime in

20   Philadelphia.  No credible evidence in any of this.  Any of

21   it at all.

22           Now, before I impose sentence, I want to mention

23   and I want to go back to October 31.  No one talked about

24   this.

25           October 31, the jury is deliberating.  I charged

Proceedings                                                    107

1    the jury on October 29, Wednesday.  No verdict Wednesday.

2    They came back on Thursday the 30th, no verdict.  They came

3    back on Friday the 31st, no verdict.

4              On Thursday the 30th, someone approaches me after

5    court and says, "Do you know that Gigi Jordan is going to

6    be on Dr. Phil tomorrow?"  I said, "what?  Are you kidding

7    me?  This Gigi Jordan is going to be on Dr. Phil?"  So I

8    said, "Are you sure you're right about that?"  And they

9    said, "Yes, I'm sure."

10             So the DVR is a great thing.  I came to work on

11   Friday, and I went home Friday night.  I couldn't believe

12   it, couldn't believe it, and I don't think it is a

13   coincidence either.  I never thought it was a coincidence.

14   I don't believe in coincidences.  This is during the time

15   that the jury was deliberating.

16             Also that Friday night, Inside Edition, Channel 2

17   News.  Again, I don't believe in coincidences.  I don't

18   know who did it.  It wasn't these lawyers, because if they

19   did, they would be in hot water.  Someone did it.

20             Now, I can't change the facts of this case.  All I

21   can do is hand down a sentence that I feel is fitting here.

22             Because of the nature of the crime the defendant

23   committed, and the absolute lack of any remorse, justice

24   will be served by defendant serving a term of 18 years

25   imprisonment, an 18-year determinate sentence, followed by

1          five years of post-release supervision.

2                    Mandatory surcharge is imposed.

3                    Would you please advise her of her right to

4      appeal.

5                    If you wish to speak to her, you can speak to her

6      inside.

7                    Thank you, counsel.

8

9      CERTIFIED TO BE
       TRUE AND CORRECT
10

11     SATI SINGH, RPR
       SENIOR COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25