UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GIGI JORDAN,

                    Petitioner,

        -v-

                                                    CIVIL ACTION NO.: 18 Civ. 10868 (SLC)

                                                    **OPINION & ORDER**

AMY LAMANNA, IN HER OFFICIAL CAPACITY AS
SUPERINTENDENT OF THE BEDFORD HILLS
CORRECTIONAL FACILITY,

                    Respondent.

**SARAH L. CAVE**, United States Magistrate Judge.

## I.    INTRODUCTION

Petitioner Gigi Jordan ("Jordan"), who is serving an 18-year prison sentence following her

conviction for first degree manslaughter in New York State Supreme Court, brings a petition for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition") asserting that the New York

State Supreme Court, Appellate Division, First Department (the "Appellate Division")

unreasonably applied clearly established federal law in holding that her Sixth Amendment right

to a public trial was not violated when the trial court closed the courtroom to the public midway

through her nine-week trial to conduct a hearing that involved legal arguments by the parties,

evidentiary issues, and proposed instructions to the jury.  (ECF Nos. 1 at 6; 3 at 2–3; 6 at 5; 29

at 1).   Respondent Amy Lamanna, Superintendent of the Bedford Hills Correctional Facility

("Respondent"), where Jordan is serving her sentence, is represented by the New York County

District Attorney (the "DA"), which opposes the Petition on the ground that the closure of the

courtroom for a conference that was "akin to a discussion in chambers" did not violate clearly established precedent of the United States Supreme Court. (ECF No. 13 at 9).

Because the Court finds that the Appellate Division's decision rejecting Jordan's Sixth Amendment claim constituted an unreasonable application of the public trial right clearly established by Waller v. Georgia, 467 U.S. 39 (1984) and Presley v. Georgia, 558 U.S. 209 (2010), the Court GRANTS the Petition.

## II.    BACKGROUND

### A.    Factual Background

Although the parties have not submitted the entire 5000-plus page transcript of Jordan's criminal proceedings, the factual events that led to Jordan's conviction are largely undisputed and are summarized briefly below.

#### 1.    Events of February 3–5, 2010

On the evening of February 3, 2010, Jordan, "a wealthy pharmaceutical executive who lived in the Trump International Hotel in Manhattan," took her eight-year-old son, Jude Mirra ("Jude"), to a hotel room at the Peninsula Hotel in New York City. (ECF No. 14 at 6–7). At some point during the next 36 hours, Jordan gave Jude a fatal overdose of prescription medication, and also ingested multiple medications herself before sending an email to her aunt, describing what she had done. (Id. at 7). Jordan's aunt called the police, who arrived at the hotel room early on the morning of February 5 to find Jude deceased on the bed and Jordan on the floor next to the bed surrounded by prescription drugs. (Id.)

### 2.  The Indictment

On February 8, 2010, a grand jury indicted Jordan on a single count of second-degree murder.  See N.Y. Penal Law § 125.25(1).  (ECF No. 13 at 223).

### 3.  The Trial

The Honorable Charles H. Solomon, Justice of New York State Supreme Court, New York County, presided over Jordan's trial.  (ECF No. 13 at 34).  The trial began on September 1, 2014 and lasted approximately nine weeks.  (ECF Nos. 13 at 9; 14 at 7).

#### a.  Witnesses

At trial, the DA presented 26 witnesses, including hotel staff, one of Jude's teachers, a police officer and a paramedic who found Jordan and Jude in the hotel room, toxicologists, a medical investigator, and a forensic pathologist.  (ECF No. 13 at 8, 224–29).  The defense case included a forensic pathologist, police officers who spoke with Jordan at the scene, acquaintances of Jordan and Jude, a certified trauma therapist, a forensic expert, and Jordan herself.  (Id. at 229–34).

Jordan asserted the affirmative defense of extreme emotional distress predicated on two factual grounds:  (1) her December 2007 discovery that Jude had been sexually abused by his biological father, Emil Tzekov ("Tzekov"); and (2) "a series of escalating death threats" by her ex-husband, Raymond Mirra ("Mirra").  (ECF No. 13 at 223).  Based on these circumstances, Jordan "professed her belief . . . that death was the only way she and Jude could escape the danger" posed by Tzekov and Mirra.  (Id.)

### b. **The Closed Proceeding**

On October 1, 2014, as proceedings commenced for the day and before the jury had entered, the Court held a sidebar conference off the record at the DA's request. (ECF No. 13 at 35). After the sidebar, with Jordan present in the courtroom, Justice Solomon went on the record and stated:

> THE COURT:  What I'd like to do is, we have to close the courtroom to make a record.  We have to close the courtroom without any spectators in the audience for about five minutes, about something that has to be done in private.  If everyone can step out for five minutes, please.  Everybody.  Mr. Kuby[1] can stay here as part of the defense team.

(Id.)  The courtroom was then cleared of spectators, and at Justice Solomon's instruction, a court security officer stood outside the closed courtroom door, and the following occurred (the "Closed Proceeding").  (Id.)

Once the spectators had been removed, Justice Solomon stated that Assistant District Attorney Matthew Bogdanos ("Bogdanos") "want[ed] to make a record about something that he didn't want to put on the record in front of the audience or the press.  It has to do with Ms. Jordan."  (ECF No. 13 at 36).  When Jordan's defense counsel, Kuby, objected that "before the courtroom can be closed," the court must make "specific findings of fact" on the record, Justice Solomon replied, "[w]e're going to make the record outside the public's" view.  (Id. at 36–37). Kuby objected again, in response to which Justice Solomon stated, "[s]omething happened Mr. Bogdanos wants to place on the record, a very serious problem concerning Ms. Jordan."  (Id. at 37).  Kuby objected a third time, arguing that the "serious problem . . . can be articulated in an

---

[1] Ronald Kuby ("Kuby") was a member of Jordan's defense team who did not sit at counsel table during the trial.  (ECF No. 13 at 9).

open courtroom consistent with the Sixth and First Amendments unless there exists at this point some basis for closing the courtroom," which, Kuby argued, there was not.  (Id. at 37).

After noting Jordan's objection to the closure, Justice Solomon invited Bogdanos to explain the basis for the request to close the courtroom.  (ECF No. 13 at 38).  Bogdanos stated that "the reason I asked to have this done in camera on the record in the presence of the attorney[s] is actually my concern about proceeding with a fair trial," referencing the court's prior instructions to counsel "to abide by the ethical guidelines concerning publicity during the trial." (Id.)  Bogdanos distributed and described an internet post, of which he had become aware the night before, called "The Inadmissible Truth" (the "Internet Post").  (Id.; see id. at 67–209 (Ex. C)). After asking the court to mark the document as an exhibit and place it under seal, Bogdanos noted that the Internet Post accused Justice Solomon and others "of subverting justice in this case" by excluding certain evidence during the trial.  (Id. at 3940).  Bogdanos then distributed and described an email that purported to be from Jordan and had been sent to several dozen email addresses, including members of the media (the "Email").  (Id. at 40; see id. at 64–66 (Ex. B)).  The Email, in substance, described Jordan's belief that evidence was being suppressed such that she was being denied a fair trial.  (Id. at 40–41).  Bogdanos stated that the basis for his request to close the courtroom was his concern for prejudice to Jordan from her apparent "bad judgment" in creating the Internet Post and sending the Email, and his desire to avoid "a feeding frenzy" that could "ensue from the defendant's desperate act of . . . trying to go around the Court's rulings and trying to get into the public domain matters that this Court has ruled are inadmissible."  (Id. at 41).

Justice Solomon noted that he had "never had this happen before," and pressed Bogdanos to explain the relief he was seeking. (ECF No. 13 at 41–42). Bogdanos requested that Justice Solomon instruct the jury "to make sure they don't look at any media," and obtain assurance from defense counsel that they were "not in violation of [the court's] ruling and the ethical standards." (Id. at 42).

Speaking for the defense team, Kuby expressed that he "appreciate[d] Mr. Bogdanos' solicitude toward Ms. Jordan in asking that the courtroom be closed to protect her." (ECF No. 13 at 43). On behalf of Jordan, he objected (for the fourth time) that "the closed courtroom is not requested by us, is not necessary for us, is and remains unconstitutional and there is absolutely nothing in the record that Mr. Bogdanos just made that could conceivably justify the closure of the courtroom." (Id.) In response, Bogdanos reiterated his concern that Jordan receive a fair trial. (Id.)

Justice Solomon asked several questions of defense counsel about the source of the information in the Internet Post and the Email. (ECF No. 13 at 44–45). Referencing Jordan's Sixth Amendment right to a public trial, Kuby quipped to Justice Solomon, "I didn't generally know you [knew] the law in this area," because "if you did, the courtroom would not be closed, sir." (Id. at 46). Justice Solomon noted that Jordan's objection to the closure was on the record and preserved for appeal, and ordered the minutes to be placed under seal. (Id. at 47). Kuby objected to the sealing of the minutes and stated that he would make an application to unseal the minutes and the two exhibits. (Id. at 47–48). Justice Solomon noted his obligation to "make sure that everyone — that everybody gets a fair trial." (Id. at 48).

Kuby then asked, "are the lawyers prohibited . . . from speaking to the news media about accurately reporting what took place in this closed courtroom?"  (ECF No. 13 at 50).  Justice Solomon responded, "There's no gag order . . . as long as everything is done accurately."  (Id. at 50, 53).  Justice Solomon marked the Internet Post and the Email as trial exhibits V and VI, respectively, and ordered that they and the minutes of the Closed Proceeding be filed under seal.  (Id. at 53).  He invited Jordan's counsel to make a written application to unseal them.  (Id.)  After a further colloquy with counsel about potential sources of the Internet Post and the Email and the language of his anticipated instruction to the jurors (to which defense counsel made no objection), Justice Solomon reopened the courtroom.  (Id. at 56–57).  The courtroom was closed for approximately fifteen minutes.  (Id. at 9).

Once the jury entered and was seated, Justice Solomon instructed them as follows:

> I've been reminding you every day when you leave not to read anything involving this case in any way.  I know you're abiding by my instruction, not to listen to anything broadcast about the case, T.V., radio.  I know you're following that instruction.  I also want to emphasize, it's very important, that you not research anything or view anything on the Internet; in other words, do not go on the Internet at all to look up anything involving this case.  It's extremely important that you abide by these rules.  I just want to re-emphasize this morning . . .

(Id. at 58).[2]

When the trial resumed following the lunch break later that same day, Justice Solomon sua sponte unsealed the exhibits containing the Internet Post and the Email and the minutes of the closed proceeding.  (ECF No. 13 at 60).  Justice Solomon stated that "maybe [the sealing order] was an erroneous ruling," and that he could not "think of a reason" to keep the exhibits

---

[2] Justice Solomon gave a similar instruction to the jury on multiple occasions during the trial.  (ECF No. 13 at 14–33).

and minutes under seal.  (Id.)  He also commented that, "if the record has any error committed by me, it was committed for maybe five, six hours . . . I don't think it — that will be detrimental to anyone."  (Id. at 61).  He echoed Bogdanos' desire that "both sides" have "a fair trial."  (Id.)

Six days after the Closed Proceeding, Jordan took the stand and testified in her own defense.  (ECF No. 33 at 2).

### c.   Verdict

At the conclusion of the trial, Justice Solomon instructed the jury to consider the affirmative defense of "extreme emotional disturbance," pursuant to which they could find that Jordan committed the elements of second-degree murder, yet if they concluded that she had shown by a preponderance of the evidence that she acted under the influence of an extreme emotional disturbance, they could find her guilty of the lesser offense of first-degree manslaughter.  (ECF Nos. 14 at 8; 29-1 at 18–23).

On November 5, 2014, after deliberating for several days, the jury found Jordan not guilty of second-degree murder but found her guilty of first-degree manslaughter.  (ECF No. 13 at 234).

### d.   Motion to set aside the verdict

After the verdict and before sentencing, Jordan moved to set aside the verdict, arguing that the Closed Proceeding, which occurred without Justice Solomon first making appropriate findings under Waller v. Georgia, violated her right to a public trial and required that the jury's verdict be set aside.  (ECF No. 13 at 7, 10).  The DA argued that Waller did not apply to the type of proceeding for which the courtroom had been closed, but even if it did apply, the trial court did comply with Waller.  (Id.)  The DA also argued that any error was trivial and inconsequential, and therefore not a basis to set aside the jury's verdict.  (Id.)

In a six-page written decision, Justice Solomon found that the Closed Proceeding did not involve testimony or discussion of "legal issues" or "anything of a substantive nature," and therefore, "was not the type of trial proceeding that falls within the ambit of <u>Waller</u>." (ECF No. 13 at 11).  Taking into account "the concerns the right to a public trial is designed to protect," Justice Solomon found "that none of them [were] implicated here."  (<u>Id.</u>)  He found that the proceeding did not involve evidentiary issues and was not a "substantive trial proceeding, such as jury selection," but rather a "tangential" discussion of the "allegation that defendant was disseminating to the press and public information about the case that had been previously ruled inadmissible," which "had nothing to do with the evidence in the case."  (<u>Id.</u>)  Justice Solomon noted the risk that discussing the Internet Post and the Email in an open courtroom "might very well have created additional media coverage that might have been difficult to the jury to avoid." (<u>Id.</u> at 12).  He also credited the DA's concern that "one of the many people employed by [Jordan] might have been involved in the dissemination of" the Internet Post and the Email, and therefore the request "that an inquiry be made of the defense team in a closed setting was certainly appropriate."  (<u>Id.</u>)

In the alternative, Justice Solomon concluded that even if <u>Waller</u> applied, "the closure here was so <u>de minimis</u> and so trivial that setting aside the verdict would be a miscarriage of justice." (ECF No. 13 at 12).  He noted that the closure involved fifteen minutes of a two-month trial, defense counsel was permitted to discuss the proceeding with the media, and the minutes and exhibits were unsealed after the lunch recess the same day.  (<u>Id.</u> at 12–13).  He also commented that, because the Email and Internet Post had been disseminated before the Closed Proceeding, "closing the courtroom in the first instance was not even necessary." (<u>Id.</u> at 13).

Therefore, he held that, even if closing the courtroom was erroneous, it was not the type of error "that should result in the verdict being set aside," and denied Jordan's motion.  (Id.)

### e.  Sentencing

On May 28, 2015, Justice Solomon sentenced Jordan to a determinate prison term of 18 years followed by five years of supervised release.  (ECF No. 14 at 6, 8).

## B.  Procedural History

### 1.  Direct Appeal

On direct appeal, Jordan argued, inter alia, that Justice Solomon's closure of the courtroom and sealing of the exhibits and minutes were "per se" reversible errors.  (ECF No. 13 at 272–95).

The Appellate Division held that Jordan's "Sixth Amendment right to a public trial was not violated when the court briefly closed the courtroom during a discussion of a legal matter relating to protecting the jury from exposure to publicity about the case." People v. Jordan, 145 A.D.3d 584, 585 (1st Dep't 2016).  The court found that the proceeding was "the equivalent of a sidebar, robing room or chambers conference" to which the right to a public trial did not extend and did "not restrict judges 'in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings.'"  Id. (quoting Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 598 n.23 (1980)).  The Appellate Division also noted that "the conference had no impact upon the conduct of the trial other than having the court repeat its previous instructions about trial publicity," and that the minutes and exhibits "were unsealed the same day."  Id.  The court therefore affirmed Jordan's conviction.  Id. at 585–86.

### 2. **Discretionary Appeals**

On May 3, 2017, the New York Court of Appeals denied Jordan's request for leave to appeal. People v. Jordan, 29 N.Y.3d 1033 (2017). On November 27, 2017, the United States Supreme Court denied Jordan's petition for a writ of certiorari. Jordan v. New York, 138 S. Ct. 481 (2017).

### 3. **Federal Habeas Corpus Petition**

On November 20, 2018, Jordan filed the Petition in this Court, challenging her conviction on the single ground that the closure of the courtroom violated her Sixth Amendment right to a public trial. (ECF Nos. 1, 3).[3] Jordan argues in her Petition that the Appellate Division's affirmance of "the trial court's decision to close the courtroom without first finding that a closure was strictly necessary to protect an overriding interest was contrary to clearly established federal law." (ECF No. 3 at 14). Jordan contends that: (1) the trial court's failure to conduct a Waller hearing and make findings of fact, alone, constitutes a constitutional violation; (2) the DA never identified an "overriding interest" that necessitated closing the courtroom; (3) the proceeding was "akin to a hearing on a motion in limine or an evidentiary hearing" to which her right to a public trial attached; and (4) the subsequent unsealing of the minutes and exhibits did not remedy the "structural error" and she is entitled "to automatic reversal without any inquiry into prejudice." (Id. at 15–17) (internal citations omitted). Therefore, Jordan contends that the Appellate Division's rejection of her Sixth Amendment claim "resulted in a decision that was contrary to, or

---

[3] On November 21, 2018, the Petition was refiled (ECF No. 6) without the instructional cover page, but appears in substance to be identical to the original.

involved an unreasonable application of, clearly established Federal law" justifying a writ of habeas corpus "requiring her release, retrial, or at a minimum[,] resentencing."  (Id. at 18).

The DA argues that the Petition should be denied because Jordan has not shown that the trial court's "brief, inconsequential closure of the courtroom violated her Sixth Amendment right to a public trial" in violation of Supreme Court precedent.  (ECF No. 14 at 23).  The DA argues that:  (1) Jordan has not identified Supreme Court precedent that was "clearly contradicted or unreasonably applied;" and (2) "even if the closure here were technically erroneous, the closure was trivial and does not warrant the remedy of a new trial or sentencing proceeding."  (Id. at 29–32).

In her reply in further support of her Petition, Jordan argues that:  (1) the proceeding "was not the equivalent of a sidebar or chambers conference;" (2) the trial court "did not comply with Waller;" and (3) the closure of the courtroom "was not trivial."  (ECF No. 22).  Accordingly, she continues to request a new trial, or, at a minimum, resentencing before a different judge.  (Id. at 19–22).

On June 1, 2020, the Court heard oral argument on the Petition.  (ECF No. 30).  Following argument, the Court directed the parties to provide additional briefing on the following question:

> If the Court were to grant the Petition under the scope of review permitted by 28 U.S.C. § 2254(d), on what authority may the Court grant the Petitioner the alternative relief of resentencing in New York State Supreme Court?

(ECF No. 28).

In her supplemental brief, Jordan maintains her "principal position" that "the Court must order release or a new trial."  (ECF No. 29 at 3).  Regarding the alternative of resentencing, Jordan points to authorities supporting the view that "[t]he congressional 'mandate' under federal

habeas corpus 'is broad with respect to the relief that may be granted' and is not limited to 'discharge of the applicant from physical custody.'"  (Id. (quoting Carafas v. LaVallee, 391 U.S. 234, 239 (1968))).  Jordan notes that, while courts within the Second Circuit have ordered resentencing in state criminal cases under Section 2254 in three scenarios in which the sentence itself was constitutionally infirm, her counsel has "not uncovered any federal habeas cases in which the court has ordered resentencing under Section 2254 for a violation of the public trial right."  (Id. at 4).  Relying on precedents from the Supreme Court and courts within the Second Circuit ordering a new trial where a public trial violation was found, Jordan argues that "clearly established federal law requires" a new trial.  (Id. at 5–8).

In its supplemental brief, the DA describes the Closed Proceeding as one during which "[n]o trial testimony or evidence was taken, no trial witnesses were even involved, no accusations were levied, no discussion of [Jordan's] guilt or innocence took place, and no rulings were made." (ECF No. 32 at 2).  The DA criticizes Jordan for failing to identify any Supreme Court precedent holding that it was "objectively unreasonable" for the Appellate Division "to liken the closed proceedings here to a bench or chambers conference not subject to the public trial right."  (Id. at 3).  In the absence of "clear Supreme Court precedent extending the public trial right to such ancillary proceedings as took place here," the Appellate Division's decision was not contrary to or an unreasonable application of clearly established federal law.  (Id. at 3–4).  In terms of a remedy, the DA argues that, "[u]nder Waller, there is nothing left to fix" because Justice Solomon unsealed the minutes and the exhibits the same day.  (Id. at 5).  Opposing a new trial or resentencing, the DA argues that the only appropriate remedy, should the Court find a Sixth

Amendment violation, "would be to remand to repeat the closed proceeding in open court." (Id. at 8).

In her supplemental reply brief, Jordan reiterates that "[i]t was objectively unreasonable for the Appellate Division to uphold the closure by relabeling it [as] something that it was not," and that "the appropriate remedy in these circumstances is a new trial." (ECF No. 33 at 1). Jordan points out that it is undisputed that Justice Solomon cleared the entire courtroom for the Closed Proceeding, that he did not make the findings required under Waller before doing so, and that violations of the public trial right are structural errors. (Id.) Jordan disputes the DA's assertion that no trial witnesses were involved, pointing to the fact that Jordan herself was present during the Closed Proceeding and may have been "chill[ed]" in her own testimony, which occurred six days later. (Id. at 2). She also disputes the DA's contention that "no accusations were levied," noting that Bogdanos accused Jordan of criticizing Justice Solomon and her counsel of failing to "abide by the ethical guidelines concerning publicity during the trial." (Id. at 2–3). Finally, Jordan disputes the DA's argument that "no rulings were made" during the Closed Proceeding, pointing to Justice Solomon's overruling of Jordan's objection to the closure, granting of the DA's request to issue a jury instruction, confirmation that no gag order was in place, and sealing of the transcript and exhibits. (Id. at 3). In conclusion, Jordan argues that the violation of her public trial right was not trivial and can only be remedied by a new trial. (Id. at 4–10).

### III.   DISCUSSION

**A. Applicable Legal Standards**

####   1.   Exhaustion

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not consider a petition for a writ of habeas corpus by a prisoner in state custody unless the petitioner has exhausted all state judicial remedies.  28 U.S.C. § 2254(b)(1)(A); see Jackson v. Conway, 763 F.3d 115, 133 (2d Cir. 2014).  To satisfy the exhaustion requirement, the petitioner must have "fairly presented" her claim to the state courts, thereby affording those courts the opportunity to correct the alleged violation of a federal right.  Picard v. Connor, 404 U.S. 270, 275 (1971).  The exhaustion requirement is fulfilled once the federal claims have been presented to "the highest court of the state."  Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (internal citation omitted).

Here, Jordan raised her Sixth Amendment claim on direct appeal to the Appellate Division and in seeking leave to appeal to the Court of Appeals.  People v. Jordan, 145 A.D.3d at 585.  (See ECF Nos. 1 at 3–4; 14 at 8–9).  She has therefore exhausted her claim for the purposes of federal court review.  See Galdamez, 394 F.3d at 74 (explaining that "one complete round" of New York's appellate review process involves appeal to Appellate Division and then application to Court of Appeals for certificate granting leave to appeal).  Further, the Petition is timely because it was filed on November 20, 2018, within one year of November 27, 2017, the date on which the Supreme Court denied Jordan's petition for writ of certiorari.  Jordan v. New York, 138 S. Ct. 481 (2017).  The DA does not dispute that Jordan's claim is exhausted and timely.  (ECF Nos. 13 at 3 ¶ 4; 14 at 9).

2.      **Standard of Review**

Where the state court has adjudicated the merits of a claim, this Court must apply a "highly deferential" standard in reviewing that claim in a habeas corpus proceeding.  28 U.S.C. § 2254(d); Renico v. Lett, 559 U.S. 766, 773 (2010); Williams v. Taylor, 529 U.S. 362, 413 (2000). A claim has been "adjudicated on the merits" when the state court ruled on the substance of the claim itself, rather than on a procedural or other ground.  See Bell v. Miller, 500 F.3d 149, 154–55 (2d Cir. 2007); Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced").

Here, the Appellate Division considered and rejected Jordan's Sixth Amendment claim on its merits.  People v. Jordan, 145 A.D.3d at 585.  Therefore, this Court must apply the "limited" standard of review set forth in Section 2254(d).  Harrington v. Richter, 562 U.S. 86, 92 (2011). Section 2254(d) permits, in relevant part, a court to grant a writ of habeas corpus on a claim that has been previously adjudicated on the merits by a state court only if the state adjudication:

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or,

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).

a)      **Clearly established federal law**

The relevant date for determining applicable "clearly established Supreme Court law" is the date of the last state court adjudication of the petitioner's claim "on the merits."  Greene v. Fisher, 565 U.S. 34, 40 (2011).  Here, that date is December 22, 2016, the date of the Appellate

Division's decision affirming Jordan's conviction.  See DeJesus v. Superintendent of Attica Corr. Facility, No. 17 Civ. 3932 (GBD) (AJP), 2017 WL 6398338, at *14 (S.D.N.Y. Dec. 13, 2017) ("The relevant Supreme Court jurisprudence is that in effect at the time of the state court's adjudication on the merits (in New York, usually the decision of the Appellate Division), not at the time of a subsequent decision (e.g., the New York Court of Appeals) denying leave to appeal.").

As to what constitutes clearly established federal law, "a principle is clearly established Federal Law for § 2254(d)(1) purposes only when it is embodied in a Supreme Court holding, framed at the appropriate level of generality."  Washington v. Griffin, 876 F.3d 395, 403 (2d Cir. 2017) (internal citations omitted).  In White v. Woodall, the Supreme Court discussed "clearly established Federal law" in the habeas context:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply it to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.

The Court went on to explain:

> This is not to say that § 2254(d)(1) requires an identical factual pattern before a legal rule must be applied.  To the contrary, state courts must reasonably apply the rules "squarely established" by this Court's holdings to the facts of each case.

572 U.S. 415, 426–27 (2014) (internal citations omitted).  Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington, 562 U.S. at 101 (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  The Supreme Court has explained, "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case

determinations." <u>Yarborough</u>, 541 U.S. at 664.  Thus, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court."  <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122 (2009) (internal citations omitted).

### b) <u>Contrary to clearly established federal law</u>

Under Section 2254(d)(1), a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that contradicts Supreme Court precedent or confronts a case with materially similar facts to a Supreme Court case and arrives at a different result.  <u>See</u> <u>Rosario v. Ercole</u>, 601 F. 3d 118, 123 (2d Cir. 2010) (quoting <u>Williams</u>, 529 U.S. at 412–13).  This is a very high bar to meet.  "Ordinarily, a 'run-of-the-mill state court decision applying the correct legal rule from [Supreme Court] cases . . . would not fit comfortably within § 2254(d)(1)'s "contrary to" clause,' even if a federal court believes that the state court reached the wrong result."  <u>Sevencan v. Herbert</u>, 342 F.3d 69, 75 (2d Cir. 2003) (quoting <u>Williams</u>, 529 U.S. at 406).  Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (quoting <u>Harrington</u>, 562 U.S. at 101).  In fact, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  <u>Id.</u> (internal citations omitted).

### c) <u>Unreasonable application of clearly established federal law</u>

An "unreasonable application" of clearly established federal law occurs when the state court identifies and applies the correct governing legal principle, but its application was

"objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 73–76 (2003) (citing Williams, 529 U.S. at 409). Under Section 2254(d)(2), the Court must consider the reasonableness of the decision in light of the evidence presented at the proceeding under review. See Cardoza v. Rock, 731 F.3d 169, 182 (2d Cir. 2013). Even if the standard under Section 2254(d)(2) is met, the petitioner "still bears the ultimate burden of proving by a preponderance of the evidence that [her] constitutional rights have been violated." Id. at 178. (internal citation omitted). The question under the AEDPA "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable[, which is] a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). Before a federal court may grant the writ, there must be "[s]ome increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal citation omitted).

### 3. **Sixth Amendment right to a public trial**

The Sixth Amendment to the United States Constitution requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . ." U.S. Const. amend. VI. This right extends to trials occurring in state courts. See In re Oliver, 333 U.S. 257, 267–68 (1948); Gibbons v. Savage, 555 F.3d 112, 115 (2d Cir. 2009) ("The right to a public trial is guaranteed by the Sixth Amendment and incorporated against the States by the Fourteenth Amendment."). A "defendant has a right to an open, public trial, including during the jury selection" and other phases of the trial. Gibbons, 555 F.3d at 115; see Presley, 558 U.S. at 214 (voir dire of prospective jurors); Waller, 467 U.S. at 45 (suppression hearing). "The right to a

public trial exists not only for the accused, as articulated in the Sixth Amendment, but also for the press and public as a First Amendment right."  Brown v. Artuz, 283 F.3d 492, 499 (2d Cir. 2002) (citing Richmond Newspapers, 448 U.S. 555); Ayala v. Speckard, 131 F.3d 62, 69 (2d Cir. 1997) ("The explicit Sixth Amendment right of the accused is complemented by an implicit, 'qualified' First Amendment right of the press and the public of access to a criminal trial.").

Despite the "presumption of openness" of a criminal trial, Press-Enterprise v. Super. Ct., ("Press Enterprise I"), 464 U.S. 501, 510 (1984), "the entitlement to a public trial is not absolute" and "may give way in certain cases to other rights or interests, such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information."  Brown, 283 F.3d at 499 (quoting Waller, 467 U.S. at 45).  Because the circumstances justifying courtroom closure are "rare," the Supreme Court established in Waller "a four-prong test for evaluating the constitutionality of courtroom closures during criminal proceedings."  Id.  To overcome the presumption of openness "and justify closing the courtroom to the public during a criminal proceeding," the following elements must be satisfied:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] the court must make findings adequate to support the closure.

Gibbons, 555 F.3d at 116 (quoting Waller, 467 U.S. at 48).  The Supreme Court has "refined the first factor to require 'a substantial probability that the defendant's right to a fair trial will be prejudiced by publicity that closure would prevent.'"  Ayala, 131 F.3d at 69 (quoting Press-Enterprise Co. v. Super. Ct., 478 U.S. 1, 14 (1986) ("Press-Enterprise II")) (emphasis added in Ayala).  In Presley, the Supreme Court subsequently reminded trial courts of their "obligat[ion]

to take every reasonable measure to accommodate public attendance at criminal trials," and the importance of "consider[ing] alternatives to closure" and identifying the "overriding interest likely to be prejudiced absent the closure."  558 U.S. at 215.

For purposes of habeas review under AEDPA, "Waller recognized that, subject to certain limitations, the right to a public trial is clearly established federal law."  Brown, 283 F.3d at 500; Williams v. Artuz, 237 F.3d 147, 152 (2d Cir. 2001) (recognizing Waller as "clearly established" law applicable to habeas review of courtroom closures).

"The violation of the constitutional right to a public trial is a 'structural error' warranting remediation regardless of prejudice."[4]  Sevencan, 342 F.3d at 74 (citing Waller, 467 U.S. at 49–50 & n.9).  Thus, the violation of the public trial right is not subject to harmless error analysis. See Fulminante, 499 U.S. at 309–10 (including "the right to a public trial" in the list of "structural errors" not subject to harmless error review); Carson v. Fischer, 421 F.3d 83, 94 (2d Cir. 2005) (explaining that harmless error analysis does not apply to violation of the public trial right); Guzman v. Scully, 80 F.3d 772, 776 (2d Cir. 1996) (same); see also Waller, 467 U.S. at 49–50 & n.9 (explaining that defendant is not required to prove specific prejudice to obtain relief for public trial right violation).  That harmless error does not apply "does not mean that the Sixth Amendment is violated every time the public is excluded from a courtroom," and "even an unjustified closure, may, on its facts, be so trivial as not to violate the charter."  Peterson v. Williams, 85 F.3d 39, 40 (2d Cir. 1996); Yarborough v. Keane, 101 F.3d 894, 897 (2d Cir. 1996) ("To determine whether an error is properly categorized as structural, we must look not only at

---

[4] A "structural error" is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself."  Arizona v. Fulminante, 499 U.S. 279, 310 (1991).

the right violated, but also at the particular nature, context and significance of the violation."). Therefore, remediation does not necessarily require a new trial "if some other relief would cure the violation." Hoi Man Yung v. Walker, 468 F.3d 169, 177 (2d Cir. 2006) (citing Waller, 467 U.S. at 49–50); see United States v. Canady, 126 F.3d 352, 364 (2d Cir. 1997) (holding that failure to announce verdict publicly violated defendant's public trial right and remanding for public pronouncement of verdict).

**B. Analysis**

Under the AEDPA review standard, Jordan's Sixth Amendment claim presents the question of whether the Appellate Division's "approval of the closure in this case constituted an 'unreasonable application' of the Waller standard." Broadhurst v. West, No. 04 Civ. 10149 (GEL), 2006 WL 89946, at *2 (S.D.N.Y. Jan. 1, 2006).  (See ECF No. 29 at 2).  As set forth above, the Appellate Division concluded that the Closed Proceeding "was the equivalent of a sidebar, robing room or chambers conference" to which the public trial right did not extend, and "had no impact upon the conduct of the trial other than" Justice Solomon's repetition of the jury instructions about trial publicity.  People v. Jordan, 145 A.D.3d at 585.

The Court finds that the Appellate Division's decision was an unreasonable application of the Waller standard because (1) the Sixth Amendment public trial right, and therefore the Waller standard, applied to the Closed Proceeding (infra Section III.B.1), and (2) the requirements of the Waller standard were not met (infra Section III.B.2).  Furthermore, the triviality standard does not apply to the circumstances of this case, (infra Section III.B.3), and the only appropriate remedy is a new trial (infra Section III.C).

### 1.   The public trial right extended to the Closed Proceeding.

The Appellate Division held that "[t]he right to a public trial [did] not extend" to the hearing conducted in Jordan's case, because it "was the equivalent of a sidebar, robing room, or chambers conference."  People v. Jordan, 145 A.D.3d at 585.  In support of this conclusion, the Appellate Division cited, without explanation, a footnote in Justice Brennan's decision concurring in the judgment in Richmond Newspapers, and then concluded that "the conference had no impact upon the conduct of the trial other than having the court repeat its previous instructions about trial publicity."  Id.  The full text of the footnote from Richmond Newspapers on which the Appellate Division relied is as follows:

> The presumption of public trials is, of course, not at all incompatible with reasonable restrictions imposed upon courtroom behavior in the interests of decorum.  Cf. Illinois v. Allen, 397 U.S. 337, 90 S. Ct. 1057, 25 L.Ed.2d 353 (1970).  Thus, when engaging in interchanges at the bench, the trial judge is not required to allow public or press intrusion upon the huddle.  Nor does this opinion intimate that judges are restricted in their ability to conduct conferences in chambers, inasmuch as such conferences are distinct from trial proceedings.

448 U.S. at 598 n.23.  The Appellate Division also cited People v. Olivero, 289 A.D.2d 1082 (4th Dep't 2001), in which the trial court recessed to chambers to discuss the legal question of a co-defendant's immunity, reconvened in the courtroom, and closed the courtroom to "treat[] it as annex to its chambers," which did not violate the defendant's right to a public trial.

As a result of its conclusion that the Sixth Amendment did not apply to the hearing conducted in Jordan's case, the Appellate Division did not analyze whether the requirements of Waller were satisfied.  The DA urges this Court to reach the same conclusion:  that the "conference was akin to a discussion in chambers," and because "the Supreme Court has not pronounced that proceedings such as the one that took place here fall within the public trial

right," the Sixth Amendment and Waller simply did not apply.  (ECF No. 14 at 9, 23).  The DA

variously characterizes the hearing as "tangential" and "inconsequential," (Id. at 22, 27 n.5), and

argues that because Jordan has not identified a "case on point in [her] corner," then "fair-minded

jurists could [] disagree" such that habeas relief is not warranted.  (Id. at 29).

　　　Contrary to the DA's argument that the public trial right did not apply to the Closed

Proceeding because the Supreme Court "has not pronounced" that the right applies to

proceedings like it (ECF No. 14 at 23), Jordan was not required to find a Supreme Court opinion

holding that the public trial right applied to the specific type of Closed Proceeding that occurred

during her trial "in order to prevail on [her] claim that 'clearly established law' mandated a

different result in [her] case."  Garlick v. Lee, No. 18 Civ. 11038 (CM) (SLC), 2020 WL 2854268, at

*5 (S.D.N.Y. June 2, 2020).  Section 2254(d) does not require "an identical fact pattern before a

legal rule must be applied."  White, 572 U.S. at 427 (internal citation omitted).  The question this

Court must answer is whether the Appellate Division unreasonably applied Supreme Court

precedent in concluding that Jordan did not have the right, under the Sixth Amendment, to have

the Closed Proceeding open to the public.

　　　The Supreme Court's precedent concerning the public trial right instruct courts to

examine the nature of the proceeding at issue, not how it is labeled, to determine whether the

proceeding triggers the defendant's public trial right.  See Waller, 467 U.S. at 47 (comparing

importance of and manner in which suppression hearings are conducted in determining that

public trial right applied); Press-Enterprise II, 478 U.S. at 8 (noting decisions in which the Court

has "considered whether the place and process have historically been open to the press and

general public").  After examining the events that occurred during the Closed Proceeding, the

Court concludes that the Appellate Division unreasonably applied Supreme Court precedent in holding that the Sixth Amendment did not apply.

First, the Supreme Court has explained that "[t]rial courts are obligated to take <u>every</u> <u>reasonable</u> <u>measure</u> to accommodate public attendance at criminal trials." <u>Presley</u>, 558 U.S. at 215 (emphasis added); <u>Press-Enterprise I</u>, 464 U.S. at 501 ("Closed proceedings, although not absolutely precluded, must be rare and only for cause shown that outweighs the value of openness."). As the Supreme Court noted in <u>Presley</u>, "<u>Waller</u> provided standards for courts to apply <u>before</u> excluding the public from <u>any</u> stage of a criminal trial." 558 U.S. at 213 (emphasis added). Thus, Supreme Court precedent afforded the proceedings during Jordan's criminal trial the "presumption of openness," <u>Press-Enterprise I</u>, 464 U.S. at 510, unless Justice Solomon <u>first</u> found that the four <u>Waller</u> factors had been satisfied, which he did not. <u>See Presley</u>, 558 U.S. at 214.

Second, even if some trial events may be held outside of public view, cf. <u>Richmond</u> <u>Newspapers</u>, 448 U.S. at 598 n.23 (referring to "interchanges at the bench" or "conferences in chambers" as distinct from "trial proceedings" to which the Sixth Amendment attached), no such bench conference or chambers proceeding occurred here. Rather, Justice Solomon presided from the bench, counsel spoke from their respective positions in the courtroom, and Jordan herself was in the courtroom. (ECF No. 13 at 35–56). These events during the Closed Proceeding were of the character that would typically be conducted publicly: the proceedings involved accusations of wrongdoing by Jordan and her counsel, as Bogdanos asked for "some assurance that nobody on the defense team is in violation of your Honor's rulings and the ethical standards, some assurance that no one in the defense team has anything to do with" the Internet Post and

the Email.  (ECF No. 30 at 17:4–7; ECF No. 13 at 42).  Justice Solomon also received the Internet

Post and the Email, which, although not entered into evidence to be presented to the jury, he

marked as exhibits and read excerpts into the trial record.  (ECF No. 30 at 17:19–22; ECF No. 13

at 53, 62[5]).  The parties made legal arguments about the propriety of the courtroom closure, the

accusations against Jordan and her counsel, and the language of the instructions to the jury that

were to follow.  (ECF No. 13 at 36–47).  And, although Jordan did not speak during the Closed

Proceeding, she was present and observed the colloquy, which occurred days before she testified

as a witness in her own defense.  (ECF Nos. 13 at 35; 33 at 2).  Thus, the Closed Proceeding was

not an off-the-record chambers conference and the public trial right applied.  Cf. Waller, 467 U.S.

at 47 (noting that suppression hearing involves witness testimony, arguments by counsel, and

factual resolution).

Third, contrary to the Appellate Division's conclusion that the conference had "no impact"

on Jordan's trial, Justice Solomon made rulings that impacted the course of the trial:  he overruled

Jordan's objection to the Closed Proceeding; he granted the DA's request for a supplemental jury

instruction, the language of which the parties discussed and agreed on during the Closed

Proceeding; he declined to impose any gag order preventing Jordan's counsel from discussing the

substance of the Closed Proceeding with the media; and he ordered that the minutes and the

exhibits be sealed.  (ECF No. 13 at 36–47; see ECF No. 33 at 3).

Fourth and finally, just as in Waller, the closure here was complete — the courtroom went

from being "packed with interested members of the public, with members of the press, and with

---

[5] "THE COURT:  Counsel, I want to read something into the record.  It's from Ms. Jordan apparently in this exhibit.  This is the e-mail.  It's from The Inadmissible Truth, it's entitled.  Again, it's attributed to her.  It's not someone else's name on the thing."  (ECF No. 13 at 62).

members of the defense and prosecutorial teams" (ECF No. 30 at 8:23–25), to the "spectators exit[ing] the courtroom and the courtroom [being] closed" with "an officer outside" the closed door to prevent spectators from entering.  (ECF No. 13 at 35).  Contrary to the DA's argument that "the only real closure" was the sealing of the minutes and exhibits (ECF No. 14 at 25), the categorical exclusion of the public necessitated an evaluation, before the courtroom was closed, whether the closure was justified under Waller.  See Gibbons, 555 F.3d at 117 (concluding that "when the trial judge ordered the courtroom closed to all spectators, the courtroom was closed within the meaning of the Sixth Amendment," requiring an evaluation of whether Waller was satisfied).[6]

Given the circumstances surrounding and the events that occurred during the Closed Proceeding, the Court concludes that the Appellate Division's relabeling of the Closed Proceeding as the "equivalent of a sidebar, robing room or chambers conference" to which the Sixth Amendment public trial right did not apply was an unreasonable application of clearly established Supreme Court precedent, precedent that required an evaluation of the Waller factors before the closing of the courtroom to the public.

### 2.  The Waller standard was not satisfied.

As noted above, "Waller reformulated the standards for courtroom closure into a four-factor test:  [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must

---

[6] Notably, even before Waller, New York law "require[d] courts to conduct a hearing to determine the propriety and scope of a closure."  Smith v. Hollins, 448 F.3d 533, 535 (2d Cir. 2006) (citing People v. Hinton, 31 N.Y.2d 71 (1972)).

make findings adequate to support the closure."  Ayala, 131 F.3d at 69 (quoting Waller, 467 U.S. at 48).  The Court considers each factor in turn.

### a.  The interest justifying closure

In his opposition to the Petition, the DA does not articulate an "overriding interest" that was at risk if the courtroom had remained open, and instead upends reality to argue that the DA's application to close the courtroom was denied and no "real closure [] took place" because Justice Solomon subsequently unsealed the exhibits and the minutes of the Closed Proceeding. (ECF No. 14 at 25).  Neither did the DA make much, if any, contemporaneous attempt to articulate an overriding interest for closing the courtroom, telling Justice Solomon only that he had a "concern about proceeding with a fair trial" and "he didn't want a feeding frenzy that . . . would ensue from [Jordan's] desperate act of going — trying to go around the Court's rulings and trying to get into the public domain matters that [Justice Solomon] ha[d] ruled inadmissible."  (ECF No. 13 at 38, 41).

The Second Circuit has recognized that "the Supreme Court has used various formulations to describe the gravity of the interest that will justify courtroom closure, as well as the degree of certainty that the asserted interest will be harmed," including "overriding," "compelling," and "cause [] that outweighs the value of openness."  Ayala, 131 F.3d at 69 (internal citations omitted).  To reconcile these formulations in Supreme Court precedent, the Second Circuit has "relat[ed] the gravity of the interest asserted to the degree of closure requested."  Id. at 70. Given the difficulty in making a "meaningful distinction[]" between "compelling" and "overriding" interests, and "likely" as opposed to a "substantial probability of" prejudice, the Second Circuit has explained that:

> the sensible course is for the trial judge to recognize that open trials are strongly
> favored, to require persuasive evidence of serious risk to an important interest in
> ordering any closure, and to realize that the more extensive is the closure
> requested, the greater must be the gravity of the required interest and the
> likelihood of risk to that interest.

Ayala, 131 F.3d at 70.[7]

Here, after an off-the-record sidebar with counsel, the trial court closed the courtroom, without holding a separate hearing, conducting any colloquy, referencing the requirements of Waller,[8] or making any findings as to the propriety of the closure.  (ECF No. 13 at 35–36).  When Jordan's counsel objected and pointed out that findings were required before the courtroom was closed, the trial court responded that "[t]he record is going to be made outside the public's [presence]" and ordered the spectators and press out of the courtroom with a court officer stationed outside the door.  (Id. at 36–37).  Indeed, after reflecting on the closure after the fact, the trial court noted that the closure may have been "erroneous" and he could not "think of a reason" for the courtroom to have been closed in the first place.  (Id. at 60).

The record demonstrates that "[t]he trial court based its decision [to close the courtroom] solely upon representations made by the prosecutor," and "made no inquiry whatsoever" before closing the courtroom, circumstances that led the Second Circuit in Guzman to conclude that even a partial closure violated the defendant's right to a public trial.  Guzman, 80 F.3d at 775. Because the trial court here undertook no inquiry and made no findings before closing the

---

[7] Although the "overriding interest" requirement "is slightly relaxed" in instances of partial, rather than complete closure, see Guzman, 80 F.3d at 775, it is undisputed that Justice Solomon completely cleared the courtroom during the Closed Proceeding, and therefore, an "overriding interest" was required to justify the closure under Waller.

[8] Given the absence of any mention of Waller by the trial court or any findings that its requirements were met, the DA's assertion that the "state court [] properly recognized Waller" is disingenuous, if not a misrepresentation of the record altogether.  (ECF No. 14 at 25).

courtroom, "there was no ascertainment that the reason advanced by the prosecutor was 'substantial' . . . or likely to be prejudiced . . .  There was no showing that any such interest even existed." Id. at 775–76 (internal citations omitted).  Accordingly, the first Waller factor was not satisfied.

### b.  The closure was broader than necessary.

Despite the complete closure of the courtroom, the DA argues that the trial court "sought to keep the proceedings as open as possible," pointing to the subsequent unsealing of the transcript and exhibits.  (ECF No. 14 at 27).  A courtroom closure may be "no broader than necessary," Waller, 467 U.S. at 48, and the trial court is "obligated to take every reasonable measure to accommodate public attendance." Presley, 558 U.S. at 215.  "In analyzing the extent of infringement, courts consider the testimony to be rendered during closure, the duration of the anticipated closure, the availability of transcripts, and the relationship of those excluded to the objecting defendant." United States v. Schulte, No. S2 17 Crim. 548 (PAC), 2020 WL 534515, at *5 (S.D.N.Y. Jan. 31, 2020) (citing Bobb v. Senkowski, 196 F.3d 350, 353 (2d Cir. 1999)).  Under Second Circuit precedent applying Waller, "it is clear that some inquiry regarding who in particular to exclude is necessary." Edwards v. Brown, No. 10 Civ. 6475 (NRB), 2011 WL 5920901, at *5 (S.D.N.Y. Nov. 18, 2011) (emphasis added) (citing English v. Artuz, 164 F.3d 105, 109 (2d Cir. 1998)).

Here, the trial court made no inquiry as to whether anyone present in the courtroom could remain during the Closed Proceeding, instead ordering a "blanket exclusion" of the entire gallery. Edwards, 2011 WL 5920901, at *5.  There was no suggestion that Jordan's friends or family had caused any disturbance or bore any responsibility for the Email or the Internet Post,

and at a minimum, an inquiry to identify those individuals to allow them to remain in the courtroom "would [not] have been too burdensome a task" for the trial court to undertake.  Id. at 5–6 (where trial court made no inquiry regarding whom to exclude, holding that "excluding every family member of the petitioner was overbroad and improper, and fails to satisfy the second prong of the Waller test"); cf. Mickens v. Larkin, 633 F. App'x 24 (2d Cir. 2016) (holding that closure permitting certain family members to remain in courtroom while other members of the public could enter only on request was not "broader than necessary").  In addition, the press and the public appeared to be following Jordan's high-profile trial closely, such that abruptly emptying the courtroom mid-trial would hardly go unnoticed.  Cf. Brown v. Kuhlmann, 142 F.3d 529, 535 (2d Cir. 1998) (in concluding that public trial right was not violated, noting that "the public was unaware of this routine trial").

The trial court's unsealing, later the same day as the Closed Proceeding, of the transcript and exhibits does not mitigate the breadth of the closure for at least two reasons.  First, he did so only after acknowledging closing the courtroom may have been erroneous, noting, "if the record has any error committed by me, it was committed for maybe five, six hours."  (ECF No. 13 at 61).  Second, the Supreme Court has explained that a transcript "is a very imperfect reproduction of events that transpire in the courtroom" and "is no substitute for a public presence at the [proceeding] itself."  Richmond Newspapers, 448 U.S. at 597 n.22.  The Court also noted that "to the extent that publicity serves as a check upon trial officials, 'recordation . . . would be found to operate rather as a cloaks than checks.'"  Id. (quoting In re Oliver, 333 U.S. at 271).  Thus, the after-the-fact unsealing does not absolve the error.

### c.  **Reasonable alternatives**

Under the third prong of Waller, trial courts have a duty to consider "reasonable alternatives to closure," even when they are not offered by the parties.  United States v. Ledee, 762 F.3d 224, 231 (2d Cir. 2014) (citing Presley, 558 U.S. at 214).  If the court has determined that narrow or limited closure is warranted, "it is the obligation of the party opposing the closure to suggest possible alternatives," United States v. Smith, 426 F.3d 567, 573 (2d Cir. 2005), and the trial court "has no responsibility to assess other alternatives sua sponte."  Bowden v. Keane, 237 F.3d 125, 131 (2d Cir. 2001); Ayala, 131 F.3d at 72 (holding that if "[n]o additional alternatives were suggested by any party," trial court "had no obligation to consider additional alternatives sua sponte").

The trial court need not make express findings as to the consideration of reasonable alternatives, "so long as the record is sufficiently detailed that a reviewing court can glean that the trial court considered and rejected alternatives and, in turn, 'can determine whether the closure order was properly entered.'"  Moss v. Colvin, 845 F.3d 516, 522–23 (2d Cir. 2017) (quoting Presley, 558 U.S. at 215).  While it is the "better" practice to make a clear record of the "application of the Waller/Presley test, including [the] consideration of reasonable alternatives to closure," it is not "contrary to clearly established Supreme Court precedent" for a federal court on habeas review to "look to the record as a whole to determine whether the trial court complied with" constitutional requirements.  Moss, 845 F.3d at 522–23.

Here, "[t]he third requirement of considering alternatives was not even attempted to be met."  Guzman, 80 F.3d at 776.  As noted above, there was no inquiry as to whether any of the individuals in the gallery had any involvement in the Email or the Internet Post, and before

emptying the courtroom, the trial court "did not even do so much as admonish the family members [or the press] to respect" the prior orders concerning courtroom decorum or trial publicity.  Edwards, 2011 WL 5920901, at *6.  Indeed, by closing the courtroom in the midst of fervent objections by Jordan's counsel, the trial court "refused to consider any alternatives to closure."  Ip v. Henderson, 710 F. Supp. 915, 918 (S.D.N.Y. 1989).  Therefore, the trial court did not fulfill its burden under the third prong of Waller.  See Edwards, 2011 WL 5920901, at *6; Aguayo v. Headley, No. 96 Civ. 2918 (JGK), 1997 WL 217589, at *4 (S.D.N.Y. May 1, 1997) (holding that closure of courtroom "without consideration of reasonable alternatives[] denied the petitioner his constitutional right to a public trial").

### d.  The trial court did not make adequate findings.

Under the fourth prong of Waller, "the factual record must 'adequate[ly]' support the particular courtroom closing ordered by the trial judge."  Bowden, 237 F.3d at 131 (quoting Waller, 467 U.S. at 48).  "The quality and extent of the evidence that will support a closure [varies] from case to case, depending on the scope of the closure."  Id.  Applying this sliding scale, the Second Circuit has held "that a trial judge's findings adequately buttressed a 'very limited' closure even though they were 'neither entirely accurate nor particularly compelling.'"  Id. at 132 (quoting Brown, 142 F.3d at 538).  The trial court's findings must be "'specific enough that a reviewing court can determine whether the closure order was properly entered.'"  Soto v. Reynolds, 64 F. Supp. 2d 331, 336 (S.D.N.Y. 1999) (quoting Press-Enterprise I, 464 U.S. at 510).

"Gleaning competent evidence from the record" as a whole may be sufficient under the fourth prong of Waller "when the closure at issue is a narrow one."  Bowden, 237 F.3d at 132; see Woods v. Kuhlmann, 977 F.2d 74, 77–78 (2d Cir. 1992) (where closure was "partial" and

"temporary," Waller's fourth prong satisfied by information support the closure "gleaned" from the trial record); Loney v. N.Y. State. Dep't of Corr., 632 F. Supp. 2d 337, 347 (S.D.N.Y. 2009) (Waller's fourth prong "met if the trial judge grounds his reasoning on facts contained in the record that are sufficient to support the partial closure"); Broadhurst, 2006 WL 89946, at *3 (rejecting argument that fourth prong of Waller required "specific factual findings").

Here, not only did the trial court fail to make any "meaningful findings for the record" before completely closing the courtroom, Mason v. Schriver, 14 F. Supp. 2d 321, 325 (S.D.N.Y. 1998), as Jordan's counsel argued needed to occur (ECF No. 13 at 36), the trial court refused to follow the requirements of Waller, insisting that "[t]he record is going to be made outside the public's" presence.  (ECF No. 13 at 36–37).  This "conclusory statement is plainly insufficient under Press-Enterprise I, Waller, and their progeny as it falls far short of the 'explicit' and 'specific' recorded findings necessary to support closure."  Mason, 14 F. Supp. 2d at 325; see Waller, 467 U.S. at 48 ("broad and general" findings insufficient); Press-Enterprise II, 478 U.S. at 13–14 ("[P]roceedings cannot be closed unless specific, on the record findings are made demonstrating that 'closure is essential to preserve higher values and is narrowly tailored to serve that interest.'") (quoting Press-Enterprise I, 464 U.S. at 510)); Guzman, 80 F.3d at 776 (trial court made no finding that closure of the courtroom would mitigate the DA's alleged concern); Edwards, 2011 WL 5920901, at *6 (finding that Waller's fourth prong was not satisfied because "at no point did the trial court make findings sufficient to support its closure of the courtroom"); Collins v. Travis, No. 00 Civ. 3746 (AJP), 2000 WL 1476664, at *9 (S.D.N.Y. Oct. 5, 2000) (where trial court "categorically and summarily ruled" to exclude petitioner's friends "violated his right to a public

trial guaranteed by the Sixth Amendment and the Supreme Court's <u>Waller</u> decision"). Accordingly, the fourth <u>Waller</u> factor was not met.

### 3. **The closure was not trivial.**

Although the harmless error analysis does not apply to a violation of the public trial right, (<u>see</u> <u>supra</u> Section III.A.3), when a courtroom closure was "brief and inadvertent," the "'triviality standard' is the proper benchmark" <u>Smith</u>, 448 F.3d at 540 (quoting <u>Peterson</u>, 85 F.3d at 42); <u>Gonzalez v. Quinones</u>, 211 F.3d 735, 737 (2d Cir. 2000) ("a brief and inadvertent closing of a courtroom, depending on the circumstances, can be too 'trivial' to give rise to a constitutional violation"); <u>see also</u> <u>Yarborough</u>, 101 F.3d at 897 (a constitutional violation exempt from harmless error review does not "mean that any violation of the same constitutional right is a 'structural defect,' regardless of whether the error is significant or trivial").  The "triviality standard does not 'dismiss a defendant's claim on the grounds that the defendant was guilty anyway or that [she] did not suffer prejudice or specific injury.'" <u>Smith</u>, 448 F.3d at 540 (quoting <u>Peterson</u>, 85 F.3d at 42) (internal citations omitted).  The triviality standard inquires "whether the actions of the court and the effect that they had on the conduct of the trial deprived the defendant — whether otherwise innocent or guilty — of the protections conferred by the Sixth Amendment." <u>Peterson</u>, 85 F.3d at 42.  The triviality analysis involves assessing the impact of the closure on the four values the Supreme Court has identified as those the drafters of the Sixth Amendment sought to protect:

> 1) to ensure a fair trial; 2) to remind the prosecutor and the judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury.

<u>Smith</u>, 448 F.3d at 540 (quoting <u>Peterson</u>, 85 F.3d at 43).

Here, the DA presses the argument that the Closed Proceeding was too trivial to constitute a Sixth Amendment violation necessary to justify granting the Petition and awarding a new trial.  (ECF Nos. 14 at 29–31; 32 at 7–8).  The Closed Proceeding, while relatively brief, was not inadvertent and, as explained above, was a substantive proceeding in which the trial court heard argument, made rulings, and received evidence in the presence of a witness (Jordan) who testified just a few days after the proceeding.  (See supra Section III.B.1).  The manner in which the Closed Proceeding was conducted "deprived" Jordan "of the protections conferred by the Sixth Amendment."  Peterson, 85 F.3d at 42.

Furthermore, the complete emptying of a packed courtroom and the stationing of a court officer outside the closed courtroom door while the parties discussed "a very serious problem concerning" Jordan (ECF No. 13 at 37) distinguish the Closed Proceedings from cases in which a single person was accidentally excluded from the courtroom for a short period of time such that the partial closure was deemed trivial.  See, e.g., Gibbons, 555 F.3d at 121 (finding that exclusion of defendant's mother from portion of voir dire, although "not justified," was "too trivial to justify vacating the [conviction]"); Carson, 421 F.3d at 93 (finding no violation where "the values underlying the Sixth Amendment were not implicated despite the trial court's failure to make particularized findings" before excluding defendant's ex-mother-in-law during testimony of confidential informant); see also Peterson, 85 F.3d at 43–44 (finding trivial trial court's inadvertent failure to reopen the courtroom after appropriately closing it for the testimony of undercover officer).  Accordingly, excluding the public from Jordan's trial during the Closed Proceeding was "not trivial."  United States v. Gupta, 699 F.3d 682, 689 (2d Cir. 2011) (reversing conviction where exclusion of public from voir dire without justification was "not trivial").

*     *     *

After reviewing each of the four <u>Waller</u> factors under the circumstances of this case, the Court concludes that closure of the courtroom during Jordan's trial "was not accomplished in conformity with constitutional requirements." <u>Guzman</u>, 80 F.3d at 776.  Nor was it "trivial" in comparison to other precedent within the Second Circuit.  As eloquently stated by a District Judge of this Court after she reached a similar conclusion as to a state court's courtroom closure:

> By issuing an overbroad order excluding petitioner's family from the courtroom without considering reasonable alternatives or making findings sufficient to support such an order, the trial court made a wholly unreasonable application — to the limited extent it made any application at all — of the <u>Waller</u> test.

<u>Edwards</u>, 2011 WL 5920901, at *6.  Consequently, the Appellate Division's affirmation of Jordan's conviction notwithstanding the trial court's failure to comply with <u>Waller</u> constituted an unreasonable application of, if not contrary to, clearly established federal law.  28 U.S.C. § 2254(d)(1).

In reaching this conclusion, the Court is mindful of the Supreme Court's discussion in <u>Harrington v. Richter</u> of the standard for "objective unreasonableness" in the context of habeas review.  562 U.S. at 101.  In <u>Harrington</u>, the Supreme Court explained:

> A state court's determination that a claim lacks merit precludes federal habeas review so long as 'fairminded jurists could disagree' on the correctness of the state court's decision.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L.Ed.2d 938 (2004).  And, as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.'  <u>Ibid.</u>  '[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.'  <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 122, 129 S. Ct. 1411, 1413–14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

Id.  The Court emphasized, "[a]s a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Id. at 103.

Jordan has demonstrated that this high standard has been met in this case.  The specific legal rule articulated in Waller, Presley, Press-Enterprise I, and Press-Enterprise II that Jordan was entitled to a public trial "has been squarely established by the Supreme Court[,] . . . is based upon holdings, not dicta, of this nation's highest court and its application here does not require an 'extension' of that rule; rather, the application here requires reference only to the core, well-established rule itself."  Izaguirre v. Lee, 856 F. Supp. 2d 551, 578 (E.D.N.Y. 2012).  In addition, there is no indication that the Appellate Division applied these Supreme Court precedents to Jordan's Sixth Amendment claim, and, had it done so, "any application of such precedent to the facts of this case that resulted in rejection of [her] claim would be an unreasonable application under the above-referenced standard."  Id.

Accordingly, Jordan's Petition must be granted.

**C.   Remedy**

Even if the closure is found to be non-trivial and unjustified under Waller, a petitioner is "not necessarily entitle[d]" to having her conviction set aside for a retrial.  See Gonzalez, 211 F.3d at 738; Brown, 142 F.3d at 539 (instructing courts to "proceed with some caution" before ordering new trial).  As a remedy for the public trial right violation that occurred during the petitioner's suppression hearing in Waller, for example, the Supreme Court ordered a new suppression hearing, noting that "[a] new trial need be held only if a new, public suppression

hearing results in the suppression of material evidence not suppressed at the first trial, or in some other material change in the positions of the parties."  467 U.S. at 50.  The Second Circuit has explained that "the remedy of reversal is a procedural device to ensure that 'the benefits of a public trial,' although 'frequently intangible, difficult to prove, or a matter of chance,' are not lightly disregarded."  Brown, 142 F.3d at 539.

Jordan asks that, if her Petition is granted, she be awarded "release, retrial, or at a minimum, resentencing."  (ECF No. 3 ¶ 55).  In their initial submissions in support of and against the Petition, the parties devoted little attention to the appropriate remedy for the Sixth Amendment violation that occurred here, and, as noted above, following oral argument, the Court ordered supplemental briefing as to whether resentencing was an alternative and appropriate remedy within the Court's authority.  (See supra Section II.B.3).

In her supplemental briefing, Jordan points to Supreme Court and Second Circuit authority supporting the view that the Court is "'invested with the largest power to control and direct the form of judgment to be entered in" habeas cases.  (ECF No. 29 at 3 (quoting Ragbir v. Homan, 923 F.3d 53, 74 (2d Cir. 2019) and citing Carafas v. LaVallee, 391 U.S. at 239 (explaining that "mandate" under federal habeas statute "is broad with respect to the relief that may be granted", including but not limited to "discharge of the applicant from physical custody")).  Nevertheless, after surveying decisions by courts within the Second Circuit granting resentencing under Section 2254, she reports having found no examples of a court granting resentencing for violation of the Sixth Amendment public trial right, and instead, cites to courts that have "uniformly h[e]ld, instead, that when a public trial violation has occurred, a new trial is the

required remedy."  (ECF No. 29 at 4).[9]  In particular, Jordan cites to <u>English v. Artuz</u>, 164 F.3d 105 (2d Cir. 1998), in which the Second Circuit affirmed the grant of habeas awarding a new trial for the violation of the public trial right, and <u>Vidal v. Williams</u>, 31 F.3d 67 (2d Cir. 1994), in which the Second Circuit reversed the denial of habeas relief for the violation of the public trial right and instructed the district court to enter "an order granting the petitioner's release unless the state affords him a new trial within a reasonable time."  (ECF No. 29 at 5–6).[10]  Jordan acknowledges examples where courts have granted more limited relief of a repeat of the portion of the trial tainted by the Sixth Amendment violation, including <u>Waller</u>, in which the Supreme Court ordered a repeat of the suppression hearing and a new trial only if the outcome of that hearing was different.  (<u>Id.</u> at 6–7; <u>see</u> <u>Waller</u>, 467 U.S. at 50).  She argues, however, that "[t]he effects of the courtroom closure reverberated throughout the remaining five weeks of proceedings," such that a repeat of the Closed Proceeding would not provide an adequate remedy.  (ECF No. 29 at 7).  Because, she contends, "any attempt to disentangle and rectify the effects of the [Closed Proceeding] on the remainder of the trial would be an impossible task, entailing a 'speculative inquiry into what might have occurred in an alternate universe,'" (<u>Id.</u> at 8 (quoting <u>United States</u>

---

[9] Jordan categorizes the three circumstances in which courts within the Second Circuit have ordered resentencing under Section 2254 as follows:   "(1) when the state sentencing judge sentenced the defendant beyond the maximum sentence permitted by the statute (<u>e.g.</u>, <u>Stewart v. Scully</u>, 925 F.2d 58, 5859 (2d Cir. 1991); (2) when the state sentencing judge enhanced a sentence based on unindicted conduct (<u>e.g.</u>, <u>Stevens v. Spitzer</u>, 2010 WL 3958845, at *1 (S.D.N.Y. Sept. 27, 2010)); <u>Robinson v. Superintendent of Wende Corr. Facility</u>, 2010 WL 1544115, at *3 (W.D.N.Y. Apr. 16, 2010)); and (3) when the state sentencing judge imposed the maximum sentence allowable as punishment for the defendant's decision to take his case to trial, which is a violation of the Due Process Clause (<u>e.g.</u>, <u>Izaguirre v. Lee</u>, 856 F. Supp. 2d 551, 580 (E.D.N.Y. 2012))."
[10] Jordan cites additional examples of courts in this district ordering new trials as a remedy for violation of the public trial right, including <u>Edwards</u>, 2011 WL 5920901, at *7, <u>Collins</u>, 2000 WL 1476664, at *10, <u>Mason</u>, 14 F. Supp. 2d at 322–25, <u>Aguayo</u>, 1997 WL 217589, at *5, and <u>Ip</u>, 710 F. Supp. at 916.

v. Gonzalez-Lopez, 548 U.S. 140, 150 (2006))), Jordan maintains that "Supreme Court precedents accordingly require a new trial."  (Id. at 8).

In his supplemental briefing, the DA takes the opposite view, arguing that because a re-do of the Closed Proceeding is an "impracticality," it follows that "[u]nder Waller, there is nothing left to fix."  (ECF No. 32 at 5).  The DA then repeats the arguments, which the Court has rejected above, that the public trial right did not apply to the Closed Proceeding, and in any event, the closure was "trivial."  (Id. at 7).  Even in the event of a Sixth Amendment violation, the DA contends that "the appropriate remedy would be to remand to repeat the [C]losed [P]roceeding in open court, not to remand for resentencing."  (Id. at 8).

This Court is mindful of the Second Circuit's admonition in Brown v. Kuhlmann to "proceed with some caution before ordering such disproportionate relief [like a new trial] in a case in which the trial judge did not 'deliberately enforce[] secrecy in order to be free of the safeguards of the public's scrutiny,' Levine v. United States, 362 U.S. 610, 619 . . . (1960), and in which the error is not of 'the sort that risks an unreliable trial outcome and the consequent conviction of an innocent person.'  O'Neal v. McAninch, 513 U.S. 432, 442 . . . (1995)."  142 F.3d at 539.  This, however, is not such a case.  Here, the trial court's closure of the courtroom was deliberate, over the multiple, strenuous objections of Jordan's counsel, and was a closure that the trial court in fact acknowledged after the fact may well have been erroneous.  (ECF No. 13 at 61).  And, while Jordan's actions in February 2010 may not have been in dispute, whether her conduct constituted the crimes of which she was charged was vigorously disputed over the course of her lengthy trial, and this Court is not permitted to assess whether the error was harmless as to her ultimate conviction.  See Carson, 421 F.3d at 94; Peterson, 85 F.3d at 40;

Guzman, 80 F.3d at 776. As Second Circuit Judge Walker observed in a case in which the court held that the public was improperly excluded from the jury's delivery of their verdict, "if we were to hold that the error was not structural and thus subject to harmless error analysis, it would almost always be held to be harmless. In this way, the right would become a right in name only, since its denial would be without consequence." Canady, 126 F.3d at 364.

In Jordan's case, under clearly established Supreme Court precedent, the Sixth Amendment public trial right applied to the Closed Proceeding, and the Appellate Division's decision holding that it did not was an unreasonable application of that precedent. Consistent with the other courts within the Second Circuit finding a violation of the Sixth Amendment public trial right, the Petition must be granted and Jordan must be re-tried. See English, 164 F.3d at 109–10 (affirming grant of habeas petition and order of new trial); Vidal, 31 F.3d at 69 (reversing denial of habeas and ordering new trial); Edwards, 2011 WL 5920901, at *7 (granting habeas petition based on violation of public trial right and ordering retrial); Collins, 2000 WL 1476664, at *10 (same); Aguayo, 1997 WL 217589, at *5 (same); Ip, 710 F. Supp. at 916 (same).

## IV.   CONCLUSION

For the reasons set forth above, Jordan's Petition is GRANTED. Accordingly, Respondent must release Jordan from custody unless the DA informs the Court of its decision to re-try her within the next 90 days. Because the Court grants the Petition, there is no need to issue a Certificate of Appealability for purposes of appeal. The Clerk of the Court is respectfully directed to close this case.

Dated:      New York, New York
            September 25, 2020

                                        _____
                                        SARAH L. CAVE
                                        United States Magistrate Judge